4

United States District Court
Southern District of Texas
FILED

APR 2 6 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | District Court Civil Case # B-02-073 |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | In Chapter 11 |
| Debtor | |

| | |
|---|---|
| Colin Kelly KAUFMAN, Appellant | Appeal No. 02-05 |
| vs. | and |
| CKS ASSET MANAGEMENT, INC. & | Appeal No. 02-06 |
| Michael BOUDLOCHE, Appellees | |

Font: Korinna

ORIGINAL BRIEF ON APPEAL
OF DOCKET NUMBERS 469 & 470 OF
APPELLANT COLIN KELLY KAUFMAN

Respectfully Submitted by:

Colin Kelly Kaufman, Attorney at Law
1106 Third Street 78404-2312
P.O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865
Telecopier (361) 888-8172

email address: colinkkk@yahoo.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | District Court Civil Case # B-02-073 |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | In Chapter 11 |
| Debtor | |
| Colin Kelly KAUFMAN, Appellant | Appeal No. 02-05 |
| | and |
| vs. | Appeal No. 02-06 |
| | |
| CKS ASSET MANAGEMENT, INC. & | |
| Michael BOUDLOCHE, Appellees | |

### Table of Contents of Appellant Colin Kelly Kaufman's
### Original Brief on Appeal of Docket Numbers 469 & 470

Table of Cases and Authorities.................................................................................i

Table of Statutes and Rules.....................................................................................v

I. Statement of the Case.........................................................................................1

II. Jurisdiction........................................................................................................1

III. Issues Presented...............................................................................................1

    1. Erred in Disallowing Fees.................................................................................1

        A. It Was Done.............................................................................................1
        B. Reasonable Rate.......................................................................................1
        C. Was Agreed to.........................................................................................1
        D. Intentional Tort Required (None Found)...................................................1
        E. Finding Required to Disallow...................................................................2
        F. Not the Major Work to Be Paid For.........................................................2
        G. Primary Focus.........................................................................................2
        H. Effect of Action Below............................................................................2

    2. Res Judicata; Judicial Estoppel.........................................................................2

        A. Denied Motion to Compel........................................................................2
        B. Hired Someone Else to Do Them..............................................................3
        C. No Complaint..........................................................................................3

D. Judge Kazen's Ruling................................................................................3
E. (Court Below) Changed His Own Ruling re: Accountings................3
F. Changed His Own Ruling re: Payment....................................................3
G. Not Loans...................................................................................................4

3. (Court Below Erred in) Applying Texas Trust Code.........................4

A. Not What the Plan Said..........................................................................5
B. Ex Post Facto Wrongdoing......................................................................5
C. Claims Issues Still Not All Ruled On......................................................5
D. What They Did Was Under Federal Law, Not State.............................6

4. Benefit of the Estate..............................................................................6

A. $250,000 in Cash.....................................................................................6
B. $2 Million in Other Benefits...................................................................6
C. What About Plan Trustee Service..........................................................7

5. Expenses of the "Trust"........................................................................7

A. Not a Trust...............................................................................................7
B. King Log vs. King Stork..........................................................................7
C. Lucky to Get $10,000.............................................................................7
D. Moved to Convert....................................................................................7
E. Hired CPA................................................................................................7
F. No Creditor Asked...................................................................................7
G. The Other Million Dollars......................................................................7

IV. Standard of Review....................................................................................8

V. Facts............................................................................................................8

A. Introduction..............................................................................................8
1. Could Do a Plan....................................................................................9
2. Terms of Employment.........................................................................10

B. CKS Appears............................................................................................11
Footnote 1 (Parkwell withdraws its sanctions against CKS) ............11

C. Term Ends................................................................................................12

D. MAR Appears...........................................................................................13
1. No Interest............................................................................................13

VI. Argument...............................................................................................14

  A. Disallowing Fees...............................................................................14
    1. Eight Factors................................................................................14
           Footnote 2 ( most documents sought in discovery were never
               produced by the debtor) ......................................................14
    2. The Usual Suspects.......................................................................15
    3. No Tort........................................................................................15
    4. What Was Work for.......................................................................16
      a. Most Work Directly Benefitted Estate.......................................16
          Footnote 3 ( Benefit More than a Million) ..............................17
          Footnote 4 (Applicant not paid in advance) ....................17- 18
      b. Who Assumed the Risk...........................................................18
      c. Needs of the System...............................................................19
      d. Work in the Federal District Court.........................................19
      e. Work before the State Bar of Texas.........................................20
      f. Who Prevailed.......................................................................20
    5. Primary Focus..............................................................................21
    6. Effect of Action Below...................................................................21
          Footnote 5 ( One live issue left) ...........................................21

  B. Prior Adjudications............................................................................22
    1. Res Judicata................................................................................22
      a. Denied Motion to Compel........................................................22
      b. Hired Someone Else to Do Them..............................................23
      c. No Complaint.........................................................................23
      d. Judge Kazen's Ruling.............................................................23
      e. ( Court Below) Changed His Own Ruling re: Accountings...........24
    2. Equitable, Judicial & Quasi Estoppel.............................................25
      a. Reliance...............................................................................25
      b. Inconsistent Positions............................................................25
      c. Ratification and Other Forms of Quasi Estoppel.......................26

  C. Misuse of the Texas Trust Code...........................................................27
    1. Scope of Act in This Plan...............................................................27
          Footnote 6 ( No duty to give accounting absent written request) ....27
      a. Not What Plan Said...............................................................28
          Footnote 7 ( Quotes Tex. Tr. Code Sec. 113.001,
               Limitation of Powers) ....................................................30
      b. Ex Post Facto Wrongdoing.......................................................31
          Footnote 8 (Didn't have to use the state law form) ...............Footnote 31
      c. Claims Issues Still Not All Ruled on.........................................32
      d. A Recent Invention.................................................................33

D. Benefit of the Estate..........................................................................................33
    1. $250,000 in Cash..........................................................................................33
        a. The Cases..........................................................................................34
        b. $2 Million in Other Benefits..........................................................34
    2. What About Plan Trustee Service..............................................................34
E. Disclosures; Expenses of the "Trust"................................................................35
    1. Will Expenses Exceed Its Corpus?..............................................................35
        a. Was It True..........................................................................................35
        b. Was It Material..................................................................................36
    2. Silence Was a Legal Option..........................................................................36
        a. It's a What?  Who Wrote the Opinion Below.................................37
            Footnote 9 (Sec. 704(8) applied to Feldman, not Applicant).......37
            Footnote 10 (Another factor tending to show Mr.
            Rosenstein wrote opinion below) ..............................................38
        b. Case Not on Point..............................................................................39
        c. Decision Below Amounts to Saying: Why Didn't the Plan Trustee
           Disclose the Guy Was Bankrupt.................................................40
        d. Hired CPA..........................................................................................40
        e. No Creditor Asked..............................................................................41
        f. Experienced Creditors Already Know Better.................................42
    3. But Look at the Facts..................................................................................43
        a. King Log vs. King Stork......................................................................43
            Footnote 11 (Explains why funds were disappearing by the use
            of the analogy to Aesop's fable) ...........................................43-44
        b. Lucky to Get $10,000..........................................................................44
        c. Moved to Convert..............................................................................44
            Footnote 12 (Quotes passage disclosing when CKS claimed to be
            holding 95% of claims, that it would only get cerca $10,000) .......44
        d. The Other Million Dollars..................................................................45
    4. Best Disclosure Possible..............................................................................45

F. Court Below Refused to Wait and See................................................................45
    1. Refused to Liquidate..................................................................................46
    2. Wrong Standard..........................................................................................46
        a. The Law Is Clear................................................................................46
        b. Not Disputed......................................................................................47
        c. Ineffective Economics........................................................................47

VII. Comment..........................................................................................................48

VIII. Conclusion......................................................................................................48

## Table of Citations

In re Ames Dept. Stores, Inc., 76 F.3d 66, 71 (2d Cir.1996) ........................................ p. 47

In re Annett Ford, Inc., 64 B.R. 946 (D Neb. 1986) ........................................ p. 17, n. 3

In re Apex Oil Co. (Novelly v. Palans), 960 F.2d 728, 733 (8ᵗʰ Cir. 1992) ........................................ p. 47

In re B. A. Montgomery & Son, 17 F.2d 404, 407 (ND Ohio 1927) ........................................ p. 23

In re The Bennett Funding Group, Inc., 213 B.R. 234, 250
     (Bkcy., ND N.Y. 1997) ........................................ p. 46- 47

Bowie Natl. Bk. v. Homart Devt. Corp., 532 S.W.2d 67 (Tex. 1975) ........................................ p. 5

In re Busy Beavers Bldg. Centers, Inc., 19 F.3d 833, 848- 856 (3ʳᵈ Cir. 1994) ........................................ p. 47

In re Cajun Elec. Power Coop., Inc. (United States ex rel. Rural Utilities Service
     v. Cajun Elec. Power Coop., Inc.), 109 F.3d 248, 254 (5ᵗʰ Cir. 1997) ........................................ p. 38

Chatz v. Bloom, 34 N.E. 2d 889 (Ill. App. 1ˢᵗ 1944.) ........................................ p. 24

In re Coastal Plains, Inc. (Browning Mfg. v. Mims, Trustee), 179 F.3d 197, 204
     (5ᵗʰ Cir. 1999) ........................................ pp. 8, 26

In re Coleman, 131 B.R. 59 (Bkcy., ND Tex. 1991) ........................................ p. 39

In re Constructors of Florida, Inc., 349 F.2d 595, 599 (5th Cir.1965) ........................................ p. 16

Corbin on Contracts Sec. 723 (3d Ed. 1964) ........................................ pp. 5, 32

Corbin on Contracts Sec. 752 (3d Ed. 1964) ........................................ p. 41

Corbin on Contracts Secs. 767, 1253 and 1264 (3d Ed. 1964) ........................................ p. 19

Cox's Bakeries v. Homart Devt. Corp., 515 S.W.2d 326 (Tex. Civ. App. Dallas 1974,
     no writ) ........................................ p. 5

In re Davidson (Davidson v. Davidson), 947 F. 2d 1294, 1297 (5ᵗʰ Cir. 1991) ........................................ p. 26

In re Davis (Davis v. Davis), 105 F.3d 1017 (5ᵗʰ Cir. 1997) ........................................ p. 38

In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 15- 16 (Bkcy., SD N.Y. 1991) ........................................ p. 47

In re Dublin Securities, Inc. (Terlecky, Trustee v. Hurd), 133 F.3d 377
    (6th Cir. 1998) ..................................................................................................... p. 24

Ergo Science, Inc. v. Martin, 73 F.3d 595, 598 (5th Cir. 1996) .........................p. 26

In re Erie Hilton Jt. Venture, 125 B.R. 140 (Bkcy., WD Pa. 1991), rehearing denied
    157 B.R. 244 (Bkcy., WD Pa. 1992) ...........................................................p. 17, n. 3

FDIC v. Duffy, 47 F.3d 146, 152 at n. 7 (5th Cir. 1995) .....................................p. 26

In re First Colonial Corp. of America, 544 F.2d 1291 (5th Cir. 1977) ..................p. 46

Gonzales v. Parks, 830 F.2d 1033 (9th Cir. 1987) .............................................p. 38

In re Granite Partners, L.P., 194 B.R. 318 (Bkcy., SD N.Y. 1996) .......................p. 24

Hannover Corp. of America v. Beckner, 211 B.R. 849, 858 (MD La. 1997) ........p. 24

In re Hanson, 309 F.Supp. 810 (D Minn. 1970) .................................................p. 24

Hendrick v. Avent, 891 F.2d 583 (5th Cir. 1990) .......................................p. 22-23

Highpoint of Montgomery Corp. v. Vail, 638 S.W.2d 624 (Tex. App. Houston 1st 1982,
    no writ) ...........................................................................................................p. 5

In re H.L.S. Energy Co., Inc. (State of Texas v. Lowe, Trustee), 151 F.3d 434
    (5th Cir. 1998) ...................................................................................................p. 35

In re Hospitality Ltd., 86 B.R. 59 (Bkcy., WD Pa. 1988) ...............................p. 17, n. 3

John R. Lewis, Inc. v. Newman, 446 F.2d 800 (5th Cir. 1971) ..........................p. 24

Jones v. Keene Corp., 933 F.2d 209 (3d Cir. 1991) ...........................................p. 30

Kaufman, Prof. C. K., "The Scientific Method in Legal Thought: Legal Realism
    and the Fourteen Principles of Justice," 12 St. Mary's L. J. 77 (1981) .............p. 29

Koffman v. Osteoimplant Technology, Inc., 182 B.R. 115, 125 (D Md. 1995)
    (Smallkin, Dist. J.) ............................................................................................p. 38

In re Lambertville Rubber Co., 111 F.2d 45, 48 (3d Cir. 1940) ..........................p. 23

In re Leasing Consultants, Inc., 592 F.2d 103 (2d Cir. 1979) ..............................p.24

Longview S. & L. Assn. v. Nabours, 673 S.W.3d 357 **(Tex. App. Texarkana 1984)**,
  *aff'd* 700 S.W.2d 901 (Tex. 1985) ............................................................. p. 5

In re The Mediators, Inc. (The Mediators, Inc. v. Manney), 105 F.3d 822,
  826-27 (2d Cir. 1997) .......................................................................... p. 39

In re Medomak Canning Co. (Bezanson v. Bayside Ents., Inc.), 922 F.2d 895,
  903 in note 6 (1st Cir. 1991) .................................................................. p. 24

In re Missionary Baptist Foundation of America (Wilson v. Huffman), 818 F.2d
  1135, 1142 (5th Cir.1987) ...................................................................... p. 8

In re Multiponics, Inc., 622 F.2d 709, 713 (5th Cir.1980) .............................. p. 8

In re Nucorp. Energy, Inc., 764 F.2d 655, 658 (9th Cir. 1985) ......................... p. 47

Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F. Supp. 821, 831 (SD N.Y. 1969) ......... p. 5

Perez v. Campbell, 402 U.S. 637, 652, 91 S.Ct. 1704, ___ L.Ed.2d ___ (1971) ........................ p. 30

Petitioning Creditors of Melon Produce, Inc. v. Braunstein, 112 F.3d 1232, 1238
  (1st Cir. 1997) .................................................................................... p. 42

In re Prudhomme, 43 F.3d 1000, 1003 (5th Cir. 1995) .................................... p. 39

In re Robb (Robb-Fulton v. Robb), 23 F.3d 895 (4th Cir. 1994) ....................... p. 26

In re Roswick, 231 B.R. 843, 860 (Bkcy. SD N.Y. 1999) ............................... pp. 46, 47

In re Royale Airlines, Inc., 98 F.3d 852 (5th Cir. 1996) ................................ p. 24

In re Sampson (Sampson v. Sampson), 997 F.2d 717 (11th Cir. 1993) ............... p. 26-27

Schneider v. O'Neal, 248 F.2d 914 (8th Cir. 1957) ..................................... p. 24

Scholes v. Lehman, 56 F.3d 750 (7th Cir. 1995), cert. denied, ___ U.S. ___,
  116 S.Ct. 673, 133 L.Ed.2d 522 (1995) .................................................... p. 24

Securities Invr. Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 328
  (Bkcy., SD N.Y. 1999) ....................................................................... pp. 38-39

In re Senior-G&A Operating Co., Inc., 957 F.2d 1290 (5th Cir. 1992) ............. p. 17, n. 4

State Unauthorized Practice of Law Committee v. Paul Mason & Assocs., Inc.,

46 F.3d 469, 471 (5th Cir. 1995) .................................................................p. 30

In re Stratford of Texas, Inc. (Official Creditors Committee v. Stratford of Texas, Inc.),
    635 F.2d 365, 368 (5th Cir. 1981) ....................................................................16

In re Taxman Clothing Co., 49 F.3d 310, 316 (7th Cir. 1995) .............................pp. 17, n. 4, 34

Tennessee ex rel Sizemore v. Surety Bank, 200 F.3d 373, 382 (5th Cir. 2000) ...............p. 26

In re Triangle Chems., Inc. (Fanelli v. Hensley), 697 F.2d 1280 (5th Cir. 1983) ...............p. 28

In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1231 (7th Cir. 1990) ..........................p. 38

Webb v. Reserve Life Ins. Co., 954 F.2d 1102, 1103 (5th Cir.1992) ............................p. 8

In re White Motor Credit Corp. (Volvo White Truck Corp. v. Chambersburg Beverage,
    Inc.), 75 B.R. 944, 17 C.B.C.2d 293 (Bkcy., ND Ohio 1987) ..............................p. 31

Yadkim Valley Bk. & Tr. Co. v. McGee, 819 F.2d 74 (4th Cir. 1987) .........................p. 23

In re Zpancic, 3 F.3d 34 (9th Cir. 1995) ......................................................p. 17, n. 4

## Table of Statutes and Rules on Appeal

P. 39...........................................................................Bankruptcy Code ( 11 U.S. Code) Sec. 327:

( a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

( b) If the trustee is authorized to operate the business of the debtor under section 721, 1202, or 1108 of this title, and if the debtor has regularly employed attorneys, accountants, or other professional persons on salary, the trustee may retain or replace such professional persons if necessary in the operation of the business.

( c) In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

( d) The court may authorize the trustee to act as the attorney or accountant for the estate if such authorization is in the best interest of the estate.

( e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

( f) The trustee may not employ any person that has served as an examiner in a case.

P 39..........................................................................Bankruptcy Code ( 11 U.S. Code) Sec. 328:

( a) The trustee, or a committee appointed under section 1102 of this title, with the Court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title , as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

( b) If the court has authorized the trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attorney or accountant for the estate, and not for the performance of any of the trustee's duties that are generally performed by the trustee without the assistance of an attorney or accountant for the estate.

( c) Except as provided in section 327(c) , 327(e) , or 1107(b) of this title, the court may deny allowance of compensation for professional services and reimbursement of expenses of

a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

P39...................................................................................................Bankruptcy Code ( 11 U.S. Code) Sec. 330( a) :

(a) (1) After notice to the parties in interest and the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103 –

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person or attorney, and by any paraprofessional person employed by such person; and

(B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

(3) (A) In determining the amount of compensation that is to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were reasonably necessary to the administration of, or beneficial at the time the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation was reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4) (A) Except as provided in subparagraph (B), the Court shall not allow compensation for –

(i) unnecessary duplication of services; or

(ii) services that were not –

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

(B) In a chapter 12 or 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

(5) The court shall reduce the amount of compensation awarded under this section by

the amount of any interim compensation awarded under section 331, and, if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate.

(6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application

P. 39..............................................................Bankruptcy Code (11 U.S. Code) Sec. 503(b)(2),(3) & (4):

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under Sec. 502(i) of this title, including –

    (1) * * *

    (2) compensation and reimbursement awarded under section 330(a) of this title;

    (3) the actual necessary expenses, other than compensation and reimbursement specified by paragraph (4) of this subsection, incurred by –

        (A) a creditor that files a petition under section 303 of this title;

        (B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

        (C) a creditor in the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

        (D) a creditor, an indenture trustee, an equity security holder, or committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

        (E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

        (F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

    (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the value, and the extent of the services, and the cost of comparable services other than in a case under this title, and reimbursement for the actual, necessary expenses by such attorney or such accountant;

    (5) * * *

    (6) * * *

..............................................................Bankruptcy Code (11 U.S.Code) Sec. 506(c):

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Pp. 15, 27, n. 6, 37 & 37, n. 9.............................Bankruptcy Code (11 U.S. Code) Sec. 704(2), (5), (7), (8) & (9):

The trustee shall —

    (1) * * *

    (2) be accountable for all property received;

    (3) * * *

    (4) * * *

    (5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

    (6) * * *

    (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest.

    (8) if the business of the debtor is authorized to be operated, file with the court, with the United states trustee, and with any governmental unit charged with responsibility for the collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of the receipts and disbursements, and such other information as the United States trustee or the court requires; and

    (9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

P. 1.................................................................................................................28 U.S.C. Sec. 1334(a):

    (a) Except as provided in subsection (b) of this section, the district courts of the United States shall original and exclusive jurisdiction of all cases under title 11.

Pp. 3, 4, 5, 25.................................................................. Federal Rules of Civil Procedure Rule 60(b):

    (b) MISTAKES; INADVERTENCE; EXCUSABLE NEGLECT; NEWLY DISCOVERED EVIDENCE; FRAUD, ETC. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment

for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

P. 8........................Federal Rules of Bankruptcy Procedure, Rule 8013:

    Rule 8013. **Disposition of Appeals; Weight Accorded Bankruptcy Judge's Findings of Fact**. On an appeal the district court of bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

P. 30..............................................................Federal Rules of Bankruptcy Procedure, Rule 9010(a):

    (a) Authority to Act Personally or by Attorney. A debtor, creditor, equity security holder, indenture trustee, committee or other party may (1) appear in a case under the Code and act either in the entity's own behalf or by an attorney authorized to practice in the court, and (2) perform any act not constituting the practice of law by an authorized agent, attorney in fact or proxy.

P. 30 & in p. 30 n. 7, p. 31, n. 8........................................................Texas Trust Code, Sec. 113.001:

    Sec. 113.001. **Limitation of Powers**. A power given to a trustee by this subchapter does not apply to a trust to the extent that the instrument creating the trust, a subsequent court order, or another provision of this subtitle conflicts with or limits the power.

Pp. 15, 27-28 (n. 6), 37........................................................Texas Trust Code, Sec. 113.151(a):

    Sec. 113.151. **Demand for Accounting**.
        (a) A beneficiary by written demand may request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later. * * * However, the trustee is not obligated or required to account to the beneficiaries of a trust more frequently than once every twelve months unless a more frequent accounting is required by the court.

Font: Korinna

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Colin Kelly Kaufman, former plan trustee in the captioned case and the Appellant, and respectfully shows the Court as follows:

I. STATEMENT OF THE CASE.  This appeal concerns payment of post-confirmation fees under a bankruptcy plan confirmed in 1992.

II. Jurisdiction.  This Court has jurisdiction under 28 U.S.C. Sec. 1334(a) and 158(a).

III. Issues Presented on Appeal.

Appellant designated the following issues on his Appeal of Docket # 469 and # 470:

1. Erred in Disallowing Fees.  Whether the bankruptcy court erred in refusing to approve the $454,000 fee bill submitted and in ordering a return of funds paid to the former plan trustee, when:

A. It Was Done.  The bankruptcy court found that the work was done;

B. Reasonable Rate.  The bankruptcy court found that the rate was within the range charged by bankruptcy attorneys in such cases;

C. Was Agreed to.  The bankruptcy court found that the former plan trustee had, when he was offered the job, agreed to payment at an hourly rate for all his work in the case;

D. Intentional Tort Required.  The amendment to the Plan by which the former plan trustee was appointed specifically required a finding of bad faith or such gross negligence as would constitute an intentional tort to take any money from the plan trustee;

-1-

and there was neither evidence nor finding of any intentional tort;

E. <u>Finding Required to Disallow</u>.  Absent a finding of such an intentional tort on the part of the former plan trustee, he was entitled to recover for all work done on account of his service as former plan trustee, including work defending himself against the charges made by creditor CKS Asset Management, Inc. and its president, Steve Ditto; and

F. <u>Not the Major Work to Be Paid For</u>.  Simply adding up the fees spent defending against CKS's attacks shows it was cerca a fourth of the fees applied for, and so the bankruptcy court erred in stating that "Kaufman's fees largely relate to opposing requests for accountings and defending his own reputation" as stated by the bankruptcy court on p. 7 of docket # 469, R3608;

G. <u>Primary Focus</u>.  Since the creditors didn't even ask for any accountings between 1997 and April, 2001 (when 70% of the ten years of work was done), it is impossible that the "creditors' primary focus was obtaining accountings which Kaufman was require to provide" as stated by the bankruptcy court on p. 7 of docket # 469, R3608;

H. <u>Effect of Action Below</u>.  It was an abuse of discretion for the bankruptcy court to deny former plan trustee's fees when the evidence showed that the natural effect of this would be to cost the bankruptcy estate the value of its $ 1 million dollar claim against the Feldmans, when that claim had not yet been liquidated.

2. <u>Res Judicata; Judicial Estoppel</u>.  Whether the bankruptcy court violated principles of res judicata and equitable, judicial, and quasi estoppel by going back and redetermining that Appellant violated duties to give accountings in 1997 when:

A. <u>Denied Motion to Compel</u>.  A final order of the bankruptcy court in 1997

-2-

(docket # 312, R0494) denied that Appellant should be required to do any more accountings;

     B. <u>Hired Someone Else to Do Them</u>.  A final order of the bankruptcy court in 1997 (docket # 315, R 0496) hired an accountant, Al White, to do any further accountings that a creditor might want done (docket # 287, R0457-R0474), in lieu of Appellant;

     C. <u>No Complaint</u>.  No complaint of the quality or nature of the accountings actually furnished was made for nearly four years;

     D. <u>Judge Kazen's Ruling</u>.  The federal district court had previously heard all CKS's complaints about Appellant's accountings, and ruled against them; R3715-17; and

     E.  <u>Changed His Own Ruling re: Accountings</u>.  The bankruptcy court's own prior rulings of June 28, 2001, docket #444, R2798-R2811 did not state that any insufficiency of the accountings furnished was "good cause" to remove the former plan trustee, nor that it justified giving the former plan trustee nothing for trustee's fees; and no Rule 60(b) grounds were pled nor stated for changing the prior ruling, nor was any new evidence offered, nor was any new evidence received, on the point; and if the bankruptcy court did have a procedural right to change its mind, it was wrong on the merits to do so, because everyone was satisfied with former plan trustee's accountings until a new attorney came into the case four years later.

     F.  <u>Changed His Own Ruling re: Payment</u>.  The bankruptcy court's own prior rulings of June 28, 2001, docket # 444, R2798-R2811, did not state that payment of fees in advance was "good cause" to remove the former plan trustee, nor that it justified giving

the former plan trustee nothing for trustee's fees, and no Rule 60(b) grounds were pled nor stated for changing the prior ruling, nor was any new evidence offered nor was any new evidence received on the point; and if the bankruptcy court did have a procedural right to change its mind, it was wrong on the merits to do so, because the former plan trustee had earned his fees and in any case could have paid his fees in advance under the plan (as the bankruptcy court actually admitted, last sentence on p. 4 of docket #469, R3605).

G. Not Loans. The bankruptcy court's own prior rulings of June 28, 2001 (docket # 444, R2798-R2811) never said that payment of fees for the proposed final report in advance would have been a breach of fiduciary duty; and no Rule 60(b) grounds were pled nor stated for changing the prior ruling, nor was new evidence offered or received; and if the bankruptcy court did have a procedural right to change its mind; and if despite its admission in the last sentence of p. 4, Docket # 469, R3605, that "the plan did not prohibit the payment of a reasonable retainer" (i.e., the plan trustee could have paid himself in advance under the plan), if even so, the bankruptcy court could still go on to make the statement, first sentence on p. 5, docket # 469, R3606 that payments for work "could be construed as loans from the trust, which would also constitute a breach of fiduciary duty"; that finding would still be error on the merits because a "loan" requires a duty or possibility of having to repay in cash or kind, and here the payment was for work done and to be done, not for repayment in cash or kind, and no evidence was ever offered or received tending to show that plan trustee ever thought any fees he got would not be fully earned by work done and to be done.

3. Applying Texas Trust Code. Whether the bankruptcy court erred in applying

-4-

provisions of the Texas Trust Code relating to denying fees when a trustee is removed for cause, when:

A. <u>Not What the Plan Said</u>.  The plan said the Texas Trust Act would apply only to the extent of the "rights, duties and responsibilities" of the plan trustee; and denying fees is not a right, a duty, nor a responsibility of the plan trustee.

B. <u>Ex Post Facto Wrongdoing</u>.  Even if the plan had completely adopted the Texas Trust Act, and so Court could have applied the Texas Trust Code provisions for removal for "cause," and even if the court's statement on June 28, 2001 (that the plan trustee did not make the kind of accountings that the Texas Trust Code contemplates) could be treated as an announcement of "cause," still the undisputed evidence shows that nobody asked for a Texas Trust Code style accounting until after April 27, 2001, and any complaint had been waived by non-assertion from 1997 til 2001; and a waiver can be retracted only on prospective reasonable notice. *See, e.g.*, Sec. 723, <u>Corbin on Contracts</u> (3d Ed. 1964); <u>Bowie Natl. Bk. v. Homart Devt. Corp.</u>, 532 S.W.2d 67 (Tex. 1975); <u>Oleg Cassini, Inc. v. Couture Coordinates, Inc.</u>, 297 F. Supp. 821, 831 (SD N.Y. 1969); <u>Cox's Bakeries v. Homart Devt. Corp.</u>, 515 S.W.2d 326 (Tex. Civ. App. Dallas 1974, no writ); <u>Highpoint of Montgomery Corp. v. Vail</u>, 638 S.W.2d 624 (Tex. App. Houston 1st 1982, no writ); <u>Longview S. & L. Assn. v. Nabours</u>, 673 S.W.3d 357 (Tex. App. Texarkana 1984), aff'd 700 S.W.2d 901 (Tex. 1985).

C. <u>Claims Issues Still Not All Ruled On</u>.  Even if the plan had completely adopted the Texas Trust Act, and so the bankruptcy court could have applied the Texas Trust Code provisions for removal for "cause," and even if the court's statement on June

-5-

28, 2001 (that the plan trustee did not make a distribution to creditors) could be treated as

an announcement of "cause," still the undisputed evidence shows that a distribution to

creditors was impossible (transcript not yet available, R3769) because the claims had and

still have not been finally fixed, and the administrative expenses had to be paid in full

before creditors were entitled to anything, and administrative expenses had not and still

have not been fixed.

     D.  <u>What They Did Was under Federal Law, Not State</u>.  What the bankruptcy

court said on June 28, 2001 (docket # 444, R2798-R2811) could not possibly have been

meant and understood as an announcement that the Court was replacing the former plan

trustee because of the provisions of the Texas Trust Code; because the order (docket #

451) requested by the bankruptcy court from the United States Trustee's Office, submitted

by the U.S. Trustee's Office by motion (docket # 447, R 2825-27), and signed by the

bankruptcy judge, said that the former plan trustee was being replaced by an amendment

of the Plan (i.e., under the Bankruptcy Code). See R2841.

    4.  <u>Benefit of the Estate</u>.  Whether the bankruptcy court erred in awarding only

$50,000 for benefit of the estate to the former plan trustee, when

     A.  <u>$250,000 in Cash</u>.  Mr. Kaufman's uncontroverted evidence was that he

brought $250,000 in cash into the bankruptcy estate that otherwise would not have existed

(docket # 464, p. 3572-73); and the size of the benefit is the limit on recovery for benefit

of the estate, not 20% of that amount;

     B.  <u>$2 Million in Other Benefits</u>.  The uncontroverted evidence of Mr.

Kaufman was that he had given the estate over two million dollars in other benefits (docket

# 464, R3572-73); and

      C. <u>What about Plan Trustee Service</u>.  The award for benefit to the estate did not give Mr. Kaufman anything at all for his service as plan trustee.

    5. <u>Expenses of the Trust</u>.  Whether the bankruptcy court erred in ordering sanctions for non-disclosure because its ruling that, "None of the accountings included information which would alert beneficiaries that the expenses of the trust might exceed its corpus" when:

      A. <u>Not a Trust</u>.  It was not a trust, it was a bankruptcy estate;

      B. <u>King Log vs. King Stork</u>.  The former plan trustee's Fifth Accounting discussed King Log and King Stork, and how CKS's demands for work were going to eat up in administrative expenses the entire amount of funds generated under the Plan;

      C. <u>Lucky to Get $10,000</u>.  The former plan trustee's Sixth Accounting disclosed that CKS, at a time when it was claiming to be 90- 95% of the creditors would be lucky to get $10,000 in total on a final distribution;

      D. <u>Moved to Convert</u>.  CKS moved in response to the Sixth Accounting to convert the case to Chapter 7;

      E. <u>Hired CPA</u>.  Al White, a CPA, was specifically hired to give CKS (or any other creditor) whatever accounting-type information it might ever be interested in having, and CKS did not ask Al White for any more information along that line;

      F. <u>No Creditor Asked</u>.  No creditor asked for another accounting after the 1997 orders until the proposed final report was filed in April, 2001; and

      G. <u>The Other Million Dollars</u>.  There is still a million dollar claim against the

Feldmans which former plan trustee was prosecuting, and would have prosecuted and obtained funds for creditors but for the creditors actions which prevented him.

IV. Standard of Review.

The district court acts as an appellate court when reviewing a bankruptcy court's decision. See, Webb v. Reserve Life Ins. Co., 954 F.2d 1102, 1103 (5th Cir.1992). The standard of review on appeal of bankruptcy court decisions is de novo for questions of law; In re Missionary Baptist Foundation of America (Wilson v. Huffman), 818 F.2d 1135, 1142 (5th Cir.1987) (bankruptcy court's conclusions of law "are freely reviewable on appeal"), quoting In re Multiponics, Inc., 622 F.2d 709, 713 (5th Cir.1980); In re Coastal Plains, Inc. (Browning Mfg. v. Mims), 179 F.3d 197, 204 (5th Cir. 1999) (error of law is always an abuse of discretion, citing U.S. Supreme Court case); and the standard of review is "clearly erroneous" for findings of fact; Rules of Bankruptcy Procedure Rule 8013 and see also, Webb, 954 F.2d 1102 at 1103.

V. Facts.

A. Introduction. Mr. Feldman ran (and still runs) a chain of liquor stores in the Rio Grande Valley. They are incorporated under the name, Feldman's Valley-Wide, and were originally owned jointly with his now deceased brother. The real estate on which the stores were located was owned by Feldman Real Estate, Inc. Two other entities also existed in the group, Feldman Rentals and Clara Feldman Properties. Although these properties produced a steady income, Mr. Feldman decided he wanted to speculate in other real estate developments. After he got involved in some of these, Congress passed a tax reform act which eliminated the tax sheltering incentives which had previously existed to

induce doctors, lawyers, dentists and others to own depreciable commercial real estate. Market values crashed. He owed nearly $7 million, mostly to banks, when he and they failed. 99% of this debt was owed to institutions taken over by the FDIC.

1. <u>Could Do a Plan</u>. But one note, secured by Island Moorings Marina on Padre Island in Corpus Christi, was sold by the FDIC to a group friendly to Mr. Feldman. So he could get them and his other non-FDIC creditors to support a plan for him to pay five years of income to creditors and get a discharge of the $7 million. But the FDIC's remaining claims let it veto a plan, and it wouldn't allow the deal unless a plan trustee was appointed, to see that Mr. Feldman actually turned over the money he would owe to pay. Harlingen National Bank was asked to serve as plan trustee, and promised a minimum of $25,000 a year for its fees, whether its officers spent that much time on the project or not. But HNB turned the offer down. R1305 (Docket # 383, Proposed Final Report). The evidence at the hearing on February 22, 2002 indicated that banks all have to get a committee to approve taking on new estate work – and they will hardly ever take on new work where litigation is already on-going and they might become a target. (Transcript not available yet, p. 3765.) So that may have happened to HNB. (The evidence at that hearing also showed that banks will charge out their trust officers' time -- just a college degree usually, no professional degree -- at $125 an hour where legal work is required -- plus hire an attorney or accountant at his usual fee rate, thereby adding a layer of expense, rather than just take a percentage of assets, as Appellees claimed was an appropriate fee.) Eventually, the U.S. Trustee's office suggested the debtor and creditors try to get Colin Kelly Kaufman, the (third) examiner in the case, to serve as Plan Trustee. As examiner,

Applicant had suggested that a minimum $50,000 payment be made to the bankruptcy estate to settle out the Feldman's liabilities for fraudulent conveyance of Mr. Feldman's stock in Feldman's Valley Wide to his children; and when Applicant was hired, that term became a part of the deal hiring him. So both sides were aware that the Applicant as plan trustee might not agree fully with either side, the debtor or the FDIC, on any particular dispute.

      2. <u>Terms of Employment</u>. Applicant negotiated over the terms of his employment with Charles Jefferson, the FDIC's attorney. Mr. Kaufman negotiated for payment of all his time at his usual rate (raised to compensate for the fact that his usual rate took a percentage of savings or recovery as well as an hourly component, and he was not going to get a percentage here), including full payment for travel time, not half payment (transcript not available, R3765). Mr. Jefferson felt that Mr. Feldman had sinned before, and would sin again. Though he doubted the plan would produce enough money to pay much if anything to creditors, at least prior to the end of the plan term, if ever; Mr. Jefferson did want Mr. Feldman made to carry out his promises as to paying the five years of income, which he considered modest enough repayment for taking $7 million out of the banking system which the FDIC had to cover. Mr. Jefferson reminded Mr. Kaufman that Mr. Feldman had already acted once in such a way that the Plan had to settle out the Feldman's resulting fraudulent conveyance claims liabilities. He wanted assurances that Mr. Kaufman would be especially careful to check at the end of the plan term whether Mr. Feldman had actually turned over all his income for the five years, because he felt the leopard would not change his spots (transcript not available, R 3765). The plan was

confirmed in late September, with an effective date of early October, 1992.

     B. <u>CKS Appears</u>.  A few skirmishes were had between the FDIC and the reorganized debtor, which the former plan trustee helped work out, but generally all went well until 1995, when CKS Asset Management, Inc. (Steve Ditto, President) bought out the remaining FDIC claims (excluding the Island Moorings Marina, Inc. claim previously sold by the FDIC).  Mr. Ditto promptly (and in violation of the plan) filed abstract of judgment liens against all the bankruptcy estate property, making the realty unsaleable.  Time was spent to get this corrected, and eventually CKS was sanctioned.  Later, CKS sought a rehearing of the sanctions, and the sanctions order was vacated for the matter to be tried again later.  That issue remains open today.  R2800.  When CKS got the right to a new hearing on the sanctions order reducing its claim, it turned its attention to Parkwell, objecting to Parkwell's claim.  Plan Trustee could not avoid dealing with this war between Parkwell and CKS, because Parkwell pled that only the plan trustee had standing to object to its claim, and CKS lacked it.  Docket # 299, R0490.  Eventually, after a year of litigation, CKS sought to withdraw its objection to Parkwell's claim, and Parkwell's response to this motion asked for sanctions against CKS.[1]  (Docket # 331, R0499-0500.)  Also, from 1995 to 1997, the former plan trustee did 4th, 5th, 6th and 7th accountings (although the Texas Trust Act specifically says a beneficiary may not have more than one accounting a year), and still CKS was unhappy.  Mr. Kaufman warned the creditors in these

---

[1] Eventually, at a hearing after February 22, 2002, Parkwell's counsel announced orally that Parkwell would withdraw any request for sanctions against CKS.  Transcript not yet available.

reports that CKS's battles were eating up the estate and little could be expected by way of distributions to creditors. Eventually, in 1997, former plan trustee persuaded the Court to authorize the employment of an accountant to deal with any future CKS requests for accountings or like information. (Order, Docket # 315, R 0496; Motion, Docket # 287, R0457-R0474). Interestingly, as soon as someone else was given the responsibility to respond to CKS's requests for accountings, CKS stopped asking for them.

C. <u>Term Ends</u>. The plan term lasted for the years 1993 through 1997, and at the end of that time, the debtor owed to make a report. This was completed by his counsel in August, 1998. The debtor then made significant efforts to end the case at that time, without an audit of Mr. Feldman's performance. But former plan trustee demanded a right to have the data (required to be furnished him by the plan) to determine if Mr. Feldman really did turn over to creditors all the required income during the five years. After demands and skirmishing, some documents were finally turned over to former plan trustee cerca Thanksgiving, 2000, and they were sent to CKS by the first week of December of 2000. The case was then closed by the bankruptcy clerk's office, and Applicant had to get it reopened, over the Debtor's objection. CKS's principal dismissed these documents as useless garbage. But meager as they were, the former plan trustee (though delayed by illness from working on them until spring of 2001) was able to analyze them and show how they proved that the Feldman interests had failed to carry out their obligations under the plan, including failing to account for $179,000 in funds that Mr. Feldman withheld from the bankruptcy estate for alleged expenses. And so Applicant's "Proposed Final Report" pointed out in April, 2001, that even restitution damages for the Feldman defaults would

-12-

have to be cerca $225,000 (for which former plan trustee offered to settle out the Feldmans' liability), and that expectation damages would be several times higher, cerca another $1 million.  It was at this point, when Mr. Feldman faced the potential problem of actually having to pay creditors what he promised, that the whole case changed.

D. <u>MAR Appears</u>.  At this point, CKS acquired the latest in a long line of counsel, Matthew A. Rosenstein.  When Mr. Rosenstein began to represent CKS on or after April 27, 2001, it was eleven years after the case began, nine years after Plan Trustee was involved, and six years after CKS bought the FDIC's claim.  This caused a major change in the direction of the case.  CKS filed a motion to remove the plan trustee (docket # 412, R2018-R2034), stating *inter alia* the following grounds: that it was illegal for Applicant to pay himself without a prior court order, that it was illegal for Applicant to use an IOLTA account as this would be illegal commingling of estate funds, that Applicant illegally concealed from creditors all data relating to the bankruptcy estate, and that it was illegal for Applicant to do other things.  Additionally, the plan trustee moved to compel Mr. Feldman to furnish data, accounting for the funds he had received but not turned over to the bankruptcy estate, Docket # 413, R2035-46.  And Mr. Rosenstein, on behalf of CKS, opposed that.

1. <u>No Interest</u>.  CKS showed no interest in the million-dollar claims against Mr. Feldman and his relatives, except to oppose them.  The only issue CKS wanted to look at was the possibility of alleging a wrong on the part of the Plan Trustee.  CKS complained of the accountings that Mr. Kaufman had given, and ignored that the Feldmans owed accountings and had not given them.  CKS asserted identical positions with Mr. Feldman

-13-

on all issues after Mr. Rosenstein came into the case.   CKS's opposition to discovery of

the Feldmans' liabilities came even though the plan called for the Plan Trustee to get this

data without requiring even the adversary proceeding that Plan Trustee finally resorted to.[2]

Instead of being thrilled that Mr. Kaufman could show that the bankruptcy estate had a

summary judgment case for $1 million against the Feldmans, CKS decided to keep Mr.

Kaufman from pursuing the bankruptcy estate's claims.  CKS has not revealed any good

(or other) reason why its attorneys would want to try to avoid recovery from Mr. Feldman in

favor of attacking Mr. Kaufman.

VI. Argument.

   A. Disallowing Fees.  The bankruptcy court erred in refusing to approve the former

plan trustee's fee bill and in ordering a return of funds paid to the former plan trustee:

     (1) Eight Factors.  When it found (Docket # 469, R. 3601): (A) the work was

done, R3606; (B) the rate was not excessive, R3604; (C) the hourly rate had been agreed

to, R3604; (D); the Plan in Sec. 7-5 specifically required such bad faith or gross negligence

as would be an intentional tort to take money back from former plan trustee, see Plan

shown as an exhibit to Docket # 383, Proposed Final Report, and evidence and findings

---

[2] Most documents which Plan Trustee asked for in discovery were never ordered produced by the Court – because Mr. Feldman and Mr. Rosenstein asked that the documents not have to be furnished until a new plan trustee was appointed, who might decide not to prosecute any claims against Mr. Feldman.  Transcript not available, R3765.  Those which were produced became the basis of the adversary complaint filed by Mr. Kaufman as plan trustee against the Feldmans.  Evidently, Mssrs. Feldman & Rosenstein knew whereof they spoke, about the attitude of the new trustee (then still unordered and unappointed): The remainder of the items in the motion to compel have not been prosecuted by the new trustee, nor has the adversary proceeding been prosecuted by the new trustee.

were lacking of any such intentional tort; (E) lacking a finding of intentional tort, former plan trustee was entitled to recover for work defending himself against CKS's charges, just like other work on account of his service as plan trustee; (F) the bankruptcy court erred in stating that "Kaufman's fees largely relate to opposing requests for accountings and defending his own reputation" as stated by the bankruptcy court on p. 7 of docket # 469, R3608; (G) since the creditors didn't even ask for any accountings between 1997 and April, 2001 (when 70% of the ten years of work was done), and given that Applicant had NO DUTY to give an accounting under Sec. 704(7) of the Bankruptcy Code, nor Sec. 113.151 of the Texas Trust Code without a positive request for it, it is impossible that the "creditors' primary focus was obtaining accountings which Kaufman was require to provide" as stated by the bankruptcy court on p. 7 of docket # 469; and (H) the natural effect of denying the fees would be to cost the bankruptcy estate the value of its $ 1 million dollar (as yet unliquidated, but amenable to summary judgment) claim against the Feldmans, who would come out of the bankruptcy with over $1 million in bankruptcy estate assets.

      2. <u>The Usual Suspects</u>. The usual defenses to a fee application is that the work was not done, or it was not done right, or the bill was padded, or that the work done wasn't the work one was hired to do, or the like. All those typical defenses were negated in this case. The bankruptcy judge finally just came out and said that none applied. *See e.g.,* docket # 469, R3603.

      3. <u>No Tort</u>. As a result, something affirmatively wrong had to be proven to make a defense to the fee application. But how much wrong? Here, §7.5 of the Plan said

-15-

that before a plan trustee could be ordered to pay money, a mere breach of contract would not work. Instead, he must have committed a wrong so serious as to amount to an intentional tort. The plan is the contract between the parties, <u>In re Constructors of Florida, Inc.</u>, 349 F.2d 595, 599 (5th Cir.1965); <u>In re Stratford of Texas, Inc. (Official Creditors Committee v. Stratford of Texas, Inc.)</u>, 635 F.2d 365, 368 (5th Cir. 1981) (held, plan of reorganization "should be construed basically as a contract"); and it controls. Assuming that the bankruptcy court thought a contract was breached (and note, a finding that the contract was not fully performed is NOT equivalent to a finding it was breached – some performances are impossible, such as distributing funds to creditors when the amounts of their claims are not fixed), still it made no finding that an intentional tort was committed. And the evidence did not show that Mr. Kaufman ever thought he was committing one. Nobody else said he thought so, either. Even Mr. Kaufman's opponent's witness, Harrell Browning, never alleged Mr. Kaufman was committing an intentional tort.

    4. <u>What Work Was for</u>. The Court did say that Mr. Kaufman could not recover because most of his work was done opposing requests for accountings and defending his reputation. R3608. Those statements are untrue. Only one pleading filed by Applicant ever asked that a request for an accounting not be granted. Even taking that all work done after Mr. Rosenstein got on the case was done to defend Applicant's reputation, that was not large a part of the bill. Less than $100,000 of work was done defending Mr. Kaufman against CKS's attacks. Out of a $454,000 fee bill, that is less than a quarter of the bill, and certainly not "most" of the work.

       a. <u>"Most" Work Directly Benefitted the Estate</u>. Applicant benefitted

-16-

the bankruptcy estate when first accepted employment with it. His proposal to settle out fraudulent conveyance claims by accepting the $50,000 in cash from Feldman Valley Wide was made part of the deal (payable over the plan term at $10,000 a year). This money would not have been paid but for Applicant's agreement to serve as plan trustee. And this settlement was included as a term in the same plan amendments that hired Applicant.[3] Then, Mr. Feldman had some bank stock scheduled as a $15,000 asset. Though he was supposed to, he did not sell this stock during the plan term, and did not say anything about it. The Kaufmans went over the schedules at the end of the plan term, and cross-checked them against the assets that Mr. Feldman had sold and turned over money for. They discovered the bank stock had never been sold. So Applicant demanded that Mr. Feldman sell it, and this produced another $200,000 in cash for the bankruptcy estate.[4]

---

[3] The Applicant also benefitted the estate by about a million dollars at this time by enabling the plan to be confirmed, thereby keeping the businesses running, and their assets at their going concern value, and their good will available for creditors, instead of having it all lost. Applicant is less inclined to rely on that benefit to the bankruptcy estate than others, even though that was very beneficial, and the caselaw establishes it is compensable benefit, *see e.g.*, In re Erie Hilton Jt. Venture, 125 B.R. 140 (Bkcy., WD Pa. 1991), *rehearing denied*, 157 B.R. 244; In re Hospitality, Ltd., 36 B.R. 59 (Bkcy., WD Pa. 1988); In re Annett Ford, Inc., 64 B.R. 946 (D Neb. 1986) (all three cases holding that preserving going concern value of business is a value that secured creditor had to pay fees and expenses for). Still it was not the same thing as "cash brought in." The initial benefit went to the Feldmans. This value will not become "cash brought in" to the estate, i.e., something creditors and administrative expense claimants can actually spend, until one actually collects the $1 million from the Feldmans.

[4] This $250,000 cash produced by the Applicant entitled Applicant to fees for benefitting the estate in THAT AMOUNT, not 20% of it. *See, e.g.*, In re Zupancic, 3 F.3d 34 (9th Cir. 1995) (creditor whose litigation on behalf of estate produced $10,000 in asset recovery could recover $10,000 in attorneys fees for the work); In re Taxman Clothing Co., 49 F.3d 310, 316 (7th Cir. 1995) cited by the court below; and In re Senior-G&A Operating Co., Inc., 957 F.2d 1290 (5th Cir. 1992) (amount secured creditors could be made to pay for benefits was limited to amount of assets they had in the estate -- 5.95% where they had previously sold off 90% of their former 59.5% interest in an oil well.) Besides, Applicant had paid expenses of $23,634.61 plus $2,300

Things such as these, and dealing with CKS's unending litigations, and looking to see if Mr. Feldman actually paid what he owed (creating or discovering the $1 million claim against the Feldmans) were the great majority of the work done by Applicant.

b. <u>Who Assumed the Risk?</u>  Furthermore, unless Mr. Kaufman was proven to have committed an intentional tort, he was entitled to defend his reputation. The bankruptcy system ought not to be a place where creditors can engage in abusive litigation without any consequences to them.  The former plan trustee was attacked to prevent him from achieving certain goals as representative of the bankruptcy estate, and the cost of defense was logically related to his service.  If people have to assume the risk creditors will attack their bar license every time they represent a bankruptcy estate, they won't serve.  Those engaging in reckless litigation should have to bear consequences from their choices, not their innocent targets.  The creditors, knowing that their actions would certainly raise the administrative expenses charged in the case, chose to make

---

(or $25,934.61), for an amount of $275,934.61.  In 1998, after waiting five years to start paying them, Applicant began paying, in addition to the $89,000 he paid out to other administrative expense claims, his own fees and expenses.  CKS claimed in its Exhibit CKS-17, docket # 433, that Applicant got paid in advance, and that would be illegal.  CKS-17 was never updated for corrections in Applicant's final fee application that increased Applicant's claim; but the facts do not support CKS's claim, anyway, not even counting that Applicant waited over five years to get paid anything, and presumably was entitled to interest during that five-year time period.  Why? Because Exhibit 17 shows Applicant only got about $1800 more, total, than he was entitled to be paid under the "benefit of the estate."  When Applicant got the last payment of $2600 on May 19, the estate owed him another $40,000 above what he was paid.  Prior to that payment, Exhibit 17 shows on March 26, 2001, the $275,197.50 amount that was paid was $750 less than Applicant owed to be paid for benefit of the estate.  The corrections shown by the fee bill as applied for added some $4,000+ more than the raw figures in Applicant's billing computer used by Mr. Rosenstein for his Exhibit 17.  That means there was closer to $5,000 more owed to Applicant for benefit of the estate on March 26, 2001 than had been paid him.  All this is without taking into account Applicant's testimony at the hearings that there is ALWAYS time spent which is not recorded, and citing examples.  (Transcript not available, R3765.)

-18-

unnecessary attacks against the plan trustee. They chose to attack in the bankruptcy court. And when the bankruptcy court did not immediately give them the rulings they wanted, they went forward to launch the same attacks in proceedings before the federal district court and the state bar. When someone wishes to perform, and the other parties to the deal prevent him, his performance is excused; and he is treated as having earned the promised return compensation for his performance, even if he was not permitted to perform completely. *See, e.g.*, Corbin on Contracts Secs. 767, 1253 and 1264 (3d Ed. 1964).

   c. Needs of the System. Logic requires such actions to be compensable. When a bankruptcy estate's fiduciary is accused of doing wrong, he has a duty to make an adequate response if he can. Bankruptcy courts need to know if bankruptcy estates are being taken care of properly. So there can be no doubt that the work done defending against the allegations in this Court was within the scope of the former plan trustee's duties, and is compensable.

   d. Work in the Federal District Court. No authority has been cited to the Court (and none is known to counsel) which states that fiduciaries for bankruptcy estates cannot earn compensation for work done in other courts. Many cases have let bankruptcy trustees and other types of trustees be compensated for work done in other courts. So the district court complaint related to how the Applicant dealt with the bankruptcy estate. So that complaint was just as relevant as the bankruptcy court complaint. And that complaint was just as much in need of an answer, and the answer was just as much entitled to be paid for, as the bankruptcy court complaint was.

e. <u>Work before the State Bar of Texas</u>. No difference exists in theory between the treatment of work done before the State Bar of Texas and the federal district court. CKS used that forum to complain about how the former plan trustee dealt with the bankruptcy estate.

f. <u>Who Prevailed</u>. It was well-known, and occasionally discussed in the record, that CKS had an absolute right to get a new trustee by amending the plan if it could acquire the support of Parkwell and the debtor. See R2667 (pointing out that <u>Manges</u> case says amendment of the Plan still lies.) But doing this inexpensive and easy procedure was not the path CKS started down. Why not? Because then it would not have been able to allege the many attacks CKS leveled at Applicant? Consider the effect of this path on CKS's claim that use of IOLTA accounts (well disclosed in open court, and known to all the creditors, and not complained of by anyone until many years later) is an automatically illegal commingling of client funds justifying disbarment, and CKS's many other allegations which were not sustained. It would have been immaterial. Now CKS suggests that the removal and replacement of the former plan trustee shows he was found to have committed wrongdoing sufficient to bar him from exoneration. But that's the point: it isn't true, because no wrongdoing had to be found to remove him or replace him, since this could be done without cause, just because the plan proponent and the voting creditors wanted to. So why has Matt Rosenstein demanded compensation for his efforts to drive up the costs and expenses in this case (even saying how much he wanted from the bankruptcy estate in case of any appeal), when it was clear from the Manges case cited to all the creditors in 1997 that the plan could be amended to change trustees without any

-20-

need to try to run up the $100,000 in billing that CKS ran up in the case? CKS did not prevail on any wrongdoing claims, until the opinion below, docket # 469. And that opinion is wrong. CKS has not proven wrongdoing in the other two forums where it pressed its claims.[5]  And this appeal is good. That is enough to support payment for exoneration.

5. <u>Primary Focus</u>. It is impossible that the "creditors' primary focus was obtaining accountings which Kaufman was require to provide" as stated by the bankruptcy court on p. 7 of docket # 469, R3608. Just a glance at the docket proves otherwise. Former plan trustee gave an accounting whenever one was requested. And most of the docket entries relate to other things, such as the years of litigation between CKS and the debtor, and then between CKS & Parkwell. And the court below expressly ruled on June 28, 2001 that Mr. Kaufman did not hide anything. R0806.

6. <u>Effect of Action Below</u>. Normally, it is not considered to be a primary purpose of the bankruptcy system to insure that reorganized debtors will leave bankruptcy as a millionaires. Normally, a bankruptcy court would try to avoid ruling in such a way that his creditors forfeit the million dollars the debtor owes them. Normally, the court will want to give plan trustees rulings that will enforce the plan, and not exempt those who owe from paying under it. That did not happen here. The evidence before the bankruptcy court tended to establish that the former plan trustee had figured out and stated a $ 1 million dollar claim against the Feldmans, and that would be hard to avoid having the Feldmans

---

[5] Judge Kazen's review of CKS's complaints left one live issue available for further investigation. And that claim of wrongdoing is demolished in footnote 4, p. 17 above.

-21-

liable for such sums unless some way could be found to undermine the former plan trustee's reputation and character. So the bankruptcy court tried to backtrack on his prior rulings that the former plan trustee had acted honestly, and in the opinion (which later analysis in this brief will show owes its character to positions taken by Matt Rosenstein) tried to speculate as to some possible wrongdoing. Normally, a bankruptcy court would want to be sure that the $1 million claim was dealt with first, and the alleged defenses to the plan trustee's fees were dealt with after they could no longer cut off the creditors rights to their payments from the debtor.

B. <u>Prior Adjudications</u>. The bankruptcy court basically ignored that any prior rulings had ever existed which might impact the decision below. But issues were raised whether res judicata and equitable, judicial, and quasi estoppel would keep the court from changing its mind.

1. <u>Res Judicata</u>. Some prior rulings raise the issue of res judicata.

a. <u>Denied Motion to Compel</u>. A final order of the bankruptcy court in 1997 (docket # 312, R0494) denied that Appellant should be required to do any more accountings. So it was not open to the bankruptcy court to decide, four years later, that Appellant owed to do more accountings then he actually did. This is not to say the court below could never change its mind. But it had to have a motion to change the prior order, and new grounds – change of circumstances or the like. And even so, having grounds to change, until the bankruptcy court altered the prior order, the plan trustee could not be penalized for acting in reliance on it. *See, e.g.,* <u>Hendrick v. Avent</u>, 891 F.2d 583 (5th Cir. 1990) (sale of cattle was approved by bankruptcy court, so it could not be complained

about later); In re Lambertville Rubber Co., 111 F.2d 45, 48 (3d Cir. 1940) (trustee cannot be liable for such actions as he takes pursuant to court order); In re B. A. Montgomery & Son, 17 F.2d 404, 407 (ND Ohio 1927) (Westenhaver, Dist. J.) (trustee could have used referee's order as defense against liability for distributing to wrong parties, but he failed to obtain one); Yadkim Valley Bk. & Tr. Co. v. McGee, 819 F.2d 74 (4th Cir. 1987) (held, cannot charge back against the trustee when he has acted in accordance with a court order, whether the order was a good one or a bad one).

        b. <u>Hired Someone Else to Do Them</u>. A final order of the bankruptcy court in 1997 (docket # 315, R 0496) hired an accountant, Al White, to do any further accountings that a creditor might want done (see the motion set out in docket # 287, R0457-R0474), in lieu of Appellant. Having once adjudicated that Al White would do what CKS wanted done in the future, not Appellant, the bankruptcy court was not at liberty to conclude that Appellant owed to do that work instead, at least until the prior order was vacated.

        c. <u>No Complaint</u>. No complaint of the quality or nature of the accountings actually furnished was made for nearly four years. Apart from the reliance (estoppel), ratification (quasi estoppel) and the like discussed below, this raises the defense of laches, which would also bar future complaints.

        d. <u>Judge Kazen's Ruling</u>. The federal district court had previously heard all CKS's complaints about Appellant's accountings, and ruled against them. Although a trustee or other representative of the bankruptcy estate is normally not bound by the acts of creditors unless ALL of them were bound; *see e.g.*, In re Leasing

-23-

Consultants, Inc., 592 F.2d 103 (2d Cir. 1979) (debtor's wrong did not bar trustee under doctrine of pari delicto, because trustee also represents creditors, and they were not all guilty of wrongdoing); and *see also*, Chatz v. Bloom, 34 N.E. 2d 889 (Ill. App. 1st 1944); Hannover Corp. of America v. Beckner, 211 B.R. 849, 858 (MD La. 1997) (Berrigan, Dist. J.); In re Hanson, 309 F.Supp. 810 (D Minn. 1970); John R. Lewis, Inc. v. Newman, 446 F.2d 800 (5th Cir. 1971); In re Royale Airlines, Inc., 98 F.3d 852 (5th Cir. 1996); Schneider v. O'Neal, 248 F.2d 914 (8th Cir. 1957); Scholes v. Lehman, 56 F.3d 750 (7th Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995); *compare contra*, In re Dublin Securities, Inc. (Terlecky, Trustee v. Hurd), 133 F.3d 377 (6th Cir. 1998); In re Granite Partners, L.P., 194 B.R. 318 (Bkcy., SD N.Y. 1996). Here all the creditors had been in the case for many years, and none had any different defenses or fact issues to raise. None of them disavowed the actions taken by CKS and they were in privity with CKS. *See e.g.*, In re Medomak Canning Co. (Bezanson v. Bayside Ents., Inc.), 922 F.2d 895, 903 in note 6 (1st Cir. 1991) (unsecured creditors and trustee of bankruptcy estate were "privies" to each other post petition). So an adverse ruling against CKS by the district court bound the rest of them, too; and if all were bound, this thereby likewise bound the replacement plan trustee, Mike Boudloche. And if res judicata and collateral estoppel did not bind Mike Boudloche, this Court ought to reach the same result by applying the doctrine of *stare decisis*.

        e. Changed His Own Ruling re: Accountings. It is not unknown for two rulings, made at different times in the same case, to look like they were made by two different judges in two different cases. That often happens when a different party

prevailed, and a different lawyer wrote the court's findings and opinion on the second occasion.  But the bankruptcy court's power to disregard its own prior rulings is not unlimited.  It cannot disregard res judicata and collateral estoppel to reach different results on a later occasion.  Docket # 469, R3602 et seq., violated that rule in at least three ways.  First, the bankruptcy court disregarded docket #312.  Second the bankruptcy court disregarded docket #315.  Third, the bankruptcy court disregarded its own prior rulings of June 28, 2001 (docket #444, R2798-R2811).  Contrary to the assertion in Docket # 469, Docket # 444 did not state that any insufficiency of the seven prior accountings (raised for the first time many years later) was "good cause" to remove the former plan trustee, nor that it justified giving the former plan trustee nothing for trustee's fees.  "Good cause" does not appear in Docket # 444.  No Rule 60(b) grounds were pled nor stated for changing the prior ruling, nor was any new evidence offered, nor was any new evidence received, on the point.   And if the bankruptcy court did have a procedural right to change its mind, it was wrong on the merits to do so, because everyone was satisfied with former plan trustee's accountings until a new attorney came into the case four years later.

2.  Equitable, Judicial and Quasi Estoppel.  The privity of the replacement plan trustee with CKS's acts post-replacement will not only bring res judicata into play as a bar, but also make estoppel an effective bar.

a.  Reliance.  Given that Applicant relied on the lack of complaint to leave the accountings alone, and turn his attention to other things, (transcript not available, R3765), the four years would create ordinary equitable estoppel.

b.  Inconsistent Positions.  Judicial estoppel applies when a party

-25-

asserts one position in a judicial proceeding, and wins.  Then he or she cannot later take

an inconsistent position just because that benefits him or her.  In re Coastal Plains, Inc.

(Browning Mfg. v. Mims), 179 F.3d 197, 205-06 (5th Cir. 1999).  When CKS alleged that

plan trustee did not do enough and got relief based on it (i.e., the seventh accounting),

then judicial estoppel would bar CKS from later claiming that the plan trustee did too

much work, and so it is not compensable.  See also, FDIC v. Duffy, 47 F.3d 146, 152 at n.

7 (5th Cir. 1995) (having gained a conviction of Mmahat based on a theory of intentional

wrong, FDIC cannot now pursue Duffy on a theory that Mmahat's conduct was

negligence); Tennessee ex rel Sizemore v. Surety Bank, 200 F.3d 373, 382 (5th Cir. 2000)

citing Ergo Science, Inc. v. Martin, 73 F.3d 595, 598 (5th Cir. 1996).  When the debtor,

with the knowledge and acquiescence of all the creditors, moved to have the former plan

trustee involved in dealing with the claims objections, less than a month after the effective

date of the plan, see docket # 185, then they could not later change their minds and say

that the work was unauthorized or excessive or otherwise should not have been paid for.

   c.  Ratification and Other Forms of Quasi Estoppel.  Quasi estoppel

does not require reliance to bar a party from rescinding or disavowing an action.  Its theory

is that because a party accepted the benefit of a position, he or she is not permitted to

take a different one.  In re Davidson (Davidson v. Davidson), 947 F. 2d 1294, 1297 (5th

Cir. 1991); followed in In re Robb (Robb-Fulton v. Robb), 23 F.3d 895 (4th Cir. 1994) and

In re Sampson (Sampson v. Sampson), 997 F.2d 717 (11th Cir. 1993), et al. (having

secured the benefits of deducting spousal payments from income as "alimony" for tax

purposes, bankrupts would not be allowed to assert status of "property settlement" instead

for purposes of claiming such payments may be discharged in bankruptcy).  Having accepted the benefits of Al White as accountant for the estate, creditors cannot now be heard to complain that he should not have been delegated Mr. Kaufman's duties.  He was so delegated, the creditors knew it, Mr. White began performing his delegated duties, and so now creditors cannot object to it.  Likewise, having demanded and accepted the benefits of Applicant's work in this case, creditors are quasi-estopped from denying that the estate owes to pay for that work.

C. Misuse of the Texas Trust Code.  The bankruptcy court appeared to believe it could apply a provision of the Texas Trust Code to deny fees when a trustee is removed for cause.  That was wrong.

1. Scope of Act in This Plan.  The plan said the Texas Trust Act would apply only to the extent of the "rights, duties and responsibilities" of the plan trustee.  (This was no doubt intended to be an inducement to the bank, whose trust department operated under the Act all the time, to take on the job.)  "Rights" are things the plan trustee may do.  "Duties" are things the plan trustee must do.[6]  "Responsibilities" are things the plan trustee

_____

[6] And by the way, the assumption made by CKS in this case that there is always a duty to make an accounting is incorrect.  Sec. 704(7) of the Bankruptcy Code says a trustee may give out information about an estate when that is requested.  (The provision in Sec. 704(8) of the Bankruptcy Code for monthly operating reports and the like only applies to the person who is "operating a business" and so the person bound to make reports under it was always only Mr. Feldman, not the Applicant.)  Of course, provisions like Sec. 704(7) & (8) do not survive confirmation of a plan unless the plan so provides, and this plan didn't.  The Texas Trust Code also imposes a duty to account ONLY when it is demanded, or to the extent that the writing requires it more often.  See Sec. 113.151(a), first and last sentences, which say as follows:
   Sec. 113.151.  Demand for Accounting.
        (a) A beneficiary by written demand may request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later. * * * However, the trustee is not

-27-

must look after. None of these things includes remedies. The Texas Trust Act provisions dealing with remedies are not "rights, duties and responsibilities" of plan trustees. And if they were, they would be excluded by the express provisions in the plan, that the plan trustee may be liable only for actual damages, and then only if he has committed such bad faith or gross negligence as is the equivalent of an intentional tort.

a. <u>Not What the Plan Said</u>. Nothing in the Plan said that the bankruptcy court would deny 80% of fees if the form of an accounting, furnished creditors a few years back, later turns out not to be in exactly the same form as prescribed by the Texas Trust Code. Normally, in a court of equity, a minor error as to form like that is not sufficient to justify such denial of fees as a matter of substance. *See e.g.*, <u>In re Triangle Chems., Inc. ( Fanelli v. Hensley)</u>, 697 F.2d 1280 ( 5th Cir. 1983). So you wouldn't think a court, even a Texas state court, applying the Texas Trust Code, would have done what the court below did. Normally, one would think that after four years go by, it's a little late to be raising an issue of form that could have been corrected if it had just been mentioned four years earlier. Furthermore, as the bankruptcy judge pointed out on the record on February 22, 2002, it does not usually pass on fees earned post-confirmation, transcript not available yet, R3765 – the court did not in the Clinton Manges litigation, for example, which lasted some 22 years after bankruptcy was filed. The only reason the bankruptcy court would have heard these fees at all was because the former plan trustee bargained for that right back when he negotiated to be hired. R2680, last sentence of paragraph 2.

---

obligated or required to account to the beneficiaries of a trust more frequently than once every twelve months unless a more frequent accounting is required by the court.

That's a far cry from saying that the bankruptcy judge gets to make up any rule he wants, because he has to protect the "integrity" of the system. R3604. If the system's integrity is to be protected, then the court below should have considered this: how much integrity does it show for the system to: 1. help a debtor make off with $1 million in bankruptcy estate money after, 2. he was caught committing fraudulent conveyances at the outset, after 3. he was detected trying to keep over $200,000 in bank stock in the middle, after 4. he refused to prove that a single dollar of the $179,000 he kept for "expenses" was actually spent on an expense, docket #383, after 5. he was caught opening several new stores with the profits that were supposed to go to creditors; after 6. his tax returns (an exhibit to the Applicant's fee application, docket # 464, R3572 et seq.) show that he built up six-figure certificates of deposit and treasury bills which he was buying and selling during the plan term, and after 7. he was finally found to have stashed from the very beginning $650,000 in cash in the companies whose profits he was supposed to turn over to creditors.  A system with integrity looks at the reality of a debtor taking a million dollars from creditors and $7 million from the banking system,  instead of trying to manufacture complaints to stop the hired whistle-blower from making him play by the rules.  The first responsibility of a judge is to play the game according to the rules.  Prof. C. K. Kaufman, The Scientific Method in Legal Thought:  Legal Realism and the Fourteen Principles of Justice, 12 St. Mary's L.J. 77 (1981) (quoting Oliver Wendell Holmes).  It's when judges are playing by the rules that we know they are playing fair.  And the rules negotiated for were not a wholesale adoption of the entire Texas Trust Code as the court below claims at R3603 (though Applicant's performance was substantial performance under the Texas Trust Code,

contrary to the bankruptcy court's claim of continuous demands for accountings from 1995-2001, when the facts show that demands were not made after 1997 until 2001.) Anyway, since denying fees is not a right, a duty, nor a responsibility of the plan trustee, that provision of the Texas Trust Code was not adopted by this Plan. The Texas Trust Code is not an all or nothing proposition; it can be adopted in part and excluded in part. Sec. 113.001.[7] No attempt was made in the Plan to give bankruptcy courts an extra power to deny fees that they never had under ordinary bankruptcy law. But if one had, the Supremacy Clause of the Constitution makes federal bankruptcy law the supreme law of the land, and if any state rule of law conflicted with the federal bankruptcy law, the latter would prevail. See e.g., <u>Jones v. Keene Corp.</u>, 933 F.2d 209 (3d Cir. 1991), quoting <u>Perez v. Campbell</u>, 402 U.S. 637, 652, 91 S.Ct. 1704, ___ L.Ed.2d ___ (1971), to show that "If a provision of the Plan, a creature of federal law, conflicts with the law of a state, and the state law 'frustrates the full effectiveness of federal law, it is rendered invalid by the Supremacy Clause';" <u>State Unauthorized Practice of Law Committee v. Paul Mason & Assocs., Inc.,</u> 46 F.3d 469, 471 (5th Cir. 1995) (federal courts must be able to determine what non-lawyers may do under Federal Rules of Bkcy. Procedure Rule 9010(a) without having to defer to state law in making that determination, so state rules on unauthorized practice of law must give way to that under the Supremacy Clause); <u>In re White Motor</u>

---

[7] This section reads as follows:

Sec. 113.001. **Limitation of Powers**. A power given to a trustee by this subchapter does not apply to a trust to the extent that the instrument creating the trust, a subsequent court order, or another provision of this subtitle conflicts with or limits the power.

Credit Corp. (Volvo White Truck Corp. v. Chambersburg Beverage, Inc.), 75 B.R. 944, 17 C.B.C.2d 293 (Bkcy., ND Ohio 1987) (plan provision for no "successor liability" would pre-empt state law contra, because Supremacy Clause makes plan enforceable despite state law contra. Here, the reality is that the federal bankruptcy system works if attorneys make it work, and they make it work in exchange for getting paid, and if the state statute really was supposed to work in such a way as to keep them from getting paid after rendering substantial performance for ten years (a doubtful proposition at best), then the federal law would prevent state law from being effective to so undercut and destroy the federal system.

   b. <u>Ex Post Facto Wrongdoing</u>.  Suppose the plan had completely adopted the Texas Trust Act (which it didn't).  Suppose the court below thereby could have applied the Texas Trust Code provisions for removal for "cause" (which it couldn't).  And suppose the court's statement on June 28, 2001 (that the plan trustee did not make the KIND of accountings that the Texas Trust Code contemplates)[8] could be treated as an announcement of "cause" (which it wasn't).  Still the announcement would have been wrong.  The undisputed evidence shows that nobody asked for a Texas Trust Code style

---

   [8] And by the way, that view about the format of accountings raises another real problem. There is real question whether plan trustee was bound to use the Texas Trust Code form. The plan only adopted certain substantive rights, responsibilities and duties out of the Texas Trust Act. It did not adopt the Act in whole. Procedural formalities are exactly the kind of thing that often do not get imported when only limited state substantive terms get imported into a federal document. In any case, if the plan trustee had ever been bound to use the Texas Trust Code form, Sec. 113.001, quoted in footnote 6 above, says that the duty vanished with the 1997 order of the court below saying that CKS's motion for more accountings was denied. And Sec. 113.001 also indicates that the 1997 order was effective to ensure that the duty to make accountings in any particular form belonged to Al White, CPA, after he was hired, not to Applicant.

accounting at any time, from the very beginning until after April 27, 2001; and no

accounting was asked for at all from 1997 until after April 27, 2001.  So any complaint

had been waived by non-assertion at least from 1997 til 2001; and a waiver can be

retracted only on prospective reasonable notice.  *See e.g.*, Corbin on Contracts Sec. 723,

and the basic first year law school course in contracts.

        c.  Claims Issues Still Not All Ruled On.  It is not good "cause" to

remove a trustee that he failed to do the impossible.  If the plan had completely adopted

the Texas Trust Act (which it didn't), and if the bankruptcy court could have applied the

Texas Trust Code provisions for removal for "cause" (which it couldn't); and even if the

court's statement on June 28, 2001(docket # 444, R2798-R2811) (that the plan trustee

did not make a distribution to creditors) could be treated as an announcement of "cause"

(which it wasn't); still the court below was in error.  The undisputed evidence shows that a

distribution to creditors was impossible because the claims had and still have not been

finally fixed.  Even the other side's expert, Harrell Browning, admitted that such was the

case.  (Transcript not available, R3765).  The Court told Mr. Boudloche to try to settle out

the claims objections, so that the claims could be fixed, or he would set a date to try them.

(Transcript not available, R3765).  But if the bankruptcy court had $1 million in its registry

today, it could pay no creditors.  It still needs to know how much their claims are for.  And

the administrative expenses still have to be paid in full before creditors are entitled to

anything, and administrative expenses had not and still have not been fixed – they won't be

and can't be, until after this appeal is disposed of (and for a certain amount of time after

that).  It is familiar law in equity that courts cannot make people do the impossible, nor

-32-

penalize them because they cannot do the impossible.

d. <u>A Recent Invention</u>. The bankruptcy court (and the parties) thought that it was acting under federal law (amending the plan) when it announced it would order a new trustee. That meant it knew no cause was needed and none need be announced. What it said on June 28, 2001 could not possibly have been meant and understood as an announcement that the Court was replacing the former plan trustee because of the provisions of the Texas Trust Code. The order requested by the bankruptcy court from the United States Trustee's Office, submitted by it, and signed by the bankruptcy judge, said that the former plan trustee was being replaced by an amendment of the Plan (i.e., under the Bankruptcy Code). The Texas Trust Code, and its standards for replacing a trustee, was not even mentioned. So the position now taken, that the bankruptcy court thought it was somehow adjudicating wrongdoing, and announcing cause, is a recent invention.

D. <u>Benefit of the Estate</u>. The bankruptcy court had to admit that Mr. Kaufman's actions brought in the $200,000 on the bank stock. Other than that, the court below basically ignored Applicant's actions benefitting the bankruptcy estate, and how much money they would show that Applicant should get. This was because the bankruptcy court awarded only $50,000 for benefits of the estate exceeding a million dollars.

1. <u>$250,000 in Cash</u>. Mr. Kaufman's uncontroverted evidence was that he brought $250,000 in cash into the bankruptcy estate that otherwise would not have existed and that two other actions, creating or discovering the $1 million claim against the Feldmans, and preserving $1 million in going concern value and good will, were also

-33-

beneficial to the bankruptcy estate and deserved to be compensated for. Docket # 464, R3572-73.

a. <u>The Cases</u>. Even the $200,000 found by the court below shows it committed reversible error -- the size of the benefit is the limit on recovery for benefit of the estate, not 20% of that amount. The cases show that Applicant could have gotten $200,000 in fees for $200,000 worth of cash brought in. *See, e.g.*, cases cited in fn 3 & 4 above; and even <u>In re Taxman Clothing Co.</u>, 49 F.3d 310, 316 (7th Cir. 1995) cited by the court below shows this.

b. <u>$2 Million in Other Benefits</u>. The $2 million in other contributions - of making out a cause of action, and of preserving going concern value and good will, are both compensable benefits to an estate as well. *See e.g.*, cases cited in footnotes 3 & 4, above.

2. <u>What about Plan Trustee Service</u>. The award for benefit to the estate did not give Mr. Kaufman anything at all for his service as plan trustee. Yet Applicant served. Since the court below did not find Mr. Kaufman had committed an intentional tort, it had a duty to allow Mr. Kaufman to keep what he paid himself even if it had exceeded benefit to the estate, so long as it was paying for things relevant to work on behalf of an estate. Claims objections (still not resolved, since Parkwell sold its collateral and got paid millions, and may not have any deficiency claim remaining) may not add lots of dollars to an estate, but they have to be dealt with; it's the law; and things that cost a bankruptcy estate money are legally just as "beneficial" to the bankruptcy estate as bringing money in, when the law requires them to be done. <u>In re H.L.S. Energy Co., Inc. (State of Texas v. Lowe, Trustee)</u>,

-34-

151 F.3d 434 (5th Cir. 1998).

E. Disclosures; Expenses of the "Trust". Ignoring its previous ruling that Mr. Kaufman had not tried to conceal anything from anyone, R0806; and ignoring Judge Kazen's ruling that no wrongdoing had been shown in respect to any accountings, the bankruptcy court said it could deny fees as a sanctions for non-disclosure in the accountings, because "None of the accountings included information which would alert beneficiaries that the expenses of the trust might exceed its corpus". R3608.

1. Will Expenses Exceed Its Corpus? A lot of things are wrong with the Court's statement. First of all is the assumption that somehow, expenses of the trust are going to exceed its corpus. Not unless the replacement plan trustee and the court below are determined to give away $1 million of the bankruptcy estate's assets, they aren't! Applicant asked the court below, docket # 458, paragraph 9 - 9-D of fee application, not to treat the estate as being insolvent and having no further assets unless and until it had been finally adjudicated that the $1 million claims were no good. R2877-80. The court below ignored that request, but the request was a fair and reasonable one; and in any case no evidence was taken by the court that tended to say that the $1 million claim against the Feldmans was worthless. (In fact, the replacement trustee said in court on the record, transcript not available, R3765, that he would mediate the matter, so to the contrary, that is some evidence of value.)

a. Was It True. How could a plan trustee disclose that the estate was insolvent until he believed it was true? What Applicant told creditors in 1997 was that it was unlikely that a distribution would exceed $10,000. And it was bound to get worse: it

-35-

was abundantly clear that a lot of work still would have to be done to analyze the Feldman

documents, and see if he owed money. The real question at that time was how much

Applicant was willing to give up of his fees to see that creditors got a distribution.    That

was not a duty; it was completely voluntary, and many lawyers would not even consider

giving up something they have a legal right to keep.  If Applicant had no duty to do it, why

would he have a duty to disclose, in advance of the decision being made, that he was

going to do (or not do) it?

    b.  <u>Was it Material</u>.  Furthermore, how material was it that the

expenses owed for were or might be greater than liquid assets, when the former plan

trustee was willing to prosecute the litigation against the Feldmans for the $1 million

anyway?  The material question would have been, "how likely is it that we can get some

money in from the Feldmans?"  And the answer to that question came after the tax returns

were furnished cerca Thanksgiving, 2001.  Applicant was finally able to determine that it

seemed highly likely, a slam dunk that could be achieved on a motion for summary

judgment, and that is what the Proposed Final Report said in April, 2001.  See also R2879,

paragraph C.  But of course, that reckoned without the creditors and the bankruptcy court

siding with the efforts of the debtor to refuse to disclose how much money actually came

in during the plan term, and what it was actually spent on.  Normally discovery is virtually

automatic, and here the plan expressly called for the plan trustee to be given that

information, so it was not foreseeable by the former plan trustee that somehow that a

different rule would apply in this case.

    2.  <u>Silence Was a Legal Option</u>.  Another error in this statement is the

-36-

premise that any change in the estate's liquidity required an immediate disclosure to creditors. Evidently, if you pay your debts, you have to disclose that, whether people ask you or not. But unless a statute or regulation requires that, that isn't the law. Even the Texas Trust Code tells us that disclosures are not required unless people ask for them. Sec. 113.151(a) (first and last sentence). If nobody asked for any disclosure, none was required. Bankruptcy Code Sec. 704(7).[9] It is undisputed that nobody asked for any between 1997 and 2001. So the court below was wrong even under the Texas Trust Code, much less under federal law.

   a. It's a What?  Who Wrote the Opinion Below. Although the record does not reflect that Matt Rosenstein was ever asked to draft the opinion of the court below, Appellant believes that he did. The opinion below keeps calling the bankruptcy estate a "trust." (A footnote says the terms are interchangeable under the facts; which, even if true, is beside the point.) Of course, the "trust" was a bankruptcy estate. The plan calls it a "bankruptcy estate." That's what plans normally deal with. And usually all bankruptcy specialists would expect to think of a bankruptcy estate as a bankruptcy estate, not as a trust. In this case, however, Matt Rosenstein spent enormous efforts to try to make the bankruptcy estate into a trust so that the Texas Trust Code (allegedly) would apply to it directly, in contravention of such cases as Gonzales v. Parks, 830 F.2d 1033 (9th Cir. 1987); Koffman v. Osteoimplant Technology, Inc., 182 B.R. 115, 125 (D Md. 1995)

_____

[9] The exception for monthly operating reports under Sec. 704(8) only applies where a party is running a business in bankruptcy. So it applies to the debtor, Feldman, not the Applicant. See footnote 6.

-37-

(Smallkin, Dist. J.); In re Cajun Elec. Power Coop., Inc. (United States ex rel. Rural Utilities Service v. Cajun Elec. Power Coop., Inc.), 109 F.3d 248, 254 (5th Cir. 1997); *and see*, In re Davis (Davis v. Davis), 105 F.3d 1017 (5th Cir. 1997), all of which support the view that the bankruptcy law is paramount, not state law. And the bankruptcy court's original ruling on June 28, 2001 recognized Appellant's point that the writing does not call it a trust, and bankruptcy plans need to say they are creating a trust before they can be so treated. Docket # 444, R R2798-R2811. The fact that the court's 2002 opinion uses the description "trust," instead, is a good indication that it was work of Matt Rosenstein, who was the one trying to think in those terms.[10] So what does that mean? Well, it means that Matt Rosenstein was not working on this case for the last ten years; that's what it means. So he blithely would have no qualms writing something like "most of the work was done to protect Mr. Kaufman's reputation" – that's the reality he has tried to create since April 27, 2001; and since he wasn't there before, the work that was done from 1990 to April 26, 2001 has made no impression on his consciousness. Similarly, Mike Schmidt had only the one hearing under his belt when the ruling below came out. And the ruling below had nothing to do with what Mike Schmidt requested, it was all Matt Rosenstein's requested relief, though CKS may even lack standing to complain. In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1231 (7th Cir. 1990); Securities Invr. Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 328 (Bkcy., SD N.Y. 1999); In re The Mediators, Inc. (The Mediators, Inc. v. Manney), 105 F.3d 822, 826-27 (2d Cir. 1997); In re Coleman, 131

---

[10] Another factor tending to show that Mr. Rosenstein wrote it is that it always calls Mr. Kaufman just plain "Kaufman" and the bankruptcy judge usually shows more courtesy than that.

B.R. 59 (Bkcy., ND Tex. 1991).  So the "presumption of correctness" that one usually afford an experienced trial judge loses a lot of its lustre when someone else is writing the opinion below, and it is clear that the blind are leading the author of it.

        b.  <u>Case Not on Point</u>.  The court below cited a case for the proposition that disclosure is required.  But <u>In re Prudhomme</u>, 43 F.3d 1000, 1003 (5th Cir. 1995) was a case interpreting the statutory requirement to disclose adverse affiliations prior to employment under Sec. 327 of the Bankruptcy Code.  Because the disclosure there was required by statute, and was not something that required a request before the duty existed, the court felt it should provide a remedy.  That case did not say a plan trustee's discretion to do what he thinks best for the estate is lost, where no disclosure has been requested.  That case did not say that disclosures of estate business are always required, even when doing so might harm the estate.  That case had nothing whatsoever to do with what disclosures a plan trustee ought to make, as a matter of good business judgment, when an estate is not liquid -- but the plan trustee is willing to prosecute the recovery of assets for it anyway.  Note that in Chapter 7 cases, bankruptcy estates are normally never liquid.  And Chapter 11 cases are not very different -- why would we have all these cash collateral orders and like first day orders if liquidity was something to be expected of a Chapter 11 estate?  Lack of liquidity is the usual and customary problem in bankruptcy cases -- how to dispose of claims and property, since they need to be turned into cash.  It's having cash that is rare, not needing it.  That's why 90% of Chapter 11 cases end up failing.  Contingent fees are often offered in these cases, because there will often be no cash flow into the bankruptcy estate to go along with the lack of liquidity.  How

can the lack of liquidity be a thing of major interest to vulture funds and bankruptcy attorneys, when it is the usual and customary state of affairs for bankruptcy estates? Since the former plan trustee was always willing to continue with and to prosecute the litigation to make the Feldmans pay what they owed under the Plan, surely that was the most relevant and material fact, not whether the estate had lost liquidity in the four years since anyone had asked what its assets were.

c. <u>Decision Below Amounts to Saying:  Why Didn't the Plan Trustee Disclose the Guy Was Bankrupt?</u>  The rule announced by the court below makes no sense. The plan trustee had to disclose that the bankruptcy estate might not make money? Insolvent and illiquid is unusual, and must be disclosed?  That's why these people are BANKRUPT!  In the first place.  At all.  They are insolvent or illiquid, or both.  In every case. If someone is not insolvent in some sense of the word, he isn't even ELIGIBLE for bankruptcy in the first place, and a filing is considered to be in bad faith.  (And, as discussed below, only in 1.5% of Chapter 11 cases will an unsecured creditor be promised any money.)  Every pleading in the case disclosed it was a bankruptcy case, and everyone in the case knew what that meant.  If lawyers are held by judges to be guarantors of the solvency and liquidity of the bankruptcy estates on which they work (however litigious or unreasonable the creditors are), then lawyers just cannot afford to work on bankruptcy estates for those judges.

d. <u>Hired CPA</u>.  The court's statement about the illegality of the prior accountings flies in the face of its own prior orders.  What the accountings said must be legally okay.  They cannot be legal wrongs unless the prior court orders (not to mention

Judge Kzaen's subsequent order) were void.  The court's statement can be true only if disclosure was so fundamentally a positive, non-delegable duty that any court order to the contrary was void.  But docket #312, R0494, on September 25, 1997 denied CKS's motion for more accountings.  And by docket # 315, R0496, on October 15, 1997, Al White, a CPA, was specifically hired to give CKS (or any other creditor) whatever accounting-type information it might ever be interested in having.  If the order hiring him for that purpose was not so fundamentally wrong that it was void, then it stands, and the former plan trustee's disclosure duties were delegated to Al White.  And CKS did not ask Al White for any more information along that line.  So unless the court's order hiring Al White was void for illegality, the opinion and order below were wrong.  And of course, the order denying that Applicant would furnish further accountings also had to be so illegal as to be void before it could be ignored by the opinion and order below.

> e.  No Creditor Asked.  Normally rights possessed by a beneficiary of a contract may be waived by the person for whose benefit the provision was made.  *See e.g.*, Corbin on Contracts, §752 (3d Ed. 1964).  The court's decision below must be taken as a holding that some rights (i.e., to disclosure) are inherently non-waivable.  But usually a statute must at least positively require something (if it does not expressly forbid a waiver), before that requirement can be non-waivable.  It makes no sense to hold that plan trustees have a duty to cram data down the sensors of hapless creditors, whether they want the data or not.  And why would creditors want this data; they already KNEW they'd be lucky to get $10,000.  They moved to convert to Chapter 7 on the ground the Chapter 11 case was going to make them no money.  And anyway, no known authority supports the position

-41-

that a plan trustee has to disclose what his creditors already know.  So  Applicant could

not be guilty of a wrong.  Creditors had gotten all the data they wanted, and they knew to

bother Al White, CPA,  if they wanted more.   No creditor asked for another accounting

after the 1997 orders until after the proposed final report was filed in April, 2001.

       f. Experienced Creditors Already Know Better.  Nobody involved with

this case was unknowledgeable about bankruptcy.  CKS is an entity of the sort often

described as a "vulture fund."  It bought FDIC and other such agencies' bad loans.  This is

known to be high-risk business, much more risky than mere commodity futures, or the

like.  Parkwell's group includes attorneys, and its counsel has practiced bankruptcy law for

many years.  These people have all been around.  And they know, as we all do, it is a

fundamentally untrue idea that creditors normally think that having a claim against a

bankruptcy estate is a money-making proposition.  Most Chapter 11 cases fail (90%)

without a plan being confirmed.  Of the 10% which remain and in which a plan is

confirmed, in 85% of those cases, unsecured creditors are told that they are going to get

nothing, and only get an average of 8% when they do get paid.  *See e.g.,* Petitioning

Creditors of Melon Produce, Inc. v. Braunstein, 112 F.3d 1232, 1238 (1st Cir. 1997).  So

only in 1.5% do general creditors get anything; and even there, the promise is better than

the performance.    Charles Jefferson, FDIC's attorney, thought they would get nothing.

And CKS was never told things would be better in this case than in most cases, until the

final report indicated that former plan trustee ought to be able to get something out of Mr.

Feldman for not paying all his income to creditors.  So a dedicated and experienced

bankruptcy professional was in a position to pull off a miracle for the unsecured creditors

in the Feldman case before CKS, Parkwell and the Debtor worked so desperately to grab defeat from the jaws of victory by taking Mr. Kaufman off the case. It is not and was not true that, without lots and lots of disclosure, bankruptcy creditors generally, or in this case specifically, would be thinking that any particular bankruptcy would normally be their own personal lotto machine (Mr. Feldman may feel he hit the lotto, and so far he would be right, but his creditors are in a different position -- nobody is trying to help THEM make off with $1 million of bankruptcy estate money. Applicant would have thought that Mr. Feldman should have felt he was on a roll when Applicant offered to settle out his liabilities for $225,000 reliance damages, instead of demanding the full $1 million potential expectancy liability -- especially when he had $650,000 or so in cash socked away in the various Feldman entities at the time the Plan was confirmed, without effective disclosure of this to his creditors. See generally the Proposed Final Report, R1305 (Docket # 383), and the complaint in the adversary proceeding (adversary proceeding docket #1).

　　　　3. But Look at the Facts. And that quoted statement misstates the facts, too. The Applicant's writings did adequately disclose a possibility that creditors might get nothing at all.

　　　　　　a. King Log vs. King Stork. The former plan trustee's Fifth Accounting, docket # 272, paragraph 2, in April, 1997, R2680, discussed King Log and King Stork, and how CKS's demands for work were going to eat up in administrative expenses the entire amount of funds generated under the Plan.[11] R2680. That was an

---

[11] The passage in question, R 2680, explains why the funds were disappearing by the use of an analogy to Aesop's fable:

-43-

adequate disclosure that creditors might get nothing.

      b. <u>Lucky to Get $10,000</u>. The former plan trustee's Sixth Accounting was heard, docket # 284, paragraph 1, in July, 1997, and concluded docket # 306, in September, 1997. It disclosed that CKS, at a time when it was claiming to be 90-95% of the creditors would be lucky to get $10,000 in total on a final distribution.[12] R2665. That was an adequate disclosure that creditors might get nothing.

      c. <u>Moved to Convert</u>. In response to the Sixth Accounting, CKS tried to convert the case to Chapter 7. Docket #278, response by plan trustee in Docket # 281. This conduct was an admission that CKS understood that Applicant thought they were going to get nothing or practically nothing under the facts known at the time.

---

"2. * * * Mr. Kaufman determined that the creditors felt his job was to be, to use the analogy of one of Aesop's Fables, "King Log" rather than "King Stork." (You know the fable: A pond of frogs, having seen that their neighboring societies all had kings, petitioned the gods for a king. The gods sent them King Log. After a while the grogs noticed that the Log wasn't doing anything to them particularly; so they petitioned the gods for a more active king. The gods sent them King Stork, who promptly began eating them all up. When the complained to the gods for the third time, the gods refused to intervene, pointing out that the frogs had gotten exactly the kind of king they had asked for, and now must take the consequences.) Mr. Kaufman, having experience with the bankruptcy rule that any action done by a trustee which has been blessed by the Court may not thereafter be questioned by anyone else, negotiated for the right to ask this Court to pass on any distributions or accountings he might make."

In Paragraph 3 of this writing, same page, R2680, Applicant explained that CKS was the outfit forcing Applicant to be King Stork, and to expend the estate's assets on court hearings.

[12] The passage in question, R2665, was written at a time when CKS was claiming to be the holder of 95% of the claims in the bankruptcy estate, and reads as follows:

"1. <u>The Reaction to the Fifth Report</u>. As the Court is aware, much litigation post-petition has been initiated or caused by one creditor, an assignee of the FDIC in Dallas named CKS. This has resulted in court proceedings and consequent legal work causing otherwise unnecessary expenditures of estate funds. The legal work caused by CKS, who is probably going to get paid in the vicinity of $10,000 * * *."

-44-

d. <u>The Other Million Dollars</u>. The facts show that former plan trustee could not have properly disclosed that the estate was insolvent, anyway. It wasn't true. As long as Mr. Feldman owed the $179,000 he kept for "expenses" and the $1 million for his other defaults in carrying out the Plan, the estate was not insolvent. The a million dollar claim against the Feldmans still exists in the adversary proceeding which former plan trustee was prosecuting; and Applicant would have prosecuted the claim, and obtained funds for creditors but for the creditor's actions which prevented him.

4. <u>Best Disclosure Possible</u>. It would have been wrong for Applicant to tell creditors at any time: "You definitely will get nothing, as expenses will exceed assets." Until it is known how much the Feldmans will pay of the $1 million they owe, one cannot say whether expenses will exceed assets. Assets have to be liquidated before you know how much they are worth. That having never been certain in this case, no disclosure could ever take a positive, absolute position on how much creditors would have or even now will get.

F. <u>Court Below Refused to Wait and See</u>. Applicant wanted to see how much money would be realized from the Feldman liabilities to the bankruptcy estate, but waiting to find out was not an option for him. He had to file his fee application when he did, because the bankruptcy court ORDERED HIM TO DO SO AT THAT TIME. No waiting to see how much Feldman owed. No resolution of the disputed claims amounts of Parkwell and CKS's claims. (One might have thought a case that had taken twelve years to resolve already could take a couple of months longer, since these other matters would prevent the case from concluding anyway; but that was not the decision of the court below.) Applicant

-45-

specially and specifically pointed out that it was improper to treat the estate as insolvent and to deny Applicant's fees on that basis (because the Feldman liabilities were not yet liquidated).  Docket # 468, paragraph 9 to 9-D; R2868 - R2880.  The court owed to liquidate the Feldman claims first.

       1.  <u>Refused to Liquidate</u>.  The court below ignored that the assets were not yet liquidated, and just assumed, without evidence to support it, that the Feldman adversary claims were without value.  (Of course, the court's actions tended to reduce that value, but even so, there was no evidence introduced by anyone of a zero value for these claims.)

       2.  <u>Wrong Standard</u>.  The court below also has in recent years consistently refused to apply the rule adopted by the 1978 Bankruptcy Code, that "competitive equality" is the standard for payment of fee applications, not "economy of administration."  R3605, where the court below says "economy is the most important principle in awarding fees" citing <u>First Colonial</u>, a case decided prior to the 1978 Bankruptcy Code.

       a.  <u>The Law Is Clear</u>.  The law is clear: "economy of administration" is an obsolete rule.  It was the basis for bankruptcy attorney compensation before the 1978 Code was adopted.  <u>In re Roswick</u>, 231 B.R. 843 (Bkcy., SD N.Y. 1999) at p. 860 (first and second sentence), citing <u>Collier on Bankruptcy</u>, a well-known treatise, to show that "Congress clearly disagrees" with that principle today; <u>In re The Bennett Funding Group, Inc.</u>, 213 B.R. 234, 250 (Bkcy., ND N.Y. 1997), citing <u>In re Ames Dept. Stores, Inc.</u>, 76 F.3d 66, 71 (2d Cir.1996), <i>et al.</i>, to show the same.  "Parity in payment" is the theory of bankruptcy compensation today.  <u>Roswick</u>, <i>supra</i>, citing <u>In re The Bennett Funding Group,</u>

Inc., 213 B.R. 234, 250 (Bkcy., ND N.Y. 1997); In re Busy Beavers Bldg. Centers, Inc., 19

F.3d 833, 848-856 (3rd Cir. 1994); In re Apex Oil Co. (Novelly v. Palans), 960 F.2d 728,

733 (8th Cir. 1992); In re Nucorp. Energy, Inc., 764 F.2d 655, 658 (9th Cir. 1985); and In re

Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 15-16 (Bkcy., SD N.Y. 1991) to

demonstrate that rule.

        b. Not Disputed.  The facts were undisputed that Applicant actually

charged all his other cases at the same rate as he charged the Feldman bankruptcy estate.

R2875.  So he should have been paid at those rates.  The court thought that $50,000

would be ample compensation for ten years of work, $5,000 a year.  If one pays his or her

yardman $100 a week, that is $5,200 a year.  Under the court's standard, yard men get

paid more money than lawyers do.

        c. Ineffective Economics.  The reasons Congress abandoned

"economy of administration" continue to apply, and they apply to this case.  If bankruptcy

attorneys get as much money from a bankruptcy court in a bankruptcy case as they would

get representing private parties, then they will be willing to work for the bankruptcy estate

to the same extent they would be willing to work for private parties.  So bankruptcy estates

will be able to get work done whenever assets will be realized from that work.  Here $1

million could be recovered from the bankrupt for breach of his promise to pay contained

in the plan.   But everyone jumped on the former plan trustee to keep him from getting

that $1 million.  It's weird.  Nobody wants to do their own job, and especially nobody

wanted Mr. Kaufman to do his job.  Sure, CKS and Parkwell can walk away and decide

they don't want any of the money Mr. Feldman owes them.  They can leave him as a

-47-

bankruptcy millionaire. It's fine if they want him to be someone who paid only a half million (less $179,000 which he kept for "expenses") while getting rid of $7 million in debt and making a million dollars from the estate for himself, all at the expense of the taxpayers and the FDIC's insurance fund. But however well they want to treat Mr. Feldman, they don't have a right to take Applicant's money away. They don't have the right to try to destroy Applicant and his 32-year career as a bankruptcy attorney and law professor, to try to take his bar license, just to keep Applicant from getting his money for ten years of dedicated work.

VII. Comment.

Because of an error at the clerk's office, Appellant's deadline to file this brief started running before the transcripts were done and able to be put in the record, and thus before the documents were numbered. Applicant was left with only a week or less to complete this brief, and meet the filing deadline. So record page number references could not be completed perfectly (transcript references particularly). Applicant would be pleased to file an amended brief with perfect record references when these become available, if the Court would like. Gwen Jones at the Clerk's office said she can supplement the record, and will send a supplementary record to you; but she cannot amend any filing deadlines. Thank you for your time and tolerance.

VIII. Conclusion.

The bankruptcy court ignored that Applicant had earned the money applied for, that Applicant's efforts had created (or at least discovered) $250,000 in cash that came in from the bank stock and Feldman Valley-Wide, not to mention the $1 million asset in the

-48-

form of the liabilities of the Feldmans to the bankruptcy estate, which more than justified even greater compensation than had ever been paid, that no intentional tort had been proven sufficient to authorize taking any money back, that any complaints about accountings or the like had been resolved four years before and no retraction of any prior waivers had ever been issued, that it is improper to treat Applicant's actions as illegal *ex post facto* and without notice, when they were proper when done, and done in compliance with and in reliance on the prior orders of the bankruptcy court. As a result, the decision below should be reversed, and a decision should be rendered here allowing Applicant the fees applied for.

WHEREFORE, PREMISES CONSIDERED, Applicant respectfully asks the Court to reverse the decision below, and render judgment that Applicant's fees and expenses be allowed (in the amount of cerca $454,000) as submitted.

Respectfully Submitted,

Colin Kelly Kaufman in propria personam
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone (361) 888-8865
Telecopier (361) 888-8172

### Certificate of Service

I certify I had one of the personnel at this law office serve the foregoing writing on the persons shown on the Appeal Service List which follows, by U.S. mail, first class postage prepaid, this 25th day of April, 2002.

Colin Kelly Kaufman

-49-

<u>Appeal Service List</u>

1.  Matthew A. Rosenstein, Esq.
    420 American Bank Plaza
    Corpus Christi, TX. 78475

    FAX (361) 883-5590

2.  Richard Grant, Esq.
    3102 Oak Lawn #700
    Dallas, TX. 75219

    FAX (214) 777-5082

3.  Michael B. Schmidt, Esq.
    712 American Bank Plaza
    Corpus Christi, TX. 78475

    FAX (361) 884-6000

4.  Ron Simank, Esq.
    Schauer & Simank, Attys.
    615 N. Upper Broadway, Ste. 2000
    Corpus Christi, TX. 78476

    FAX (361) 884-2822

5.  James P. Moon, Esq.
    1401 Elm St., Suite 3300
    Dallas, TX. 75202-2946

    FAX (361) 931-1452

6.  Colin Kelly Kaufman
    P. O. Box 1662
    Corpus Christi, TX. 78403-1662

    FAX (361) 888-8172

*Exhibit to Part VII*
*Comment, p.48.*

# COLIN KELLY KAUFMAN
# ATTORNEY AT LAW
1106 Third Street 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone (361) 888-8865 - FAX (361) 888-8172

Board Certified, Business & Consumer Bankruptcy Law, Texas Board of Legal Specialization

April 18, 2001

Ms. Sharon Russell, Deputy Clerk
United States Courts, SD Texas, CC Div.
1133 N. Shoreline
Corpus Christi, TX. 78401

Re:    Charles B. Feldman dba Charles B. Feldman
       Investments, Bkcy. Case 90-01254, Appeal #
       02-05 and # 02-06, Dist. Case # B-02-073
       & B-02-074, before Hon. Hilda G. Tagle

Dear Ms. Russell:

Thanks very much for your time in the captioned bankruptcy appeals. Yesterday our office received your letter transmitting the Record on Appeal. It seems only two items were sent.

Although Rule 8006 does provide for appealing parties to furnish the clerk with a copy of the items designated, it does not furnish the time limit for that action. The time limits for completing the record on appeal are derived from Rule 8007, Rules of Bankruptcy Procedure. Rule 8007(a) says that ordering transcripts means that the reporter should disclose when he or she expects to complete the transcript, and send a copy of the order form with that due date indorsed on it, to the clerk of the district court or bankruptcy appellate panel. It says normally the transcripts will be completed within 30 days, unless the reporter applies for extra time. Only on the completion of the transcripts does it become ripe for the clerk to transmit the record on appeal. So receipt of the transcripts creates the deadline to look at, for an appellant to furnish the copies of the writings as a record to the clerk, for transmittal to the appellate district court.

We ordered transcripts (five or six of them) the day the record was designated, and got a cashiers check and tendered it to the clerk for the estimated cost of transcripts, the day after we were told what the estimated cost was. 30 days have not passed. We have not been told a transcript is ready. We timely tried to complete a record for the appeal.

It is my custom to assemble all the documents which make up the record on appeal (including transcripts), and furnish them to the clerk's office in chronological order, all

-1-

pages numbered consecutively. We do this when the transcripts are done, and that kind of consecutive numbering thereby becomes possible. If the record is numbered this way, the briefs can refer to the record with a simple page number, and the appellate (district) judge's time spent finding citations to the record is much reduced. If someone demands that a record be furnished, or transmits one to the District Court BEFORE the transcripts are completed, then it becomes impossible to number the record consecutively. And so it enormously increases the burden on the district judge to have to look up documents by their docket numbers, and then after finding the document, again look up the appropriate page of each such docket number, just to check a cite.

However, one has a duty to submit a brief, even without transcripts, and so even without page numbering of the record, once a clerk transmits it to the district court. Rule 8009(a)(1) requires the appellant's brief to be filed 15 days after the district clerk dockets the appeal. We are not aware of the rules giving an excuse for timely filing of the brief if no transcripts existed when the record was sent, so the record could not possibly have been complete when the appeal is docketed. Besides the extra burden placed on the district judge, transmitting the record without awaiting completion of ordered transcripts forces an appellant to prepare a brief without them. The quality of the brief suffers.

Despite these difficulties, we hope to make the least waves possible. So we propose to go forward and file our brief with the district court. The brief will just cite to the designated record by each document's docket number, and then to the appropriate section or page of the document, instead of citing a (non-existent) single integrated record page number.

If you still want them, we will go ahead and furnish the clerk's office with the writings we assembled when we designated the record some weeks back, waiting on the transcripts to send them over to the clerk's office. Or we can send the copies of the documents to Brownsville. Or we can send one set each place. Please let us know.

Sincerely,

Colin Kelly Kaufman

CKK:

Copies to:    Hon. George P. Kazen, Esq.
              Hon. Hilda Tagle, Esq.
              Hon. Keith P. Ellison, Esq.
              Hon. Richard S. Schmidt, Esq.
              Charles B. Feldman
              Michael B. Schmidt
              Matthew A. Rosenstein

# UNITED STATES COURTS
# SOUTHERN DISTRICT OF TEXAS

## CORPUS CHRISTI DIVISION

**Michael N. Milby**
**Clerk**

**1133 N. Shoreline**
**Corpus Christi, Texas 78401**

April 11, 2002

Michael N. Milby
United States Federal Building and Courthouse
600 E. Harrison St.
Brownsville, TX 78520-7114

Re:   Charles B. Feldman dba Charles B. Feldman Investments
      Case No. 90-01254, Appeal No. 02-05

Dear Mr. Milby:

Enclosed please find certified copies of the following:

Notice of Appeal filed March 15, 2002
Appellant's Original Designation of Record and Issues on Appeal of Docket Numbers 469 & 470
Trustee's Designation of Additional Items to be Included in the Record
Court Docket Sheet
Record on Appeal

Sincerely,

Sharon Russell
Deputy Clerk

Enclosures

cc:   Judge Richard S. Schmidt
      Colin K. Kaufman
      Charles B. Feldman
      Michael B. Schmidt
      Matthew A. Rosenstein



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 1 1 2002

Michael N. Milby, Clerk

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES B. FELDMAN DBA | § | BANKRUPTCY CASE |
| | § | NUMBER 90-01254-B-11 |
| CHARLES B. FELDMAN | § | |
| INVESTMENTS | § | |
| | § | |
| DEBTOR | § | APPEAL NUMBER 02-05 |

---

## RECORD ON APPEAL

The following items are included in this transmittal of Record on Appeal and are undocketed items:

1. All Exhibits offered by CKS and admitted at trial held on June 22, 2001;

2. All Exhibits offered by CKS and admitted at trial held on February 22, 2002

*****************************

Appellant, Colin K. Kaufman's, Designation of Record and Issues on Appeal of Docket Numbers 469 & 470 was filed on March 25, 2002. Items to be designated were listed, but no copies of these items were attached.

DATED at Corpus Christi, Texas, this 11th day of April, 2002.

MICHAEL N. MILBY, CLERK

*Sharon L. Russell*
Sharon Russell, Deputy Clerk

# UNITED STATES COURTS
# SOUTHERN DISTRICT OF TEXAS

## CORPUS CHRISTI DIVISION

**Michael N. Milby**
**Clerk**

**1133 N. Shoreline**
**Corpus Christi, Texas 78401**

April 11, 2002

Michael N. Milby
United States Federal Building and Courthouse
600 E. Harrison St.
Brownsville, TX 78520-7114

Re:    Charles B. Feldman dba Charles B. Feldman Investments
       Case No. 90-01254, Appeal No. 02-06

Dear Mr. Milby:

Enclosed please find certified copies of the following:

Notice of Appeal filed March 15, 2002
Appellant's Original Designation of Record and Issues on Appeal of Docket Numbers 469 & 470
Trustee's Designation of Additional Items to be Included in the Record
Court Docket Sheet
Record on Appeal

Sincerely,

Sharon Russell
Deputy Clerk

Enclosures

cc:    Judge Richard S. Schmidt
       Colin K. Kaufman
       Charles B. Feldman
       Michael B. Schmidt
       Matthew A. Rosenstein



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 11 2002

Michael N. Milby, Clerk

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES B. FELDMAN DBA | § | BANKRUPTCY CASE |
| | § | NUMBER 90-01254-B-11 |
| CHARLES B. FELDMAN | § | |
| INVESTMENTS | § | |
| | § | |
| DEBTOR | § | APPEAL NUMBER 02-06 |

---

### RECORD ON APPEAL

The following items are included in this transmittal of Record on Appeal and are undocketed items:

1. All Exhibits offered by CKS and admitted at trial held on June 22, 2001;

2. All Exhibits offered by CKS and admitted at trial held on February 22, 2002

*****************************

Appellant, Colin K. Kaufman's, Designation of Record and Issues on Appeal of Docket Numbers 469 & 470 was filed on March 25, 2002. Items to be designated were listed, but no copies of these items were attached.

DATED at Corpus Christi, Texas, this 11th day of April, 2002.

MICHAEL N. MILBY, CLERK

Sharon L. Russell

Sharon Russell, Deputy Clerk

AO435
(Rev. 1/90)

**ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS**

**TRANSCRIPT ORDER**

| FOR COURT USE ONLY |
|---|
| DUE DATE |

Read Instructions on Back.

| 1. NAME | 2. PHONE NUMBER | 3. DATE |
|---|---|---|
| Colin Kelly Kaufman | 361-888-8865 | |

| 4. MAILING ADDRESS | 5. CITY | 6. STATE | 7. ZIP CODE |
|---|---|---|---|
| P.O. Box 1662 | Corpus Christi | TX | 78403 |

| 8. CASE NUMBER | 9. JUDICIAL OFFICIAL | DATES OF PROCEEDINGS |
|---|---|---|
| 90-01354 | Schmidt | 10. FROM 06-22-01   11. TO 06-22-01 |

| 12. CASE NAME | LOCATION OF PROCEEDINGS |
|---|---|
| Charles B Feldman | 13. CITY Corpus Christi   14. STATE TX |

**15. ORDER FOR**

- [ ] APPEAL
- [ ] NON-APPEAL
- [ ] CRIMINAL
- [ ] CIVIL
- [ ] CRIMINAL JUSTICE ACT
- [ ] IN FORMA PAUPERIS
- [X] BANKRUPTCY
- [ ] OTHER (Specify)

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | *All* | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [ ] OTHER (Specify) | |
| [ ] SENTENCING | | | |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Free Copy for the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [ ] | [ ] | NO. OF COPIES | | |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES | | |
| DAILY | [ ] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |

| | ESTIMATE TOTAL | |
|---|---|---|

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

| SIGNATURE | PROCESSED BY |
|---|---|
| Colin Kelly Kaufman | |
| DATE | PHONE NUMBER |
| March 25, 2002 | |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | |
|---|---|---|---|
| ORDER RECEIVED | | | |
| DEPOSIT PAID | | | DEPOSIT PAID |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT |
| ORDERING PARTY NOTIFIED | | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | | |
| | | | TOTAL DUE |

AO435
(Rev. 1/90)

**ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS**

## TRANSCRIPT ORDER

*Read Instructions on Back.*

**FOR COURT USE ONLY**
**DUE DATE:**

| | | |
|---|---|---|
| 1. NAME *Colin Kelly Kaufman* | 2. PHONE NUMBER *361-888-8865* | 3. DATE |
| 4. MAILING ADDRESS *P.O. Box 1668* | 5. CITY *Corpus Christi* | 6. STATE *TX*   7. ZIP CODE *78403* |
| 8. CASE NUMBER *90-01254* | 9. JUDICIAL OFFICIAL *Schmidt* | DATES OF PROCEEDINGS |
| | | 10. FROM *06-26-01*   11. TO *06-26-01* |
| 12. CASE NAME *Charles B. Feldman* | | LOCATION OF PROCEEDINGS |
| | 13. CITY *Corpus Christi* | 14. STATE *TX* |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER (Specify) |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | *All* | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Free Copy for the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☒ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |

*Per Betty Anderson 4/5/02 — No hearing held, continued to 6-27-01*

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

SIGNATURE *Colin Kelly Kaufman*

DATE *Mar 25 2002*

ESTIMATE TOTAL

PROCESSED BY *6-27-01*

PHONE NUMBER *0*

TRANSCRIPT TO BE PREPARED BY

COURT ADDRESS

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | DEPOSIT PAID | |
| DEPOSIT PAID | | | TOTAL CHARGES | |
| TRANSCRIPT ORDERED | | | LESS DEPOSIT | |
| TRANSCRIPT RECEIVED | | | TOTAL REFUNDED | |
| ORDERING PARTY NOTIFIED | | | | |
| PICK UP TRANSCRIPT | | | TOTAL DUE | |
| PARTY RECEIVED TRANSCRIPT | | | | |

AO435
(Rev. 1/90)

**ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS**

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**
**DUE DATE**

*Read Instructions on Back.*

| | | |
|---|---|---|
| 1. NAME: *Colin K. Kaufman* | 2. PHONE NUMBER: *361-888-8865* | 3. DATE |
| 4. MAILING ADDRESS: *P.O. Box 1662* | 5. CITY: *Corpus Christi* | 6. STATE *TX*  7. ZIP CODE *78403* |
| 8. CASE NUMBER: *90-01254* | 9. JUDICIAL OFFICIAL: *Schmidt* | DATES OF PROCEEDINGS |
| | | 10. FROM *06-27-01*  11. TO *06-27-01* |
| 12. CASE NAME: *Charles B. Feldman* | | LOCATION OF PROCEEDINGS |
| | 13. CITY *Corpus Christi* | 14. STATE *TX* |

15. ORDER FOR

- [ ] APPEAL
- [ ] NON-APPEAL
- [ ] CRIMINAL
- [ ] CIVIL
- [ ] CRIMINAL JUSTICE ACT
- [ ] IN FORMA PAUPERIS
- [X] BANKRUPTCY
- [ ] OTHER (Specify)

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | *All* | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [ ] OTHER (Specify) | |
| [ ] SENTENCING | | | |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (includes Free Copy for the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [X] | [ ] | NO. OF COPIES | | |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES | | |
| DAILY | [ ] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

| | |
|---|---|
| 18. SIGNATURE: *Colin Kelly Kaufman* | PROCESSED BY |
| 19. DATE: *Mar 25, 2002* | PHONE NUMBER |

| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|

| | DATE | BY | |
|---|---|---|---|
| ORDER RECEIVED | | | DEPOSIT PAID |
| DEPOSIT PAID | | | TOTAL CHARGES |
| TRANSCRIPT ORDERED | | | LESS DEPOSIT |
| TRANSCRIPT RECEIVED | | | TOTAL REFUNDED |
| ORDERING PARTY NOTIFIED | | | TOTAL DUE |
| PICK UP TRANSCRIPT | | | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE |

AO435
(Rev. 1/90)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

FOR COURT USE ONLY
DUE DATE:

Read Instructions on Back.

| 1. NAME | 2. PHONE NUMBER | 3. DATE |
|---|---|---|
| Colin Kelly Kaufman | 361-888-8865 | |

| 4. MAILING ADDRESS | 5. CITY | 6. STATE | 7. ZIP CODE |
|---|---|---|---|
| P.O. Box 1663 | Corpus Christi | TX | 78403 |

| 8. CASE NUMBER | 9. JUDICIAL OFFICIAL | DATES OF PROCEEDINGS |
|---|---|---|
| 90-01354 | Schmidt | 10. FROM 09-12-01  11. TO 09-12-01 |

| 12. CASE NAME | LOCATION OF PROCEEDINGS |
|---|---|
| Charles B. Feldman | 13. CITY Corpus Christi   14. STATE TX |

15. ORDER FOR
- [ ] APPEAL
- [ ] NON-APPEAL
- [ ] CRIMINAL
- [ ] CIVIL
- [ ] CRIMINAL JUSTICE ACT
- [ ] IN FORMA PAUPERIS
- [X] BANKRUPTCY
- [ ] OTHER (Specify)

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | | |
| [ ] OPENING STATEMENT (Plaintiff) | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | | |
| [ ] CLOSING ARGUMENT (Defendant) | All | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | | |
| [ ] SENTENCING | | [ ] OTHER (Specify) | |
| [ ] BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL (Includes Free Copy for the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [X] | [ ] | NO. OF COPIES | | |
| ...DITED | [ ] | [ ] | NO. OF COPIES | | |
| DAILY | [ ] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |

*per Betty Anderson 04/13/05*
*no hearing held*
*agreed order signed & entered*

CERTIFICATION (18. & 19.)
By signing below, I certify that I will pay all charges
(deposit plus additional)

| 18. SIGNATURE | | ESTIMATE TOTAL | |
|---|---|---|---|
| Colin Kelly Kaufman | | | |
| 19. DATE Mar. 25 2002 | PROCESSED BY | | |
| TRANSCRIPT TO BE PREPARED BY | PHONE NUMBER | | |
| | COURT ADDRESS | | |

| | | DATE | BY |
|---|---|---|---|
| ...DER RECEIVED | | | |
| ...POSIT PAID | | | |

*Ordered*

| ...ANSCRIPT ORDERED | DEPOSIT PAID | |
|---|---|---|
| N... RECEIVED | TOTAL CHARGES | |
| ...ERING PARTY NOTIFIED | LESS DEPOSIT | |
| ...PICK UP TRANSCRIPT | | |
| ...Y RECEIVED TRANSCRIPT | TOTAL REFUNDED | |
| | TOTAL DUE | |

...us editions of this form may still be used)
PO 1999 761-436

ORIGINAL - COURT COPY

(Rev. 1/90)

**ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS**

**TRANSCRIPT ORDER**

FOR COURT USE ONLY
DUE DATE:

Read Instructions on Back.

| | | |
|---|---|---|
| 1. NAME  Colin Kelly Kaufman | 2. PHONE NUMBER  361-888-8865 | 3. DATE |
| 4. MAILING ADDRESS  P.O. Box 11662 | 5. CITY  Corpus Christi | 6. STATE  TX   7. ZIP CODE  78403 |
| 8. CASE NUMBER  90-01254 | 9. JUDICIAL OFFICIAL  Schmidt | DATES OF PROCEEDINGS  10. FROM 02-22-02   11. TO 02-22-02 |
| 12. CASE NAME  Charles B. Feldman | | LOCATION OF PROCEEDINGS  13. CITY Corpus Christi   14. STATE TX |

**15. ORDER FOR**

☐ APPEAL   ☐ CRIMINAL   ☐ CRIMINAL JUSTICE ACT   ☒ BANKRUPTCY
☐ NON-APPEAL   ☐ CIVIL   ☐ IN FORMA PAUPERIS   ☐ OTHER (Specify)

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | All | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Free Copy for the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

| | |
|---|---|
| 18. SIGNATURE  Colin Kelly Kaufman | PROCESSED BY: |
| DATE  Mar. 25, 2002 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | DEPOSIT PAID | |
| DEPOSIT PAID | | | TOTAL CHARGES | |
| TRANSCRIPT ORDERED | | | LESS DEPOSIT | |
| TRANSCRIPT RECEIVED | | | | |
| ORDERING PARTY NOTIFIED | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | |

**Frost National Bank.**
Member Cullen/Frost Bankers, Inc.
P.O. Box 1600  San Antonio, Texas 78296  Member FDIC

**Cashier's Check**

No. **10552558**

23-1354
440

April 10, 2002

PAYABLE THRU:
HUNTINGTON NATIONAL BANK
COLUMBIA, OH

Remitter:  **Colin K. Kaufman**

**One Thousand Eight Hundred Six Dollars and 00/100**

PAY TO THE ORDER OF

Judicial Transcribers

$    **$1,806.00**

DRAWER: FROST NATIONAL BANK
ISSUER ACCEPTS AS DRAWER/DRAWEE
AUTHORIZED SIGNATURE

"10552558"  ":044013543:  01400104513148"

---

**Frost National Bank**

**CUSTOMER'S COPY**
**NON-NEGOTIABLE**

April 10, 2002

10552558

Op:  0326
Payee:  Judicial Transcribers

Remitter:  Colin K. Kaufman

Amount:    $1,806.00
Fee:       $0.00
Total:     $1,806.00

re: Feldman Transcripts - 90-01254

dates:  6-22-01
Ordered 6-27-01
        9-12-01
        2-22-02

THIS DOCUMENT HAS AN ARTIFICIAL WATERMARK PRINTED ON THE BACK. ABSENCE OF THIS FEATURE WILL INDICATE A COPY.

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
APR -8 02
MICHAEL N. MILBY, CLERK

*(handwritten note)* "This was a check denied because it needed to be prepared by judicial memorandum on front & not the item's as shown on back of check as the interim measure (per memorandum service) new check requested."

23405/M #09030-H

*(signature)* Alexia Gonzalez
Name                    Branch #

**Frost National Bank.**                    **Cashier's Check**                    No. **10552497**

Member Cullen/Frost Bankers, Inc..
P.O. Box 1600  San Antonio, Texas 78296  Member FDIC

Remitter: Colin K. Kaufman                                        April 05, 2002

                                                                    25-1554
                                                                    440

PAY
TO THE
ORDER OF          Colin K. Kaufman                              $   **$1,806.00**

**One Thousand Eight Hundred Six Dollars and 00/100**

PAYABLE THRU
HUNTINGTON NATIONAL BANK
COLUMBUS, OH

DRAWER: FROST NATIONAL BANK
*(signature)* Rebecca Kircherer
AUTHORIZED SIGNATURE
ISSUER ACCEPTS AS DRAWER/DRAWEE

⑈10552497⑈ ⑆044015543⑆ 014001045134⑈

THIS DOCUMENT HAS AN ARTIFICIAL WATERMARK PRINTED ON THE BACK. ABSENCE OF THIS FEATURE WILL INDICATE A COPY

---

**Frost National Bank**

**CUSTOMER'S COPY**
**NON-NEGOTIABLE**

10552497

Op: 0321                                            April 05, 2002

Payee: Colin K. Kaufman

Remiter: Colin K. Kaufman                          Amount:      $1,806.00
                                                    Fee:            $0.00
                                                    Total:      $1,806.00

*(handwritten notes)*
Transcripts —
10-22-01
6-27-01
8-22-03

9-13-01

10-21-01

Pay to the order of Judicial Transcribers, Thanks!

Colin K. Kaufman



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT TEXAS
FILED

MAR 25 2002

MICHAEL N. MILBY, CLERK

IN RE:
Charles B. FELDMAN dba
Charles B. Feldman Investments
    Debtor

In Bankruptcy Case # 90-01254-B-11
Appeal # 02-06
In Chapter 11

Font: Korinna

COLIN KELLY KAUFMAN'S
ORIGINAL DESIGNATION OF RECORD AND ISS
OF DOCKET NUMBERS 469 & 47

*Note:* 4-18-02

*Except for the document appealed from, the two appeals are identical, so we enclose both first pages, & only one copy of the rest of the document. Thanks.*

TO THE HONORABLE UNITED STATES BANKRUPTCY JUD(

NOW COMES Colin Kelly Kaufman, former plan trustee

the Appellant, and for his Original Designation of Record and I

Numbers 469 (Appeal # 02-05) and 470 (Appeal # 02-06), res

follows:

I. Designation of Issues on Appeal.

Appellant hereby designates the following issues on his Appeal of Docket # 469 and

# 470:

1. Erred in Disallowing Fees. Whether the bankruptcy court erred in refusing to

approve the $454,000 fee bill submitted and in ordering a return of funds paid to the

former plan trustee, when:

    A. It Was Done. The bankruptcy court found that the work was done;

    B. Reasonable Rate. The bankruptcy court found that the rate was within

the range charged by bankruptcy attorneys in such cases;

    C. Was Agreed to. The bankruptcy court found that the former plan trustee

had, when he was offered the job, agreed to payment at an hourly rate for all his work in the

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | Appeal # 02-05 |
| Debtor | In Chapter 11 |

Font: Korinna

COLIN KELLY KAUFMAN'S
ORIGINAL DESIGNATION OF RECORD AND ISSUES ON APPEAL
OF DOCKET NUMBERS 469 & 470

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman, former plan trustee in the captioned case and

the Appellant, and for his Original Designation of Record and Issues on Appeal of Docket

Numbers 469 (Appeal # 02-05) and 470 (Appeal # 02-06), respectfully shows the Court as

follows:

I. Designation of Issues on Appeal.

Appellant hereby designates the following issues on his Appeal of Docket # 469 and

# 470:

1. Erred in Disallowing Fees. Whether the bankruptcy court erred in refusing to

approve the $454,000 fee bill submitted and in ordering a return of funds paid to the

former plan trustee, when:

A. It Was Done. The bankruptcy court found that the work was done;

B. Reasonable Rate. The bankruptcy court found that the rate was within

the range charged by bankruptcy attorneys in such cases;

C. Was Agreed to. The bankruptcy court found that the former plan trustee

had, when he was offered the job, agreed to payment at an hourly rate for all his work in the

1

case;

D. Intentional Tort Required.  The amendment to the Plan by which the

former plan trustee was appointed specifically required a finding of bad faith or such gross

negligence as would constitute an intentional tort to take any money from the plan trustee;

and there was neither evidence nor finding of any intentional tort;

E. Finding Required to Disallow.  Absent a finding of such an intentional tort

on the part of the former plan trustee, he was entitled to recover for all work done on

account of his service as former plan trustee, including work defending himself against the

charges made by creditor CKS Asset Management, Inc. and its president, Steve Ditto; and

F. Not the Major Work to Be Paid For.  Simply adding up the fees spent

defending against CKS's attacks shows it was cerca a fourth of the fees applied for, and so

the bankruptcy court erred in stating that "Kaufman's fees largely relate to opposing

requests for accountings and defending his own reputation" as stated by the bankruptcy

court on p. 7 of docket # 469;

G. Primary Focus.  Since the creditors didn't even ask for any accountings

between 1997 and April, 2001 (when 70% of the ten years of work was done), it is

impossible that the "creditors' primary focus was obtaining accountings which Kaufman

was require to provide" as stated by the bankruptcy court on p. 7 of docket # 469;

H. Effect of Action Below.  It was an abuse of discretion for the bankruptcy

court to deny former plan trustee's fees when the evidence showed that the natural effect of

this would be to cost the bankruptcy estate the value of its $ 1 million dollar claim against

the Feldmans, when that claim had not yet been liquidated.

2

2. Res Judicata: Judicial Estoppel. Whether the bankruptcy court violated principles of res judicata and equitable, judicial, and quasi estoppel by going back and redetermining that Appellant violated duties to give accountings in 1997 when:

A. Denied Motion to Compel. A final order of the bankruptcy court in 1997 (docket # 312) denied that Appellant should be required to do any more accountings;

B. Hired Someone Else to Do Them. A final order of the bankruptcy court in 1997 (docket # 315) hired an accountant, Al White, to do any further accountings that a creditor might want done, in lieu of Appellant;

C. No Complaint. No complaint of the quality or nature of the accountings actually furnished was made for nearly four years;

D. Judge Kazen's Ruling. The federal district court had previously heard all CKS's complaints about Appellant's accountings, and ruled against them; and

E. Changed His Own Ruling re: Accountings. The bankruptcy court's own prior rulings of June 28, 2001 did not state that any insufficiency of the accountings furnished was "good cause" to remove the former plan trustee, nor that it justified giving the former plan trustee nothing for trustee's fees; and no Rule 60(b) grounds were pled nor stated for changing the prior ruling, nor was any new evidence offered, nor was any new evidence received, on the point; and if the bankruptcy court did have a procedural right to change its mind, it was wrong on the merits to do so, because everyone was satisfied with former plan trustee's accountings until a new attorney came into the case four years later.

F. Changed His Own Ruling re: Payment. The bankruptcy court's own prior rulings of June 28, 2001 did not state that payment of fees in advance was "good cause" to

3

remove the former plan trustee, nor that it justified giving the former plan trustee nothing

for trustee's fees, and no Rule 60(b) grounds were pled nor stated for changing the prior

ruling, nor was any new evidence offered nor was any new evidence received on the point;

and if the bankruptcy court did have a procedural right to change its mind, it was wrong on

the merits to do so, because the former plan trustee had earned his fees and in any case

could have paid his fees in advance under the plan (as the bankruptcy court actually

admitted, last sentence on p. 4 of docket #469).

      G. Not Loans. The bankruptcy court's own prior rulings of June 28, 2001

never said that payment of fees for the proposed final report in advance would have been a

breach of fiduciary duty; and no Rule 60(b) grounds were pled nor stated for changing the

prior ruling, nor was new evidence offered or received; and if the bankruptcy court did have

a procedural right to change its mind; and if despite its admission in the last sentence of p.

4, Docket # 469, that "the plan did not prohibit the payment of a reasonable retainer" (i.e.,

the plan trustee could have paid himself in advance under the plan), if even so, the

bankruptcy court could still go on to make the statement, first sentence on p. 5, docket #

469, that payments for work "could be construed as loans from the trust, which would also

constitute a breach of fiduciary duty"; that finding would still be error on the merits because

a "loan" requires a duty or possibility of having to repay in cash or kind, and here the

payment was for work done and to be done, not for repayment in cash or kind, and no

evidence was ever offered or received tending to show that plan trustee ever thought any

fees he got would not be fully earned by work done and to be done.

      3. Applying Texas Trust Code. Whether the bankruptcy court erred in applying

4

provisions of the Texas Trust Code relating to denying fees when a trustee is removed for cause, when:

  A. <u>Not What the Plan Said</u>. The first amended plan said in Sec. 7.3, p. 8, that the Texas Trust Act would apply only to the extent of the "rights, duties and responsibilities" of the plan trustee; and denying fees is not a right, a duty, nor a responsibility of the plan trustee.

  B. <u>Ex Post Facto Wrongdoing</u>. Even if the plan had completely adopted the Texas Trust Act, and so Court could have applied the Texas Trust Code provisions for removal for "cause," and even if the court's statement on June 28, 2001 (that the plan trustee did not make the kind of accountings that the Texas Trust Code contemplates) could be treated as an announcement of "cause," still the undisputed evidence shows that nobody asked for a Texas Trust Code style accounting until after April 27, 2001, and any complaint had been waived by non-assertion from 1997 til 2001; and a waiver can be retracted only on prospective reasonable notice.

  C. <u>Claims Issues Still Not All Ruled On</u>. Even if the plan had completely adopted the Texas Trust Act, and so the bankruptcy court could have applied the Texas Trust Code provisions for removal for "cause," and even if the court's statement on June 28, 2001 (that the plan trustee did not make a distribution to creditors) could be treated as an announcement of "cause," still the undisputed evidence shows that a distribution to creditors was impossible because the claims had and still have not been finally fixed, and the administrative expenses had to be paid in full before creditors were entitled to anything, and administrative expenses had not and still have not been fixed.

5

D. <u>What They Did Was under Federal Law, Not State</u>. What the bankruptcy court said on June 28, 2001 could not possibly have been meant and understood as an announcement that the Court was replacing the former plan trustee because of the provisions of the Texas Trust Code; because the order requested by the bankruptcy court from the United States Trustee's Office, submitted by it, and signed by the bankruptcy judge, said that the former plan trustee was being replaced by an amendment of the Plan (i.e., under the Bankruptcy Code).

4. <u>Benefit of the Estate</u>. Whether the bankruptcy court erred in awarding only $50,000 for benefit of the estate to the former plan trustee, when:

A. <u>$250,000 in Cash</u>. Mr. Kaufman's uncontroverted evidence was that he brought $250,000 in cash into the bankruptcy estate that otherwise would not have existed, and the size of the benefit is the limit on recovery for benefit of the estate, not 20% of that amount;

B. <u>$2 Million in Other Benefits</u>. The uncontroverted evidence of Mr. Kaufman was that he had given the estate over two million dollars in other benefits; and

C. <u>What about Plan Trustee Service?</u> The award for benefit to the estate did not give Mr. Kaufman anything at all for his service as plan trustee.

5. <u>Expenses of the Trust</u>. Whether the bankruptcy court erred in ordering sanctions for non-disclosure because its ruling that, "None of the accountings included information which would alert beneficiaries that the expenses of the trust might exceed its corpus" when:

A. <u>Not a Trust</u>. It was not a trust, it was a bankruptcy estate;

6

B. <u>King Log vs. King Stork</u>.  The former plan trustee's Fifth Accounting (docket # 272) discussed King Log and King Stork, and how CKS's demands for work were going to eat up in administrative expenses the entire amount of funds generated under the Plan;

C. <u>Lucky to Get $10,000</u>.  The former plan trustee's Sixth Accounting (docket # 275) disclosed that CKS, at a time when it was claiming to be 90- 95% of the creditors would be lucky to get $10,000 in total on a final distribution;

D. <u>Moved to Convert</u>.  CKS moved in response to the Sixth Accounting to convert the case to Chapter 7 (docket # 278);

E. <u>Hired CPA</u>.  Al White, a CPA, was specifically hired (docket # 287 and # 315) to give CKS (or any other creditor) whatever accounting-type information it might ever be interested in having, and CKS did not ask Al White for any more information along that line;

F. <u>No Creditor Asked</u>.  No creditor asked for another accounting after the 1997 orders until the proposed final report was filed in April, 2001; and

G. <u>The Other Million Dollars</u>.  There is still a million dollar claim against the Feldmans which former plan trustee was prosecuting, and would have prosecuted and obtained funds for creditors but for the creditors actions which prevented him.

II. <u>Designation of Record on Appeal and Record on Cross-Appeal</u>.

Appellant Colin Kelly Kaufman designates the following items as part of the record on the Appeals of Docket # 469 and 470:

6. <u>Dockets</u>.  The dockets of Case # 90-02154-B-11 (main case) and the adversary

proceeding, Kaufman v. Feldman, # 01-2090-B.

7. 07/27/90 -- Docket #5: Schedule of Assets and Liabilities *{Used as Exhibit A(schd) to Plan trustee's final report #383 - filed on April 17, 2001 & Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

8. 07/27/90 — Docket #6: Statement of Financial Affairs for a Debtor engaged in business. *{Used as Exhibit A(stfn) to Plan trustee's final report #383 - filed on April 17, 2001 & Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

9. 01/28/91 — Docket #40: Plan of Reorganization of Charles B. Feldman d/b/a Charles B. Feldman Investments

10. 01/28/91 — Docket #41: Disclosure Statement of Charles B. Feldman

11. 12/06/91 — Docket #130: First Amended Disclosure Statement

12. 12/06/91 — Docket #131: First Amended Plan of Reorganization

13. 09/21/92 — Docket #176: Order Confirming Plan

14. 09/24/92 — Docket #178: Modification to First Plan of Reorganization *{Used as Exhibit A to Fee Application #458 - filed on 02/08/02 & Used as Exhibit 3(3c)(A) to Hon. George P. Kazen, Esq., Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

15. 10/05/92 — Docket #181: Order entered. Post confirmation order and notice

16. 10/29/92 — Docket #185: Motion for extension of time to file objection to claims — filed by debtor C/S; no notice provisions; order enclosed *{Used as Exhibit to 3(3d) to Hon. George P. Kazen, Esq., Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

17. 12/21/92 — Docket #195: Plan trustee's notice of and motion to approve 1st quarterly distribution *{Used as Exhibit M(n) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

18. 01/09/95 — Docket #220: Colin K. Kaufman's original response to court's order to show cause, and first post-confirmation application for leave to pay Mr. Moon and others additional sums. *{Used as Exhibit M(n) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

8

19. 03/20/95 — Docket #222: Notice of appearance and request for notice from Steven A. Ditto for CKS Asset Management, Inc.

20. 03/20/95 — Docket #223: Notice of assignment of claim (CKS Asset Management is substituted for FDIC).

21. 05/03/95 —/docket #224: order entered. Re: #223 CKS Asset Management, Inc. is substituted in place of FDIC.

22. 07/03/95 — docket #225: motion for order to show cause why CKS Management should not be held in contempt for violation of 11 USC Sec. 1141(c) & (d).

23. 07/18/95 — docket #226: supplement to #225 motion for order to show cause.

24. 09/06/95 — docket #232: courtroom minutes — hearing held 09/06/95 re: #225 M/show cause why CKS mgmt. Should not be held in contempt. Arguments heard and no appearance by CKS; court orders CKS to remove notices within 10 days. CKS is further ordered to pay attorneys' fees and expenses in the amount of $4,600.00 of Charles Moon and $3,000.00 of Colin Kaufman. Order to be submitted by Charles Moon within 10 days.

25. 09/21/95 — docket #233: order entered parties notified. Re: #232. Motion granted. Order Imposing sanctions against CKS Asset Management, Inc. for violation of confirmation order. CKS to immediately take steps to release all abstracts of judgment, assignment of judgments and similar documents. All releases to be filed no later than 10 days. CKS shall pay to debtor the sum of $4,600.00 attorneys' fees and expenses. C. Kaufman authorized to withhold sums which might have been paid to CKS until the $7,600.00 awarded in this Order has been fully paid.

26. 03/01/96 — docket #234: motion of CKS Asset Management, Inc. to obtain relief from order imposing sanctions, order enclosed.

27. 06/12/96 — docket #242: trancript of show cause hearing held September 6, 1995

28. 08/23/96 — docket #250: motion of CKS Asset Mgmt. To enforce and implement confirmed plan and to compel plan trustee to file an accounting and to perform his duties C/S; 20 day notice: order enclosed (Newsom)

29. 09/09/96 — docket #252: plan trustee response to CKS's motion to compel re: #250

30. 09/30/96 — docket #258: courtroom minutes — hearing held on 09/30/96 re: #234 motion of CKS Asset Management, Inc. to obtain relief from Order imposing sanctions. Hearing commenced/concluded. Exhibits offered and admitted. Witness sworn and questioned. Arguments presented. The Court will reconsider the order imposing sanctions.

31. 12/20/96 — docket #261: order entered. Re: #250 - denying motion of CKS Asset Management to enforce and implement confirmed plan and to compel plan trustee to file an accounting (failure to prosecute).

32. 04/16/97 — docket #272, and refiled as part of docket # 441: plan trustee's fifth report — filed by Colin Kelly Kaufman *{Used as Exhibit M(g) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*

33. 05/13/97 — docket #275, and refiled as part of docket # 441: plan trustee's sixth report and partly unopposed motion to extend plan term to January 31, 1998; order enclosed. *{Used as Exhibit M(f) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*

34. 06/02/97 — docket #278: response of CKS Asset Mgmt. To plan trustee's motion to extend plan term re: #275. *{Used as Exhibit M(e) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*

35. 06/04/97 — docket #279: notice of hearing set 07/16/97 @ 9:00am McAllen Re: #275 Plan trustee's sixth report and partly unopposed motion to extend plan term to January 31, 1998.

36. 06/27/97 — docket #281: plan trustee's response to CK's motion to convert (Kaufman). *{Used as Exhibit M(d) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*

37. 07/16/97 — docket #284: courtroom minutes — hearing held on 07/16/97. Re#275 plan trustee's third unopposed motion to extend plan term to January 31, 1998. Hearing previously continued to 08/20/97 @ 9:00am McAllen.

38. 08/13/97 — docket #287: plan trustee's original partly unopposed motion to employ accountant — filed by Colin K. Kaufman; order enclosed. *{Used as Exhibit 1(1c) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar — dated 03/12/02}*

39. 08/18/97 — docket #290: objection to claim of Parkwell Investments, Inc. filed by CKS Asset Management, Inc.

40. 09/04/97 — docket #299: response to objection to claim of Parkwell Investments, Inc. - filed by Parkwell Investments, Inc. (Simank).

41. 09/18/97 — docket #306: courtroom minutes: hearing held 09/18/97 Re: #275 plan trustee's sixth report and partly unopposed motion to extend plan term to January 31, 1998. Hearing commenced/concluded. The Court ruled that the debtor will turnover property to the

plan trustee to be distributed and sold.  Exhibits offered.

42.  09/25/97 — docket #312: order entered.  Parties notified.  Re:#150; denying CKS Asset Management's Motion to compel and enforce (failure to prosecute).

43.  10/08/97 — docket #314: courtroom minutes: hearing held 10/08/97 Re: #287 plan trustee's motion to employ accountant.  Motion granted.  Unopposed order submitted and assigned.

44.  10/15/97 — docket #315: order entered.  Unopposed order granting plan trustee's application for employment of accountant (Al White) - Granted.  *{Used as Exhibit 1(1d) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge — dated 03/08/02 & Richard Russell w/State Bar — dated 03/12/02}*

45.  02/27/98 — docket #331: response to motion of CKS Mgmt. To withdraw objection to claim of Parkwell Investments, Inc. (Simank)

46.  03/19/98 — docket #337: transcript of hearing held 09/18/97.

47.  01/22/01— docket #363 motion by plant trustee Colin Kelly Kaufman to reopen case.

48.  02/05/01 — docket #364 response by creditor Parkwell Investments, Inc. to motion to reopen case by Colin Kelly Kaufman.

49.  02/09/01 — docket #365 order to set hearing re: [363-1] motion to reopen case by Colin Kelly Kaufman scheduled for 9:00am 03/07/01 in Brownsville.

50.  03/08/01 — docket #376 motion by trustee Colin Kelly Kaufman to sell free and clear of liens hearing set for 9:00am 03/14/01 in Corpus Christi.

51.  03/19/01 — docket #378 objection by creditor CKS Asset Management to [376-1] motion to sell free and clear of liens by Colin Kelly Kaufman.

52.  03/27/01 — docket #381 order to set hearing re: [378-1] objection to expedited sale by CKS Asset Mgmt. scheduled for 9:00am 05/09/01 in Brownsville.

53.  04/09/01 — docket #382 motion by trustee Colin Kelly Kaufman to extend time to file final report.

54.  04/18/01 — docket #383 plan trustee's proposed report of distribution.  *{Used as Exhibit M(b)[w/o exhibits] to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01 & Exhibit A[w/exhibits]}*

**Exhibit List to Plan Trustee's Proposed Final Report**

| | | |
|---|---|---|
| 1. | Exhibit | (Filed) |
| 2. | Exhibit STFN | (Filed) |
| 3. | Exhibit SCHD | (Filed) |
| 4. | Exhibit INVS | (Filed) |
| 5. | Exhibit DCKT | (Filed) |
| 6. | Exhibit PLAN | (Filed) |
| 7. | Exhibit TAXR - (Includes 1992 - 1997) | (Filed) |
| | a. FREI | |
| | b. Feldman Rentals | |
| | c. Clara Feldman Properties | |
| 8. | Exhibit ALWH | (Filed & Mailed) |

55. 04/18/01 — docket #384 notice of corrected exhibits re: [383-1] distribution report. *{Used as Exhibit B to Hon. Keith P. Ellison, Esq., U.S. District Judge – dated 08/13/01 & to Richard Russell w/State Bar – dated 08/31/01}*

56. 04/24/01 — docket #385 response by creditor CKS Asset Mgmt. To [383-1] proposed distribution report.

57. 04/25/01 — docket #387 motion by creditor CKS Asset Mgmt. To substitute attorney: Matthew A. Rosenstein for old attorney: R. Kirk Newson.

58. 04/25/01 — docket #388 motion by Matthew A. Rosenstein for creditor CKS Asset Mgmt. To expedite hearing re: [386-1] motion to extend time to respond to plan trustee's final report by CKS Asset Mgmt., [387-1] motion to substitute attorney: Matthew A. Rosenstein for old attorney: R. Kirk Newsom by CKS Asset Mgmt.

59. 04/26/01 — docket #386 motion by creditor CKS Asset Mgmt. To extend time to respond to plan trustee's final report.

60. 04/26/01 — docket #389 order granting [388-1] motion to expedite hearing re: [386-1] motion to extend time to respond to plan trustee's final report by CKS Asset Mgmt., [387-1] motion to substitute attorney: Matthew A. Rosenstein for old attorney: R. Kirk Newsom by CKS Asset Mgmt. Hearing set to 9:00am 04/27/01 in Corpus Christi.

61. 04/27/01 — docket #390 order to set hearing re: [383-1] plan trustee's proposed final report scheduled for 9:00am 06/06/01 in Brownsville.

62. 04/27/01 — docket #391 hearing held re: [386-1] motion to extend time to respond to plan trustee's final report by CKS Asset Mgmt.

63. 04/27/01 — docket #392 hearing held re: 387-1] motion to substitute attorney: Matthew A. Rosenstein for old attorney: R. Kirk Newsom by CKS Asset Mgmt.

64. 04/27/01 — docket #393 order granting motion to extend time to resond to plan trustee's final report by CKS Asset Mgmt. Time extended to May 31, 2001.

65. 04/27/01 — docket #394 plan trustee's notice of mooted hearing.

66. 04/30/01 — docket #395 certificate of service by trustee Colin Kelly Kaufman of [390-1] order setting hearing on plan trustee's proposed final report.

67. 05/16/01 — docket #396 opposed expedited motion by plan trustee Colin Kelly Kaufman for protective order.

68. 05/16/01 — docket #397 motion by Plan trustee Colin Kelly Kaufman to expedite hearing re: motion for protective order by CKK.

69. 05/17/02 — docket #398 response by creditor CKS Asset Mgmt. In opposition to motion for protective order by CKK.

70. 05/17/01 — docket #399 response by trustee CKK to response by CKS Asset Mgmt. On motion for protective order filed by CKK.

71. 05/18/01 — docket #401 hearing held re: opposed expedited motion for protective order by CKK. Motion denied. Order to be submitted under green sheet by Attorney Rosenstein.

72. 05/18/01 — docket #407 hearing held re: motion for protective order by CKK. Motion denied order to be submitted.

73. 05/21/01 — docket #400 order denying original opposed expedited motion for protective order by CKK.

74. 05/23/01 — docket #402 Order Granting [382-1] Motion To Extend Time To File Final Report by Colin Kelly Kaufman.

75. 5/25/01 -- docket #403 Motion By Matthew A Rosenstein for Creditor CKS Asset Management To Continue Hearing Re: [383-1] Chapter 11 Plan Trustee's "Distribution Report" .

76. 5/25/01 -- docket #404 Motion By Matthew A Rosenstein for Creditor CKS Asset Management To Expedite Hearing Re: ( [403-1] Motion To Continue Hearing Re: [383-1] Chapter 11 Plan Trustee's "Distribution Report" by Matthew A. Rosenstein ).

77. 5/29/01 -- docket #408  Second Amended [383-1] Proposed Final Report of Distribution.  Filed by: Trustee Colin Kelly Kaufman. *{Used as Exhibit F to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated*

*08/31/01}*

78. 5/29/01 -- docket #409  Response By Trustee Colin Kelly Kaufman To [385-1] Response by CKS Asset Management to Plan Trustee's Proposed Final Report and Motion for CKS Asset Management, Inc., to Compel Plan Trustee to Perform an Independent Accounting Prepatory to Filing a Final Report. *{Used as Exhibit E to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

79. 5/30/01 -- docket #405  Order Granting [403-1] Motion To Continue Hearing Re: [383-1] Chapter 11 Plan Trustee's "Distribution Report" by Matthew A Rosenstein Hearing set To 9:00 6/22/01 at 1133 N Shoreline Corpus Christi . Parties Notified.

80. 5/30/01 -- docket #406  Order Granting [404-1] Motion To Expedite Hearing Re: ([403-1] Motion To Continue Hearing Re: [383-1] Chapter 11 Plan Trustee's "Distribution Report" by Matthew A Rosenstein ) by Matthew A Rosenstein Hearing set To 9:00 5/29/01 at 1133 N Shoreline Corpus Christi .

81. 5/30/01 -- docket #410  Objection By Creditor Parkwell Investments Inc To [383-1] Trustee's Proposed Final Distribution Report . cc: TA (vr) [EOD 06/01/01] [90-1254]

82. 5/30/01 -- docket #411  Supplement RE: [385-1] Response in Opposition to Plan Trustee's Proposed Final Report by CKS Asset Management. cc: TA (vr) [EOD 06/01/01] [90-1254]

83. 5/30/01 -- docket #412  Motion by Creditor CKS Asset Management for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds. m/d 6/22/01 (vr) [EOD 06/01/01] [90-1254] *{Used as Exhibit D to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

84. 6/5/01 -- docket #413  Opposed Expedited Motion By Trustee Colin Kelly Kaufman To Compel Production of Documents . Hearing set for 9:00 6/8/01 at 1133 N Shoreline Corpus Christi to lg (swm) [EOD 06/06/01] [90-1254] *{Used as Exhibit G to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

85. 6/5/01 -- docket #414  Motion By Trustee Colin Kelly Kaufman To Expedite Hearing Re: ([413-1] Motion To Compel Production of Documents by Colin Kelly Kaufman ). to lg (swm) [EOD 06/06/01] [90-1254] *{Used as Exhibit G to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

86. 6/7/01 -- docket #415 Order Granting [414-1] Motion To Expedite Hearing Re: ( [413-1]Motion To Compel Production of Documents by Colin Kelly Kaufman ) Hearing set for 9:00 6/8/01 at 1133 N Shoreline CorpusChristi . Parties Notified. (swm) [EOD 06/07/01] [90-1254]

87. 6/7/01 -- docket #416 Motion By Creditor CKS Asset Management To Consolidate Hearing on Trustee's Proposed Final Report With CKS Asset Management, Inc's Motion For Removal Of Trustee . to lg (swm) [EOD 06/07/01] [90-1254]

88. 6/7/01 -- docket #417 Motion By Matthew A Rosenstein for Creditor CKS Asset Management To Expedite Hearing Re: ( [416-1] Motion To Consolidate Hearing on Trustee's Proposed Final Report With CKS Asset Management, Inc's Motion For Removal Of Trustee by CKS Asset Management ) . to lg (swm) [EOD 06/07/01] [90-1254]

89. 6/7/01 -- docket #418 Order Granting [417-1] Motion To Expedite Hearing Re: ( [416-1] Motion To Consolidate Hearing on Trustee's Proposed Final Report With CKS Asset Management, Inc's Motion For Removal Of Trustee by CKS Asset Management ) Hearing set for 9:00 6/11/01 at 1133 N Shoreline Corpus Christi . Parties Notified. (swm) [EOD 06/07/01] [90-1254]

90. 6/8/01 -- docket #419 Hearing Re: [416-1] Motion To Consolidate Hearing on Trustee's Proposed Final Report With CKS Asset Management, Inc's Motion For Removal Of Trustee by CKS Asset Management continued by agreement to 9:00 6/22/01 at 1133 N Shoreline Corpus Christi (swm) [EOD 06/08/01] [90-1254]

91. 6/8/01 -- docket # 420 Hearing Re: [413-1] Motion To Compel Production of Documents by Colin Kelly Kaufman continued to 9:00 6/22/01 at 1133 N Shoreline Corpus Christi. Arguments presented. Tax returns to be provided by 6/13/01. (swm) [EOD 06/08/01] [90-1254]

92. 6/8/01 -- docket #421 Order Granting in Part [413-1] Motion To Compel Production of Documents by Colin Kelly Kaufman And Continuing Hearing Re: [413-1] Motion To Compel Production of Documents by Colin Kelly Kaufman. Hearing reset for 9:00 6/22/01 at 1133 N Shoreline Corpus Christi . Parties Notified. (swm) [EOD 06/08/01] [90-1254]

93. 6/8/01 -- docket #422 Order to Set Hearing RE: [408-1] Second Amended To Proposed Final Report by Colin Kelly Kaufman scheduled for 9:00 6/22/01 at 1133 N Shoreline Corpus Christi Parties Notified. (swm) [EOD 06/08/01] [90-1254]

94. 6/11/01 -- docket #423 Objection By Creditor CKS Asset Management To [408-1] Second Amendment to Proposed Final Report by Colin Kelly Kaufman . (swm) [EOD 06/12/01] [90-1254]

95. 6/13/01 -- docket # 424  Opposed Expedited Motion By Trustee Colin Kelly Kaufman to Cancel CKS's Claim, Or Alternatively To Assign CKS's Claim, Or Set-Off Its Potential Dividend To Plan Trustee To Secure Fees (swm) [EOD 06/13/01] [90-1254] *{Used as Exhibit H to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

96. 6/13/01 -- docket # 425  Motion By Trustee Colin Kelly Kaufman To Expedite Hearing Re: ( [424-1] Motion to Cancel CKS's Claim by Colin Kelly Kaufman, [424-2] Motion To Assign CKS's Claim by Colin Kelly Kaufman, [424-3] Motion Set-Off Its Potential Dividend To Plan Trustee To Secure Fees by Colin Kelly Kaufman ) to lg. (swm) [EOD 06/13/01] [90-1254] *{Used as Exhibit I to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

97. 6/13/01 -- docket # 426  Response By Trustee Colin Kelly Kaufman To [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management . to lg (swm) [EOD 06/13/01] [90-1254] *{Used as Exhibit H to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

98. 6/14/01 -- docket # 427  Order to Set Hearing RE: [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management scheduled for 9:00 6/22/01 at 1133 N Shoreline Corpus Christi Parties Notified. (swm) [EOD 06/14/01] [90-1254]

99. 6/14/01  -- docket # 428  Order Granting [425-1] Motion To Expedite Hearing Re: (424-1] Motion to Cancel CKS's Claim by Colin Kelly Kaufman, [424-2] Motion To Assign CKS's Claim by Colin Kelly Kaufman, [424-3] Motion Set-Off Its Potential Dividend To Plan Trustee To Secure Fees by Colin Kelly Kaufman ) Hearings set for 9:00 6/22/01 at 1133 N Shoreline Corpus Christi Parties Notified. (swm) [EOD 06/14/01] [90-1254]

100. 6/18/01 -- docket # 429  Response By Creditor Parkwell Investments Inc To [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management . (swm) [EOD 06/18/01] [90-1254]

101. 6/18/01-- Complaint (01-2090) Colin Kelly Kaufman vs. Charles B Feldman. NOS 454 Recover Money/Property . ( Filing Fee $ r 150.00 Receipt # 952513) (jh) [EOD 06/21/01] [01-2090] *{Used as Exhibit J to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01 }*

102. 6/22/01 -- docket # 430  Objection By Debtor Charles B Feldman To [408-1] Amended Trustee's Final Report by Colin Kelly Kaufman . (swm) [EOD 06/22/01] [90-1254]

103. 6/22/01 -- docket # 431  Hearing Re: [408-1] Trustee's Second Amended Proposed Final Report of Distribution by Colin Kelly Kaufman continued to 6/27/01 by telephone conference. Parties will be advised as to time. (swm) [EOD 06/25/01] [90-1254]

104. 6/22/01 -- docket # 432  Hearing Re: [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management continued to 6/27/01 by telephone conference. Parties will be advised as to time. (swm) [EOD 06/25/01] [90-1254]

105. 6/22/01 -- docket #433  Creditor CKS Asset Management Witness and Exhibit List (swm) [EOD 06/25/01] [90-1254]

106. 6/22/01 -- docket # 434  Trustee Colin Kelly Kaufman Witness and Exhibit List (swm) [EOD 06/25/01] [90-1254]

107. 6/22/01 -- docket # 435  Motion By Matthew A Rosenstein for Creditor CKS Asset Management To Continue Hearing Re: [424-1] Motion to Cancel CKS's Claim by Colin Kelly Kaufman, [424-2] Motion To Assign CKS's Claim by Colin Kelly Kaufman, [424-3] Motion Set-Off Its Potential Dividend To Plan Trustee To Secure Fees by Colin Kelly Kaufman to lg (swm) [EOD 06/25/01] [90-1254]

108. 6/22/01 -- docket # 436  Response By Creditor CKS Asset Management To [424-1] Motion to Cancel CKS's Claim by Colin Kelly Kaufman, [424-2] Motion To Assign CKS's claim by Colin Kelly Kaufman, [424-3] Motion Set-Off Its Potential Dividend To Plan Trustee To Secure Fees by Colin Kelly Kaufman . (swm) [EOD 06/25/01] [90-1254]

109. 6/22/01 -- docket # 437  Proposed Findings of Fact and Conclusions of Law Re: [408-1] Second Amended Final Report by Colin Kelly Kaufman . Parties Notified. (swm) [EOD 06/25/01] [90-1254]

110. 6/26/01 -- docket # 438  Status report filed by Letty Garza. Closing arguments on #408 and 412 set for 6/27/01 2:00 pm. Rosenstein will notify all parties. (swm) [EOD 06/26/01] [90-1254]

111. 6/26/01-- Hearing On Final Arguments Re: [408-1] Amended Final Report by Colin Kelly Kaufman [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management scheduled for 2:00

17

6/27/01 at 1133 N Shoreline Corpus Christi (swm) [EOD 06/26/01] [90-1254]

112. 6/27/01 -- docket # 439  Plan Trustee's Proposed Findings of Fact and Conclusions of Law Re: [383-1] Distribution Report, [408-1] Second Amended Distribution Report and [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management . (swm) [EOD 06/27/01] [90-1254] *{Used as Exhibit L to Hon. Keith P. Ellison, Esq., U.S. District Judge – dated 08/13/01 & to Richard Russell w/State Bar – dated 08/31/01}*

113. 6/27/01 -- docket # 440  Hearing Re: [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management. Final arguments presented. Copy of relevant docket entries to be submitted by the trustee to court by 9:00 a.m. on 6/28/01. Copies of all accounting to be submitted by trustee to Court by 9:00 on 6/28/01. Court will rule at 3:00 6/28/01 at 1133 N Shoreline Corpus Christi (swm) [EOD 6/28/01] [90-1254]

114. 6/28/01 -- docket # 441  Trustee Colin Kelly Kaufman's Copies of Documents Relating to Plan Trustee's Accountings (swm) [EOD 06/29/01] [90-1254] *{Used as Exhibit M to Hon. Keith P. Ellison, U.S. District Judge – dated 08/31/01 & to Richard Russell w/State Bar – dated 08/31/01 & as Exhibit 5 to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge – dated 03/08/02 & Richard Russell w/State Bar – dated 03/12/02}*

## List of Enclosures

A.   Exhibits to 2nd Amendment to Plan Trustee's Proposed Final Report (docket #408):
   Feldman Estate Payments Corrected Summary
   Feldman Estate Deposit Summary (Frost IOLTA Account)
   Feldman Claims Register

B.   Plan Trustee's Proposed Final Report (docket #383)

C.   Plan Trustee's Seventh Report (COS says served "on the persons who appeared in court on this matter on September 18, 1997 - Plan Trustee and SKK gave copy to CKS Asset Mgmt. after court)

D.   Plan Trustee's Response to CKS' Motion to Convert (docket #281)

E.   Response of CKS Asset Management, Inc. to Plan Trustee's Motion to Extend Plan Term - May 29, 1997 (docket #278) - (CKS's Motion to Convert to Chapter 7)

F.   Plan Trustee's Sixth Report and Partly Unopposed Motion to Extend Plan Term to January 31, 1998 (docket #275)

G.   Plan Trustee's Fifth Report - April 16, 1997 (docket #272)

H.   Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy

(4th Accounting) (handed out in court)

I.    Plan Trustee's Record or Receipts and Expenditures in the Charles Feldman Bankruptcy
      (3rd Accounting) (handed out in court)

J.    Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy
      (2nd Accounting) (handed out in court)

K.    Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy
      (1st Accounting) (mailed out on September 20, 1995)

L.    Notice of Assignment of Claim (CKS Asset Mgmt. is substituted for FDIC) (S. Ditto m/d 04/29/95) (docket #223) -
      filed March 20, 1995

M.    Colin K. Kaufman's Original Response to Court's Order to Show Cause, and First Post-
      Confirmation Application for Leave to Pay Mr. Moon and Others Additional Sums. - January 9, 1995 (docket #220)

N.    Plan Trustee's Notice of and Motion to Approve 1st Quarterly Distribution - December 21, 1992 (docket #197)

115. 6/28/01 -- docket # 442  Hearing Held Re: [412-1] Motion for Removal of Trustee,
For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to
Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset Management .
Matters in this case that are still under advisement were clarified on record. Plan contemplated
fee applications were not required. Trustee would not have to file fee applications to be paid.
Trustee to be paid at lawyer rate. Fiduciary duty is owed by trustee to plan. Duty also requires
that fees and expenses should not exceed the estate assets. Detailed clarification of case and
Court's review of all matters and germane docket entries were stated on record. No creedence to
Court that trustee was obscuring or hiding any facts. Edwards v Hollaman was cited. Adequate
accounting was not given in this case. Payments were made by trustee to trustee before services
were rendered. Substantial matters are yet to be heard in this case. Outstanding issues were
clarified on record. New trustee should be appointed to continue this case. Court will withhold at
this time ruling on fees yet due to plan trustee. (swm) [EOD 06/29/01] [90-1254]

116. 6/29/01 -- docket # 443  Order Granting in Part [412-1] Motion for Removal of
Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for
Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds by CKS Asset
Management . Colin Kaufman is removed as Plan Trustee. The United States Trustee is ordered
to appoint a Successor Trustee. Parties Notified. (swm) [EOD 06/29/01] [90-1254] {Used as
Exhibit 4(4e)to Hon. George P. Kazen, Esq. Chief U.S. District Judge & Hon. Keith P. Ellison,
Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated
03/12/02 which is used as an exhibit from docket #467 labeled CKS 24}

117. 7/3/01 -- docket # 444  Transcript of Hearing Held on 6/28/01 (swm) [EOD
7/03/01] [90-1254]{Used as Exhibit N to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated
08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01 - see hearing held docket #442}

118. 7/3/01 -- docket # 445  Motion by Creditor CKS Asset Management For

Clarification and Correction Of Order Removing Plan Trustee md 7/26 (swm) [EOD 07/05/01] [90-1254]

119. 7/23/01 -- docket # 446 Response By Trustee Colin Kelly Kaufman To [445-1] Motion For Clarification and Correction Of Order Removing Plan Trustee by CKS Asset Management . to lg (swm) [EOD 07/24/01] [90-1254] *{Used as Exhibit O to Hon. Keith P. Ellison, Esq., U.S. District Judge — dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*

120. 7/24/01 -- docket # 447 Motion by US Trustee To Further Modify Modification To First Amended Plan Confirmed By Order Dated October 5, 1992 md 8/17 (swm) [EOD 7/25/01] [90-1254]

121. 7/24/01 -- docket # 448 Post-Trial Brief By Matthew A Rosenstein for Creditor CKS Asset Management In Support Of [412-1] Disgorgement of Unreasonable Fees Taken Without Court Approval (swm) [EOD 07/25/01] [90-1254]

122. 7/26/01 -- docket # 449 Order to Set Hearing RE: [445-1] Motion For Clarification and Correction Of Order Removing Plan Trustee by CKS Asset Management scheduled for 9:00 9/12/01 at 600 E Harrison, Brownsville Parties Notified. (swm) [EOD 07/26/01] [90-1254]

123. 7/30/01 -- docket # 450 Certificate Of Service By Matthew A Rosenstein for Creditor CKS Asset Management Of [449-1] Order Setting Hearing on Motion for Clarification and Correction of Order Removing Plan Trustee. (swm) [EOD 07/31/01] [90-1254]

124. 8/21/01 -- docket # 451 Order Granting [447-1] Motion To Further Modify Modification To First Amended Plan Confirmed By Order Dated October 5, 1992 by US Trustee D Michael Boudloche is named as Plan Trustee. Parties Notified. (swm) [EOD 08/21/01][90-1254]

125. 9/12/01 -- docket # 452 Trustee Colin Kelly Kaufman's Outline of Arguments on September 12, 2001. (swm) [EOD 09/13/01] [90-1254]

126. 9/12/01 -- docket # 453 Hearing Held Re: [445-1] Motion For Clarification and Correction Of Order Removing Plan Trustee by CKS Asset Management . Agreed Order presented and signed. (swm) [EOD 09/13/01] [90-1254]

127. 9/13/01 -- docket # 454 Agreed Corrected Order Granting in Part, Denying in Part [412-1] Motion for Removal of Trustee, For Disgorgement of Unreasonable Fees Taken Without Court Approval and for Damages to Estate for Breach of Fiduciary Duty and Misapplication of funds by CKS Asset Management. Parties Notified. (swm) [EOD 09/13/01] [90-1254] *{Used as*

*Exhibit 4(4e) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge – dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02 & as Exhibit CKS 25 to docket #467}*

128.  9/18/01 – docket # 455  Application By Trustee D Michael Boudloche To Employ Michael B Schmidt as Attorney . to lg (swm) [EOD 09/18/01] [90-1254]

129.  9/20/01 – docket # 456  Order Granting [455-1] Application To Employ Michael B Schmidt as Attorney by D Michael Boudloche . Parties Notified. (swm) [EOD 09/20/01][90-1254]

130.  1/29/02 – docket # 457  Order Setting Deadlines on Final Fee Application of Colin K Kaufman - February 8, 2002 and Setting Hearing Thereon - February 22, 2002  9:00 in Corpus Christi . Parties Notified. (seh) [EOD 01/29/02] [90-1254]

131.  2/8/02 -- docket # 458  Final Application By Trustee Colin Kelly Kaufman For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser Last Day to Object: 3/4/02 md 3/4 (seh) [EOD 02/12/02][90-1254] *{Used as Exhibit 3(3c) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar – dated 03/12/02}*

### Exhibit List

**Tab 1**

1a    Accounting of James P. Moon of Aug. 22, 1997 (faxed and first class mail to Steve Ditto's attorney, Mr. Newsom).

1b    Docket entry referring to Al White, CPA's employment

1c    Motion to employ Al White as accountant for the bankruptcy estate with exhibits showing purpose of employment was to answer requests of Steve Ditto/CKS

1d    Order approving employment of Al White as CPA for the bankruptcy estate

**Tab 2 – DOCUMENTS RE: RULINGS**

2a    Ruling of Hon. George P. Kazen, Chief U.S. District Judge – dated December 6, 2001

2b    Transcript of ruling of Hon. Richard S. Schmidt – dated June 28, 2001

2c    Notice of filing of Colin K. Kaufman's Post-Hearing letter memorandum of issues presented – filed and delivered March 5, 2002 (15-pg. Letter setting out issues presented on fee application)

2d    Memorandum opinion and order on Colin Kelly Kaufman's final fee application – entered March 7, 2002 (Brownsville Division) by Hon. Richard S. Schmidt

**Tab 3 – EXHIBITS (Judge took judicial notice of the entire file and all exhibits filed before).**

3a    Exhibit list of February 22, 2002

3b    Proffer of former plan trustee's testimony regarding benefits bestowed on the estate (shows over $2 million in benefits

for items listed)

3c — Colin Kelly Kaufman's final fee application for work done to date benefitting estate or on account of service as former plan trustee — filed on February 8, 2002

   Exhibits to Item 3c (fee application to date):

      Exhibit A —   Modification to First Amended Plan of Reorganization of Charles B. Feldman d/b/a/ Charles B. Feldman Investments

      Exhibit B —   Invoice for services rendered — dated February 6, 2002

      Exhibit C —   Expert Witness Data Sheet of Colin Kelly Kaufman
      Exhibit D —   One Page Summary
      Exhibit E —   Adversary cover sheet with Plan Trustee's Original Complaint
          (Includes a copy of the proposed final report without exhibits, and a summary of damages)
      Exhibit F —   Feldman's Individual Income Tax Returns — for years of 1993 thru 1997
          (Showing several hundred thousands of CD's and T-Bills)
      Exhibit G —   Feldman Rentals Income Tax Returns — for years of 1993 Thru 1997
          (Proposed final report reveals money owed to the estate)
      Exhibit H —   Feldman Real Estate, Inc., Income Tax Returns — for years of 1993 thru 1997
          (Proposed final report reveals money owed to the estate)
      Exhibit I —   Clara Feldman Properties Income Tax Returns — for years of 1993 thru 1997
          (Proposed final report reveals money owed to the estate)

3d — Motion for extension of time to file objection to claims by James Moon on behalf of Charles Feldman, debtor — dated October 28, 1992 (asking for more time so that former plan trustee could participate in the review and evaluation of claims and potential objections) — exhibit admitted into evidence in the courtroom

3e — FAX from Frost Bank re: trust department, exhibit admitted into evidence in the courtroom (bank would have refused the trustee work based on ongoing litigation disclosing hourly fees charged for unusual responsibilities and attorneys fees charged for all legal work) (would have been another layer of administrative expenses)

## Tab 4 — OBJECTIONS AND RESPONSES FOR THE COURT HEARING ON FEBRUARY 22, 2002

4a — Trustee's objection to Kaufman's final fee application as plan trustee — filed Feb. 15, 2002 by attorney Mike Schmidt for new plan trustee Mike Boudloche

4b — Applicant's response to Mike Boudloche's objection to his fee application — filed Feb. 21, 2002 w/exhibits

4c — CKS Asset Management, Inc.'s objection to "Colin Kelly Kaufman's final fee application for work done to date benefitting estate or on account of service as former plan trustee" — filed Feb. 15, 2002 w/exhibits

4d — Applicant's response to CKS Asset Management, Inc.'s objection to his fee application — filed Feb. 21, 2002 w/exhibits

4e — CKS Asset Management, Inc.'s exhibit list

## Tab 5 — EXHIBIT M (the letter to Hon. Richard S. Schmidt of June 28, 2001 and the book of accountings he requested which made up part of the basis of his ruling of June 28, 2001, sent before)

### List of Enclosures

A.   Exhibits to 2nd Amendment to Plan Trustee's Proposed Final Report (docket #408):
      Feldman Estate Payments Corrected Summary

Feldman Estate Deposit Summary (Frost IOLTA Account)
Feldman Claims Register

B.  Plan Trustee's Proposed Final Report (docket #383)

C.  Plan Trustee's Seventh Report (COS says served "on the persons who appeared in court on this matter on September 18, 1997 - Plan Trustee and SKK gave copy to CKS Asset Mgmt, after court)

D.  Plan Trustee's Response to CKS' Motion to Convert (docket #281)

E.  Response of CKS Asset Management, Inc. to Plan Trustee's Motion to Extend Plan Term - May 29, 1997 (docket #278) - (CKS's Motion to Convert to Chapter 7)

F.  Plan Trustee's Sixth Report and Partly Unopposed Motion to Extend Plan Term to January 31, 1998 (docket #275)

G.  Plan Trustee's Fifth Report - April 16, 1997 (docket #272)

H.  Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (4th Accounting) (handed out in court)

I.  Plan Trustee's Record or Receipts and Expenditures in the Charles Feldman Bankruptcy (3rd Accounting) (handed out in court)

J.  Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (2nd Accounting) (handed out in court)

K.  Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (1st Accounting) (mailed out on September 20, 1995)

L.  Notice of Assignment of Claim (CKS Asset Mgmt. is substituted for FDIC) (S. Ditto m/d 04/29/95) (docket #223) - filed March 20, 1995

M.  Colin K. Kaufman's Original Response to Court's Order to Show Cause, and First Post-Confirmation Application for Leave to Pay Mr. Moon and Others Additional Sums - January 9, 1995 (docket #220)

N.  Plan Trustee's Notice of and Motion to Approve 1st Quarterly Distribution - December 21, 1992 (docket #197)

132. 2/15/02 -- docket # 459  Objection By Creditor CKS Asset Management To [458-1] Application For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman . to lg (seh) [EOD 02/19/02] [90-1254] *{Used as Exhibit 4(4c) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

133. 2/15/02 -- docket # 460  Objection By Trustee D Michael Boudloche To [458-1] Application For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman . to lg (seh) [EOD 02/19/02] [90-1254] *{Used as Exhibit 4(4a) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

134. 2/19/02-- Hearing Re: [458-1] Application For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman scheduled for 9:00 2/22/02 at 1133 N Shoreline Corpus Christi (seh) [EOD 02/19/02] [90-1254]

135. 2/21/02 -- docket # 461  Response By Trustee Colin Kelly Kaufman To [460-1] Objection by D Michael Boudloche To Application for Fees. (seh) [EOD 02/22/02] [90-1254] *{Used as Exhibit 4(4b) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

136. 2/21/02 -- docket # 462  Response By Trustee Colin Kelly Kaufman To [459-1] Objection by CKS Asset Management to Application for Fees. (seh) [EOD 02/22/02] [90-1254] *{Used as Exhibit 4(4d) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

137. 2/21/02 -- docket # 463  Objection By Creditor Parkwell Investments Inc To [458-1] Application For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman . (seh) [EOD 02/22/02] [90-1254]

138. 2/21/02 -- docket # 463  Support By Creditor Parkwell Investments Inc To [460-1] Objection by D Michael Boudloche to Application For Fees. (seh) [EOD 02/22/02] [90-1254]

139. 2/21/02 -- docket # 464  Proffer of Trustee Colin Kelly Kaufman's Testimony Regarding Benefits Bestowed on the Estate (seh) [EOD 02/25/02] [90-1254] *{Used as Exhibit 3(3b) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

140. 2/22/02 -- docket # 465  Hearing Re: [458-1] Application For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman. Exhibits offered and admitted. Arguments presented. Witness (C K Kaufman) sworn and testimony presented. Witness (Michael Boudloche) sworn and testimony presented. Additional exhibits were discussed and admitted with stipulations on record. Pending issues on this case are in  settlement discussions. Court will be informed by 3/8/02 as to the results of those discussions, if not settled, then a trial will be set for 9:00 3/22/02 at 1133 N Shoreline Corpus Christi. Court will issue a written ruling in the matter heard this date. Under Advisement. (seh) [EOD 02/25/02] [90-1254]

141. 2/22/02 -- docket # 466  Trustee Colin Kelly Kaufman Exhibit List (seh) [EOD 02/26/02] [90-1254] *{Used as Exhibit 3(3a) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

142. 2/22/02 -- docket # 467  Creditor CKS Asset Management Exhibit List (seh) [EOD. 02/26/02] [90-1254] *{Used as Exhibit 4(4e) to Hon. George P. Kazen, Esq, Chief U.S. District*

Judge & Hon. Keith P. Ellison, Esq., United States District Judge – dated 03/08/02 & Richard Russell w/State Bar – dated 03/12/02]

143. 2/25/02-- Under Advisement [458-1] Application For Compensation ( Fees: $427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman . (seh) [EOD 02/25/02] [90-1254]

144. 3/5/02 -- docket # 468  Notice Re: Filing of Colin K Kaufman's Post-Hearing Letter Memorandum of Issues to be Presented. (seh) [EOD 03/06/02] [90-1254] [Used as Exhibit 2(2c) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq, United States District Judge – dated 03/08/02 & Richard Russell w/State Bar – dated 03/12/02]

145. 3/7/02 -- docket # 469  Memorandum Opinion and Order Granting [458-1] Application For Compensation ( Fees: $ 427,291.50, Expenses: $ 23,634.61) and $2,300 for an appraiser by Colin Kelly Kaufman. Payment to Colin K. Kaufman of $50,000.00 in fees and $13,759.61 in expenses . Parties Notified. (gc) [EOD 03/07/02] [90-1254] [Used as Exhibit 2(2d) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq, United States District Judge – dated 03/08/02 & Richard Russell w/State Bar – dated 03/12/02 & exhibit to Notice of Appeal #471/#472]

146. 3/12/02 -- docket # 470  Final Judgment For Trustee D Michael Boudloche Against Trustee Colin Kelly Kaufman On Final Fee Application of Colin Kelly Kaufman. Parties Notified. (seh) [EOD 03/12/02] [90-1254] [Used as Exhibit 2(2d)to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq, United States District Judge – dated 03/08/02 & Richard Russell w/State Bar – dated 03/12/02 & exhibit to Notice of Appeal #471/#472]

147. 03/15/02 -- docket #471 notice of appeal. Receipt number 958246, fee amount. Filed by Colin Kelly Kaufman (related document(s) 469). Appellant designation due by 03/25/2002. (Srus,)(Entered: 03/19/2002).

148. 03/15/02 -- docket # 472 notice of appeal. Receipt number 958246, fee amount. Filed by Colin Kelly Kaufman (related document(s) 470). Appellant designation due by 03/25/2002. (Srus,)(Entered: 03/19/2002).

149. 03/19/02 -- docket # 473 notice of retention of BK record pursuant to Local Bankruptcy Rule 8007. (srus,)(Entered: 03/19/02).

150. 03/19/01 -- docket # 474 notice of retention of BK record pursuant to Local Bankruptcy Rule 8007. (srus,) (Entered: 03/19/02).

151. 06/18/01 -- adversary docket #1(01-2090) complaint (01-20-90) Colin Kelly Kaufman, vs. Charles B. Feldman. NOS 454 Recover Money/Property. (Filing Fee $, r 150.00

25

Receipt # 952513) (jh) [EOD 06/21/01][01-2090] *{Used as Exhibit J to State Bar letter dated 08/31/01 & as Exhibit 3(3c)(E) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge — dated 03/08/02 & Richard Russell w/State Bar — dated 03/12/02}*

152. 07/13/01 — Letter from Hon. Keith P. Ellison, U.S. District Judge re: letter to notify you that a complaint has been filed.

153. 12/06/01 — Letter ruling of Hon. George P. Kazen, Chief United States District Judge (in record as part of Docket #466).

154. Letters and Exhibits before Hon. George P. Kazen, Esq., Chief United States District Judge (originally sent to Hon. Keith P. Ellison, Esq., United States District Judge on August 13, 2001), showing what was before him when he ruled December 6, 2001.

Exhibits are as follows:

Exhibit List

A. Plan Trustee's Proposed Final Report, with exhibits including Amended Plan, Disclosure Statement, Order Confirming Plan, docket of case, tax returns of some Feldman group entities showing debtor's defaults under the Plan, etc. (04/17/01)

Exhibit List to Plan Trustee's Proposed Final Report

| 1. | Exhibit | (Filed) |
|----|---------|---------|
| 2. | Exhibit STFN | (Filed) |
| 3. | Exhibit SCHD | (Filed) |
| 4. | Exhibit INVS | (Filed) |
| 5. | Exhibit DCKT | (Filed) |
| 6. | Exhibit PLAN | (Filed) |
| 7. | Exhibit TAXR - (Includes 1992 - 1997) | (Filed) |
|    | a. FREI | |
|    | b. Feldman Rentals | |
|    | c. Ciara Feldman Properties | |
| 8. | Exhibit ALWH | (Filed & Mailed) |

B. Notice of Corrected Exhibits to Plan Trustee's Proposed Final Report (04/17/01)

C. CKS's "Response to Plan Trustee's Proposed Final Report and Motion of CKS Asset Management, Inc. to Compel Plan Trustee to Perform an Independent Accounting Preparatory to Filing a Final Report (04/20/01)

D. CKS's Motion for Removal of Plan Trustee, for Disgorgement of Fees, and for Damages to Estate (04/29/01)

E. Plan Trustee's Notice of His Response to "Response to Plan Trustee's Proposed Final Report and Motion of CKS Asset Management, Inc. to Compel Plan Trustee to Perform an Independent Accounting Preparatory to Filing a Final Report." (05/29/01)

F. Plan Trustee's Second Amendment to His Proposed Final Report (05/29/01)

G.   Plan Trustee's Motion to Expedite Hearing on His Original Opposed Expedited Motion to Compel Production of Documents, Plan Trustee's Original Opposed Expedited Motion to Compel Production of Documents, and orders to both (06/05/01)

H.   Plan Trustee's Original Response to CKS's Motion for Removal of Plan Trustee, for Disgorgement of Fees, and for Damages to Estate (06/13/01)

I.   Plan Trustee's Original Opposed Expedited Motion to Cancel CKS's Claim, or Alternatively to Assign CKS's Claim or Set-Off Its Potential Dividend to Plan Trustee to Secure Fees (06/13/01)

J.   Plan Trustee's Original Complaint with Adversary Cover Sheet (06/18/01)

K.   Feldman's Personal Tax Returns

L.   Plan Trustee's Original Findings of Fact and Conclusions of Law Submitted on His Proposed Final Report and Its Amendments and on CKS Asset Management, Inc.'s Motion to Remove Plan Trustee (06/27/01)

M.   Letter of Enclosure (docket #441) of Over Seven Prior Accountings by Plan Trustee (with exhibits) (06/28/01)

**List of Enclosures**

A.   Exhibits to 2nd Amendment to Plan Trustee's Proposed Final Report (docket #408):
Feldman Estate Payments Corrected Summary
Feldman Estate Deposit Summary (Frost IOLTA Account)
Feldman Claims Register

B.   Plan Trustee's Proposed Final Report (docket #383)

C.   Plan Trustee's Seventh Report (COS says served "on the persons who appeared in court on this matter on September 18, 1997 - Plan Trustee and SKK gave copy to CKS Asset Mgmt. after court)

D.   Plan Trustee's Response to CKS' Motion to Convert (docket #281)

E.   Response of CKS Asset Management, Inc. to Plan Trustee's Motion to Extend Plan Term - May 29, 1997 (docket #278) - (CKS's Motion to Convert to Chapter 7)

F.   Plan Trustee's Sixth Report and Partly Unopposed Motion to Extend Plan Term to January 31, 1998 (docket #275)

G.   Plan Trustee's Fifth Report - April 16, 1997 (docket #272)

H.   Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (4th Accounting) (handed out in court)

I.   Plan Trustee's Record or Receipts and Expenditures in the Charles Feldman Bankruptcy (3rd Accounting) (handed out in court)

J.   Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (2nd Accounting) (handed out in court)

K.   Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (1st Accounting) (mailed out on September 20, 1995)

L.   Notice of Assignment of Claim (CKS Asset Mgmt. is substituted for FDIC) (S. Dito m/d 04/29/95) (docket #223) - filed March 20, 1995

M.  Colin K. Kaufman's Original Response to Court's Order to Show Cause, and First Post-Confirmation Application for Leave to Pay Mr. Moon and Others Additional Sums - January 9, 1995 (docket #220)

N.  Plan Trustee's Notice of and Motion to Approve 1st Quarterly Distribution - December 21, 1992 (docket #197)

N.  Transcript of the Court's Ruling (06/28/01)

O.  Plan Trustee's Response to CKS's Motion for Reconsideration (07/23/01)

P.  Secs. 507(a) and 1129 of the Bankruptcy Code (11 U.S. Code), and legislative history to the latter

Q.  Expert Witness Data Sheet

154.  03/08/02 — Letters to Hon. George P. Kazen, Chief U.S. District Judge & Hon. Keith P. Ellison, U.S. District Judge re: copy of Judge Schmidt's opinion and order; also enclosed are the writings which were before Judge Schmidt.

Letter to Hon. George P. Kazen, Esq. — dated March 8, 2002 (enclosing exhibits updating his file, as per his ruling of December 6, 2001)

**Exhibit List**

*Tab 1*

1a⁼  Accounting of James P. Moon of Aug. 22, 1997 (faxed and first class mail to Steve Ditto's attorney, Mr. Newsom).

1b⁼  Docket entry referring to Al White, CPA's employment

1c⁼  Motion to employ Al White as accountant for the bankruptcy estate with exhibits showing purpose of employment was to answer requests of Steve Ditto/CKS

1d⁼  Order approving employment of Al White as CPA for the bankruptcy estate

*Tab 2 — DOCUMENTS RE: RULINGS*

2a⁼  Ruling of Hon. George P. Kazen, Chief U.S. District Judge — dated December 6, 2001

2b⁼  Transcript of ruling of Hon. Richard S. Schmidt — dated June 28, 2001

2c⁼  Notice of filing of Colin K. Kaufman's Post-Hearing letter memorandum of issues presented — filed and delivered March 5, 2002 (13-pg. Letter setting out issues presented on fee application)

2d⁼  Memorandum opinion and order on Colin Kelly Kaufman's final fee application — entered March 7, 2002 (Brownsville Division) by Hon. Richard S. Schmidt

*Tab 3 — EXHIBITS (Judge took judicial notice of the entire file and all exhibits filed before).*

3a⁼  Exhibit list of February 22, 2002

3b – Proffer of former plan trustee's testimony regarding benefits bestowed on the estate (shows over $2 million in benefits for items listed)

3c – Colin Kelly Kauffman's final fee application for work done to date benefitting estate or on account of service as former plan trustee – filed on February 8, 2002

Exhibits to Item 3c (fee application to date):

Exhibit A – Modification to First Amended Plan of Reorganization of Charles B. Feldman d/b/a/ Charles B. Feldman Investments

Exhibit B – Invoice for services rendered – dated February 6, 2002

Exhibit C – Expert Witness Data Sheet of Colin Kelly Kauffman
Exhibit D – One Page Summary
Exhibit E – Adversary cover sheet with Plan Trustee's Original Complaint
(Includes a copy of the proposed final report without exhibits, and a summary of damages)

Exhibit F – Feldman's Individual Income Tax Returns – for years of 1993 thru 1997
(Showing several hundred thousands of CD's and T-Bills)

Exhibit G – Feldman Rentals Income Tax Returns – for years of 1993 thru 1997
(Proposed final report reveals money owed to the estate)

Exhibit H – Feldman Real Estate, Inc., Income Tax Returns – for years of 1993 thru 1997
(Proposed final report reveals money owed to the estate)

Exhibit I – Clara Feldman Properties Income Tax Returns – for years of 1993 thru 1997
(Proposed final report reveals money owed to the estate)

3d – Motion for extension of time to file objection to claims by James Moon on behalf of Charles Feldman, debtor – dated October 28, 1992 (asking for more time so that former plan trustee could participate in the review and evaluation of claims and potential objections) – exhibit admitted into evidence in the courtroom

3e – FAX from Frost Bank re: trust department, exhibit admitted into evidence in the courtroom (bank would have refused the trustee work based on ongoing litigation disclosing hourly fees charged for unusual responsibilities and attorneys fees charged for all legal work) (would have been another layer of administrative expenses)

**Tab 4 – OBJECTIONS AND RESPONSES FOR THE COURT HEARING ON FEBRUARY 22, 2002**

4a – Trustee's objection to Kauffman's final fee application as plan trustee – filed Feb. 15, 2002 by attorney Mike Schmidt for new plan trustee Mike Boudloche

4b – Applicant's response to Mike Boudloche's objection to his fee application – filed Feb. 21, 2002 w/exhibits

4c – CKS Asset Management, Inc.'s objection to "Colin Kelly Kauffman's final fee application for work done to date benefitting estate or on account of service as former plan trustee" – filed Feb. 15, 2002 w/exhibits

4d – Applicant's response to CKS Asset Management, Inc.'s objection to his fee application – filed Feb. 21, 2002 w/exhibits

4e – CKS Asset Management, Inc.'s exhibit list

**Tab 5 – EXHIBIT M (the letter to Hon. Richard S. Schmidt of June 28, 2001 and the book of accountings he requested which made up part of the basis of his ruling of June 28, 2001, sent before)**

List of Enclosures

A.    Exhibits to 2nd Amendment to Plan Trustee's Proposed Final Report (docket #408):
     Feldman Estate Payments Corrected Summary

29

Feldman Estate Deposit Summary (Frost IOLTA Account)
Feldman Claims Register

**B.** Plan Trustee's Proposed Final Report (docket #383)

**C.** Plan Trustee's Seventh Report (COS says served "on the persons who appeared in court on this matter on September 18, 1997 - Plan Trustee and SKK gave copy to CKS Asset Mgmt. after court)

**D.** Plan Trustee's Response to CKS' Motion to Convert (docket #281)

**E.** Response of CKS Asset Management, Inc. to Plan Trustee's Motion to Extend Plan Term - May 29, 1997 (docket #278) - (CKS's Motion to Convert to Chapter 7)

**F.** Plan Trustee's Sixth Report and Partly Unopposed Motion to Extend Plan Term to January 31, 1998 (docket #275)

**G.** Plan Trustee's Fifth Report - April 16, 1997 (docket #272)

**H.** Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (4th Accounting) (handed out in court)

**I.** Plan Trustee's Record or Receipts and Expenditures in the Charles Feldman Bankruptcy (2nd Accounting) (handed out in court)

**J.** Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (2nd Accounting) (handed out in court)

**K.** Plan Trustee's Record of Receipts and Expenditures in the Charles Feldman Bankruptcy (1st Accounting) (mailed out on September 20, 1995)

**L.** Notice of Assignment of Claim (CKS Asset Mgmt. is substituted for FDIC) (S. Ditto m/d 04/29/95) (docket #223) - filed March 20, 1995

**M.** Colin K. Kaufman's Original Response to Court's Order to Show Cause, and First Post-Confirmation Application for Leave to Pay Mr. Moon and Others Additional Sums - January 9, 1995 (docket #220)

**N.** Plan Trustee's Notice of and Motion to Approve 1st Quarterly Distribution - December 21, 1992 (docket #197)

155. 03/15/02 — Letters to Hon. George P. Kazen, Chief U.S. District Judge and Hon. Keith P. Ellison, U.S. District Judge re: another "final judgment" w/ exhibits enclosed.

**EXHIBIT LIST**

1. Final Judgment on final fee application of Colin Kelly Kaufman (docket #470 - entered 03/12/02)

2. Colin Kelly Kaufman's Original Notice of Appeal - filed on 03/15/02

3. Memorandum Opinion and Order on Colin Kelly Kaufman's final fee application (docket #469 — entered 03/07/02)

156. 06/22/01 — Transcript of hearing held on June 22, 2001.

157. 06/26/01 — Transcript of hearing held on June 26, 2001.

158. 06/27/01 — Transcript of hearing held on June 27, 2001.

159. 09/12/01 — Transcript of hearing held on September 12, 2001.

30

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldman Investments
926 Lantana Street
Harlingen, TX 78550-8080

Al White, CPA
2202 Treasure Hills Blvd.
Harlingen, TX 78550

Office of US Trustee
Wilson Plaza Building
606 N. Carancahua
Corpus Christi, TX 78476

MBNA America
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA 19355

Ms. Nancy Holley
Assistant US Trustee
515 Rusk, #3516
Houston, TX 77002

James P. Moon, Esq.
2642 Brenner Drive
Dallas, TX 75220

Christopher M. Weil
Weil & Petrocchi, P.C.
1601 Elm Street, #1900
Lock Box 100
Dallas, TX 75201

Richard G. Grant
3102 Oak Lawn Avenue, #700
Dallas, TX 75219

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, TX 78403-1662

Matthew A. Rosenstein
American Bank Plaza, #420
711 N. Carancahua
Corpus Christi, TX 78475

Ronald A. Simank, Esq.
615 N. Upper Broadway, #2000
Corpus Christi, TX 78477

Mike Schmidt, Esq.
712 American Bank Plaza
711 N. Carancahua
Corpus Christi, TX 78475

160.  02/22/02 — Transcript of hearing held on February 22, 2002.

Respectfully Submitted,

Colin Kelly Kaufman, In propria personam
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone (361) 888-8865
Telecopier (361) 888-8172

### Certificate of Service

I certify I had one of the personnel at this law office serve the foregoing writing on the persons shown on the list below, by U.S. mail, first class postage prepaid, this 25th day of March, 2002.

Colin Kelly Kaufman

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldman Investments
926 Lantana Street
Harlingen, TX 78550-8080

Al White, CPA
2202 Treasure Hills Blvd.
Harlingen, TX 78550

Office of US Trustee
Wilson Plaza Building
606 N. Carancahua
Corpus Christi, TX 78476

MBNA America
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA 19355

Ms. Nancy Holley
Assistant US Trustee
515 Rusk, #3516
Houston, TX 77002

James P. Moon, Esq.
2642 Brenner Drive
Dallas, TX 75220

Christopher M. Weil
Weil & Petrocchi, P.C.
1601 Elm Street, #1900
Lock Box 100
Dallas, TX 75201

Richard G. Grant
3102 Oak Lawn Avenue, #700
Dallas, TX 75219

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, TX 78403-1662

Matthew A. Rosenstein
American Bank Plaza, #420
711 N. Carancahua
Corpus Christi, TX 78475

Ronald A. Simank, Esq.
615 N. Upper Broadway, #2000
Corpus Christi, TX 78477

Mike Schmidt, Esq.
712 American Bank Plaza
711 N. Carancahua
Corpus Christi, TX 78475

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

Official Form 17

## COLIN KELLY KAUFMAN'S ORIGINAL NOTICE OF APPEAL

NOW COMES Colin Kelly Kaufman and for his Original Notice of Appeal,

respectfully shows the Court as follows:

1. Colin Kelly Kaufman, former plan trustee herein, appeals under 28 U.S.C. Sec.

158(a) the following orders:

A. Memorandum Opinion and Order on Colin Kelly Kaufman's Final Fee

Application (Docket # 469), a copy of which is attached as an exhibit and incorporated by

reference for all purposes.

B. Final Judgment on Final Fee Application of Colin Kelly Kaufman (Docket

# 470), a copy of which is attached as an exhibit and incorporated by reference for all

purposes.

2. The names of all parties to the judgment, order or decree appealed from, and

the names addresses and telephone numbers of their respective attorneys, are as follows:

A. CKS Asset Management, Inc., Creditor. The names and addresses of

its attorneys are as follows:

Matthew A. Rosenstein, Esq.
American Bank Plaza #420
711 No. Carancahua
Corpus Christi, TX. 78475

-1-

Telecopier (361) 883-5590

Richard Grant, Esq.,
3102 Oak Lawn #700
Dallas, TX. 75219

Telephone (214) 777-5081
Telecopier (214) 777-5082

B.  Parkwell Investments, Inc.  The name and address of Parkwell's attorney are as follows:

Ron Simank, Esq.,
Schauer & Simank,  Attys.
615 N. Upper Broadway #2000
Corpus Christi, TX. 78476

Telephone (361) 884-2800
Telecopier (361) 884-2822

C.  Michael Boudloche, plan trustee.  Mr. Boudloche's attorney's name and address are as follows:

Mike Schmidt, Esq.
712 American Bank Plaza
711 No. Carancahua
Corpus Christi, TX. 78475

Telephone (361) 884-9949
Telecopier (361) 884-6000

D.  Colin Kelly Kaufman, Applicant and former plan trustee.  Mr. Kaufman's attorney is himself in propria personam, and his name and address are as follows:

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865

Telecopier (361) 888-8172

Respectfully Submitted,

Colin Kelly Kaufman, In propria personam
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

## Certificate of Service

I certify I had one of the personnel at this law office serve the foregoing writing on the persons listed above as attorneys for the parties to the order appealed from, by U.S. mail, first class postage prepaid, this 15th day of March, 2002.

Colin Kelly Kaufman



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:                              §
CHARLES B. FELDMAN dba              §          Case No. 90-01254-B-11
CHARLES B. FELDMAN                  §
INVESTMENTS                         §
        Debtor                      §

---

### MEMORANDUM OPINION AND ORDER ON COLIN KELLY KAUFMAN'S FINAL FEE APPLICATION

On this day came on for consideration the Final Fee Application filed by Colin Kelly

Kaufman ("Kaufman"). The Court, having heard the evidence and arguments of counsel, finds as

follows:

### BACKGROUND

Kaufman was appointed plan trustee under a confirmed plan of reorganization in this

case on September 24, 1992. The Amended Plan of Reorganization (the "Plan") provided for

the court's retention of jurisdiction to approve Kaufman's accounts and gave Kaufman the right

to seek bankruptcy court approval of his fees and expenses. Kaufman served as Plan trustee until

June 28, 2001, when this court removed him for cause[1] and requested that the United States

Trustee appoint another Plan trustee. Thereafter, Kaufman filed his Final Fee Application (the

"Fee Application"), which was heard by the court on February 22, 2002. The Fee Application

seeks court approval of $427,291.50, in fees and $23,634.61, in expenses, for a total of

$451,926.11. Kaufman collected 354,066.92, for the beneficiaries, and paid himself a total of

---

[1] The court found that Kaufman's accountings were insufficient, that he failed to make the semi-annual
disbursements required by the plan, and that he paid himself fees before they were earned.

1

$278,631.50, from the corpus of the trust. After payment of court-approved fees and expenses to other professionals, only $600.00 is left for creditors of the bankruptcy estate.[2] CKS and Parkwell, creditors and beneficiaries under the Plan, object to Kaufman's Fee Application and seek disgorgement of the payments made by Kaufman to himself. The United States Trustee's office also objected to the Fee Application.

DISCUSSION

### 1. Jurisdiction.

The court has jurisdiction to hear and decide this matter pursuant to 28 U.S.C. §1334. The Plan provides that the Plan trustee has the right to seek bankruptcy court approval of his fees and expenses and retains jurisdiction in the bankruptcy court for that purpose. The Order Confirming the Plan is a final, non-appealable order.

### 2. The standard of review for fee applications.

Kaufman was a contract trustee appointed by agreement, not a Chapter 11 trustee appointed by this court. The Plan did not contemplate that the Plan trustee would be compensated under the statutory guidelines of 11 U.S.C. §326, but instead was subject to the Texas Trust Code. Two separate types of fees are at issue. First, what is Kaufman entitled to as his compensation for acting as plan trustee? Under Texas law, a trustee "is entitled to reasonable compensation from the trust for acting as trustee." TEXAS TRUST CODE §114.061(a)(Vernon's 2002). Second, should the fees billed by Kaufman as attorney for himself as Plan trustee and paid by Kaufman to himself without notice to any plan beneficiaries, be allowed? Kaufman was

---

[2] The terms "bankruptcy estate" and "trust" or "corpus" are used interchangeably herein because they are indistinguishable in this case. All three terms refer to the pool of assets supervised by Kaufman as trustee for the benefit of creditors of Charles Feldman, the debtor.

not barred from hiring himself as attorney for the trustee and was entitled to pay himself a reasonable fee. However, Kaufman's Fee Application does not differentiate between the two services. He billed all services at an hourly rate and the rate did not change according to what "hat" Kaufman was wearing. The uncontroverted evidence indicated that Kaufman negotiated with the Plan proponents to charge his normal hourly rate for all services to the trust. Moreover, Kaufman only agreed to take on the trusteeship after a bank turned it down.

In bankruptcy cases, fee applications are subject to review by the court under the standard set forth in 11 U.S.C. §330(a)(3), which provides as follows:

(3)(A)(*sic*)In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including —

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and

(E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

In the Southern District of Texas, applications for compensation are also required to cover the elements of *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), cert. denied, 431 U.S. 904 (1977). Rule 2016(a), Bankruptcy Local Rules. The *First Colonial* factors are:

(1) The time and labor required;
(2) The novelty and difficulty of the questions;
(3) The skill requisite to perform the legal service properly;

3

(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee;
(6) Whether the fee is fixed or contingent;
(7) Time limitations imposed by the client or other circumstances;
(8) The amount involved and the results obtained;
(9) The experience, reputation, and ability of the attorneys;
(10) The "undesirability" of the case;
(11) The nature and length of the professional relationship with the client;
(12) Awards in similar cases.

-- 544 F.2d at 1298-99.

A bankruptcy court's review of professional fee applications is important for at least two reasons. First, the integrity of the court itself is at issue and must be preserved. *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 337 (Bankr. W.D. Tex. 1989). Second, "[a] bankruptcy court is also charged with evincing an 'over-arching' policy of avoiding the waste of the debtor's estate." *id.* at 336; see also, *First Colonial*, supra. at 1299(economy is the most important principle in awarding fees to the trustee's attorneys); *In re El Paso Refinery, L.P.*, 257 B.R. 809 (Bankr. W.D. Tex. 2000).

### 3. Application of the standards to this case.

As a trustee under the Texas Trust Code, Kaufman had a fiduciary duty to the beneficiaries to provide accountings of the trust activity. TEXAS TRUST CODE §113.151- 152 (Vernons 2002). The court previously held that Kaufman breached this duty. The evidence shows that CKS began demanding accountings from Kaufman in 1995 and continued until Kaufman was removed as trustee. Although Kaufman prepared several accountings, none were adequate. None of the accountings included information which would alert beneficiaries that the expenses of the trust might exceed its corpus. Moreover, Kaufman paid himself in advance for unearned attorneys fees. The Plan did not prohibit the payment of a reasonable retainer.

4

Kaufman's advances to himself, however, could be construed as loans from the trust, which would also constitute a breach of fiduciary duty. A trustee may not loan trust funds to himself. TEXAS TRUST CODE §113.052(a)(1) (Vernons 2002). In addition, Kaufman breached his duties under the Plan by failing to make semi-annual distributions to the beneficiaries. Under Texas law, a court has the discretion to deny the trustee compensation when the trustee commits a breach of trust. TEXAS TRUST CODE, §114.061(b) (Vernon's 2002). Courts have denied all compensation, despite benefits to the estate, when fraud on the court and the estate is present. *See e.g., Matter of Futuronics Corp.*, 655 F.2d 463, 471 (2nd Cir. 1981), cert. denied, 455 U.S. 941 (1982); *In re Endeco*, 675 F.2d 166, 167 (8th Cir. 1982); *In re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358 (Bankr. W.D.La. 1999). Here, however, there was no evidence of fraud. For the above violations of the Texas Trust Code, the court finds that Kaufman's compensation should be significantly reduced as set forth below.

The Seventh Circuit Court of Appeals held that "[f]ees obtained as a consequence of a breach of fiduciary obligation, even a nonwillful breach..., may be retained only if, by analogy to claims for quantum meruit, the fiduciary, notwithstanding his breach, conferred a benefit on his principal." *Matter of Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995). In the *Taxman Clothing* case, the attorney for a chapter 11 trustee consumed the entire chapter 11 estate with fees and expenses. The *Taxman Clothing* court held that "neither the trustee in bankruptcy nor the trustee's lawyer has a duty to collect an asset of the debtor's estate if the cost of collection would exceed the value of the asset." *id.* at 315. Most notably, the court went onto hold that a trustee and the trustee's lawyer have a "duty to endeavor to maximize the value of the estate." *id.* In analyzing the fee application before it under the reasonable and necessary standard of the

Bankruptcy Code, the Seventh Circuit Court of Appeals found that the fees were not reasonable or necessary once the efforts required exceeded the potential for recovery. *id.* at 316. Although the *Taxman Clothing* case involved the attorney for a chapter 11 trustee, not a plan trustee, the facts otherwise are quite analogous to the case at bar and the Seventh Circuit's analysis and its conclusion reached, give this court considerable guidance.

Kaufman's attorneys fees in his capacity of attorney for the trustee (himself) are immediately suspect because no system of checks and balances were in place. Absent informed consent from the affected beneficiaries, reasonable fees are only recoverable if they actually resulted in financial benefit to the estate. *See, e.g, In re NRG Resources, Inc.,* 64 B.R. 643 (Bankr. W.D.La. 1986). The court does not dispute that Kaufman spent the time for which he billed. Nor does the court dispute his hourly rate as within the tolerances, although on the very high end, of the rates charged by other bankruptcy attorneys. The reasonableness and necessity of the fees, however, are doubtful based on the results achieved. In short, Kaufman as trustee was charged with collecting payments from the debtor and distributing them to the creditors, but instead, used the entire amount collected to pay himself fees which did not result in collection of sufficient money to justify the fees. Absent notice to the beneficiaries, a trustee may only pay himself a reasonable fee in comparison to the size of the corpus of the trust.

Trustee's fees are calculated in a variety of methods. Corporate trustees are ordinarily paid a yearly fee based on a percentage of the trust, plus expenses including reasonable attorneys fees. Here, the evidence indicated that approximately $3,500 per year, for a total of $35,000 in trustee's fees would be the ordinary compensation paid to a corporate trustee. A chapter 7 or 11 trustee's compensation is limited by statute to a percentage of distributions, which, applying the

statutory formula to this case would be approximately $23,000, plus reasonable expenses and attorneys fees. 11 U.S.C. §326(a). Here, however, Kaufman did not distinguish between trustee's fees and attorney's fees and filed one fee application for all services. As noted above, Kaufman's compensation is limited by the benefit to the trust. As trustee, Kafuman did provide some benefit to the estate, including the collection of $200,000 in bank stock. Based on the evidence presented, the court finds that the reasonable amount of fees based on benefit to the estate is $50,000.

"Additionally, the court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure." *Matter of Prudhomme*, 43 F.3d 1000, 1003(5th Cir. 1995)(attorney for chapter 11 debtor ordered to disgorge pre-petition retainer for non-disclosure). Kaufman should be ordered to disgorge all fees collected above the $50,000 awarded herein.

Kaufman argues that the creditors' litigation tactics caused the excessive fees, but the evidence does not bear out his argument. The creditors' primary focus was obtaining accountings which Kaufman was required to provide. Kaufman's fees largely relate to opposing requests for accountings and defending his own reputation, neither of which benefitted the estate.

Kaufman's Fee Application further requests reimbursement of $23,634.61 in expenses. A review of the itemized expenses indicates that most expenses were appropriate, including appraisal fees, copy costs, travel and fax expenses. Also included, however, is nearly $11,000 in computer legal research expenses which, like legal fees, are only reimbursable if they resulted in

benefit. Accordingly, this Court finds that reasonable costs and expenses in this case are $13,759.61.

## CONCLUSION

Taking into consideration the provisions of Section 330(a) of the Bankruptcy Code and the *First Colonial* factors, the court concludes that reasonable and necessary compensation for Kaufman's services as trustee and as attorney for the estate is $50,000, plus expenses in the amount of $13,759.61, for a total of $63,759.61. Kaufman should be ordered to disgorge the balance of all fees and expenses which he previously paid himself.

It is therefore ORDERED that Colin Kelly Kaufman's Fee Application is approved in part and Colin Kelly Kaufman is awarded $50,000.00 in fees and $13,759.61 in expenses, for a total award of $63,759.61.

It is further ORDERED that Colin Kelly Kaufman shall disgorge the balance of the funds paid to him from the trust and shall pay the difference to Mike Boudloche, successor trustee under the Plan.

Corpus Christi this 6th day of March, 2002.

RICHARD S. SCHMIDT
United States Bankruptcy Judge

8

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldman Investments
926 Lantana Street
Harlingen, TX 78550-8080

Office of US Trustee
Wilson Plaza Building
606 N. Carancahua
Corpus Christi, TX 78476

Ms. Nancy Holley
Assistant US Trustee
515 Rusk, #3516
Houston, TX 77002

Christopher M. Weil
Weil & Petrocchi, P.C.
1601 Elm Street, #1900
Lock Box 100
Dallas, TX 75201

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, TX 78403-1662

Ronald A. Simank, Esq.
615 N. Upper Broadway, #2000
Corpus Christi, TX 78477

Al White, CPA
2202 Treasure Hills Blvd.
Harlingen, TX 78550

MBNA America
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA 19355

James P. Moon, Esq.
2642 Brenner Drive
Dallas, TX 75220

Richard G. Grant
3102 Oak Lawn Avenue, #700
Dallas, TX 75219

Matthew A. Rosenstein
American Bank Plaza, #420
711 N. Carancahua
Corpus Christi, TX 78475

Mike Schmidt, Esq.
712 American Bank Plaza
711 N. Carancahua
Corpus Christi, TX 78475

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SOUTHERN DISTRICT TEXAS
FILED

MAR 15 2002

MICHAEL N. MILBY, CLERK

| IN RE: | |
|---|---|
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

Official Form 17

## COLIN KELLY KAUFMAN'S ORIGINAL NOTICE OF APPEAL

NOW COMES Colin Kelly Kaufman and for his Original Notice of Appeal,

respectfully shows the Court as follows:

1. Colin Kelly Kaufman, former plan trustee herein, appeals under 28 U.S.C. Sec.

158(a) the following orders:

A. Memorandum Opinion and Order on Colin Kelly Kaufman's Final Fee

Application (Docket # 469), a copy of which is attached as an exhibit and incorporated by

reference for all purposes.

B. Final Judgment on Final Fee Application of Colin Kelly Kaufman (Docket

# 470), a copy of which is attached as an exhibit and incorporated by reference for all

purposes.

2. The names of all parties to the judgment, order or decree appealed from, and

the names addresses and telephone numbers of their respective attorneys, are as follows:

A. CKS Asset Management, Inc., Creditor. The names and addresses of

its attorneys are as follows:

> Matthew A. Rosenstein, Esq.
> American Bank Plaza #420
> 711 No. Carancahua
> Corpus Christi, TX. 78475

Telecopier (361) 883-5590

Richard Grant, Esq.,
3102 Oak Lawn #700
Dallas, TX. 75219

Telephone (214) 777-5081
Telecopier (214) 777-5082

B.  Parkwell Investments, Inc.  The name and address of Parkwell's
attorney are as follows:

Ron Simank, Esq.,
Schauer & Simank,  Attys.
615 N. Upper Broadway #2000
Corpus Christi, TX. 78476

Telephone (361) 884-2800
Telecopier (361) 884-2822

C.  Michael Boudloche, plan trustee.  Mr. Boudloche's attorney's name

and address are as follows:

Mike Schmidt, Esq.
712 American Bank Plaza
711 No. Carancahua
Corpus Christi, TX. 78475

Telephone (361) 884-9949
Telecopier (361) 884-6000

D.  Colin Kelly Kaufman, Applicant and former plan trustee.  Mr.

Kaufman's attorney is himself in propria personam, and his name and address are as

follows:

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865

Telecopier (361) 888-8172

Respectfully Submitted,

Colin Kelly Kaufman, In propria personam
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

### Certificate of Service

I certify I had one of the personnel at this law office serve the foregoing writing on the persons listed above as attorneys for the parties to the order appealed from, by U.S. mail, first class postage prepaid, this 15th day of March, 2002.

Colin Kelly Kaufman

United States District Court
Southern District of Texas
ENTERED

MAR 1 2 2002

Michael N. Milby
Clerk of Court

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

IN RE:

CHARLES B. FELDMAN D/B/A        CASE NO. 90-01254-B-11
CHARLES FELDMAN INVESTMENTS

## FINAL JUDGMENT ON FINAL FEE APPLICATION OF COLIN KELLY KAUFMAN

By Memorandum Opinion and Order entered March 7, 2002 (docket # 469), this Court
ORDERD that Colin Kelly Kaufman's Fee Application be approved in part, awarding him
$50,000.00 in fees and $13,759.61 in expenses, for a total award of $63,759.61. The Court
further ORDERED Colin Kelly Kaufman immediately disgorge the balance of funds previously
paid to himself, which amount totals $214,871.89 and pay such $214,871.89 over to Mike
Boudloche, successor trustee under the Plan. The Court hereby renders a Final Judgment in
favor of Mike Boudloche, successor trustee under the Plan, against Colin Kelly Kaufman in the
amount of $214,871.89, with interest thereon at the federal judgment rate. Mike Boudloche,
successor trustee is allowed such writs and processes as may be necessary in the enforcement
and collection of this judgment.

IT IS SO ORDERED.

Dated: _12 Mar 02_

Richard S. Schmidt
United States Bankruptcy Judge

470

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldman Investments
926 Lantana Street
Harlingen, TX 78550-8080

Al White, CPA
2202 Treasure Hills Blvd.
Harlingen, TX 78550

Office of US Trustee
Wilson Plaza Building
606 N. Carancahua
Corpus Christi, TX 78476

MBNA America
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA 19355

Ms. Nancy Holley
Assistant US Trustee
515 Rusk, #3516
Houston, TX 77002

James P. Moon, Esq.
2642 Brenner Drive
Dallas, TX 75220

Christopher M. Weil
Weil & Petrocchi, P.C.
1601 Elm Street, #1900
Lock Box 100
Dallas, TX 75201

Richard G. Grant
3102 Oak Lawn Avenue, #700
Dallas, TX 75219

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, TX 78403-1662

Matthew A. Rosenstein
American Bank Plaza, #420
711 N. Carancahua
Corpus Christi, TX 78475

Ronald A. Simank, Esq.
615 N. Upper Broadway, #2000
Corpus Christi, TX 78477

Mike Schmidt, Esq.
712 American Bank Plaza
711 N. Carancahua
Corpus Christi, TX 78475