United States District Court
Southern District of Texas
FILED

MAY 1 0 2002,

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
BROWNSVILLE DIVISION

---

CIVIL ACTION B-02-073

---

IN RE: CHARLES B. FELDMAN
DEBTOR

---

Appeal from the United States Bankruptcy Court
for the Southern District of Texas
Brownsville Division
(Bankruptcy Case No. 90-01254-B-11)

---

**RESPONSE BRIEF OF APPELLEE
MIKE BOUDLOCHE, TRUSTEE TO THE
ORIGINAL BRIEF ON APPEAL OF APPELLANT
COLIN KAUFMAN ON APPEAL OF DOCKET NUMBERS 469 AND 470**

Michael B. Schmidt
712 American Bank Plaza
Corpus Christi, TX 78475
SBN 17775200 FBN 10260
361.884.9949
361.884.6000 fax
mbsatty@swbell.net
ATTORNEY FOR MIKE BOUDLOCHE,
SUCCESSOR TRUSTEE

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

CASES AND STATUTES ............................................................................................ ii

**STATEMENT OF JURISDICTION** ..................................................................... 1

**STATEMENT OF ISSUES** .................................................................................... 1

**STANDARD OF REVIEW** .................................................................................... 1

**FACTUAL BACKGROUND** ................................................................................. 2
     MR. KAUFMAN'S BREACHES OF FIDUCIARY DUTY ............................................ 3
     MR. KAUFMAN LOANED HIMSELF CORPUS .......................................................... 4
     LACK OF RESULTS ................................................................................................ 4
     COURT'S RULINGS THAT ARE THE SUBJECT OF APPEAL ....................................... 4

**ARGUMENT AND AUTHORITY** ........................................................................ 5
     BANKRUPTCY LAW ............................................................................................. 5
         Texas Trust Code .......................................................................................... 7
         Evidence before the Bankruptcy Court .......................................................... 8

     DEFENSIVE ISSUES .............................................................................................. 10
         Bad Faith ....................................................................................................... 10
         Res Judicata .................................................................................................. 11
         Collecting $250,000 Entitles Mr. Kaufman to a $250,000 Fee ...................... 13

**CONCLUSION** ........................................................................................................ 13

EXHIBIT APPENDIX ................................................................................................. 15

## CASES AND STATUTES

Atlantic Mut. Ins. Co. v. Trusck Ins. Exch., 797 F2d 1288, 1293 (5th Cir. 1986). -------------------- 10
Central Sav. v. Stemmon, 848 SW2d 232, 243 (Tex.App.—Dallas, 1992, no writ) ----------------- 10
Douglas v. Aztec Petroleum Corp., 695 SW2d 312, 318 (Tex.App. —Tyler, 1985 no writ) ------- 10
Hawthorne v. Guenther, 917 SW2d 924, 934 (Tex.App.—Beaumont 1996, writ denied).---------- 11
In Re Lil' Things, Inc. 243 B.R. 278, 280 (ND TX. 2000). ------------------------------------------6
In re National Gypsum, 243 B.R. 676, 681 (Bkr. ND. Tex. 1999). ------------------------------ 12
In re Taxman Clothing Co. 49 F.3d. 310 (7th Cir. 1995). ---------------------------------------- 13
In re U.S. Golf, 639 F.2d 1197, 1207 (5th Cir. 1981). ------------------------------------------6
Matter of Fender, 12 F.3d. 480, 487 (5th Cir. 1994). --------------------------------------------2, 6
Matter of Haber Oil, 12 F.3d. 426, 434 (5th Cir. 1994). ----------------------------------------2, 6
Matter of Oxford Management, 4 F.3d. 1329, 133 (5th Cir. 1993). -------------------------------2, 6
Matter of Prudhomme, 43 F.3d. 1000, 1003 (5th Cir. 1995). -----------------------------------6
Matter of Taxman Clothing Co. 49 F.2d 310, 316 (7th Cir. 1995). ------------------------------ 6, 13
Nissho-Iwai Co. v. Occidental Crude Sales, Inc. 729 F 2d 1530, 1549 (5th Cir 1984). -------------- 10
Republic Supply v. Shoaf, 815 F.2d 1046, 1051 (5th Cir. 1987). ----------------------------------11, 12
Sequa Corp. v. Christopher, 28 F.3d. 512, 514 (5th Cir. 1994)------------------------------------6


28 U.S.C. § 158(a) -----------------------------------------------------------------------------1
Rule 8001 FRBP.--------------------------------------------------------------------------------1
Rule 1.14(c) SAFEKEEPING PROPERTY of the Texas Disciplinary Rules of Professional
    Conduct---------------------------------------------------------------------------------7
Tex. Bus. & Com Code § 1.201 (19)-------------------------------------------------------------- 11
Texas Trust Code §§113.052(a)(1), 113.082(a), 113.151-152, 114.061(a) and (b) ----------------7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:
CHARLES B. FELDMAN                    §
    DEBTOR

————————————————————————————

COLIN KELLY KAUFMAN                   §
    APPELLANT                        §        CA NO. B-02-073

V.                                    §        CA NO. B-02-074

MIKE BOUDLOCHE, TRUSTEE               §
    APPELLEE                         §

## RESPONSE BRIEF OF APPELLEE
## MIKE BOUDLOCHE, TRUSTEE TO THE
## ORIGINAL BRIEF ON APPEAL OF  APPELLANT
## COLIN  KAUFMAN ON APPEAL OF DOCKET NUMBERS 469 AND 470

### STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to **28 U.S.C. § 158(a)** and **Rule 8001 FRBP**.

### STATEMENT OF ISSUES

Were the Bankruptcy Court's findings that Mr. Kaufman breached his fiduciary duties to the Feldman Estate, clearly erroneous?

Were the Bankruptcy Court's findings that, in view of these breaches, a reasonable and necessary fee for Mr. Kaufman's services was $50,000, plus expenses, clearly erroneous or an abuse of discretion?

### STANDARD OF REVIEW

The standard of review for appeal from a bankruptcy court decision is to review findings of fact for clear error.  A finding of fact is clearly erroneous when, although there is evidence to

support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed. *Matter of Haber Oil*, 12 F.3d. 426, 434 (5th Cir. 1994).

The Court reviews conclusions of law de novo. *Matter of Oxford Management*, 4 F.3d. 1329, 133 (5th Cir. 1993). A bankruptcy court's determination of attorneys' fees is reviewed for abuse of discretion, and its specific findings of fact supporting the award are reviewed for clear error. Although the awarding court must explain the factors that affects its award, the amount awarded lies in the judge's discretion and is recalculated only if the judge abuses that discretion. *Matter of Fender*, 12 F.3d. 480, 487 (5th Cir. 1994).

## FACTUAL BACKGROUND

This is a serious case of a fiduciary trustee violating his fiduciary duties, being removed therefore and ordered to disgorge unreasonable fees he paid himself. Debtor filed for Bankruptcy under Chapter 11 in 1990. In 1992 a Plan was confirmed naming Harlingen National Bank as Trustee. The Plan provides that the Trustee is to *"have the powers, duties and responsibilities as set forth in the Texas Trust Act"*. **See**, §7.3 on page 8 of the 1st Amended Plan, CKS EX 2. The Bankruptcy Court retained jurisdiction of the administration of the Plan, including jurisdiction *"to hear and determine for allowance all applications for compensation and reimbursement of expenses"*. **See**, §15.1 (k) on page 14 of the 1st Amended Plan, CKS EX 2. In 1992, the Plan was modified to substitute Mr. Kaufman as Trustee in the place of the Bank and to require Mr. Kaufman to *"submit his accounts to the Bankruptcy Court for approval."* **See**, No. 4 and 5 on page 3 of the Modification to 1st Amended Plan, CKS EX 3. Mr. Kaufman never filed a fee application until after he had already pay himself all of the money in the trust and the Bankruptcy Court ordered Mr. Kaufman to file a Final Fee Application.

The Plan provided that the Debtor was to pay funds received from the sale of Debtor's

2

assets and net income received from Debtor's businesses over to Mr. Kaufman. Mr. Kaufman was then to account and pay over the funds received from the Debtor to creditors on a semi-annual basis. **See,** §4.2.2 on page 6 of the 1st Amended Plan, CKS EX 2.

Mr. Kaufman's Breaches of Fiduciary Duty

Mr. Kaufman failed to make any of the mandated semi-annual payments to the creditors as required by the Plan. **See,** page 6 of the Memorandum Opinion and Order, EX 2. Beginning in 1995, CKS, a creditor, began demanding accountings from Mr. Kaufman since they had not received any funds. While providing CKS with seven documents labeled as accountings, and one more document labeled final accounting, none were adequate to provide basic information about receipts, disbursements and transactions regarding the trust property. The documents labeled accountings, provided by Mr. Kaufman, listed receipts, and in some, an estimation of expenses, but not until the final one, was there an indication that there was over $250,000 paid to Mr. Kaufman. **See,** pages 8 through 10, of the transcript of the June 28, 2001 hearing, EX 1. In the Bankruptcy Court's words, these accountings failed to rise to the level of including the *"kind of information that's normally included in an account."* **See,** page 9; line 14, of the transcript of the June 28, 2001 hearing, EX 1. And, *"there wasn't adequate accounting given in this particular case."* **See,** page 11; line 5, of the transcript of the June 28, 2001 hearing, EX 1. The Bankruptcy Court also noted that *"None of the accounting included information which would alert beneficiaries that the expenses of the trust might exceed its corpus."* **See,** page 4 of the Memorandum Opinion and Order, EX 2.

During his tenure as Trustee, Mr. Kaufman, collected $354,066.92 and, without court review or approval, paid himself, $278,631.50 in fees from the trust corpus. After payment of other court-approved fees and expenses, there remained, as corpus, only $600 in Mr. Kaufman's hands.

3

Opinion and Order EX 2.

### Mr. Kaufman Loaned Himself Corpus

Mr. Kaufman charged on an hourly basis for work. However, from June 23, 1999 through March 26, 2001, Mr. Kaufman paid himself $49,428.95 more then he even said was owed to him. **See**, page 11; line 11 through page 12, Line 2, of the transcript of the June 28, 2001 hearing, EX 1 and **See**, Ledger of Amounts Paid to Mr. Kaufman, CKS EX 17. This $49,428.95 was an advance by Mr. Kaufman to himself, or in other words, a wrongful loan from the corpus by the Trustee to himself. **See**, pages 4-5 of the Memorandum Opinion and Order, EX 2.

### Lack of Results

Mr. Kaufman admitted in his testimony that all of the money the Trust received was disbursed for fees, and most of that went to him. CKS EX 11 page 34, line 8-17. The Bankruptcy Court reviewed Mr. Kaufman's accounts, bills and testimony; the testimony of Harrell Browning; and CKS Exhibits 17 and 18 and concluded that Mr. Kaufman had not satisfactorily explained his charges were reasonable or justified. **See**, page 12, line 21 through Line 24, of the transcript of the June 28, 2001 hearing, EX 1. The Court concluded that while Mr. Kaufman was charged with collecting payments from the Debtor and distributing them to the creditors, instead he used the entire amount collected to pay himself large fees. The fees Mr. Kaufman paid himself did not result in the receipt of sufficient money for the estate to justify the size of Mr. Kaufman's large fees. In comparison to the size of the corpus, Mr. Kaufman's fees, which consumed the corpus, were unreasonable. **See**, page 6 of the Memorandum Opinion and Order, EX 2.

### Court's Rulings That are the Subject of Appeal

The Bankruptcy Court held an evidentiary hearing on the Motion of CKS to remove Mr. Kaufman as Trustee. On June 28, 2001, the Bankruptcy Judge, in open Court, announced his ruling

removing Mr. Kaufman as Trustee. On June 29, 2001, the Bankruptcy Court entered an Order removing Mr. Kaufman as Trustee. By Order entered August 21, 2001, Mike Boudloche was appointed successor trustee. By Order entered January 29, 2002, a deadline was set for Mr. Kaufman to file his Final Fee Application, which he filed February 8, 2002 and hearing held thereon February 22, 2002.

By Memorandum Opinion and Order entered March 7, 2002, docket No. 469 (the "Memorandum Opinion and Order"), the Bankruptcy Court found that Mr. Kaufman as Trustee for the Feldman Bankruptcy Estate breached his fiduciary duties and denied his fee application of $451,926.11 in fees and expenses, but in the Court's discretion, approved a lesser fee of $50,000 plus expenses. The Bankruptcy Court found specific breaches by Mr. Kaufman of his fiduciary duty and determined that $50,000 was a reasonable and necessary fee for Mr. Kaufman's services. Mr. Kaufman was ordered to disgorge the balance of the funds he had paid to himself and pay it over to Mike Boudloche, Trustee. A Final Judgment, docket No. 470, was entered March 12, 2002, (the "Final Judgment") against Mr. Kaufman in favor of Boudloche, as Trustee for $214,871.89, plus interest at the federal judgement rate.

This is an appeal by Mr. Kaufman from that Memorandum Opinion and Order and the Final Judgement. Mr. Kaufman has not appealed the Order removing him as trustee and that Order is now final and non-appealable.

## ARGUMENT AND AUTHORITY

### Bankruptcy Law

1.    The standard of review for appeal from a bankruptcy court decision is to review findings of fact for clear error. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite

evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed. *Matter of Haber Oil,* 12 F.3d. 426, 434 (5th Cir. 1994). The U.S. District Court functions as an appellate court in appeals of Bankruptcy Court decisions. *In Re Lil' Things, Inc.* 243 B.R. 278, 280 (ND TX. 2000). A District Court may not, however, make independent factual findings and is not to set aside the Bankruptcy Court's findings of fact unless they are clearly erroneous. *Sequa Corp. v. Christopher,* 28 F.3d. 512, 514 (5th Cir. 1994); *In Re Lil' Things, Inc.* at 280. The Court reviews conclusions of law de novo. *Matter of Oxford Management,* 4 F.3d. 1329, 133 (5th Cir. 1993). A bankruptcy court's determination of attorneys' fees is reviewed for abuse of discretion, and its specific findings of fact supporting the award are reviewed for clear error. Although the awarding court must explain the factors that affects its award, the amount awarded lies in the judge's discretion and is recalculated only if the judge abuses that discretion. *Matter of Fender,* 12 F.3d. 480, 487 (5th Cir. 1994).

The attorney claiming a fee in a bankruptcy proceeding has the burden to establish the value of his services. Since an attorney may be awarded fees only to the extent that the hours he claims are indeed compensable as valid attorney time, it is incumbent upon the attorney to demonstrate that his hours represent work reasonably necessary. *In re U.S. Golf,* 639 F.2d 1197, 1207 (5th Cir. 1981). The bankruptcy court's broad discretion in awarding and denying fees empowers the bankruptcy court to order disgorgement as a sanction for counsel's nondisclosure. *Matter of Prudhomme,* 43 F.3d. 1000, 1003 (5th Cir. 1995). Fees obtained as a consequence of a breach of fiduciary obligation, even when they are not a willful breach, may be retained only if, by analogy to claims for quantum meriut, the fiduciary, notwithstanding his breach, conferred a benefit on his principal. *Matter of Taxman Clothing Co.* 49 F.2d 310, 316 (7th Cir. 1995).

## Texas Trust Code

2.    The Texas Trust Code is contained in the Texas Property Code and provides in §114.061(a) that a trustee is entitled to reasonable compensation from the trust for acting as trustee. Further § 114.061(b) provides that if a trustee commits a breach of trust, the court may in its discretion deny him all or part of his compensation. Furthermore, § 113.082(a) provides that a trustee may be removed and the court may deny all or part of his compensation if the trustee materially violated the terms of the trust, and the violation results in a material financial loss to the trust; or in the discretion of the court for other cause.

3.    A trustee has a fiduciary duty to provide an accounting of trust activity to the beneficiaries. **See,** § 113.151-152 of the Texas Trust Code. A Trustee is prohibited from making loans to himself from trust funds. **See,** §113.052(a)(1) of the Texas Trust Code. **Rule 1.14(c) SAFEKEEPING PROPERTY of the Texas Disciplinary Rules of Professional Conduct for Lawyers** provides:

> "When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. All funds in a trust or escrow account shall be disbursed only to those persons entitled to receive them by virtue of the representation or by law. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved, and the undisputed portion shall be distributed appropriately."

## Evidence before the Bankruptcy Court

4.     The exhibits of CKS admitted at trial, specifically Exhibits CKS 4, 5, 6 and 7 (attached hereto) were written requests to Mr. Kaufman that he make the semi-annual payments required under the Plan and that he provide accountings of his receipts and disbursement of the trust funds.  It is undisputed that Mr. Kaufman never made any semi-annual disbursements as required by the Plan. Mr. Kaufman admitted that all of the money he received as Trustee was disbursed for fees, and most of that went to him. CKS EX 11 page 34, line 8-17.  Further, Mr. Kaufman admitted that he never furnished an accounting containing all of the expenditures and that was because he did not want to tell Feldman that this estate was essentially broke. CKS EX 11 page 61, line 1 to 24.  Mr. Kaufman goes on to testify that it was his intent to pay some of the money he had received back into the estate in order to pay a dividend to the creditors, but that since CKS and the other creditor Parkwell went forward with taking his deposition he was no longer going to do that.  CKS Ex 11, page 62, line 4-13.

5.     The Court further specifically reviewed all of the written documents Mr. Kaufman had labeled as accountings and found they were not adequate accountings reflecting the receipts, disbursements and transactions regarding the trust property. **See,** pages 9 through 11 of the transcript of the June 28, 2001 hearing, EX 1.

6.     The Court further reviewed the disbursements records of Mr. Kaufman, along with the testimony of Harrell Browning and along with CKS EX 17, which is a schedule of the Amounts Mr. Kaufman paid himself from the trust funds.  This evidence shows that for the period of time from June 23, 1999 through March 26, 2001, Mr. Kaufman paid himself $49,428.95 more than even he had testified was owed to him for that time. **See,** pages 11, line 11 through 12, line 2 of the transcript of the June 28, 2001 hearing, EX 1 and CKS EX 17.

8

7.    Relying on the foregoing credible evidence, the Bankruptcy Court found that Mr. Kaufman had breached his fiduciary duty by (i) failing to make semi-annual distribution as required; (ii) by failing to provide adequate accountings when requested; (iii) by paying himself in advance for unearned attorney fees, or what amounted to loaning himself trust funds; and (iv) by paying himself unreasonable attorney fees. **See,** pages 4-6 of the Memorandum Opinion and Order, EX 2. The Bankruptcy Court's findings in this regard are fully supported by the evidence. Mr. Kaufman, who bears the burden of proof, has failed to point to evidence to support an argument that these fact-findings were *clearly erroneous,* and his appeal must therefore be denied.

8.    Furthermore, there was really no factual dispute that all of the money Mr. Kaufman received as Trustee was disbursed for fees, and most of that went to him. CKS EX 11 page 34, line 8-17. The Bankruptcy Court reviewed Mr. Kaufman's accounts, bills and testimony; the testimony of Harrell Browning; and CKS Exhibits 17 and 18 and found that Mr. Kaufman had not satisfactorily explained his charges were justified. **See,** page 12, line 21 through Line 24, of the transcript of the June 28, 2001 hearing, EX 1. The Court concluded that while Mr. Kaufman was charged with collecting payments from the Debtor and distributing them to the creditors, instead he used the entire amount collected to pay himself large fees. The fees Mr. Kaufman paid himself did not result in the receipt of sufficient money for the estate to justify the size of Mr. Kaufman's large fees. In comparison to the size of the corpus, the Bankruptcy Court found Mr. Kaufman's fees, which consumed the corpus, were unreasonable. **See,** page 6 of the Memorandum Opinion and Order, EX 2. Mr. Kaufman, who bears the burden of proof, has failed to point to evidence to support an argument that these fact-findings were *clearly erroneous*, or that the Bankruptcy Court abused its discretion in permitting a fee of $50,000, plus expenses.

9

<u>Defensive Issues</u>

### *Bad Faith*

9.       Mr. Kaufman asserts for the first time in this appeal a defensive issue that §7.5 of

the Plan requires that he be found to have committed an intentional tort before the Bankruptcy

Court can take money away from him.  Specifically, he argues there must be a finding of *bad*

*faith* or *gross negligence.*   What the Bankruptcy Court actually did, however, was determine that

Mr. Kaufman was not entitled to the fees he had taken.  §7.5 of the Plan would only be

applicable in the event one were to sue Mr. Kaufman for damages.  It is not relevant in

determining the reasonableness of his fee.

10.       This defensive issue of *bad faith* is raised here for the first time on appeal. "An issue

raised for the first time on appeal generally is not considered unless it involves a purely legal

question or failure to consider it would result in a miscarriage of justice." *Atlantic Mut. Ins. Co. v.*

*Trusck Ins. Exch.*, 797 F2d 1288, 1293 (5ᵗʰ Cir. 1986).   Interpretations of contract clauses that are

not raised at trial are not reviewed for the first time on appeal. *Nissho-Iwai Co. v. Occidental*

*Crude Sales, Inc.* 729 F 2d 1530, 1549 (5ᵗʰ Cir 1984).   This is because it would be prejudicial to

the adverse party since they were not given an opportunity at trial to present evidence on questions

of fact concerning the contract clauses. *Atlantic Mut. Ins. Co.* at 1293.

11.       However, out of an abundance of caution, we address this point raised for the first

time on appeal on its merits. It is black letter law, that a fiduciary owes the highest duty of

confidence and trust as a matter of law.  *Central Sav. v. Stemmon,* **848 SW2d 232, 243**

**(Tex.App.—Dallas, 1992, no writ)**    The duty owed is one of loyalty and good faith, strict

integrity, and fair and honest dealing. *Douglas v. Aztec Petroleum Corp.,* **695 SW2d 312, 318**

**(Tex.App. —Tyler, 1985 no writ)**   There is a general prohibition against the fiduciary using the

10

relationship to benefit his personal interest, except with <u>full</u> knowledge and consent of the principal. *Hawthorne v. Guenther*, **917 SW2d 924, 934 (Tex.App.—Beaumont 1996, writ denied).** **Tex. Bus. & Com Code § 1.201 (19)** defines *good faith* as *"honesty in fact in the conduct or transaction concerned".* The Bankruptcy Court found that for ten years Mr. Kaufman (i) had not made the semi-annual distributions required of him; (ii) since 1995, had given inadequate accountings, that failed to show his fees were consuming the corpus; (iii) without consent made loans to himself of the corpus; and (vi) used the Trust's entire amount collected to pay himself a large fee. Where is the honesty, integrity and fair dealing in that transaction? Mr. Kaufman, who bears the burden of proof on this issue, has not shown this conduct to be in *good faith,* and that is what the Bankruptcy Court concluded.

### *Res Judicata*

12.    Mr. Kaufman asserts for the first time on appeal that *res judicata* protects him from the Bankruptcy Court's findings that he breached his fiduciary duty in giving inadequate accountings.    He claims the Bankruptcy Court had ordered no more accounting, that Mr. White was hired to give accountings and Judge Kazen's ruling had ruled on the complaints about the accountings.    The elements necessary for application of *res judicata* are: the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must be a final judgment on the merits and the same cause of action must be involved. *Republic Supply v. Shoaf,* **815 F.2d 1046, 1051 (5th Cir. 1987).**

13.    In reverse order, Judge Kazen's involvement in these matters are the result of the disciplinary action being filed against Mr. Kaufman by counsel for CKS.    Neither Mike Boudloche nor this Estate is a party to that disciplinary proceeding and CKS has no standing to represent them, consequently there is no identity of parties. *Republic Supply* **at page 1051.** Judge Kazen has not

11

rendered any decision on the merits of Mr. Kaufman's responsibility to repay the Estate for his unreasonable fees. Judge Kazen's action involve Mr. Kaufman's qualification to practice law in federal court and nothing Judge Kazen did disposes of Mr. Kaufman's responsibility to repay unreasonable fees under the Memorandum Opinion and Order or the Final Judgment. *Republic Supply* **at page 1053.** Lastly, the disciplinary action before Judge Kazen does not involve the same cause of action. The disciplinary action before Judge Kazen can only affect Mr. Kaufman's qualification to practice law and will not extinguish the cause of action in the Bankruptcy Court for Mr. Kaufman's responsibility to repay the unreasonable fees he took without prior court approval. *Republic Supply* **at page 1053.**

14. Mr. Kaufman claims White was hired to do accountings and that the order employing White is *res judicata*. First, the order authorizes the employment of White to assist Mr. Kaufman, not the shifting of responsibility for the accounting. A trustee can not delegate his trust duties. The trustee, upon acceptance of the trust, is under a duty to administer the trust. The trustee cannot commit the administration of a trust to an agent unless permitted by the trust agreement. And, where a trustee has properly delegated to agents, the trustee maintains a duty to exercise general supervision over that conduct. *In re National Gypsum*, **243 B.R. 676, 681 (Bkr. ND. Tex. 1999).** While Mr. White may have been employed to assist Mr. Kaufman in the performance of his duties, nothing in that order employing White, authorized or permitted Mr. Kaufman to escape liability for breach of his duty to truthfully and fully account. Mr. Kaufman could not delegate his trust duties to account to White and the order employing him does not act as *res judicata* on Mr. Kaufman's responsibility to account accurately. Nothing in the White order would extinguish Mr. Kaufman's responsibility to repay the unreasonable fees he took.

15. Any order denying a motion to compel any more accountings does not relieve Mr.

12

Kaufman of his duty to accurately and fully account. Nothing in that order would extinguish Mr. Kaufman's liability for responsibility to repay the unreasonable fees he took.

### Collecting $250,000 Entitles Mr. Kaufman to a $250,000 fee

16.     Mr. Kaufman argues that the mere fact that he collected $250,000 entitles him to pay himself a $250,000 fee. **See,** footnote 4 on page 17 of Mr. Kaufman's brief. He cites as authority for this proposition, ***Matter of Taxman Clothing Co.* 49 F.3d. 310 (7th Cir. 1995).** The *Taxman* case was cited by the Bankruptcy Court in the Memorandum Opinion and Order as authority for denying Mr. Kaufman's fee application. The *Taxman* Case, contrary to Mr. Kaufman's statement, really stands for the proposition that a lawyer, as a fiduciary, cannot just generate fees in prosecuting claims of their estate, but must exercise care, diligence and skill in all that they do. A lawyer cannot just generate fees at the expense of the creditors and "*absent extraordinary circumstances, bankruptcy estates should not be consumed by the fees and expenses of court-appointed professionals.*" ***Taxman* at 316**. Mr. Kaufman, who bears the burden of proof on this issue, offers no evidence of the existence of any extraordinary circumstances that justify his total consumption of this estate. To the contrary, the clear evidence is that the fees charged were unnecessary and unreasonable.

17.     Mr. Kaufman has set forth many other arguments in his Brief that do not appear to be relevant to the issue of whether or not he has sufficiently meet his burden to show the Bankruptcy Court's decision on the unreasonableness of his fees was *clearly erroneous*. In an effort to be brief, we have not addressed all of these other argument. In the event this Court should request further briefing on any issue, we will provide it.

### CONCLUSION

Appellant has wholly failed to present any credible evidence or argument that the

Bankruptcy Court's findings are clearly erroneous or that it abused its discretion in determining Mr.

Kaufman's fee's were unreasonable. The Bankruptcy Memorandum Opinion and Order and Final

Judgment should be affirmed.

Respectfully submitted,

Michael B. Schmidt
712 American Bank Plaza
Corpus Christi, TX 78475
SBN 17775200 FBN 10260
361.884.9949
361.884.6000 fax
mbsatty@swbell.net
ATTORNEY FOR MIKE BOUDLOCHE,
SUCCESSOR TRUSTEE

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing legal document
was mailed, regular U.S. Mail, on this __9__ day of May, 2002 to the persons listed below:

Mike Boudloche
1508 American Bank Plaza
Corpus Christi, TX 78475

Colin Kaufman
1106 Third St.
Corpus Christi, TX 78404-2312

Matthew Rosenstein
420 American Bank Plaza
Corpus Christi, TX 7847

James Moon
6001 Summerside Dr. Ste 200
Dallas, TX 75252

Ron Simank
615 N. Upper Broadway, Ste 2000
Corpus Christi, TX 78476

Michael B. Schmidt

14

## EXHIBIT APPENDIX

Exhibit 1 ...............................................................................................................3, 4, 8, 9

Exhibit 2 .................................................................................................................3, 4, 9

CKS Exhibit 2 ...........................................................................................................2, 3

CKS Exhibit 3 ...............................................................................................................3

CKS Exhibit 4 ...............................................................................................................8

CKS Exhibit 5 ...............................................................................................................8

CKS Exhibit 6 ...............................................................................................................8

CKS Exhibit 7 ...............................................................................................................8

CKS Exhibit 11 ......................................................................................................4, 8, 9

CKS Exhibit 17 .........................................................................................................4, 8

## BANKRUPTCY COURTROOM MINUTES

Judge: Richard Schmidt
Deputy: *Joyce Burk*
ERO: *Ginny Pallett*

Case no: **90-01254-11**
Office: ~~Brownsville~~ *Corpus Christi*
Date: 06/22/01
Time: 09:00am

Debtor: **Charles B. Feldman**
Movant: *CKS Asset Management*
　　　　Appearances:
Attorney for debtor: **James P Moon**
Trustee: **Colin Kelly Kaufman**　　　　　　　　　　Atty:
*Matthew Rosenstein* for *CKS Asset Management*
*Richard Grant* for *CKS Asset Management*
*Barbara Kurtz* for *US Trustee*
~~Jet al.~~ *Ron Simank for Parkwell Investments, Inc.*

PROCEEDING/TRIAL
This hearing pertains to instrument number **412**: **Motion for removal of Trustee** ; *(2) For Disgorgement of Unreasonable Fees Taken Without Court Approval ; and (3) For Damages to Estate for Breach of Fiduciary Duty and Misapplication of Funds*

DISPOSITION-T

| | | |
|---|---|---|
| ⌐Granted | ⌐Denied | ⌐Moot  ⌐Settled |
| ⌐Withdrawn | ⌐Satisfied | |
| ⌐Order Presented | ⌐Order Signed | ⌐Agreed Order |
| ⌐Plan Confirmed | | ⌐ Disclosure Statement Approved |
| ⌐Dismissed by: | ⌐Court | ⌐Stipulation |
| ⌐ Oral Motion by | | ⌐ to be submitted by |
| ⌐ | | |

DISPOSITION-P

⌐ Under Advisement
☑ Adjourned to *6/27 - Telephone conf.*　⌐ Passed and reset to
⌐ *Parties will be advised as to time*

⌐ Exhibit admitted/list attached
⌐ Witness list admitted/attached

*482*



U.S. DISTRICT COURT
SOUTHERN DISTRICT TEXAS
FILED,

JUN -3 01

MICHAEL N. MILBY, CLERK

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

IN RE:                          §        BANKRUPTCY
                                §
CHARLES B. FELDMAN,             §        NO. 90-01254-11
                                §
            DEBTOR.             §        CORPUS CHRISTI, TEXAS
                                §        JUNE 28, 2001
                                §        3:01 P.M.
. . . . . . . . . . . . . . . . . . . . . . . . . . §

TRANSCRIPT OF RULING

BEFORE THE HONORABLE RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES FOR:

THE DEBTOR:                     MR. JAMES P. MOON
(BY TELEPHONE)                  JAMES P. MOON & ASSOCIATES
                                2611 W. OVILLA ROAD
                                RED OAK, TEXAS 75154

COLIN KAUFMAN:                  MR. COLIN K. KAUFMAN
                                ATTORNEY AT LAW
                                P.O. BOX 1662
                                CORPUS CHRISTI, TEXAS 78403

CKS ASSET MANAGEMENT:           MR. MATTHEW ROSENSTEIN
                                ATTORNEY AT LAW
                                STE 420, 711 N. CARANCAHUA
                                CORPUS CHRISTI, TEXAS 78475

U.S. TRUSTEE'S OFFICE:          MS. BARBARA KURTZ

THE COURT RECORDER:             MS. SUNNY COLLETT

PROCEEDING RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
GARCIA SERVICES CORP., P.O. BOX 1718
ROCKPORT, TEXAS 78381, (361) 727-0983

444

1       (The proceedings began at 3:01 p.m.)

2               THE COURT:  Be seated.  Mr. Moon has called in

3    Hello?  Hello?

4               MR. MOON:  Hello, Your Honor, this is James Moon.

5               THE COURT:  All right.  And I see Mr. Rosenstein and

6    Barbara Kurtz and Mr. Kaufman in the courtroom.

7               MR. MOON:  Thank you.

8               MR. ROSENSTEIN:  Your Honor, might I add that Mr.

9    Kaufman apparently sent a communication to the Court, he

10   noticed everybody except me, my name is not even on the fax

11   list and I did not get a copy of what he sent the Court nor

12   the attachments that he sent to the Court.

13              MR. KAUFMAN:  I haven't seen the fax list, Your

14   Honor, so I don't know if that's true or not.

15              MR. ROSENSTEIN:  Well, Ms. Kurtz just gave it to me.

16              MR. KAUFMAN:  But, nevertheless, I had specific

17   instructions to fax it to everyone.  I've got, I have the

18   letter, I'll be glad to give it to him, but the letter says

19   if anyone wants a copy of the exhibits that I furnished the

20   Court that we would furnish them a copy.

21       (Off the record discussion at counsel table)

22              MR. KAUFMAN:  I haven't seen it.  Yeah, I have to

23   agree, Your Honor, it shows that it was faxed to Curtis

24   Bonner, Ron Simank, James Moon, Richard Grant, Barbara Kurtz

25   and C. Ditto.  Richard Grant, of course, is his co-counsel,

3

1    but if I had seen it I would have told them to fax it to Mr.

2    Rosenstein instead of Mr. Grant, or to both of them.

3            THE COURT:  Okay.  Well, so it was sent to Mr. Ditto

4    and to your co-counsel?

5            MR. ROSENSTEIN:  Richard Grant, but I believe he's

6    involved in some other matters at this point.  He came down

7    for the limited purpose of participating or representing the

8    client in connection with the opposition to Mr. Kaufman's

9    motion to cancel the claim.

10           THE COURT:  Okay.  A review of this file indicates

11   to me -- Mr. Simank is not here, first of all, is that

12   correct?

13           MR. ROSENSTEIN:  That's correct.  I spoke with him a

14   few minutes ago, he had just gotten back from Florida and he

15   was not dressed appropriately for court.

16           THE COURT:  Is there still pending the issue of Rule

17   11 sanctions and the objection to his claim?

18           MR. ROSENSTEIN:  To whose claim?

19           THE COURT:  Mr. Simank's client's claim.

20           MR. KAUFMAN:  It was never ruled on, Your Honor.

21           THE COURT:  Is that issue still pending?

22           MR. KAUFMAN:  Yes, Your Honor.

23           THE COURT:  Is there also still pending the issue of

24   sanctions for violation of the confirmation injunction by

25   filing the --

4

1          MR. MOON:  Yes, Your Honor, the --

2          THE COURT:  -- lis pendens matter?

3          MR. MOON:  Yes, sir, it is still, it has not been

4  ruled on.

5          THE COURT:  And so at one time I ordered $6,000 in

6  fees when nobody was there and then when somebody, they

7  apparently came and asked for reconsideration and so I

8  basically rescinded the order, is that correct?

9          MR. MOON:  Yes, sir, you set aside --

10          THE COURT:  So that issue is still outstanding.

11          MR. MOON:  Yes, you set aside the order pending a

12  resetting by the Court.

13                          RULING

14          THE COURT:  All right.  All right, well, we had,

15  we've had a trial of a matter involving a confirmed plan of

16  reorganization.  The confirmed plan of reorganization, as

17  many do, provided a trustee, a plan trustee.  The evidence

18  that was presented indicates that the plan originally contem-

19  plated that a bank would be the trustee, the bank, the client

20  would be the trustee, and then negotiations by the parties

21  involved, after negotiations Mr. Kaufman agreed to be the

22  plan trustee.  While the plan doesn't really establish a

23  trust, it sets up a trustee.  I think that the evidence that

24  was presented and the statements in the plan as well as the

25  pleadings in this file indicate to me that the plan contem-

1   plated, first of all, there is some question as to the

2   wording of the plan and the plan trustee's accounts to be

3   filed with the Court and then a final accounting to be filed

4   with the Court.  I think that there is really little question

5   that the plan contemplated that fee applications were not

6   required.  The plan contemplated that there was a trustee and

7   that that trustee would not have to file a fee application to

8   pay expenses out of the trust.  I think that the plan also

9   contemplated that the trustee would be paid and in this par-

10  ticular case I think the evidence indicates that the plan,

11  that the trustee would be paid at his legal rate, and the

12  plan contemplated that the trustee, being a lawyer, would do

13  some legal work in the context of his, although he's not

14  required to do, he, in fulfilling his duties as plan trustee

15  could in fact perform legal work.  The plan also contemplated

16  that the Court would retain jurisdiction.  It would retain

17  jurisdiction to review accountings and retain jurisdiction to

18  replace the trustee and retain jurisdiction to adjudicate

19  problems that might arise out of this plan.  While there was

20  no fee application required, there's nothing in the plan that

21  prohibited the filing of a fee application.  Now, there have

22  been many legal as well as, many allegations been made in

23  this particular case.  There's no question as a general rule

24  that there is an inherent potential conflict of interest when

25  you represent yourself as a lawyer for a plan trustee.

1   There's also no question as a legal or factual matter that a

2   plan trustee is a beneficiary, I mean a fiduciary, and owes a

3   duty, a fiduciary duty, to the beneficiaries of the plan.

4   And so that right off the bat, if you are doing legal work

5   and paying yourself for the legal work, there is no one to

6   supervise, no one to challenge the amount of work you do.

7   You know, while in Gilbert & Sullivan perhaps a person can

8   assume 50 different responsibilities, in truth you can't just

9   assume your hat as plan trustee and thereby negotiate with

10  you in your hat as plan lawyer to make certain that you ful-

11  fill your fiduciary duties in not overpaying the lawyer.  So

12  while there's nothing illegal and I think there's no question

13  that the drafters of this plan and the creditors that negoti-

14  ated this plan in the beginning contemplated that the plan

15  trustee as he was hired would do that, the trustee then has

16  the fiduciary duty to be aware of all of the potential pit-

17  falls that might occur as a result of that.  The system

18  requires that when you assume a fiduciary duty you have to go

19  out of your way to make certain that any of these conflicts

20  don't turn into real conflicts.  In addition to that, as a

21  general rule when professionals are representing or working

22  for an estate, the general rule is that reasonable fees do

23  not exceed the value of the estate.  While it's not a legal

24  principle that there can't be legal fees that exceed the

25  value of the estate -- there's no question there can be and

1   there has been litigation in which the scorched-earth tactics

2   lead to costs and expenses far in excess of the amount that's

3   being litigated over -- however, as a general rule this Court

4   will always be suspect any time the fees and expenses exceed

5   the value of the estate.  Even if the plan trustee had hired

6   a separate lawyer and then had paid that attorney 100 percent

7   of the plan assets, that would be a red flag that would

8   require the trustee to come in court perhaps, if somebody

9   questioned it, and would require the trustee to account for

10   the fact that he agreed to pay out over 100 percent of the

11   plan assets to the attorney for doing work for the estate,

12   and so that every t should be crossed, every i should be

13   dotted and there should be substantial backup to account for

14   any such situation.  Under the terms of this plan the trustee

15   had the right to pay without a court order but could have

16   sought a court order.  Now, there has been some question,

17   there have been some statements that the tactic here of not

18   disclosing might be, that that was somehow a justification

19   for the fact that the trustee didn't disclose completely

20   everything that was going on in this case.  While that tactic

21   might be appropriate and in fact it might be required under

22   certain circumstances and it might be so if it were in

23   furtherance of fiduciary duties, here there was no duty of

24   secrecy and in fact, as I'll discuss, the creditor CKS had a

25   right to information about this estate.  The Bankruptcy Court

1   and bankruptcy itself has to rely on notice for the vast

2   majority of the work that's done.   In this particular case

3   there are allegations that there was no notice of what was

4   going on and that that somehow should be used to suggest that

5   somebody was in fact fraudulently paying out too much in this

6   particular case.   Now, I have reviewed extensively this

7   particular file because those particular allegations were

8   very troubling.   And if you do review this file in detail you

9   find that at docket entry 220 there was notice that the fees

10  at that time, in January of 1995, on the 9th of January of

11  1995 were about $2,000.   By April of 1997, in docket entry

12  number 272, the fifth accounting, there was a statement that

13  the fees exceeded $30,000.   By 13th of May of '97, in docket

14  entry number 275, the sixth report, there was the statement

15  that there had been an additional $10,000 in fees or

16  expenses.   By 29 May of 1997 there was a report that there

17  was at least $80,000 in the accounts of the estate and a

18  recognition that a third accounting had been received, since

19  that was a pleading by CKS.   By September of 1997, in a

20  seventh report, there was a recognition that there had been

21  $75,000 in trustee's fees and expenses to date and that there

22  was a net of $130,000 in the estate.   There is also some evi-

23  dence that there was, in addition to these accountings there

24  were other accountings.   There were some seven accountings

25  prior to the final accounting.   The first accounting appeared

1  to be mailed.  The second, fourth and seventh appeared to be

2  handed out in court, and as I indicated, the third accounting

3  which was mentioned in the pleading of CKS was also handed

4  out in court, which would lead one to believe that, in addi-

5  tion, the second, fourth and the seventh were in fact

6  received.  The fifth accounting is docketed at docket entry

7  number 272, the sixth accounting is docketed at docket entry

8  number 275 and the seventh accounting was handed out, as the

9  certificate of service states, in open court.  So I think

10  there is no credence to the position that the plan trustee

11  was somehow hiding everything.  Now, a review of these

12  accountings, any of the accountings in this particular

13  estate, would point out that none of these accountings rise

14  to the level of the kind of information that's normally

15  included in an account.  While not binding, the plan does

16  mention that the trustee has all of the rights and responsi-

17  bilities, or the rights at least, of a trustee under the

18  Trust Code.  Section 113.152 specifically sets what goes in

19  an accounting.  A written statement of accounts shows all the

20  trust property that's come into the trustee's knowledge or

21  possession.  It's a complete account of all receipts, dis-

22  bursements, transactions regarding trustee of the trust

23  property.  A listing of all the property being administered

24  with adequate descriptions.  The cash balance on hand, the

25  name and nature of the depository where the balance is kept

1  and all known liabilities owed by the trust.  I mean it's

2  really very simple and I don't know even, I assume that CPA's

3  probably under GAAP have other types of accounting but

4  there's no question that had we followed the, it seems to me

5  that had we followed the Trust Code for what an accounting is

6  in a statement of all those, that would be, that would in and

7  of itself constitute sufficient accounting by the trustee.

8  The accounts, for the most part, are a listing of receipts

9  and in some accounts there is an estimation of expenses, but

10  not until the very final accounting is there an indication

11  that there are over $250,000 in fees and expenses by the plan

12  trustee.  The law with respect to fiduciary duties is

13  expressed by the Texas Appeals Court in a case called Edwards

14  versus Holloman which held that charging an unreasonable fee

15  was a breach of fiduciary duty.  There was some discussion in

16  this case about the Canons of Ethics.  You know, there has

17  always been a conflict as to when a lawyer can put money in

18  his trust account and when a lawyer has to create a separate

19  account for money.  In this particular case there was the use

20  of an IOLTA account.  There are ways of getting permission

21  not to use the IOLTA account but in this particular case,

22  this is not a case in which the trustee simply put all the

23  money in his own account, he was placing it in a trust

24  account.  However, the Texas Disciplinary Rules do require

25  that if a third-party beneficiary or a third party who has a

1  right, a potential right to money seeks an accounting, they

2  are entitled to an accounting.  In this particular case, it

3  seems to me, after reviewing the quality of the accounting

4  that has been given, while there was notice given in this

5  case there wasn't adequate accounting given in this parti-

6  cular case.  In addition to that, the evidence seems to

7  indicate that there was a failure to make the semiannual dis-

8  bursements as required by the plan.  And it does seem to me

9  that CKS is a beneficiary of the plan as a creditor and thus

10 is a third person entitled to accounting upon request as set

11 out in the Canons of Ethics.  And I guess the most serious

12 thing that the evidence seems to indicate is that there were

13 payments made by the plan trustee to the plan trustee for

14 fees that according to his fee expense were not owed at the

15 time.  In other words, the trustee appeared to be making

16 periodic payments to himself rather than paying himself the

17 amount of the fees that he now states were owed over a period

18 of time.  I think that that would be inappropriate, that the

19 trustee, the plan trustee had -- there's nothing in the plan

20 that would have prohibited the trustee from having a set fee

21 over a period of time and I guess that could have been done,

22 but the plan trustee in this case chose to account for his

23 fees by his hours and charge an hourly amount and a review of

24 the amounts paid showed that for a period of time from June

25 23rd, 1999 through March 26th of 2001 there were actually

1    payments made that exceeded the amount that even the trustee

2    said that he was owed at that time.  For all of those reasons

3    and because there are substantial matters yet to take place

4    in this case, there is still left the amounts, if any, that

5    CKS owes this estate as a result of its conduct in placing

6    lis pendens notices on the debtor's property, there is the

7    amount, if any, that CKS may owe as a result of the violation

8    of Rule 11, should there be any, as a result of their objec-

9    tion to the claim of Mr. Simank's client, there is the

10   accounting for the disbursements made by Mr. Feldman and an

11   accounting for his income and the receipts that he should

12   have, if there are any extra that he should have made, that

13   still has to be completed.  There is the allegation by the

14   trustee that he hasn't fulfilled his responsibilities.

15   Because it seems to me that those issues are still outstand-

16   ing and because those may or may not be significant -- they

17   are certainly significant.  Whether they turn out signifi-

18   cant, I don't know, but the litigation of those is signifi-

19   cant.  It appears to me that we still have a need for a plan

20   trustee.  And it seems to me that under the circumstances of

21   this case where there has been, I'm just not satisfied that

22   there has been an explanation, sufficient explanation for the

23   fact that the, the amount of fees that have been charged in

24   relationship to the total amount of the estate, I believe

25   that the appropriate thing would be to appoint a new trustee.

1    I additionally need to decide what if any appropriate fees

2    the plan trustee should be paid.  I think there's no question

3    that the plan trustee did work in the estate and did in fact

4    benefit the estate and there's also no question that we have

5    had sufficient evidence for me to decide what the appropriate

6    fee should be.  While it's also true that it might be helpful

7    for an independent trustee to make an input on this, I don't

8    know that that independent trustee could provide any addi-

9    tional information.  So I am not going to decide today what

10   the amount, if any, of the fee will be.  I will first request

11   that a new trustee be appointed.  And while it's not strictly

12   the providence of the U.S. Trustee to appoint a plan trustee,

13   the first way that I will come about getting a plan trustee

14   is to ask the U.S. Trustee if they will in fact attempt to

15   find a plan trustee, someone to take on this position.  If

16   they don't choose to do that then we'll have to seek another

17   way for that to happen.  So my ruling today is, is that there

18   will be a new trustee appointed, that I reserve the right to

19   determine the amount of fees to be paid to the plan trustee.

20   All right.  Thank you very much.

21        MR. ROSENSTEIN:  Your Honor, we had asked the Court,

22   as a remedy, our attorney's fees and lost interest as a

23   result.  Is the Court not addressing that?

24        THE COURT:  I haven't addressed any of those issues.

25        (The proceedings ended at 3:25 p.m.)

I certify that the foregoing is a correct transcription from the electronic sound recording of the proceeds in the above entitled matter.

JUL 0 3 2001

Judith M. Garcia

United States Bankruptcy Court
Southern District of Texas
ENTERED

MAR 07 2002

Michael N. Milby, Clerk of Court

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

IN RE:                              §
CHARLES B. FELDMAN dba              §        Case No. 90-01254-B-11
CHARLES B. FELDMAN                  §
INVESTMENTS                         §
    Debtor                       §

## MEMORANDUM OPINION AND ORDER ON COLIN KELLY KAUFMAN'S FINAL FEE APPLICATION

On this day came on for consideration the Final Fee Application filed by Colin Kelly Kaufman ("Kaufman"). The Court, having heard the evidence and arguments of counsel, finds as follows:

### BACKGROUND

Kaufman was appointed plan trustee under a confirmed plan of reorganization in this case on September 24, 1992. The Amended Plan of Reorganization (the "Plan") provided for the court's retention of jurisdiction to approve Kaufman's accounts and gave Kaufman the right to seek bankruptcy court approval of his fees and expenses. Kaufman served as Plan trustee until June 28, 2001, when this court removed him for cause[1] and requested that the United States Trustee appoint another Plan trustee. Thereafter, Kaufman filed his Final Fee Application (the "Fee Application"), which was heard by the court on February 22, 2002. The Fee Application seeks court approval of $427,291.50, in fees and $23,634.61, in expenses, for a total of $451,926.11. Kaufman collected 354,066.92, for the beneficiaries, and paid himself a total of

---

[1] The court found that Kaufman's accountings were insufficient, that he failed to make the semi-annual disbursements required by the plan, and that he paid himself fees before they were earned.

1

$278,631.50, from the corpus of the trust. After payment of court-approved fees and expenses to other professionals, only $600.00 is left for creditors of the bankruptcy estate.[2] CKS and Parkwell, creditors and beneficiaries under the Plan, object to Kaufman's Fee Application and seek disgorgement of the payments made by Kaufman to himself. The United States Trustee's office also objected to the Fee Application.

## DISCUSSION

### 1. Jurisdiction.

The court has jurisdiction to hear and decide this matter pursuant to 28 U.S.C. §1334. The Plan provides that the Plan trustee has the right to seek bankruptcy court approval of his fees and expenses and retains jurisdiction in the bankruptcy court for that purpose. The Order Confirming the Plan is a final, non-appealable order.

### 2. The standard of review for fee applications.

Kaufman was a contract trustee appointed by agreement, not a Chapter 11 trustee appointed by this court. The Plan did not contemplate that the Plan trustee would be compensated under the statutory guidelines of 11 U.S.C. §326, but instead was subject to the Texas Trust Code. Two separate types of fees are at issue. First, what is Kaufman entitled to as his compensation for acting as plan trustee? Under Texas law, a trustee "is entitled to reasonable compensation from the trust for acting as trustee." TEXAS TRUST CODE §114.061(a)(Vernon's 2002). Second, should the fees billed by Kaufman as attorney for himself as Plan trustee and paid by Kaufman to himself without notice to any plan beneficiaries, be allowed? Kaufman was

---

[2] The terms "bankruptcy estate" and "trust" or "corpus" are used interchangeably herein because they are indistinguishable in this case. All three terms refer to the pool of assets supervised by Kaufman as trustee for the benefit of creditors of Charles Feldman, the debtor.

2

not barred from hiring himself as attorney for the trustee and was entitled to pay himself a reasonable fee. However, Kaufman's Fee Application does not differentiate between the two services. He billed all services at an hourly rate and the rate did not change according to what "hat" Kaufman was wearing. The uncontroverted evidence indicated that Kaufman negotiated with the Plan proponents to charge his normal hourly rate for all services to the trust. Moreover, Kaufman only agreed to take on the trusteeship after a bank turned it down.

In bankruptcy cases, fee applications are subject to review by the court under the standard set forth in 11 U.S.C. §330(a)(3), which provides as follows:

> (3)(A)(*sic*)In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and
>
> (E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

In the Southern District of Texas, applications for compensation are also required to cover the elements of *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), cert. denied, 431 U.S. 904 (1977). Rule 2016(a), Bankruptcy Local Rules. The *First Colonial* factors are:

> (1) The time and labor required;
> (2) The novelty and difficulty of the questions;
> (3) The skill requisite to perform the legal service properly;

3

(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee;
(6) Whether the fee is fixed or contingent;
(7) Time limitations imposed by the client or other circumstances;
(8) The amount involved and the results obtained;
(9) The experience, reputation, and ability of the attorneys;
(10) The "undesirability" of the case;
(11) The nature and length of the professional relationship with the client;
(12) Awards in similar cases.

- - 544 F.2d at 1298-99.

A bankruptcy court's review of professional fee applications is important for at least two reasons. First, the integrity of the court itself is at issue and must be preserved. *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 337 (Bankr. W.D.Tex. 1989). Second, "[a] bankruptcy court is also charged with evincing an 'over-arching' policy of avoiding the waste of the debtor's estate." *id.* at 336; see also, *First Colonial*, supra. at 1299(economy is the most important principle in awarding fees to the trustee's attorneys); *In re El Paso Refinery, L.P.*, 257 B.R. 809 (Bankr. W.D.Tex. 2000).

### 3. Application of the standards to this case.

As a trustee under the Texas Trust Code, Kaufman had a fiduciary duty to the beneficiaries to provide accountings of the trust activity. TEXAS TRUST CODE §113.151- 152 (Vernons 2002). The court previously held that Kaufman breached this duty. The evidence shows that CKS began demanding accountings from Kaufman in 1995 and continued until Kaufman was removed as trustee. Although Kaufman prepared several accountings, none were adequate. None of the accountings included information which would alert beneficiaries that the expenses of the trust might exceed its corpus. Moreover, Kaufman paid himself in advance for unearned attorneys fees. The Plan did not prohibit the payment of a reasonable retainer.

4

Kaufman's advances to himself, however, could be construed as loans from the trust, which would also constitute a breach of fiduciary duty. A trustee may not loan trust funds to himself. TEXAS TRUST CODE §113.052(a)(1) (Vernons 2002). In addition, Kaufman breached his duties under the Plan by failing to make semi-annual distributions to the beneficiaries. Under Texas law, a court has the discretion to deny the trustee compensation when the trustee commits a breach of trust. TEXAS TRUST CODE, §114.061(b) (Vernon's 2002). Courts have denied all compensation, despite benefits to the estate, when fraud on the court and the estate is present. *See e.g., Matter of Futuronics Corp.*, 655 F.2d 463, 471 (2nd Cir. 1981), cert. denied, 455 U.S. 941 (1982); *In re Endeco*, 675 F.2d 166, 167 (8th Cir. 1982); *In re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358 (Bankr. W.D.La. 1999). Here, however, there was no evidence of fraud. For the above violations of the Texas Trust Code, the court finds that Kaufman's compensation should be significantly reduced as set forth below.

The Seventh Circuit Court of Appeals held that "[f]ees obtained as a consequence of a breach of fiduciary obligation, even a nonwillful breach..., may be retained only if, by analogy to claims for quantum meruit, the fiduciary, notwithstanding his breach, conferred a benefit on his principal." *Matter of Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995). In the *Taxman Clothing* case, the attorney for a chapter 11 trustee consumed the entire chapter 11 estate with fees and expenses. The *Taxman Clothing* court held that "neither the trustee in bankruptcy nor the trustee's lawyer has a duty to collect an asset of the debtor's estate if the cost of collection would exceed the value of the asset." *id.* at 315. Most notably, the court went onto hold that a trustee and the trustee's lawyer have a "duty to endeavor to maximize the value of the estate." *id.* In analyzing the fee application before it under the reasonable and necessary standard of the

5

Bankruptcy Code, the Seventh Circuit Court of Appeals found that the fees were not reasonable or necessary once the efforts required exceeded the potential for recovery. *id.* at 316. Although the *Taxman Clothing* case involved the attorney for a chapter 11 trustee, not a plan trustee, the facts otherwise are quite analogous to the case at bar and the Seventh Circuit's analysis and its conclusion reached, give this court considerable guidance.

Kaufman's attorneys fees in his capacity of attorney for the trustee (himself) are immediately suspect because no system of checks and balances were in place. Absent informed consent from the affected beneficiaries, reasonable fees are only recoverable if they actually resulted in financial benefit to the estate. *See, e.g., In re NRG Resources, Inc.*, 64 B.R. 643 (Bankr.W.D.La. 1986). The court does not dispute that Kaufman spent the time for which he billed. Nor does the court dispute his hourly rate as within the tolerances, although on the very high end, of the rates charged by other bankruptcy attorneys. The reasonableness and necessity of the fees, however, are doubtful based on the results achieved. In short, Kaufman as trustee was charged with collecting payments from the debtor and distributing them to the creditors, but instead, used the entire amount collected to pay himself fees which did not result in collection of sufficient money to justify the fees. Absent notice to the beneficiaries, a trustee may only pay himself a reasonable fee in comparison to the size of the corpus of the trust.

Trustee's fees are calculated in a variety of methods. Corporate trustees are ordinarily paid a yearly fee based on a percentage of the trust, plus expenses including reasonable attorneys fees. Here, the evidence indicated that approximately $3,500 per year, for a total of $35,000 in trustee's fees would be the ordinary compensation paid to a corporate trustee. A chapter 7 or 11 trustee's compensation is limited by statute to a percentage of distributions, which, applying the

6

statutory formula to this case would be approximately $23,000, plus reasonable expenses and attorneys fees. 11 U.S.C. §326(a). Here, however, Kaufman did not distinguish between trustee's fees and attorney's fees and filed one fee application for all services. As noted above, Kaufman's compensation is limited by the benefit to the trust. As trustee, Kaufman did provide some benefit to the estate, including the collection of $200,000 in bank stock. Based on the evidence presented, the court finds that the reasonable amount of fees based on benefit to the estate is $50,000.

"Additionally, the court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure." *Matter of Prudhomme*, 43 F.3d 1000, 1003(5th Cir. 1995)(attorney for chapter 11 debtor ordered to disgorge pre-petition retainer for non-disclosure). Kaufman should be ordered to disgorge all fees collected above the $50,000 awarded herein.

Kaufman argues that the creditors' litigation tactics caused the excessive fees, but the evidence does not bear out his argument. The creditors' primary focus was obtaining accountings which Kaufman was required to provide. Kaufman's fees largely relate to opposing requests for accountings and defending his own reputation, neither of which benefitted the estate.

Kaufman's Fee Application further requests reimbursement of $23,634.61 in expenses. A review of the itemized expenses indicates that most expenses were appropriate, including appraisal fees, copy costs, travel and fax expenses. Also included, however, is nearly $11,000 in computer legal research expenses which, like legal fees, are only reimbursable if they resulted in

benefit. Accordingly, this Court finds that reasonable costs and expenses in this case are $13,759.61.

## CONCLUSION

Taking into consideration the provisions of Section 330(a) of the Bankruptcy Code and the *First Colonial* factors, the court concludes that reasonable and necessary compensation for Kaufman's services as trustee and as attorney for the estate is $50,000, plus expenses in the amount of $13,759.61, for a total of $63,759.61. Kaufman should be ordered to disgorge the balance of all fees and expenses which he previously paid himself.

It is therefore ORDERED that Colin Kelly Kaufman's Fee Application is approved in part and Colin Kelly Kaufman is awarded $50,000.00 in fees and $13,759.61 in expenses, for a total award of $63,759.61.

It is further ORDERED that Colin Kelly Kaufman shall disgorge the balance of the funds paid to him from the trust and shall pay the difference to Mike Boudloche, successor trustee under the Plan.

Corpus Christi this 6th day of March, 2002.

RICHARD S. SCHMIDT
United States Bankruptcy Judge

8

JAMES P. MOON
ERIC A. LIEPINS
SIMPSON, DOWD, & MOON
2828 Woodside
Dallas, Texas 75204
(214) 922-9330
(214) 922-9372 (Fax)

ATTORNEYS FOR THE DEBTOR

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES B. FELDMAN D/B/A | § | CASE NO. 90-01254-B-11 |
| CHARLES FELDMAN INVESTMENTS | § | |
| | § | |
| DEBTOR | § | |

### FIRST AMENDED PLAN OF REORGANIZATION OF
### CHARLES B. FELDMAN D/B/A
### CHARLES B. FELDMAN INVESTMENTS

COMES NOW, CHARLES B. FELDMAN D/B/A CHARLES B. FELDMAN INVESTMENTS (hereafter sometimes referred to as the "Debtor"), pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code ("Code"), 11 U.S.C. Section 1101, et seq., and hereby proposes this his First Amended Plan of Reorganization (hereinafter referred to as the "Plan") to resolve the Debtor's outstanding obligations to his Creditors.

Reference is made to the First Amended Disclosure Statement of Charles B. Feldman d/b/a Charles B. Feldman Investments ("Disclosure Statement") as approved by the United States Bankruptcy Court on May 6, 1992, which discusses the Debtor, his history, business, management, properties, and other matters relating to the request for confirmation of the Plan. Such Disclosure Statement also provides a summary and analysis of the Plan set forth below.

### ARTICLE I

### INTRODUCTION



**1.1** Filing of Reorganization Case

The Debtor filed his Petition for relief under Chapter 11 of the Code on July 11, 1990. Since that date, he has continued in possession of his assets and operated his business pursuant to §§1107 and 1108 of the Code.

**1.2** General Summary of the Plan

As evidenced by this Plan and the Debtor's initiation of this Chapter 11 bankruptcy proceeding, it is the ultimate intention of the Debtor to reorganize and restructure the indebtedness in a manner which will permit the Debtor to satisfy his obligations to his various Creditors, recommence normal business operations, and meet projected sales and operating income and expenses of the Debtor's business affairs.

This Plan contemplates the operation and orderly sale of certain of the non-exempt real property and personal property assets of the Debtor in order to obtain the amounts necessary to assist in funding the payments to the Creditors under the Plan.



FIRST AMENDED PLAN OF REORGANIZATION OF CHARLES B. FELDMAN D/B/A
CHARLES B. FELDMAN INVESTMENTS - Page 1

In addition, the Plan contemplates ~~accept~~ by the Debtor of additional funds out of the compromise and settlement of certain pending litigation (as more specifically described in Article XIX below) relating to stock interests previously held by the Debtor in Feldman's Real Estate, Inc. ("FREI"). Under the terms of such agreement, certain of the Defendants therein have agreed to assign, pledge, and pay to the Plan Trustee any and all net (after the escrow for payment of applicable federal and/or state taxes thereon) distributions and/or dividends received by such Defendants, by virtue of their stock ownership interest in FREI, for a period of five (5) years from the Effective Date of the Plan.

As noted herein, the funds to be utilized for payment of Creditors' Claims under the Plan will be provided through (i) the liquidation and sale of certain of the Stocks and Bonds and the Com Am Units, (ii) the sale of the Duplexes, (iii) the sale of the Arroyo Tracts, the Lots, and the Goad-Theime Property, or the Debtor's interests therein, (iv) the Debtor's Net Profit Distribution from his interests in the Duplexes, CFP, FREI, and FR, and (v) the Net Profit Distribution received from the Feldman Family Interests in FREI for the years 1991 to 1996 (hereafter referred to as the "Plan Term Years").

If the Plan is rejected by one or more impaired classes of Claims held by the Debtor's Creditors, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims or interests impaired by the Plan. The Debtor has requested herein and will request at the hearing on confirmation such a determination (commonly referred to as a "cram-down"), under §1129(b) of the Code, if the Plan or modification thereof is not accepted by one or more of the impaired classes of Claims.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR (INCLUDING, WITHOUT LIMITATION, HIS FUTURE BUSINESS OPERATIONS) OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SPECIFICALLY SET FORTH IN THE DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE WHICH ARE OTHER THAN CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT THE DECISION AS TO WHETHER TO ACCEPT OR REJECT THE PLAN, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO, IN TURN, WILL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE SOLICITATION CONTAINED IN THE DISCLOSURE STATEMENT AND THIS PLAN IS BY THE DEBTOR ONLY AND IS NOT A SOLICITATION BY THE ATTORNEYS OR ACCOUNTANTS FOR THE DEBTOR, AND THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF SUCH ATTORNEYS OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY INDICATED.

## ARTICLE II

## GLOSSARY OF TERMS

Unless the context otherwise requires, the following terms, when used in this Plan shall have the following meanings:

A. Defined Terms

2.1    "Administrative Expense Claim" shall mean a Claim allowed pursuant to §§502(f) or 503 of the Bankruptcy Code and entitled to priority under §507(a)(1) or (2) of the Bankruptcy Code, including an Allowed Priority Claim (as defined herein).

2.2    "Allowed Claim" shall mean a Claim, as that term is defined in §101(4) of the Bankruptcy Code, against the Debtor to the extent that (i) a proof of Claim has been filed on or before Bar Date, or (ii) which has not or may hereafter not be scheduled by the Debtor as unliquidated, disputed, and/or contingent; in either case to which either the Debtor or a party-in-interest does not file an objection, and, in any case a Claim as to which any order of the Court, or judgment of the Court allowing such claim in whole or in part which order or judgment is no longer appealable, to which no appeal has been filed, or to which all appellate or review remedies have been forever exhausted.

2.3    "Allowed Unsecured Claim" shall mean an Allowed Claim, or that portion thereof, which is not entitled to priority or to secured status under the Bankruptcy Code, and includes, but is not limited to, any claim arising as a result of the Debtor's execution of a guaranty agreement, promissory note, negotiable instrument, or other similar written instrument, whether as maker, endorser, guarantor, or otherwise.

EXHIBIT
CtS 2A

FIRST AMENDED PLAN OF REORGANIZATION OF CHARLES R. FELDMAN

2.4    "Allowed" _____ it" shall mean an Interest (i) in respect of which _____ f on interest has been filed with the Court, on or before the Bar Date or (ii) which is scheduled in the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the Court and which has not been listed as disputed; and in any case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by local rule, this Plan, or an Order of the Court or, as to which, if an objection has been interposed, the Interest has been determined by order of the Court.

2.5    "Allowed Secured Claim" shall mean Allowed Claim, or that portion thereof, of any Creditor of the Debtor who holds a lien or security interest, as those terms are defined in §101 of the Bankruptcy Code, which Claim has been properly perfected as required by law and determined in accordance with §506 of the Bankruptcy Code with respect to Properties owned by the Debtor. Such Allowed Secured Claim is secured only to the extent of the value of the Debtor's property which the Court finds is the valid security interest of the Creditor enforceable against property of the Estate.

2.6    "Bankruptcy Code or Code" shall mean Title 11 of the United States Code.

2.7    "Bar Date" shall mean December 13, 1990, which date is ninety (90) days from the date first set for the meeting of creditors, as provided §341(a) of the Code and Local Bankruptcy Rule 3003, for the filing of Proofs of Claim by a Creditor or Interest holder.

2.8    "Confirmation" shall mean the entry of a final Confirmation Order confirming this Plan at or after a hearing pursuant to §1129 of the Bankruptcy Code.

2.9    "Confirmation Order" shall mean a Final Order, as defined below, entered by the Court determining that this Plan meets the requirements of Chapter 11 of the Bankruptcy Code and is entitled to confirmation pursuant to §1129 of the Bankruptcy Code.

2.10    "Court" shall mean the United States Bankruptcy Court for the Southern District of Texas, Brownsville Division, which presides over these proceedings, or if necessary, the United States District Court for said District and Division having original jurisdiction over this case.

2.11    "Creditor or Creditors" shall mean any individual, corporation, partnership, joint venture, trust, estate, unincorporated organization, or a government or any agency or political subdivision thereof.

2.12    "Debtor" shall mean Charles B. Feldman, in his individual capacity and as he has done business as Charles Feldman Investments.

2.13    "Disclosure Statement" means the Disclosure Statement of the Debtor, together with any amendments, changes, additions, deletions, or modifications thereto as approved by the Court for submission to the Creditors, Interest holders, and parties-in-interest of the Debtor.

2.14    "Disputed Claim or Disputed Interest" means a Claim or Interest in the Debtors that is not an Allowed Claim or an Allowed Interest and as to which there is no final order disallowing such Claim or Interest.

2.15    "Disbursing Agent" shall mean the person or entity which shall receive and disburse all funds for distribution to Creditors under the terms and conditions of this Plan.

2.16    "Effective Date" shall mean (i) the first business day which is thirty (30) days following the date of the entry of a Confirmation Order on which a stay pending appeal of such Order is not in effect or (ii) such other day as may be specifically set by the Court.

2.17    "Executory Contracts" shall mean any unexpired lease and/or executory contract as set forth in §365 of the Bankruptcy Code.

2.18    "Estate" shall mean the estate created in this reorganization case under §541 of the Bankruptcy Code.

2.19    "Estimated Claim" shall mean a Claim, the allowed amount of which has been or may be estimated by the Court under §502(c) of the Bankruptcy Code.

2.20    "Feldman F_    /Interests" shall mean the stock interests of Sam\    _dman, Howard M. Feldman, Chad E. Feldman, Cory E. Feldman, and Jonathan Feldman in Feldman's Real Estate, Inc., a Texas corporation, resulting from the FREI Stock Transfers, as defined below.

2.21    "Final Order" shall mean an order of the Court (i) the time for appeal from which has expired and no appeal was timely filed or (ii) any appeal from which has been finally determined or dismissed.

2.22    "Insider" shall mean any entity as defined in §101(31) of the Bankruptcy Code.

2.23    "Interest" shall mean the rights of the owners and/or holders of any ownership interest of property of the Estate and with respect of such Interest as of the date immediately preceding the Petition Date.

2.24    "Net Operating Income" shall mean any net profit of the Debtor derived from the operation of a particular property of the Debtor after deducting from the income or revenue received from property all of the operating expenses, including, but not limited to, taxes, insurance, wages, utilities, management fees, repairs, maintenance, and capital expenditures necessary to maintain the properties of the Debtor in good condition, and such reserves (including reserves for replacements and capital improvements) for the reasonable needs of the business of the Debtor which are necessary, in the sole discretion of the Debtor, for the proper care and maintenance of the properties.

2.25    "Net Proceeds" shall mean the amount remaining out of the sale of an asset of the Debtor after deducting any taxes, commissions, costs, and expenses relating to such sale.

2.26    "Net Profit Distribution" shall mean the net amount of income or distribution allocated to the Debtor or the Feldman Family Interests from a particular source, which income or distribution shall have actually been distributed to the respective taxpayer, after the deduction of (i) an amount equal to any and all federal, state, and/or local income or other taxes due and owing on or because of such income or distribution, and (ii) an operating reserve in an amount equal to fifteen (15%) percent of such net income or distribution.  To the extent Feldman's Real Estate Inc. has Net Profits during the Plan Term Years, such Net Profits shall be distributed.

2.27    "Pending Litigation" shall mean all claims or causes of action by or against the Debtor arising before the Effective Date that have not been disposed of prior to such Effective Date, including, but not limited to any litigation or claims instituted or asserted by Debtor to recover preferences, fraudulent conveyances or to subordinate claims or interests under §510 of the Bankruptcy Code.  Such Claims and/or causes of action are more fully described in Article XIX of the Disclosure Statement.

2.28    "Petition Date" shall mean July 11, 1990.

2.29    "Plan" shall mean the Plan of Reorganization in its present form, or as it may be amended or supplemented from time to time in accordance with the Bankruptcy Code, or by agreement of all effected parties, or by order of the Court, as the case may be.

2.30    "Plan Term Years" shall mean a period of five (5) years, commencing on the Effective Date of the Plan of Reorganization.

2.31    "Preferential Transfer or Preferential Payment" shall mean such transfer or payment which may be avoided pursuant to §547 of the Bankruptcy Code.

2.32    "Subordinated Claim" shall mean any Claim against the Debtor the subordination of which has been determined and ordered by the Court pursuant to §510 or other applicable provisions of the Bankruptcy Code.

2.33    "Superpriority Claim" shall mean an Allowed Claim for a super-priority lien under §507(b) of the Bankruptcy Code, as authorized by prior order or orders of the Court.

2.34    "Tax Claim" shall mean an Allowed Claim of an governmental entity as provided by §507(a)(7) of the Bankruptcy Code.

2.35    "Tax Escro\   ll mean any and all federal, state, and/or local ti    /or other related taxes due and owing by reason of the Debtor's or Feldman Family Group's yearly allocation of income as Form 1065, Form 1120, Form K-1, or other relevant partnership and/or corporate form or schedule as required by the Internal Revenue Code.

B. Undefined Terms

A term used in this Plan and not defined herein, but that is defined in the Bankruptcy Code has the meaning set forth in the Bankruptcy Code. Otherwise, such term shall have its common and ordinary meaning.

## ARTICLE III

### CLASSIFICATION OF CLAIMS AND INTERESTS

For purposes of this Plan, the Claims against and the Interests of the Debtor are divided into the following classes:

3.1    Class 1: The Allowed Claims of any Creditor entitled to priority under §507 of the Bankruptcy Code, or for administrative expenses, including fees, costs, and expenses incurred by professional persons employed under §§327 and 1103 of the Bankruptcy Code, with respect to services rendered to Debtors. Class 1 is not impaired. There are currently two (2) holders of Class 1 Claims for administrative expenses: a claim for fees, costs, and expenses in the amount of $28,989.37 incurred by Simpson, Dowd, & Moon, counsel for the Debtor and a claim for fees and expenses in the amount of $1,590.00 incurred by Chidester, Marlow, & White, P.C., the accountants for the Debtor.

3.2    Class 2: The Allowed Claims against the Debtor for a Tax Claim by governmental entities entitled to priority under §507(a)(7) of the Bankruptcy Code. There are thirteen potential Class 2 claimants with an approximate amount of $11,000.00 in Class 2 Claims. Class 2 is impaired.

3.3    Class 3: The Allowed Unsecured Claims against the Debtor wherein each such Allowed Claim is in an amount of $500.00 or less. There are ten potential Class 3 claimants with a total amount of $1,597.71 in Class 3 Claims. Class 3 is unimpaired.

3.4    Class 4: The Allowed Unsecured Claims against the Debtor wherein each such Allowed Claim is in an amount of more than $500.00. There are approximately seventy-five potential Class 4 claimants with a total amount of $8,224,371.00 in Class 4 Claims. Any Class 4 claimant who so desires may voluntarily elect to reduce his Allowed Claim to $500.00 and have such reduced Claim paid as a Class 3 Claim. Class 4 is impaired.

3.5    Class 5: The separate and community Interests of the Debtor in property of the Estate. Class 5 is impaired.

## ARTICLE IV

### TREATMENT OF CLAIMS AND INTERESTS

4.1    Treatment of Unimpaired Claims. The following Classes are not impaired by the Plan and are therefore deemed to accept the Plan:

4.1.1    Class 1: The Allowed Amount of all Class 1 Claims shall be paid in full, in cash, upon the later to occur of (i) the Effective Date, (ii) thirty (30) days following the entry of a Final Order determining the extent and allowability of such Claims, or upon such other terms as may be agreed upon between the Debtor and the holders of such Claims.

4.1.2    Class 3: The Allowed Amount of all Class 3 Claims shall be paid in full, in cash, upon the later to occur of (i) the Effective Date, (ii) thirty (30) days following the entry of a Final Order determining the extent and allowability of such Claims, or upon such other terms as may be agreed upon between the Debtor and the holders of such Claims.

4.2    Treatment of Impaired Claims. The following Claims are impaired under the Plan and will be allowed to vote for the acceptance or rejection of the Plan:

4.2.1    Class 2: The holders of Class 3 Claims shall each be paid, on account of such Claim, monthly cash payments, over a period not exceeding six (6) years from the date of assessment of such Claim, of a value, as of the Effective

Date of the Plan, equal to such ____ved Tax Claim. Such payments shall commence ____ / (30) days following the later of (i) the Effective Date or (ii) the date of the entry of a Final Order allowing such Claim. In the event any such Class 2 Claim has not been determined prior to the Effective Date of the Plan, and notwithstanding any provision to the contrary herein, the Allowed Claim of each Class 2 claimant shall include such interest as shall accrue on said Claim from the Effective Date through the date of the allowance of such Class 2 Claim.

4.2.2    **Class 4**: The Allowed Claims of all Class 4 Creditors shall be satisfied in full and shall be paid, in cash, based on a pro rata basis of what each such Class 4 claimant's Allowed Claim bears to the whole of the Allowed Claims of the Class 4 claimants as follows:

(a)    **Sales Proceeds.** Such payments shall be made out of the Net Proceeds of (i) the liquidation and sale of certain of the Stocks and Bonds and the Con Am Units, (ii) the sale of the Duplexes, and (iii) the sale of the Arroyo Tracts, the Lots, and the Goad-Theime Property, or the Debtor's interests therein. The Stocks and Bonds and the Con Am Units, or the Debtor's interests therein, are hereafter sometimes referred to collectively as "Personal Property Assets"). The Duplexes, the Arroyo Tracts, the Lots, and the Goad-Theime Property, or the Debtor's interests therein, are hereafter sometimes referred to collectively as "Real Property Assets"). The Debtor contemplates that the Personal Property Assets and the Real Property Assets will, during the pendency of this Plan, be sold. In connection with the sale of the Duplexes, the Debtor will, within thirty (30) days of the Effective Date, enter into a standard, non-exclusive real estate listing and/or brokerage agreement (hereafter the "Brokerage Agreement") with an independent, third-party broker or agent. Such Brokerage Agreement shall include provisions that any commission paid thereunder shall not exceed the standard commission of six percent (6%). Upon the sale of the Personal Property Assets and the Real Property Assets, the Debtor shall be entitled to deduct out of the Net Proceeds an amount equal to any and all federal, state, and/or local income or other taxes due and owing on or because of such sale or disposition of such Personal Property Assets and Real Property Assets. Thereafter, the Debtor shall pay to the Plan Trustee eighty percent (80%) of the remaining Net Proceeds of such sales, which amounts shall be deposited in an interest-bearing account (hereafter referred to as the "Distribution Reserve Account") to be established by the Plan Trustee at a federally insured financial institution. Payments shall thereafter be paid in accordance with the provisions of sub-paragraph (c) below. The remaining twenty percent (20%) of the Net Proceeds from the sales of the Real Property Assets will be placed in the Capital Reserve Account (as hereafter defined) for use in maintaining the remaining Real Property Assets until all properties are sold. See Article XI, Paragraph F, infra.

(b)    Income Distributions. In addition, the holders of the Class 4 Claims shall receive payments out of the funds received from (i) the Debtor's Net Profit Distribution from his interests in the Duplexes, (ii) the Debtor's Net Income Distribution from his interests in CFP, FREI, and FR; (iii) the Net Income Distribution received from the Feldman Family Interests in FREI for the Plan Term Years; and (iv) the Net Income Distribution received from the Stocks and Bonds (pending their sale), the HMF Note, and the Trust Note. These Net Profits Distributions, Net Income Distributions, and Net Proceeds shall be paid to the Plan Trustee and shall be deposited into the Distribution Account to be paid in accordance with the provisions of (c) below.

(c)    Payment of Class 4 Claims. As noted above, the payments to the holders of Class 4 Claims shall be made on a pro rata basis of what each such Class 4 claimant's Allowed Claim bears to the whole of the Allowed Claims of the Class 4 claimants. For example, if the amount of a particular Class 4 Claim constitutes ten percent (10%) of the aggregate of all of the Class 4 Claims, the holder of that claim shall be entitled to an amount equal to ten percent (10%) of the funds in the Distribution Account at the time of a particular payment. The first of such payments to the Class 4 Claims out the funds then held in the Distribution Account (including the interest accrued thereon) shall begin on the date which is thirty (30) days following the Effective Date and shall continue thereafter on a semi-annual basis on January 31 and June 30 of each Plan Term Year. Allowed Class 4 Claims will also receive distributions, if any, from monies or properties recovered pursuant to avoidance actions pursued for the benefit of the Estate as set forth in the Examiner's Report. In addition, any Net Proceeds remaining in the Capital Reserve Account after the sale of all of the Real Property Assets shall be distributed to the Class 4 Creditors. Such final distribution

sh..,    made on or before thirty (30) days from the (    , the closing of the sale of the last property of the Real Property Assets.

4.2.3    Class 5: With the exception of the Personal Property Assets which are to be transferred to the Plan Trustee, the Debtor shall retain his interests all assets of the Estate.

## ARTICLE V

## REQUEST FOR CONFIRMATION
## PURSUANT TO 11 U.S.C. §1129(b)

5.1   In the event that any Class of Claims or Interests that is impaired under the Plan fails to accept the Plan, the Debtor hereby requests the Court to confirm the Plan pursuant to the provisions of 11 U.S.C. §1129(b) of the Bankruptcy Code.

A.   Impaired Secured Creditors - Under §1129(b), an impaired secured creditor must receive deferred cash payments totaling at least the amount of its allowed claim, of a value, as of the Effective Date, of at least the value of that Creditor's interest in the Estate's interest in its collateral or the proceeds of the sale of such collateral.

B.   Impaired Unsecured Creditors - Under §1129(b), an impaired class of unsecured Creditors which does not accept the Plan must receive property of value, as of the Effective Date equal to the amount of their Allowed Claim, if any class junior to them receives or retains any interest in the assets of the Debtor.

## ARTICLE VI

## IMPLEMENTATION AND FUNDING OF THE PLAN

The sources of the funds to be utilized for payment of Claims under the Plan will be provided as follows:

6.1   The Plan shall be funded from (i) the liquidation and sale of certain of the Stocks and Bonds and the Con Am Units, (ii) the sale of the Duplexes, (iii) the sale of the Arroyo Tracts, the Lots, and the Goad-Theime Property, or the Debtor's interests therein, (iv) the Debtor's Net Profit Distribution from his interests in the Duplexes, (v) the Debtor's Net Income Distributions from his interests in CFP, FREI, and FR, and (vi) the Net Income Profit Distributions received from the Feldman Family Interests in FREI for the Plan Term Years, and (vii) in the event of the avoidance of any transfers of the Debtor under §§ 544, 547, 548, 549, or 550, the property or proceeds of such avoided transfers.

6.2   As noted above, the Feldman Group, in settlement of the Fraudulent Transfer Action, has agreed to allow the Net Income Distribution received from the Feldman Family Interests in FREI during the Plan Term Years to be used by the Debtor to fund a portion of the payments under the Plan. If the examiner recommends that this settlement be rejected and that suit be brought to recover stock in FREI transferred by Feldman to the Feldman Family Interests, then such suit shall be brought and the settlement (including the Net Income Distribution), shall not be consummated.

6.3   Upon Confirmation, the Debtor will begin a comprehensive marketing program to dispose of the assets of the Estate described above through listing agreements and other marketing programs in an effort to maximize the value to be obtained from such assets.

## ARTICLE VII

## GENERAL PROVISIONS

7.1   Property of the Debtor.   Upon Confirmation of this Plan, all property, both real and personal, of the Debtor shall, except as specifically provided herein, be retained by the Debtor free and clear of all liens, claims, and encumbrances of pre-confirmation Creditors and other parties-in-interest.

7.2   Future Management of Debtor's Business Affairs.   It is anticipated that upon Confirmation of the Plan, the Debtor will continue in his capacity in managing his business affairs and shall continue to manage and operate the Duplexes, CFP, FREI, and FR in accordance with the current management and compensation agreements. Until the Duplexes are sold, such

FIRST AMENDED PLAN OF REORGANIZATION OF CHARLES B. FELDMAN D/B/A
CHARLES B. FELDMAN INVESTMENTS - Page 7.

properties shall continue to be managed by Bahaman under the same terms and conditions as its pre-petition agreement with the Debtor.

7.3  Plan Trustee. Upon entry of the Confirmation Order by the Court, Harlingen National Bank ("HNB") will act as the Plan Trustee (referred to herein as the "Plan Trustee") to receive and make the payments and/or distributions under the Plan. The Plan Trustee shall be entitled to open and maintain such bank or other accounts as are necessary in its judgment for the holding, investment, payment, and distribution of the funds required under the Plan. The Plan Trustee shall have the authority to review and investigate the performance of the Debtor, FREI and the Feldman Interests in carrying out their obligations under the Plan and may, in its discretion, file motions in the Bankruptcy Court if it believes the terms of the Plan have not been complied with. Along with the powers and duties specifically set forth herein and in any agreement with such entity, the Plan Trustee shall have the powers, duties, and responsibilities as set forth in the Texas Trust Act. The Plan Trustee shall take such other action as is necessary and required in order to implement his duties hereunder. If HNB shall refuse or become unable to serve as Plan Trustee, the Court shall appoint a successor or replacement Plan Trustee. On and after the Effective Date of the Plan, the Plan Trustee shall administer all funds deposited at Confirmation and any future funds for the disbursement and payment of the claims hereunder.

7.4  Distribution Account and Capital Reserve Account. As noted above, the Plan Trustee shall establish and maintain the Distribution Account in which the Net Proceeds of the Personal Property Assets and eighty percent (80%) of the Net Proceeds of the Real Property Assets will be placed and held prior to their payment to the Creditors under the terms of the Plan. In addition, the Debtor will establish and maintain an account (referred to herein as the "Capital Reserve Account") in which twenty percent (20%) of the Net Proceeds resulting from the sales of the Real Property Assets will be deposited. Thereafter, until such time as all of the Real Property Assets are sold, such funds will used by the Debtor to pay the reasonable and necessary costs and expenses for the care, maintenance, and upkeep of the Real Property Assets, including, but not be limited to, utilities, insurance, advertising, repair, supplies, and taxes. Upon the sale of the last of the Real Property Assets, any funds remaining in the Capital Reserve Account will be distributed to the Class 4 Creditors in accordance with the terms hereof.

7.5  Personal Liability of Plan Trustee. The Plan Trustee, and/or its officers, employees, agents, and representatives who sign disbursement checks on behalf of Debtor in the capacity as Plan Trustee, shall not be liable for any acts or failures to act hereunder in the absence of proof of bad faith or gross negligence. If HNB shall refuse or become unable to serve as Plan Trustee, the Court shall appoint a successor or replacement Plan Trustee. On and after the Effective Date of the Plan, the Plan Trustee shall administer all funds deposited at Confirmation and any future funds for the disbursement and payment of the claims hereunder.

7.6  Administration of Funds. On and after the Effective Date of the Plan, the Plan Trustee shall administer all funds deposited at Confirmation and any future funds for the disbursement and payment of the claims hereunder.

7.7  Execution of Documents: Upon the Effective Date, or at such other time as specifically provided for herein, the Debtor and the Plan Trustee shall be authorized to execute and deliver any contracts, assignments, agreements, and/or other documents or instruments which may be required or provided for hereunder to effectuate the terms and provisions of this Plan.

7.8  Contested or Disputed Claims: The Debtor hereby reserves the right to object to or contest any Claim prior to the Effective Date. Unless otherwise ordered by the Bankruptcy Court, the Debtor may, in his sole discretion, litigate to judgment, settle, or withdraw objections to contested or Disputed Claims. Any payment or distribution to the holder of a contested or Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class to which the respective holder of such Allowed Claim belongs. Such payments or distributions shall be made no sooner than thirty (30) days following the entry of the order or judgment allowing such Claim becomes a Final Order.

7.9  Authority to Execute Documents: All agreements, instruments, and other documents required hereunder to be executed by such parties as may be necessary together with such others as may be necessary, useful or appropriate in order to effectuate this Plan shall be executed on or before the Effective Date.

7.10  Actions Against the Debtor: Upon the entry of the Confirmation Order, all Creditors of the Debtor who have filed proofs of Claim or have been listed in the Debtor's schedules or who will receive any payment or distribution under this Plan will be prohibited from initiating, continuing, or pursuing any action, proceeding, claim, or judgments against the Debtor

for the collection of any indeb___ as which arose from any act, conduct, claim, o___ ___on, or agreement in connection with the indebtedness or personal or business affairs of the Debtor prior to the Confirmation of this Plan.

7.11    Consummation.  For purposes of and consistent with Bankruptcy Code §1101(2), consummation of this Plan shall occur upon the following:

(a)    the transfer of any of the property proposed to be transferred under the terms of the Plan;

(b)    the assumption by the Debtor under the Plan of the business or the management of all or substantially all of the property dealt with by the Plan; and

(c)    the commencement of distributions to creditors under the Plan.

## ARTICLE VIII

## PROVISION FOR ASSUMPTION OR REJECTION
## OF EXECUTORY CONTRACTS AND LEASES

8.1    The Debtor shall and does hereby assume the following executory contracts and agreements:

(1)    Partnership agreement of Clara Feldman Properties;

(2)    Partnership agreement of Feldman Real Estate;

(3)    Partnership agreement of Feldman Rentals;

(4)    Any partnership agreement, whether written or oral, as may exist, or be deemed to exist, in connection with the Arroyo Tracts, the Goad-Theime Property, and/or the Padre Lots; and

(5)    The Bahnman Agreement.

All other executory contracts and unexpired leases of the Debtor not assumed hereunder or pursuant to an order of the Court under §365 of the Bankruptcy Code entered prior to the date of the entry of the Confirmation Order shall be deemed rejected upon entry of such Confirmation Order.  All parties to any executory contract or unexpired lease so rejected shall have the dollar amount of any claim for damages fixed by the Court.  Such Claim resulting from the rejection of an Executory Contract shall be filed with the Court within thirty (30) days of the Effective Date or within thirty (30) days from the notice of rejection thereof.  In the event that such damage claims arise out of post-petition obligations owing by the Debtors under such executory contract or unexpired lease, such Claims, to the extent that such Claim is finally determined and allowed by the Court, shall be treated as a Class 1 Claim only to the extent that such Claim is entitled to administrative priority status under §503 of the Bankruptcy Code.

## ARTICLE IX

## PENDING AND ANTICIPATED LITIGATION

9.1    As more fully discussed in the Disclosure Statement, any and all proceeds from the Pending Litigation and Anticipated Litigation are hereby preserved and retained for the benefit of the estate.

9.2    After Confirmation, the Debtor will prosecute or defend Pending or Anticipated Litigation as set forth below.

9.2.1    NCNB Preference Action.  The Debtor will, to the extent necessary, continue with his prosecution of the NCNB Preference Action.  Any funds, with the exception of amounts recovered for attorneys' fees and expenses incurred by the counsel for the Debtor, recovered in said action will be a recovery for the benefit of the Estate and will be paid over to the Plan Trustee for distribution under the terms of the Plan.

9.2.2    Parkwell Preference Action.   The Debtor intends to complete and consummate the compromise and settlement agreement with Parkwell relating to the Parkwell Preference Action.  Upon the execution of such agreement, the

Debtor and Parkwell will take such steps as are necessary to remove or release any lien or encumbrances on real or personal property of the Debtor or the Estate.

9.2.3    Pre-Petition Actions.    The Claims asserted by the parties in any pre-petition state or federal court actions, as described in the Disclosure Statement, will be treated in accordance with the terms of this Plan. The Debtor reserves the right to object to the Claim of any of such parties.

9.2.4    Attorneys' Fees and Expenses.    Any amounts recovered for attorneys' fees and expenses incurred by the counsel for the Debtor in prosecution or defense of any Pending or Anticipated Litigation shall be held by the Plan Trustee. If no approval by the Bankruptcy Court is required, the Plan Trustee shall pay such amounts to counsel for the Debtor. . In the event such approval is required, the Plan Trustee shall, upon approval, pay the amounts as approved by the Bankruptcy Court.

9.2.5    Anticipated Litigation.    The following is a description of the anticipated litigation involving the Debtor:

1.    Fraudulent conveyance actions.    Potential claims for recovery of fraudulent transfers made by Debtor to the Trust and conveyances of stock in FREI and FVWI may be maintained against the Debtor. In the event said causes of action are pursued, the following money and/or property recovered shall be distributed as follows:

(i)    Any monies recovered from the Trust will be distributed on a pro rata basis to those Creditors holding Allowed Class 4 Claims;

(ii)    Any recovery of the FREI Stock will be immaterial to the provisions currently set forth in the Plan. All current holders of FREI Stock have agreed that all net income generated from the FREI Stock shall be paid into Debtor's Plan;

(iii)    Any recovered FVWI Stock may be sold by Debtor and the funds distributed to the Allowed Class 4 Creditors of Debtor on a pro rata basis. The Debtor is unable to satisfactorily estimate the value of any such recovered stock. FVWI is a family-owned, closely held corporation with a limited resale market. FVWI Stock is currently owned by Debtor and his four nieces and nephews. The Debtor is the principal of the corporation and is the person principally involved in the day by day operations of the business. If the Debtor elects not to personally continue in the operation of FVWI, the stock might not have any value other than the liquidation value of the assets of the corporation, which value Debtor believes to be minimal.

2.    Right of First Refusal on FVWI Stock.    In the event of the entry of a final and non-appealable judgment avoiding the transfer of the stock and returning it to the Debtor's estate, the Debtor shall have the right to either (i) sell the FVWI stock so as to obtain the proceeds therefrom to distribute to the creditors or (ii) pay, or cause to be paid, to the Estate the fair value of the Debtor's interest in such FVWI stock. In the event the Debtor elects to pay the Estate for such FVWI stock, the Debtor shall be entitled to make such payment in monthly, quarterly, or annual installments for a period not to exceed three (3) years and at an interest rate equal to the average of

the prime rate of the ten largest banks in the United States, plus one (1%) percent. In the event the Debtor elects to sell the FVWI stock, the current shareholders of FVWI shall have a right of first refusal for any offer received by the Debtor from a third party for the purchase of all or any portion of the stock.. In the event the Debtor receives such an offer from a third party, he shall notify the shareholders in writing within twenty (20) days from his receipt of the offer. Thereafter, the shareholders, or any one of them, shall have the right to exercise their right to purchase the stock on the same terms and conditions as the third party offer. If such shareholder(s) intends to exercise such right to purchase, they shall notify the Debtor in writing, within thirty (30) days of their receipt of the notice of the third party offer, of their intent to exercise such right to purchase. If the shareholder(s) fail to notify the Debtor before the expiration of such time period, the Debtor may proceed to sell the FVWI stock to such third party on the terms and conditions set forth in the notice to the shareholders. If, after the receipt by the shareholder(s) of a notice of a third party offer, the terms of such offer are revised, changed, modified, altered or amended in any manner, the shareholder(s) shall be entitled to a new notice of the revised third party offer and an additional thirty (30) day period to consider such revised offer. In the event the shareholder(s) elect to exercise their right to purchase all or a portion of the FVWI stock, they shall have sixty (60) days following the Debtor's receipt of their notice of intent to exercise such right in which to consummate such purchase. Such sixty (60) day closing period may be extended for an additional sixty (60) days upon the written agreement of the parties. In the event the shareholder(s) fail to consummate the purchase within the original, or extended closing period, the Debtor shall be entitled to accept the original third party offer and sell such stock on the terms and conditions set forth therein.

3.   <u>Turnover actions</u>.   During the course of the Fraudulent Transfer Action by NCNB against the Debtor, as described above, funds in the amount of $2,000.00 were deposited with the District Clerk of Cameron County to pay fees that were anticipated to be incurred by a master during the course of discovery.   In addition, upon answering the garnishment action filed by NCNB against the Debtor, Shearson interpled and deposited approximately $450.00 with District Clerk of Cameron County as property held that could potentially be subject to garnishment. As a result, the District Clerk of Cameron County holds these funds as a custodian and is required to deliver them to the Debtor under §543(b) of the Code. It is anticipated that the Debtor will make demand for the turnover of these funds to the Estate and, if such demand is refused, the Debtor will initiate and action for the turnover of the amounts held by District Clerk of Cameron County.

4.   <u>Action to Establish Easement</u>. As noted above, the Arroyo Tracts are not currently accessible by land, but only by water. Because the establishment of an easement to the Arroyo Tracts could result in an increase in their value and marketability, the Debtor and his co-owners are currently evaluating the feasibility and cost of an action against one of the adjacent landowners to establish an easement that was believed to be in existence at the time of the purchase of the property. In the event a decision is made to proceed with such an action, the Debtor will, in all likelihood, be called upon to contribute

a p.....n of the costs and expenses that would be ...red in prosecuting such an action.

## ARTICLE X

## PAYMENTS AND DISTRIBUTIONS UNDER THE PLAN

10.1  Performance.  Any entity, including a Creditor who has not, within the time provided by the Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules, the Plan, or any final order of the Court, performed any act required by such Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules, the Plan or in such Final Order shall not entitled to any payment or to participate in any distribution of this Plan.

10.2  Distributions.  Distributions and payments under the Plan will be made only to those Creditors who have an Allowed Claim.  In the event an objection is filed to a particular Claim, no payments or distribution shall be made upon such Claim except pursuant to an order of the Court which has become a Final Order; provided, however, that nothing herein shall preclude the payment of post-petition operating expenses incurred by the Debtor in the normal course of the operations of Debtor's business.

10.3  Claim Objections.  The Debtor shall be authorized to file and prosecute objections to the allowance of any Claims if it deems such objections to be warranted.  Such objections shall be filed on or before the Effective Date.  In the event the Court extends the Bar Date herein, an objection to such Claim shall be filed within twenty (20) days of the filing of such Claim pursuant to an extension of said Bar Date granted by the Court; PROVIDED, HOWEVER, in the event of an appeal of the Confirmation Order or a motion to reconsider or modify the Confirmation Order, such objections shall be filed within ninety (90) days after the final disposition of the appeal or motion to reconsider or modify the Confirmation Order.  Upon application filed prior to the Effective Date and upon good cause shown, the Court may extend such period to file an objection with respect to any particular Creditor for a reasonable time under the circumstances with respect to such Claim or Claims.  If no objection is filed within the time so limited to the allowance of any Claim, such Claim shall be deemed allowed in the amount which is proved and the holder of such Claim treated in accordance with the provisions of the class in which such Claim falls.

## ARTICLE XI

## MODIFICATION OF THE PLAN

11.1  The Debtor may propose amendments or modifications to the Plan at any time prior to the date of the entry of the Confirmation Order, upon written notice to Creditors, Interest Holders, and parties-in-interest.  After the date of the Confirmation Order, the Debtor may, with approval of the Court and for so long as it does not materially or adversely affect the Creditors, remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purpose and intent of the Plan.

## ARTICLE XII

## RETENTION AND ENFORCEMENT OF THE CLAIMS

12.1  Pursuant to §1123(b)(3) of the Bankruptcy Code, the Debtor, except as provided herein, will retain and may enforce any and all claims of the Debtor, except claims which may be expressly and specifically waived, relinquished, and released.  Except as otherwise provided herein, the Debtor will retain and may enforce (i) any and all claims and/or rights pursuant to §§502, 510, 544, 545, and 546 of the Bankruptcy Code, (ii) all claims for preferential payments or transfers under §547 of the Bankruptcy Code, (iii) any and all Claims for fraudulent transfers pursuant to §548 of the Bankruptcy Code, (iv) any and all Claims relating to post-petition transactions under §549 of the Bankruptcy Code and (v) any and all Claims recoverable under §550 of the Bankruptcy Code.  Such Claims preserved and retained by the Reorganized Debtor are hereby preserved and retained for the benefit of the estate and Creditors of the Reorganized Debtor.

## ARTICLE XIII

## DISCHARGE

13.1   Except as otherwise provided in the Confirmation Order, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of any and all debts of the Debtors that arose at any time before entry of the Confirmation Order including, but not limited to, all principal and any interest accrued thereon, pursuant to §1141(d)(1) of the Bankruptcy Code. The discharge of the Debtors shall be effective as to each Claim and Interest, regardless of whether a proof of Claim or Interest therefore was filed, whether the Claim or Interest is an Allowed Claim or an Allowed Interest, or whether the holder thereof votes to accept the Plan.

13.2   Except as provided herein or by applicable non-bankruptcy law, Confirmation of this Plan will not discharge any Claim which any Creditor or Interest holder of the Debtor may have against any third party.

## ARTICLE XIV

## REVESTING OF PROPERTY OF THE ESTATE

14.1   On the Effective Date, all property of the Estate, including Claims and/or causes of action, except as specifically provided herein, will vest in the Debtor. On the Effective Date, the Debtor will be entitled to operate his business and except as provided herein to use, acquire, and dispose of any of his property free of any liens, claims, encumbrances, or restrictions of the Bankruptcy Code or the Court.

## ARTICLE XV

## RETENTION OF JURISDICTION OF THE COURT

15.1   Until this Plan has been fully consummated through the entry of a final decree completely closing the reorganization case, the Court shall retain jurisdiction over all matters necessary to ensure that the purposes and intent of this Plan are carried out. Nothing herein shall be construed as restricting the Reorganized Debtor in the conduct of his business and operations. Until final consummation of the Plan, the Court shall retain jurisdiction of all such matters, including but not limited to the following:

    (a)   to hear and determine all claims against the Debtors and property of the estate, including any Claims arising from the assumption or rejection of executory contracts or unexpired leases;

    (b)   to correct any defect, to cure any omission, or to reconcile any inconsistencies in this Plan or in the confirmation order, as may be necessary to carry out the purpose and intent of this Plan;

    (c)   to enforce, modify, and interrupt the terms and conditions of this Plan;

    (d)   to enter any orders, including injunctions, necessary to enforce the title, rights, and powers of the Debtor;

    (e)   to determine all disputes regarding title to the assets of the estate, and the determination of all causes of action, controversies, disputes, or conflicts between the Debtor and any other party, including, but not limited to, any right of the Debtor to recover preferences under §547 of the Bankruptcy Code or to recover any assets on property of the estate pursuant to the provisions of the Bankruptcy Code;

    (f)   to allow and classify Claims of any Creditors, reexamine Claims as provided under the Bankruptcy Code, and to determine such objections as may be filed to such Creditor's Claims;

    (g)   to enter an order concluding and terminating the reorganization case;

    (h)   to liquidate damages in connection with any disputed or contested claim;

(i)      to determine and adjudicate all Claims of a security or ownership interest in any property of the estate or in any proceeds thereof;

(j)      to adjudicate any Claim or controversy arising out of any purchase, sale, or contract, made or undertaken by the Debtor prior to the Effective Date;

(k)      to hear and determine for allowance all applications for compensation and reimbursement of expenses;

(l)      to enter an implement such orders as may be necessary and appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, or vacated;

(m)    to hear and determine matters concerning local, state, and federal taxes pursuant to §§346, 505, 525, and 1146 of the Bankruptcy Code;

(n)     to consider and determine applications for modification of the Plan pursuant to §1127 of the Bankruptcy Code and to make rulings thereon;

(o)     to liquidate or estimate damages or claims or determine the manner in time for such liquidation or estimation in connection with a contingent or unliquidated claim; and

(p)     to hear and determine such other matters as may be provided for in confirmation order confirming this Plan or as may be permitted under the Bankruptcy Code.

## ARTICLE XVI

### EFFECT OF APPEAL OR MOTION TO
### RECONSIDER OR MODIFY THE CONFIRMATION ORDER

16.1   In the event that any Creditor or other party-in-interest files an appeal of the Confirmation Order or a motion to reconsider or modify the Confirmation Order, all payments to Creditors provided for herein shall be stayed, except for those payments which are scheduled herein to commence on a date prior to the Effective Date. All payments which are herein scheduled to commence prior to the Effective Date shall continue to be made as if the Plan has been confirmed without appeal, unless otherwise provided herein, or stayed by order of the Court with appropriate jurisdiction; PROVIDED, HOWEVER, that nothing in this section shall be construed to prohibit the payment by Reorganized Debtors of their reasonable and necessary expenses incurred in the operation of their businesses.

## ARTICLE XVII

### TAX ALLOCATIONS AND CONSEQUENCES

17.1   Net operating loss of the Debtor will be allocated annually to the Debtor as may be allowed under the terms of the Internal Revenue Code.

17.2   By reason of the sales of various assets of the Estate, the Estate may realize a taxable gain for federal, state and/or local income tax purposes. The amount of any such gain will be escrowed and paid out of the Net Proceeds of such sales.

17.3   THE TAX CONSEQUENCES TO EACH CREDITOR RESULTING FROM ANY REORGANIZATION OF THE DEBTOR OR SALE OR ANY OTHER DISPOSITION OF THE PROPERTIES OF THE ESTATE MAY VARY AND WILL DEPEND ON THE PARTICULAR CIRCUMSTANCES OF EACH CREDITOR. CONSEQUENTLY, EACH CREDITOR OF THE DEBTOR IS URGED TO CONSULT HIS OWN TAX ADVISOR(S) WITH SPECIFIC REFERENCE TO HIS PARTICULAR CIRCUMSTANCES AND TO THE TAX CONSEQUENCES OF BOTH THE PLAN AND ANY ALTERNATIVE THERETO.

## ARTICLE XVIII

### MISCELLANEOUS PROVISIONS

18.1    Captions and Headings. The captions and headings in this Plan are included for the convenience of reference only and shall not limit or otherwise effect the meanings hereof or thereof.

18.2    Articles and Paragraphs. Unless otherwise specified, all references in the Plan to Articles and Paragraphs are to the Articles and Paragraphs of the Plan.

18.3    De Minimis Distributions. With respect to any distribution of cash to the holder of an Allowed Claim, if the holder of such Allowed Claim would receive less than $100.00, the Plan Trustee shall not distribute such lesser amount to such holder, but shall instead defer the distribution thereof until the cumulative amount of cash to be distributed to such holder and any subsequent distribution is $100.00 or more. No interest on any such deferred amount shall be paid to such holder.

18.4    Extension of Payment Dates. If any payment provided for under this Plan shall fall due on a Saturday, Sunday, or holiday, then such due date shall be extended to the next following business day.

18.5    Cancellation of Certain Instruments. Any instrument which evidences any Claim against the Debtor and which is impaired by this Plan shall be deemed canceled as against the Debtor as of the Effective Date.

18.6    Notices. Any notice hereunder to the Debtor, a Creditor, or any party-in-interest, shall be in writing, and, if by telegram, telefax, or telex, shall be deemed to have been given when sent and, if mailed, shall be deemed to have been given three days after the date when sent by registered or certified mail, postage prepaid, and addressed to the Debtor, a creditor, or party in interest as follows:

If to the Debtor:

CHARLES B. FELDMAN
926 Lantana
Harlingen, Texas  78550

With a copy to:

JAMES P. MOON
Simpson, Dowd, & Moon
2828 Woodside
Dallas, Texas  75204

If to a Creditor or Party in Interest:

Addressed to such Creditor or party-in-interest in the name of and at the address listed in any Proof of Claim or interest filed by such creditor or party in interest or if such proof of claim or interest was not filed, at the last known mailing address of such Creditor or party-in-interest.

Any party desiring to have notices sent to a different address shall other parties in writing.

18.7    Severability. Should any provision of this Plan ever be held or determined by a court of competent jurisdiction to illegal, invalid, or unenforceable, such holding or determination nor the illegality, invalidity, or unenforceability of such provision shall in no way or manner limit or affect the enforceability and operative effect of the remaining provisions of this Plan.

### ARTICLE XIX

### CONDITIONS TO IMPLEMENTATION OF THE PLAN

19.1    This Plan will not become effective unless and until each and all of the following conditions are met:

(a)    the absence of any material adverse change with respect to the assets, liabilities, operations, and/or financial or business condition of the Debtor prior to the Closing which is not due to the nature of the Debtor's business and the confirmation of this Plan by the Court; and

(b)    the execution of an assignment, pledge, or other appropriate instrument authorizing FREI to pay the Net Profit Distributions of the Debtor and the Feldman Family Interests to the Plan Trustee for the term of the Plan.

19.2    The conditions set forth in 19.1(a) above may be waived in whole or in part by the Debtor.

## ARTICLE XX

## EVENTS OF DEFAULT AND THEIR EFFECT

Each of the following of the events described in Sections 20.1 through 20.3 hereof shall constitute an event of default under the Plan:

20.1    Nonpayment.  Defaults and continuance thereof for a period of twenty (20) days after notice as required and set forth above, in the payment of any payment due and owing under the provisions of this Plan, unless such nonpayment is specifically authorized by the terms and provisions of the Plan.

20.2    Noncompliance with Plan:  Failure by the Debtor to comply with or to perform any material provision of the Plan (and not constituting an event of default under any of the proceeding provisions of this Article), and continuation of such failure for thirty (30) days after written notice thereof, by certified or registered mail, to the Debtor and his counsel from a Creditor or party-in-interest.

20.3    Effect of Default:  If any event a default shall occur and be continuing for the time periods set forth above, a Creditor or party-in-interest may enforce payment of such obligation in such manner as provided for under the Bankruptcy Code or applicable federal, state, or local law.

## ARTICLE XXI

## ALTERNATIVES TO THE PLAN

As set forth in the Disclosure Statement, a brief discussion of alternatives to the Plan may be useful:

21.1  General:  The Debtor is of the opinion that the only alternatives to the Plan are the conversion of these Chapter 11 cases to liquidation proceedings under Chapter 7 of the Bankruptcy Code or the dismissal of these Chapter 11 proceedings. The Debtor, of course, believe that the Plan is in the best interest of the Creditors and the Estate.  Thus, the Debtor does not favor any alternative to the proposed Plan.  In arriving at that conclusion, the Debtor has assessed the alternatives as follows:

21.2  Liquidation.  The Debtor believes that the conversion of this case to a proceeding under Chapter 7 of the Bankruptcy Code and the subsequent liquidation of the assets of the Debtor would be unacceptable and not in the best interest of the Creditors and Interest holders of the Debtor.  In the event of a liquidation, it is highly probable that all assets of the Debtor would be liquidated at "fire sale" values, which would not provide the maximum benefit to the Estate.

21.3  Dismissal.  Dismissal of these proceedings would, in the judgment of the Debtor, lead to an unsatisfactory result.  Dismissal would result in the continuation and filing of numerous lawsuits to collect debts from the Debtor and would in all likelihood result in a disorganized liquidation of the Debtor's property.  It is highly unlikely that any unsecured Creditor or Interest holder would receive the type of benefit offered by this Plan from such a liquidation of the Debtor assets.

21.4  The Debtor has attempted to set forth alternatives to the proposed Plan.  However, the Debtor must caution Creditors and Interest holders that a vote must be for or against the Plan.  The vote on the Plan does not include a vote on alternatives to such Plan.  If you believe that one of the alternatives referred to above is preferable to the Plan and you wish to urge it upon the Court, you should contact your counsel.

FIRST AMENDED PLAN OF REORGANIZATION OF CHARLES B. FELDMAN D/B/A
CHARLES B. FELDMAN INVESTMENTS

## ARTICLE XXII

### DISCLOSURE STATEMENT

22.1  When the Debtor solicits the requisite acceptance(s) of this Plan, it will be accompanied by the Disclosure Statement, which is hereby incorporated by reference herein for all purposes, that will have been approved by the Court prior to such solicitation. The Debtor requests that, at that time, all parties whose acceptances of this Plan are solicited should direct their attention to the Disclosure Statement and information contained therein.

22.2  IF THIS PLAN IS CONFIRMED, YOU WILL BE BOUND BY ITS TERMS; THEREFORE, YOU ARE URGED TO REVIEW THIS MATERIAL AND TO MAKE SUCH FURTHER INQUIRIES AS YOU MAY DEEM APPROPRIATE, AND THEN CAST AN INFORMED VOTE ON THE PLAN.

### ARTICLE XXIII

### CONCLUSION

23.1  The Plan is the result of extensive efforts by the Debtor, his advisors, and management to provide the Creditors and Interest holders with a meaningful dividend. The Debtor therefore urges all parties to accept the Plan.

SUBMITTED this the _28_ day of May, 1992.

Respectfully submitted,

SIMPSON, DOWD, & MOON
2828 Woodside
Dallas, Texas  75204
(214) 922-9330
(214) 922-9372 (Fax)

By: _____
    JAMES P. MOON
    State Bar No. 14316300
    ERIC A. LIEPINS
    State Bar No. 12338110

ATTORNEYS FOR THE DEBTOR

JAMES P. MOON
ERIC A. LIEPINS
JAMES P. MOON & ASSOCIATES, P.C.
2828 Woodside
Dallas, Texas 75204
(214) 871-7295
(214) 922-9372 (Fax)

92 SEP 24  PH 3:

BANKRUPTCY CO

ATTORNEYS FOR THE DEBTOR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:                                §
                                      §
CHARLES B. FELDMAN D/B/A              §        CASE NO. 90-01254-B-11
CHARLES B. FELDMAN INVESTMENTS        §
                                      §
DEBTOR                                §

## MODIFICATION TO FIRST AMENDED PLAN OF REORGANIZATION OF CHARLES B. FELDMAN D/B/A CHARLES B. FELDMAN INVESTMENTS

TO THE HONORABLE U.S. BANKRUPTCY JUDGE:

COMES NOW, Charles B. Feldman d/b/a Charles B. Feldman Investments, Debtor, in the above-styled and numbered cause and, pursuant to 11 U.S.C. §1127(a) and Bankruptcy Rule 3019, files this its Modification to First Amended Plan of Reorganization ("Modification") and would hereby amend and modify the Debtor's First Amended Plan of Reorganization, prior to confirmation thereof, with respect to the following provisions:

1.      Under Article II, Glossary of Terms, Subheading A, Defined Terms, the following definition should be added as Paragraph 2.24(a):

2.24(a).   "Net Income Distribution" shall mean the net amount of income or distribution, which income or distribution shall have actually have been distributed





to the respective payer, allocated to the Debtor or Feldman Family Interest from a particular source after the deduction of an amount equal to any and all federal, state, and/or local income or other taxes due and owing on or because of or in connection with such income or distribution.

2.     Under Article IV, Treatment of Claims and Interests, Paragraph 4.2, Treatment of Impaired Claims, Subsection 4.2.2, Class 4(a), the following language shall be inserted after the fourth full sentence in the subparagraph:

"Before a Real Property Asset is sold, the Debtor will have a current appraisal of such asset made.  If the sales price of such asset is less than ninety percent (90%) of its appraised value, then the Debtor shall obtain bankruptcy court approval for the sale prior to closing such sale."

The remainder of such Paragraph and Section shall remain the same.

3.     Article IV, Treatment of Claims and Interests, Section 4.1, Treatment of Impaired Claims, Subsection 4.2.2(b), shall be amended and modified so that prior to Clause (iv), the word "and" will be deleted.  Additionally, after Clause (iv), the following language will be added till the end of the sentence:

"..., and (v) the Net Proceeds from the sale of the Debtor's interests in any Real Property Asset, CFP, FREI, and/or FR."

MODIFICATION TO FIRST AMENDED PLAN OF REORGANIZATION OF
CHARLES B. FELDMAN D/B/A CHARLES B. FELDMAN INVESTMENTS - Page 2

4.     Article VI  ᵍeneral Provisions, Subsection 7.3, P  ᵀrustee, shall be amended and amended to provide that Colin Kelly Kaufman shall serve as Plan Trustee instead of Harlingen National Bank.

5.     Article VII, General Provisions, Subsection 7.3, the following language shall be added to the end of the paragraph:

"The Plan Trustee shall submit his accounts to the Bankruptcy Court for approval. The Plan Trustee shall also submit a final accounting at the end of the Plan Term Years to the Bankruptcy Court for its approval.

6.     Subsections 1 and 2 of Paragraph 9.2.5, entitled Pending and Anticipated Litigation, of Article IX, shall be deleted in their entirety and Subsections 3 and 4 of such Paragraph shall be renumbered as Subsections 1 and 2, respectively.

7.     The following Paragraph 9.2.6 will be added to Article IX following Paragraph 9.2.5:

"9.2.6 Settlement of Fraudulent Transfer Litigation. The claims currently asserted and that could have been by and on behalf of the Estate in Adversary Proceeding No. 90-0143-B will be compromised, settled, and resolved as follows:

(a)     General. As more specifically set forth in the First Amended Disclosure Statement, (i) the Debtor and his spouse, (ii) FREI, (iii) the Charles B. Feldman Life Insurance Trusts (hereafter the "Life Insurance Trusts"), and (iv) Sam Feldman, Howard Feldman, Chad E. Feldman, Cory E. Feldman, and Jonathan Feldman (hereinafter sometimes referred to as the "Feldman Group") are currently defendants in Adversary Proceeding No. 90-0143-B (hereafter referred to as the "Fraudulent Transfer Action"), styled NCNB

NCNB Te\_\_\_\_/ational Bank v. Charles B. Feld\_\_\_\_ \_et al brought by NCNB Texas National Bank ("NCNB") seeking to set aside various transfers of the Debtor dating back to 1986, including the FREI Stock Transfers, as alleged fraudulent transfers. Such action was originally initiated by NCNB in the state district court of Cameron County. However, after the filing of the Petition herein, the Fraudulent Transfer Action was removed by NCNB to the United States District Court for the Southern District of Texas, where it remains stayed pursuant to the provisions of §362 of the Code. By reason of the tremendous cost and expense that will be incurred in prosecuting these claims through a trial and appeal, as well as the time factor involved and the potential for success on the claims, the Debtor, as Debtor-in-Possession on behalf of the Estate, has reached an agreement with the Feldman Group and other defendants in the Fraudulent Transfer Action to resolve the claims relating to the transfers of the FREI stock to such defendants through the provisions of this Plan. See above Article IV, Paragraph 4.2.2; Article VI, Paragraphs 6.1 and 6.2. See also First Amended Disclosure Statement, Article VII, Sections B, C, and F. Under the terms of the Plan, the Feldman Group has agreed to provide the Debtor with additional funds in the form of Net Income Distributions for the making of payments under the Plan. However, on April 23, 1991, the Bankruptcy Court, upon motion by NCNB, entered an Order approving the appointment of an examiner, Philip Snow ("Snow"), pursuant to the provisions of §1104(b) of the Bankruptcy Code to investigate the existence, propriety, and potential for recovery of various

transfers, juding the FREI Stock Transfers, le by the Debtor prior to the filing of this proceeding. On or about October 28, 1991, Snow filed his report (the "Examiner's Report") regarding potential recoveries available to the Estate. The Examiner's Report identified potential recoveries available to the Estate from (i) monies paid by the Debtor to the Trust, (ii) transfers of the FREI stock and (iii) transfers of the FVWI stock. Thereafter, on or about April 21, 1992, the Court entered an order ("Second Examiner Order") appointing Colin K. Kaufman ("Kaufman") as an examiner pursuant to 11 U.S.C. §1104(b) substitute in place of the Federal Deposit Insurance Corporation ("FDIC"), the successor to the claims of NCNB, as the Plaintiff in the Fraudulent Transfer Action and to examine whether pursuit of litigation to recover alleged fraudulent transfers, including those that had been asserted by NCNB in the Fraudulent Transfer Action, would be in the best interest of Debtor's bankruptcy Estate. Since his appointment, Kaufman has reviewed the proposed litigation and the documentation, including the Examiner's Report prepared and filed by Snow surrounding the alleged fraudulent transfer claims asserted in the Fraudulent Transfer Action and otherwise. As a result of such investigation and after negotiations with the Debtor and the Defendants and potential defendants in the Fraudulent Transfer Action, Kaufman and such parties have reached and agreement for the compromise and settlement of any and all claims against the Debtor, his spouse, FREI, the Life Insurance Trusts, and the Feldman Group which may

exist pursu    to 11 U.S.C. §§544, 545, 546, 54    }8, 549, 550, and 553, including those claims set forth in the pending Fraudulent Transfer Action.

(b)    Settlement of Feldman's Valley Wide Claims.    Under the terms of the agreement reached by Kaufman and the Defendants in the Fraudulent Transfer Action, any and all claims arising under §§544, 545, 546, 547, 548, 549, 550, and 553 of the Bankruptcy Code relating to (i) transfers of the stock of Feldman's Valley Wide, Inc. ("FVW") to the Life Insurance Trusts and Howard Feldman and (ii) transfers of funds to the Life Insurance Trusts by the Debtor will be compromised and settled in consideration of the sum of $50,000.00. The $50,000.00 settlement amount shall be payable without interest in five (5) yearly installments of $10,000.00 each over the Plan Term Years. The first installment shall be due thirty (30) days before the end of the first Plan Term Year, with the remaining installments shall each be due thirty (30) day prior to the end of the subsequent Plan Term Years. If any installment is not timely paid, the Plan Trustee shall send the Debtor a Notice of Default. If the payment is not made within ten (10) days after such Notice is sent, the past-due installment shall accrue interest at the rate of nine (9%) percent per annum. Such penalty is accumulative of all remedies for default available under the Plan.

(c)    Settlement of Feldman's Real Estate Claims. In addition, any and all claims arising under §§544, 545, 546, 547, 548, 549, 550, and 553 of the Bankruptcy Code relating to (i) transfers of the stock of FREI to the Feldman Group, (ii) the transfers of the partnership interests in Feldman's Real Estate ("FRE"),

a Texas ___ ral partnership, and (iii) any oth__ aims or causes of action relating to FREI and/or FRE will be settled in accordance with the terms set forth in this Plan through the payment of Net Income Distribution from the Feldman Family Interests in FREI.

(d) <u>Dismissal of Adversary Proceeding</u>. As part of the settlement herein, the parties to the Fraudulent Transfer Action will agree to execute and deliver mutual releases of claims, and the above-referenced Fraudulent Transfer Action shall be dismissed with prejudice.

8. The word "Debtors" in the first sentence of Paragraph 13.1, entitled <u>Discharge</u>, of Article XIII shall be changed to the word "Debtor".

9. Article XV, Retention of Jurisdiction, Section 15.1, a new subsection - Subsection (q) shall be added. It shall read as follows:

(q) to hear and approve the sale of any Real Property Asset which may be sold in accordance with Paragraph 4.2.2(a) above.

10. Article XIX, Paragraph 19.1(c) shall be added and shall read as follows:

"(c) the execution of leases between Feldman's Real Estate, Inc., as landlord, and Feldman's Valley Wide, as tenant, for the duration of the Plan Term Years, for each location Feldman Valley Wide currently rents from Feldman Real Estate, Inc., in substantially the same form as attached hereto as Exhibit "A".

The Debtor files these modifications and hereby submits to the Court that these modifications do not have an adverse effect on any party or Class of Claims set forth in Debtor's First Amended Plan of Reorganization.

WHEREFORE, MISES CONSIDERED, Debtor resp 'ly prays the Court approve the above modifications to its First Amended Plan of Reorganization and that pursuant to 11 U.S.C. §1127 and Bankruptcy Rule 3009, and that said modifications be incorporated into and become part of Debtor's First Amended Plan of Reorganization.

Respectfully submitted,

JAMES P. MOON & ASSOCIATES, P.C.
2828 Woodside Street
Dallas, Texas  75204-2524
(214) 871-7295
(214) 922-9322 - Telecopier

BY: _____
JAMES P. MOON
ERIC A. LIEPINS
Attorneys for Charles B. Feldman


Colin Kelly Kaufman
Attorney at Law
P. O. Box 1662
Corpus Christi, TX  78403


BY: _____
Colin Kelly Kaufman
Examiner


Chuck Jefferson
SMITH, BARSHOP, STOFFER & MILLSAP
One Riverwalk Plaza, Suite 1000
700 N. St. Mary's Street
San Antonio, TX  78205-3584

BY _____
Chuck Jefferson
Attorneys for FDIC

Curtis Bonner
BONNER & BONNER
P. O. Box 288
Harlingen, TX 78551

BY: _____
Curtis Bonner
Attorneys for Feldman's Real Estate, Inc.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been forwarded to all parties on the attached Service List, by U.S. mail, postage prepaid, on this the 24th day of August, 1992.

_____
Eric A. Liepins

c:\feldman\ch11\planmod.doc

MODIFICATION TO FIRST AMENDED PLAN OF REORGANIZATION OF
CHARLES B. FELDMAN D/B/A CHARLES B. FELDMAN INVESTMENTS · Page 9

June 25, 1995                                    *Copy*

Mr. Colin Kelly Kaufman, Esq.
Post Office Box 1662
Corpus Christi, Texas 78403

Re:    Charles B. Feldman, d/b/a Charles B. Feldman Investments
       U. S. Bankruptcy Court For the Southern District of Texas
       Brownsville Division
       Case No. 90-01254-B-11
       Plan Trustee - Colin Kelly Kaufman

Dear Mr. Kaufman:

As you know, CKS Asset Management, Inc. ("CKS") purchased and is now the holder of all
rights, title and interest of the Federal Deposit Insurance Corporation ("FDIC") in a certain
judgment and other claims against Charles B. Feldman and Helen Feldman ("Claims").

As you know, Article IV, Section 4.2.2 (c) of the Confirmed Plan provided that payments to the
creditors are to be made on a semi-annual basis on January 31 and June 30 of each Plan Term
Year. CKS trusts that you will be making the semi-annual payment on June 30, 1994, together
with your report to the Court setting forth the proceeds and other payments received by the Plan
Trustee and all distributions made by the Plan Trustee. CKS looks forward to receiving the June
30, 1995 distribution as well as receiving your report and accounting.

The Debtor's legal counsel reports that the Debtor has performed its obligations under the
Confirmed Plan and that payments have been made to the Plan Trustee, which should be
available for distribution to the Plan Creditors.

CKS looks forward to receiving your distribution and report.

Sincerely,


Steven Ditto
CKS Asset Management, Inc.

c.     Mr. Keith Kennedy, Esq.
       Mr. Moon, Esq.
       U.S. Trustee





*Copy*

March 14, 2001                              FAX (361) 888-8172


Mr. Colin Kelly Kaufman
Attorney at Law
1106 Third Street
Corpus Christi, Texas 78404

RE:    Charles B. Feldman (Case #90-01254 ) Judge Richard S. Schmidt order to submit
       accounting for review by CKS Asset Management, Inc. prior to April 6ᵗʰ hearing on Final
       Accounting.

Dear Colin,

As a reminder per the judge this morning please make available all the bank statements on the
Charles B. Feldman Bankruptcy and any accounting ( such as work sheets you prepare) for use in
the Final Accounting to be submitted to the Bankruptcy Court on April 6, 2001.

 If you are able to have them copied prior to the judges April 2, 2001 date please forward them to
my counsel Kirk Newsom at Newsom, Newsom & Terry, 5949 Sherry Lane, Suite 600, Dallas,
Texas 75225 or call me at (817) 797-5816 and I will come to Corpus Christi to pick them up. If
you need assistance in getting the copies I will be available to come to Corpus Christi anytime. I
will pay for all copies.


The copies of the bank Statements should include:

1)      Front and back of all pages of the Bank Statements.
2)      Copies of all deposit slips front and back. (Copies of supporting documents detailing the
        deposit)
3)      Copies of all checks or withdraws front and back made from the accounts. (Copies of
        supporting documents detailing the reason for the disbursement)





If there are other types of investment accounts such as certificates of deposit, etc in which the proceeds were deposited please forward all documentation and supporting copies regarding those depository accounts.

The Plan requires that two interest bearing accounts were to be opened by the Plan Trustee. The two accounts per the Plan were to be a depository account in which 80% of collections were to be deposited and account two was to be an account for 20% stilled as a capital reserve account.

Please give me a call to discuss this very important matter. If you should have any difficulty in understanding what CKS Asset Management, Inc. is requesting and the judge requested you to submit call me immediately at (817) 797-5816.

Very Truly Yours,


Steve A. Ditto
President


cc:    Hon. Richard S. Schmidt, Esq.
       Mr. Paul Gabriel, Esq.    (956) 686-0677
       Mr. Kirk Newsom, Esq. (214) 739-1000

*Copy*

December 8, 2000                          FAX (361) 888-8172


Mr. Colin Kelly Kaufman
Attorney at Law
1106 Third Street
Corpus Christi, Texas 78404

RE:   Charles B. Feldman (Case #90-01254 ) review of file accounting prepared by Al White.

Dear Colin,

I have reviewed the 486 copies of documents received last week after the court hearing.  The documents are not sufficient to determine if the confirmed plan has been completed in its entirety.

As the largest creditor in this case I feel it is necessary and I would like for you to request to the court that an outside third party prepare an analysis of the final accounting of this case before the matter can be closed.  I would like to be a party to making the decision of the third party reviewer since, CKS Asset Management, Inc. is the largest creditor is this case.  The estate has sufficient funds to contract out and pay for such services.   It is unclear from the copies given to you by Mr. Feldman's accountant that the plan has been properly completed.

As the largest creditor in this case I request that an independent third party complete an analysis and prepare a report for the court.  The copies reviewed are lacking considerable information.  Mr. White has not provided sufficient information to finalize the accounting in this matter and should not be paid for this incomplete accounting.  It is the best interest of all creditors that a independent third party be hired to complete and prepare a final accounting to the court in this Bankruptcy preceding.



EXHIBIT
CKS 6



DEPOSITION
EXHIBIT
K 14

Without, the Tax Returns dating from the beginning of the case through today a final accounting can not be finalized.  Mr. Feldman needs to provide the court all the Tax Returns regarding his 1040 filings each year and all 1120 Tax filings of Valley Wide and other entities required under the plan.  Also, copies of all the brokerage statements need to be a part of the final accounting along with the bank statements of the Trustee Deposit accounts to make sure everything has been properly accounted for and processed.   The information provided by Mr. White has no accountability to compare what assets Mr. Feldman had at the time of filing and wether all of the required assets per the Plan have been liquidated and properly accounted for to the court.

Please give me a call to discuss this very important matter at (817) 797-5816.

Very Truly Yours,


Steve A. Ditto
President

ATTORNEYS AND COUNSELORS

600 Sterling Plaza
5949 Sherry Lane
Dallas, Texas 75225
Telephone (214) 739-1000
Facsimile (214) 739-9603

R. Kirk Newman

July 28, 1997

Via Telefacsimile To
1-512-888-8172
Colin K. Kaufman, Esq.
P. O. Box 1662
Corpus Christi  78403-1662

      RE:    Case No. 90-1254-B-11
             Charles B. Feldman

Dear Colin,

    I know that you are currently in the process of obtaining the appraisals on the partnership assets which appear to be required under the Plan prior to any disposition of the assets. I also understand that you are going to complete a report shortly in early August to submit to both James Moon and me for our review prior to the date and time for the hearings now scheduled at 9:00 AM on August 21, 1997, in McAllen, Texas.

    Now, it also appears to us at this time, after further in depth study of this Plan, that as Plan Trustee, you appear to be primarily a disbursing agent only for money delivered to you by the Debtor, but coupled with a few extra duties, including at least (i) a duty to make semi-annual disbursements to creditors, and (ii) a duty to give the Debtor a notice of default if such became appropriate.

    Therefore, I am not requesting that you undertake any new action; however, in addition to preparing the foregoing information on which you are working, I would respectfully ask that you supply me information with respect to what actions you have previously completed over the past five years of the Plan, including the following information:

    1)    Please specifically identify from what source you have received any funds, and to whom and for what purposes you have disbursed any funds of the estate;

    2)    Please specifically provide all information you have obtained on the profitability of entities from which the Plan indicated that creditors would receive some net profits;

EXHIBIT
CKS 7

DEPOSITION
EXHIBIT
K15

Colin K. Kaufman, Esq
07/28/97
Page - 2

3)   Please provide any information you have received on values and sales efforts with respect to those assets indicated in the Plan to be sold, or which have been sold under the Plan; and,

4)   Please provide a specific accounting on all funds you have received and paid out indicating all sources and the use of all funds disbursed from your accounts, including the names of all recipients.

Again, I am not asking that you take any new action but only that you provide information which is surely contained in your files. I would like to be able to receive all of this information from you by at least August 11th. Please let me know if a problem exists either with providing me with the requested information or being able to do so by August 11th.

Thank you for your assistance and cooperation.

Very truly yours,

R. Kirk Newsom

cc   James P. Moon, Esq.
     James P. Moon & Assoc.
     2602 McKinney Avenue
     Suite 350
     Dallas, Texas 75204 - via telefacsimile to 220-0562

     Steve A. Ditto
     CKS Asset Management - via telefacsimile to 361-938____

     Arnaldo Cavazos, Esq. - via telefacsimile to - 748-6750

# In The Matter Of:

### IN RE:
### CHARLES B. FELDMAN, DEBTOR

---

## COLIN KELLY KAUFMAN
## May 23, 2001

---

## AK/RET REPORTING, RECORDS & VIDEO, INC.
## CERTIFIED COURT REPORTERS
## SUITE 880 TOWER II
## 555 N. CARANCAHUA
## CORPUS CHRISTI, TX  78478
## (361) 882-9037    FAX: (361) 882-3355

*Original File KAUFMAN.ASC, 71 Pages*
*Min-U-Script® File ID: 3866869565*

# Word Index included with this Min-U-Script®



EXHIBIT
CKS 11

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

IN RE:    *    BANKRUPTCY CASE NO.

＊    90-01254-B-11

CHARLES B. FELDMAN, DEBTOR *    CHAPTER 11

BANKRUPTCY RULE 2004 EXAMINATION OF

COLIN KELLY KAUFMAN

MAY 23, 2001

BANKRUPTCY RULE 2004 EXAMINATION OF COLIN KELLY

KAUFMAN, produced as a witness at the instance of the

Creditor CKS Asset Management, Inc., and duly sworn,

was taken in the above-styled and numbered cause on the

23rd day of May, 2001, from 9:38 a.m. to 11:43 a.m.

before CAROL R. HOBLIT, CSR in and for the State of

Texas, reported by machine shorthand at the law

offices of Matthew A. Rosenstein, 711 N. Carancahua,

Suite 420, Corpus Christi, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

COPY

---

**Page 2**

[1]        APPEARANCES

[2]

[3] FOR THE CREDITOR:

[4]    MR. MATTHEW A. ROSENSTEIN

Attorney at Law

[5]    711 N. Carancahua, Suite 420

Corpus Christi, Texas 78475

[6]

MR. RICHARD G. GRANT

[7]    Law Offices of Richard G. Grant

3201 Oak Lawn Avenue, Suite 700

[8]    Dallas, Texas 75219

[9]

[10] ALSO PRESENT:

MR. STEVEN A. DITTO

[11]    MR. JOE COOK, Videographer

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 3**

[1]

[2]

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10] STIPULATIONS

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 4**

[1]            INDEX

PAGE

[2] Appearances. . . . . . . . . . . . . . . .  2

Stipulations . . . . . . . . . . . . . . .  3

[3]

COLIN KELLY KAUFMAN

[4]    Examination by Mr. Rosenstein. . . .  5

Examination by Mr. Grant . . . . . .  58

[5]    Reexamination by Mr. Rosenstein. . . 60

[6]

Reporter's Certificate . . . . . . . . . . .

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 5**

[1] MR. COOK: We're on the record.

[2] COLIN KELLY KAUFMAN,

[3] having been first duly sworn, testified as follows:

[4] EXAMINATION

[5] BY MR. ROSENSTEIN:

[6] Q: Will you state your name, please, for the
[7] record.

[8] A: My name is Colin Kelly Kaufman.

[9] Q: And where do you reside, Mr. Kaufman?

[10] A: I reside at 1106 Third Street, Corpus Christi,
[11] Texas.

[12] Q: Okay.

[13] A: 78404.

[14] Q: Mr. Kaufman, you've just been given an oath to
[15] tell the truth. Do you understand the nature and
[16] consequences of that oath?

[17] A: I think so.

[18] Q: Okay. I'll be asking you several questions
[19] during this deposition and you're required to answer my
[20] truthfully. If at any time you do not understand my
[21] question, would you let me know?

[22] A: If I understand that I don't understand your
[23] question I'll let you know.

[24] Q: Okay. Mr. Kaufman, you're a licensed attorney,
[25] are you not?

**Page 6**

[1] A: That's correct.

[2] Q: And in what states are you licensed?

[3] A: I have been admitted to the bar in Kansas and
[4] in Texas.

[5] Q: And where did you — Do you have an
[6] undergraduate degree?

[7] A: From the University of Texas in Austin.

[·] Q: Excuse me, in Austin?

[·] A: University of Texas in Austin.

[10] Q: And what is that degree in?

[11] A: Political science.

[12] Q: And where did you go to law school?

[13] A: Harvard.

[14] Q: And where did you rank in your class at
[15] Harvard?

[16] A: I was in the top quarter.

[17] Q: And what year were you admitted to the bar in
[18] Texas?

[19] A: 1970.

[20] Q: And what year were you admitted to the bar in
[21] Kansas?

[22] A: Let me think about that a second. 1976.

[23] Q: Okay. So you've been admitted to the bar in
[24] Texas at least in excess of 30 years?

[25] A: That's correct.

**Page 7**

[1] Q: And you've been practicing that time?

[2] A: That's correct.

[3] (Ms. Sharon Kaufman entered the deposition
[4] room.)

[5] MR. ROSENSTEIN: You can go off the record
[6] for a second.

[7] MR. COOK: Off the record.

[8] (Ms. Sharon Kaufman left the deposition
[9] room.)

[10] MR. COOK: Back on the record.

[11] Q: (By Mr. Rosenstein) Mr. Kaufman, so you've
[12] been practicing law at least in excess of 30 years; is
[13] that correct?

[14] A: That's correct.

[15] Q: And you're specialized, are you not?

[16] A: I'm board certified in business and consumer
[17] bankruptcy law.

[18] Q: Okay. That would be by the Texas Board of
[19] Legal Specialization?

[20] A: That's correct.

[21] Q: And when you're specialized and get a
[22] certificate from the Texas Board of Legal Specialization
[23] they give you a certificate of special competence, don't
[24] they?

[25] A: I don't — I haven't looked at it lately, but I

**Page 8**

[1] think that's probably right.

[2] Q: Isn't that what the big document says, looks
[3] like a law license and it says "Certificate of Special
[4] Competence"?

[5] A: It's on my wall somewhere, but I haven't looked
[6] at it lately.

[7] Q: Okay. And when did you receive your
[8] Certificate of Special Competence in business bankruptcy
[9] law from the Texas Board of Legal Specialization?

[10] A: I don't recall. It was the first year that
[11] they offered the specialization in business bankruptcy
[12] law.

[13] Q: So it's been at least ten years?

[14] A: I would say at least ten years, uh-huh.

[15] Q: And what about consumer bankruptcy law?

[16] A: I got that at the same time.

[17] Q: Okay.

[18] A: I applied, I applied for both of them at the
[19] same time that they offered the business bankruptcy.

[20] Q: And do you put that on your letterhead, that
[21] you're board certified in both business and consumer
[22] bankruptcy law —

[23] A: Yes.

[24] Q: — by the Texas Board of Legal Specialization?

[25] A: Uh-huh.

[1] Q: Okay. And does that mean that you have a
[2] higher standard of, of excellence in the practice of law
[3] than other attorneys in those fields?
[4] A: I don't know that it necessarily means that.
[5] I've known some people that weren't board certified who
[6] do excellent work. So, I mean, what it means is that
[7] you meet a certain minimum level according to the, you
[8] know, the organization that gives the examinations and
[9] regulates those sorts of things. It doesn't mean that
[10] someone else that doesn't have one isn't just as good.
[11] Q: Okay. What, what field of law do you mostly
[12] practice in?
[13] A: I do bankruptcy law. I don't attempt to do
[14] anything else.
[15] Q: Okay. So your, your work is exclusively
[16] bankruptcy law?
[17] A: Well, I wouldn't say it's worked out to be
[18] exclusively bankruptcy law, but it's been more than 90
[19] percent bankruptcy law most of the time.
[20] Q: Okay. And do you practice representing
[21] debtors, creditors, trustees? What does your practice
[22] involve?
[23] A: Whatever. I've done all sorts.
[24] Q: Okay. Have you — In how many cases have you
[25] acted as a Chapter 7 trustee?

[1] A: I think there was about 33 or 34 of them back
[2] when I first started practicing, so — and I don't think
[3] that I've done any Chapter 7 trusteeships since then.
[4] Q: Chapter 7 would be a bankruptcy liquidation
[5] case; is that correct?
[6] A: That's correct.
[7] Q: And have you ever acted as a Chapter 13
[8] trustee, which is adjustment of, of wage earner income
[9] cases?
[10] A: No, I've never done any of that.
[11] Q: Have you acted as a Chapter 7 trustee in the
[12] last ten years?
[13] A: No.
[14] Q: In how many cases have you acted as a Chapter
[15] 11 trustee during the administration of a case?
[16] A: I don't believe that I ever have.
[17] Q: That, that, that would mean and I'm trying to,
[18] to say that, you know, once a bankruptcy petition is
[19] filed sometimes a Chapter 11 trustee is appointed by the
[20] court for cause and —
[21] A: I assume that you meant prior to plan
[22] confirmation.
[23] Q: Yes, plan to — prior to a plan confirmation.
[24] So you never have acted as a Chapter 11 trustee during
[25] the administration of a Chapter 11 case?

[1] A: No.
[2] Q: In how many cases have you acted as a Chapter
[3] 11 plan trustee or a trustee after a plan has — Chapter
[4] 11 plan has been confirmed so, so that —
[5] A: I don't think there's been any since, except
[6] this one.
[7] Q: This is the only case?
[8] A: Uh-huh.
[9] Q: Okay. Now, what documents control your
[10] responsibilities and obligations as the plan trustee in
[11] the Charles B. Feldman Chapter 11 bankruptcy?
[12] A: Well, basically would be the plan, the
[13] disclosure statement, the — there was an amendment to
[14] the plan that was approved at the time that the plan was
[15] ordered confirmed and the order confirming.
[16] Q: The order confirming the plan?
[17] A: Right.
[18] Q: Okay. I'm showing you what's been marked
[19] Deposition Exhibit K-3, and I'll represent to you that's
[20] one of the documents that you furnished to me earlier.
[21] Do you recognize that as the First Amended
[22] Plan of Reorganization in the, in the Charles B. Feldman
[23] Chapter 11 case?
[24] A: It appears to be that.
[25] Q: And I'm showing you Deposition Exhibit K-4, K

[1] being — standing for Kaufman. Do you recognize this as
[2] the Modification to the First Amended Plan of
[3] Reorganization in the Charles B. Feldman Estate?
[4] A: It appears to be, uh-huh.
[5] Q: Okay. And you acknowledge — Do you
[6] acknowledge that those documents are, are documents
[7] that, that specify what your actions and obligations are
[8] to be in connection with your duties as the Chapter 11
[9] plan trustee?
[10] A: Yes, these are two of the four governing
[11] documents that I mentioned.
[12] Q: Okay. And have you read those documents and
[13] are you thoroughly familiar with those documents?
[14] A: Well, I have read them on different occasions.
[15] I don't know if I would say that I'm thoroughly familiar
[16] with them, but, I mean, I've certainly read them.
[17] Q: Have you complied in each and every respect
[18] with your duties and obligations under the plan and the
[19] first modification to the plan?
[20] A: Well, let me put it this way: I think that
[21] some of the terms in here may have been altered by
[22] usage, but — and other than —
[23] Q: Whose usage? Your usage?
[24] A: Well, the, the, the things that I was doing and
[25] the things that the parties in the case knew about.

Page 13

[1] Q: Did you ever or has the plan ever been modified
[2] by any order authorized by the bankruptcy court, other
[3] than those two documents that you see in front of you?
[4] A: Well, there's the order of the bankruptcy court
[5] that ordered the plan confirmed. It's not in these two
[6] documents that you have shown me.
[7] Q: Okay. But the order that confirmed the plan
[8] and, and the modification just confirms it and says:
[9] This is going to be the plan of the debtor, Charles B.
[10] Feldman, and it says he's complied with all the, the
[11] obligations —
[12] Q: It goes through the list of things that have to
[13] be found in order to confirm —
[14] Q: Okay.
[15] A: — a plan, that's true.
[16] Q: But there — Have there been any other orders
[17] that have been entered by the bankruptcy court which
[18] have modified your responsibilities, duties and
[19] obligations under the plan as the plan trustee?
[20] A: I'm not aware that there has been a formal
[21] court order altering the deal in any way since the
[22] beginning.
[23] Q: Is there any document that you have that have
[24] been signed by all the creditors in the case that have
[25] consented to modification of the plan under what you've

Page 14

[1] termed usage?
[2] A: Well, there hasn't been any attempt to ask all
[3] the creditors to sign a writing to alter the terms of
[4] the plan.
[5] Q: Okay. Tell me specifically or tell the court
[6] specifically what deviations from the plan there has
[7] been that you say has been done by usage?
[8] A: Well, I don't know if there has actually been
[9] any deviations from the plan, but I'm just telling you
[10] that there has been, you know, in this case about ten or
[11] 11 years of history that have gone into what was being
[12] done and what has been done in it.
[13] Q: When, when were you — When did you become the
[14] plan trustee?
[15] A: I was appointed the plan trustee at the time of
[16] confirmation.
[17] Q: And do you know what date that was?
[18] A: I think the confirmation was in September of
[19] 1992, about the 22nd, so that the effective date would
[20] have been around October the 2nd of 1992. I believe
[21] that's right.
[22] Q: And today is May 23 of 2001?
[23] A: Uh-huh.
[24] Q: Well, let's, let's look at that exhibit, if you
[25] will, please, the plan —

Page 15

[1] A: Uh-huh.
[2] Q: — which is exhibit K-4 — K-3.
[3] A: K-3.
[4] Q: And turn to page six, if you will, please.
[5] A: Uh-huh.
[6] Q: And look at paragraph or under — it says class
[7] four, sales proceeds.
[8] A: Uh-huh.
[9] Q: About three-fourths of the way down it says,
[10] "Thereafter the debtor shall pay to the plan trustee 80
[11] percent of the remaining net proceeds of such sales,
[12] which amounts shall be deposited in an interest-bearing
[13] account hereinafter referred to as the distribution
[14] reserve account to be established by the plan trustee at
[15] a federally insured financial institution."
[16] A: Uh-huh.
[17] Q: My first question is: Did the debtor pay to
[18] you, as plan trustee, 80 percent of the remaining net
[19] proceeds of sales?
[20] A: Well, the debtor paid to me net proceeds of
[21] sales with two sets of deductions. One was 20 percent
[22] for interest, which is — I mean not interest, but
[23] what — expenses, and I think that's mentioned in here,
[24] that he's entitled to deduct out the expenses. And it
[25] also says in here that he's entitled to deduct out an

Page 16

[1] amount equal to the taxes. So what he did was he
[2] subtracted out 31 percent — it wasn't always 31
[3] percent; sometimes he subtracted out less, sometimes he
[4] subtracted out more, but most of the time it was about
[5] 31 percent for taxes and then there was 20 percent that
[6] he subtracted out for reserve for expenses.
[7] Q: Okay. But the debtor did pay to you certain
[8] sums of money?
[9] A: Yes.
[10] Q: Under this paragraph?
[11] A: That's correct.
[12] Q: And the debtor is Charles Feldman?
[13] A: Charles B. Feldman.
[14] Q: Did you establish a distribution reserve
[15] account at a federally insured financial institution?
[16] A: Yes, I did.
[17] Q: And when did you establish that distribution
[18] reserve account?
[19] A: When it first — When we first got enough money
[20] in that it looked like it might be possible to
[21] distribute some money to creditors. I would think that
[22] was around the 1st of August of 1997, was probably the
[23] first time. And we established, I think, the account
[24] within a week of that time.
[25] Q: And how much money did you put into that

**Page 17**

[1] account?.

[2]    A: Well, it's in one of these boxes here. It's a

[3] report — I think you've got also a report on it, but it

[4] was around $150,000. It will show in the Charter Bank,

[5] the money market account statements that we have here.

[6]    Q: Okay. And what happened to the $150,000 from

[7] the time you received it until August 1st of 1997?

[8]    A: Would you ask me that question again?

[9]    Q: What happened to the $150,000 that came into

[10] your possession from the time you received it until

[11] August 1st of 1997?

[12]    A: Well, I — We must be on different wavelengths.

[13] I told you I got the $150,000 about August 1st of 1997.

[14]    Q: Okay.

[15]    A: So, I mean, nothing happened to it between the

[16] time that I received it August 1st, 1997. That was

[17] about the time that we got it.

[18]    Q: Okay. I'm a little confused, then, Mr.

[19] Kaufman. In bankruptcy court the last week in April you

[20] represented to the judge that some monies went into your

[21] attorney's IOLTA account.

[22]    A: That's correct. The original money went into

[23] the IOLTA account and was distributed out to — for

[24] attorneys' fees and accountants' fees. And, in fact, we

[25] had to wait for some period of time to have enough money

**Page 18**

[1] to actually pay all the attorneys' fees and accountants'

[2] fees.

[3]    Q: Now, were those fees that were approved by

[4] bankruptcy court order?

[5]    A: Some of them were approved by bankruptcy court

[6] order and some of them weren't.

[7]    Q: What was not approved by bankruptcy court

[8] order?

[9]    A: Well, we got bankruptcy court orders right at

[10] the very beginning for the funds that were — the

[11] amounts that were due prior to the confirmation of the

[12] plan. And I think we had an order for — I don't know

[13] if any of them — if there were any orders approving

[14] attorneys' fees for time that accrued after the plan was

[15] confirmed, but I think there might have been one.

[16]    Q: Did you distribute money for attorneys' fees

[17] then after plan confirmation without court orders?

[18]    A: That's correct.

[19]    Q: And how much money did you distribute?

[20]    A: Well, I think we distributed almost all of it.

[21]    Q: Well, how much would that be?

[22]    A: Well, we've got — somewhere I've got a

[23] summary. Oh, yeah. Payment summary, and it says that

[24] the total amount that was distributed was approximately

[25] $354,066.92.

**Page 19**

[1]    Q: Is that a summary you brought today?

[2]    A: Yes, it is.

[3]    Q: May I look at it, please.

[4]    A: Yes. I think somewhere in here we've brought

[5] you a — in your copy of the things — You should have a

[6] copy of all three of these things that I've got here in

[7] these, in these boxes and you will have a copy of that

[8] in there.

[9]    Q: May I look at it?

[10]    A: Sure.

[11]    (There was discussion off the record.)

[12]    Q: (By Mr. Rosenstein) Mr. Kaufman, there's a

[13] green piece of paper here and I've marked it exhibit

[14] Deposition Exhibit K-16. Can you tell us exactly what

[15] this document is?

[16]    A: Yeah. This is — It's got a heading at the

[17] top. It says, "The Feldman Estate Payment Summary" and

[18] that's what it is. It summarizes all of the checks that

[19] came out of the IOLTA account and all the checks that

[20] came out of the money market account.

[21]    Q: May I see it back, please.

[22]    A: Certainly.

[23]    MR. ROSENSTEIN: Let's go off the record

[24] for a second.

[25]    MR. COOK: Off the record.

**Page 20**

[1]    (A recess was taken.)

[2]    MR. COOK: Back on the record.

[3]    Q: (By Mr. Rosenstein) Mr. Kaufman, is there —

[4] would you look at the Plan of Reorganization that you

[5] have in front of you. Is there anything in that

[6] document or the first modification that allows you, as

[7] Chapter 11 plan trustee, to make payments for attorneys'

[8] fees or professional fees or plan trustee's fees without

[9] an order of the bankruptcy court?

[10]    A: Surely.

[11]    Q: Would you tell me what page that is and what

[12] paragraph?

[13]    A: Okay. Paragraph 7.3 refers to the plan

[14] trustee, paragraph 7.5 refers to the plan trustee. I

[15] believe there's another provision that specifically

[16] discusses whether or not attorneys' fees have to be

[17] applied for. It was dealing with Mr. Moon. Might take

[18] me a little — Might take me a couple minutes to find

[19] that one.

[20]    Q: Take your time. Take whatever time you need.

[21]    A: Okay.

[22]    Q: What I'm concerned about, Mr. Kaufman, is on

[23] page 14, subparagraph (k) gives the bankruptcy court

[24] jurisdiction to hear and determine for allowance all

[25] applications for compensation and reimbursement of

**Page 21**

[1] expenses.

[2] A: Uh-huh.

[3] Q: And I couldn't see in this plan anywhere where
[4] there was no need to get an order of the bankruptcy
[5] court to pay professional fees and including plan
[6] trustee expenses?

[7] A: There's nothing in the plan that requires you
[8] to seek bankruptcy court approval for any fees or
[9] expenses. It's a basic rule of bankruptcy law that when
[10] a plan is confirmed that the court's retention of the
[11] jurisdiction over it is only to the extent set out in
[12] the plan and the court has only such powers as the plan
[13] will provide for. So unless the plan requires the
[14] court's approval, then it's not required.

[15] MR. GRANT: Does the plan authorize you to
[16] pay attorneys' fees incurred by debtor's counsel after
[17] the effective date?

[18] THE WITNESS: Does the plan authorize me
[19] o pay attorneys' fee incurred by the debtor's counsel
[20] after the effective date?

[21] Let me put it this way: I think the plan
[22] allows me to do all sorts of things, but it doesn't
[23] necessarily follow that if I did them that it would be
[24] the right thing.

[25] I have insisted in dealing with Mr. Moon

**Page 22**

[1] that I get a court order allowing me to pay him rather
[2] than just paid him without a court order, although I
[3] think, looking back through my bill, Mr. Moon asked me
[4] on several occasions to pay him without a court order.

[5] MR. GRANT: Does the plan authorize you as
[6] plan trustee to pay anyone other than creditors of the
[7] bankruptcy estate?

[8] THE WITNESS: The plan says that the plan
[9] trustee will receive and make the payments and/or
[10] distributions under the plan. It's in 7.3. So it
[11] certainly contemplated that I would make payments; in
[12] other words, not distributions to creditors but payments
[13] of expenses and other such items.

[14] (There was discussion off the record.)

[15] Q: (By Mr. Rosenstein) With respect to exhibit
[16] K-16, when was this prepared?

[17] A: I finished it last night.

[18] Q: So you prepared this exhibit in contemplation
[19] of giving your deposition today?

[20] A: Yeah. I wanted to be able to answer your
[21] questions.

[22] Q: Okay. How much money have you drawn down as
[23] the plan trustee for compensation in this case; do you
[24] have a number on that?

[25] A: I mean, you can add it up in here. I mean,

**Page 23**

[1] whenever it says payments to the plan trustee, then
[2] that's how much that was drawn down by me as plan
[3] compensation.

[4] Q: Which of these items — these payments on,
[5] exhibit K-16 are payments for — payments authorized by
[6] the bankruptcy court for preconfirmation expenses?

[7] A: Preconfirmation I served as an examiner, I
[8] didn't serve as a plan trustee, so the only one that
[9] would have been for preconfirmation fees and expenses
[10] would have been that one at the very top there where it
[11] says 1014 on the IOLTA account about the third entry and
[12] it says examiner.

[13] Q: My question was, was more open-ended than that,
[14] Mr. Kaufman. I didn't mean just you, for all
[15] professional fees where a bankruptcy court has approved
[16] payment. What I want to know is you, as trustee, made
[17] payment of professional fees that were incurred and
[18] approved by the bankruptcy court prior to confirmation?

[19] A: That's correct.

[20] Q: Which of those items on exhibit K-16 represent
[21] payments of preconfirmation fees approved by the court?

[22] A: Okay. Besides — Well, the first three on
[23] 12-29-92, those were all done under orders of the court
[24] approving fees. The one where it says IOLTA 1059 for
[25] 3134 I don't think was, but it might have been —

**Page 24**

[1] Q: What about —

[2] A: — approved by the court.

[3] Q: — James Moon?

[4] A: James Moon, that balance was the balance of
[5] fees that had been previously approved but there wasn't
[6] money to pay them on 12-29-92 because there wasn't
[7] enough funds in the estate to pay them all.

[8] Q: But, but all the James Moon — Would it be your
[9] testimony that all the James Moon's payments on exhibit
[10] K-16 were approved by the bankruptcy court?

[11] A: That's correct. The — That one that says 1085
[12] for the 9,000, that was a separate order that was signed
[13] by the court it says in '95, so I think that must have
[14] been signed shortly before that.

[15] Q: Why don't you, why don't you do this for me:
[16] On K-16 would you go and check, put a check mark behind,
[17] behind every or in front of every payment where there
[18] has been a payment approved by the bankruptcy court and
[19] then —

[20] A: Okay. Where do you want to put it, before or
[21] after the —.

[22] Q: Just put it at the beginning, just by each
[23] check number.

[24] A: Okay, by the check number. We might have
[25] gotten bankruptcy court orders approving payments of

Page 25

[1] funds to the clerk to reopen the case. I just don't

[2] remember that for sure right now.

[3] **Q:** Okay.

[4] **A:** Did I check —

[5] **Q:** So it's your testimony that with respect to

[6] exhibit K-16 there are no court orders authorizing

[7] disbursements, specific disbursements except for check

[8] numbers 1016, 1015, 1014, 1070, 1085 and maybe 1108?

[9] **A:** There might be one for 1108 and there might be

[10] one for 1084.

[11] **Q:** Why are there two checks 1084 and 1108 to

[12] reopen the case?

[13] **A:** Well, it was reopened in '93 and it was

[14] reopened in '95 —

[15] **Q:** Why were —

[16] **A:** — and another check was actually paid to

[17] reopen it in the year 2001.

[18] **Q:** Is that not on here?

[19] **A:** I don't believe it's on here, because I just

[20] paid it out of my regular account, put it in the bill.

[21] **Q:** Okay. And then you apparently paid yourself

[22] about $20,000 a month as I — 20- to $30,000 a month?

[23] **A:** Beginning in 1998 after I had been working in

[24] the case for, you know, five or six years after plan

[25] confirmation I started paying myself some of the funds

Page 26

[1] that had accrued.

[2] **Q:** Okay. And so beginning in May 4th of 1998 it's

[3] your testimony that's when you started drawing down?

[4] **A:** No, I think there's a couple of them before

[5] that. Might have been one or two in '96. Yeah,

[6] there's — there it is, IOLTA, 1139 and 1157. There

[7] were two of them in 1996.

[8] **Q:** Okay. Beginning with check number 1003 you

[9] started disbursing monies to yourself all the way up to

[10] check 1238?

[11] **A:** That's correct.

[12] **Q:** And so —

[13] **A:** Except, you know, those are two different

[14] account numbers and those aren't — that's not a

[15] consecutive set of checks all the way between 1003 and

[16] 1238.

[17] **Q:** So would it be accurate to say you've disbursed

[18] to yourself out of this estate approximately $249,000?

[19] **A:** Well, you're adding a lot faster than I am. I

[20] mean, I can take my calculator and add up how much it

[21] is, but I think that —

[22] **Q:** What I, what I would like to know —

[23] **A:** I wouldn't be surprised if that's right.

[24] **Q:** What I would like to know is how much money

[25] have you disbursed to yourself out of this estate

Page 27

[1] without court orders?

[2] **A:** Well, whatever it shows on this thing, those

[3] were the disbursements that were made. And since the

[4] ones that were made to me say "plan trustee" on them,

[5] you can just simply add up the amounts that were paid to

[6] the plan trustee and you'll have it.

[7] **Q:** I would like to digress very briefly from this.

[8] The question I'm going — The questions I'm going to ask

[9] you relate to a case involving and a bankruptcy appeal

[10] called John R. Schuehele, S-C-H-U-E-H-E-L-E.

[11] **A:** Uh-huh.

[12] **Q:** You're a party to that appeal; are you not?

[13] **A:** That's correct.

[14] **Q:** At a point in that case the Honorable Judge

[15] Jack ordered you to pay $100,000 to the registry of the

[16] court — of the district court; is that correct?

[17] **A:** She asked me to return it.

[18] **Q:** Did, did you pay that in?

[19] **A:** Yes, I did.

[20] **Q:** Did any of that money come from the Feldman

[21] estate?

[22] **A:** No, it all came from the Schuehele estate.

[23] **Q:** So that's your testimony, none of that came

[24] from any of the funds where you've been paid?

[25] **A:** No. The court ordered that I could withdraw

Page 28

[1] $250,000 from the, that case, from the estate in that

[2] case. It was in the registry of the court. And then

[3] later the court ordered me to pay back 100,000 of the

[4] 250.

[5] **Q:** Okay. Let me ask this —

[6] **A:** I believe you'll find the checks and everything

[7] by which that was done in the records we've brought here

[8] today.

[9] **Q:** Okay. Mr. Kaufman, I have some general

[10] questions. You're familiar with Mr. Ditto and you've

[11] received correspondence from him?

[12] **A:** That's correct, we've met on quite a few number

[13] of occasions.

[14] **Q:** And, and through the years he's been asking you

[15] for an accounting. You received letters to that effect?

[16] **A:** We've received letters requesting accountings

[17] and we've done accountings.

[18] **Q:** Have you furnished accountings to Mr. Ditto?

[19] **A:** We filed them with the court.

[20] **Q:** Did you, did you furnish them to Mr. Ditto?

[21] **A:** Well, we gave him — a copy to him every time

[22] that we filed one with the court.

[23] **Q:** Did you keep any kind of a ledger card that

[24] shows the monies that came in and the monies that went

[25] out?

**Page 29**

[1] A: I don't think so.

[2] Q: Or did you keep it on an account — on an Excel
[3] spreadsheet or a Lotus spreadsheet, or how did you keep
[4] track of the money that came in and the money that went
[5] out?

[6] A: We, we — When we would have money come in or
[7] come out we would put it in the bill and Mr. Feldman had
[8] those invoices. We had a book of the invoices. We kept
[9] the invoices in a book so that we had a rough ability to
[10] add those up and figure out how much he had given us.

[11] Q: But as the Chapter 11 plan trustee you didn't
[12] have an accounting record that you established where you
[13] wrote down the amount of money or somebody under your
[14] supervision would write down the amount of money as it
[15] came in and then write down each check as it, as it was
[16] disbursed?

[17] A: No, we — when we wrote out a check, like I
[18] said, we put it in the — we have those little slips
[19] that we would give to the secretaries that they use to
[20] put it into the computer, all of the items that happen
[21] in a case. Whenever something happens in a case there's
[22] a time slip or an expense slip that they put it in the
[23] computer, so that was how we ensured that we had a
[24] record on it.

[25] Q: Is it — Well, is it possible to — You put it

**Page 30**

[1] in the computer. What kind of an accounting record did
[2] you keep in the computer? What software program did you
[3] use?

[4] A: There's a program called Time Slips.

[5] Q: Okay.

[6] A: And it keeps, it keeps not only just time, but
[7] it also keeps expenses.

[8] Q: Okay. But that would be for your individual
[9] time; is that correct?

[10] A: Yeah, it would keep my time, it would keep
[11] paralegal time, so it would keep my time and Sharon's
[12] time. We didn't, I don't think, charge time for the
[13] other people in the office. There were several people
[14] who worked in the office that we didn't charge for their
[15] time, I don't believe.

[16] Q: Okay. I understand that that's what you did
[17] for you and your firm acting as trustee, but did you
[18] also input the monies that were received from Mr.
[19] Feldman into this Time Slips?

[20] A: Yeah. Every time, every time we would receive
[21] something from him there would be a time slip that would
[22] go in that would say, you know, received and reviewed
[23] from Charles Feldman invoice number such and so with a
[24] check if it was — if it did have a check with it, some
[25] didn't.

**Page 31**

[1] Q: And that — would that — Would you put that
[2] into monies received or how would you, how would you
[3] account for it? In other words —

[4] A: The invoice would go into the folder that had
[5] all the invoices.

[6] Q: I understand, but what I'm looking for are
[7] accounting records, not, not, not invoices, but
[8] accounting records. For example, most trustees that I
[9] know of keep — have some type of an accounting program
[10] that when they have monies come in they enter it as
[11] monies received or sales or whatever, and then when they
[12] disburse money, they, they disbursed it as an expense
[13] and then all you have to do is tell the computer print
[14] out a report and gives you all the receipts, it itemizes
[15] it and gives you all the expenses.

[16] A: Well, I'm not an accountant. I don't have an
[17] accounting program. The program that we had to keep
[18] track of financial data was the Time Slips program and
[19] to the extent that it was recorded other than, you know,
[20] the fact that we made copies of it and put it in the,
[21] the invoice log, it was recorded in the bill because
[22] that's how it was convenient to do things under Time
[23] Slips.

[24] Q: Well, let me ask this: I'm looking at your
[25] proposed final report and I will share that with you.

**Page 32**

[1] A: Okay.

[2] Q: I think you may have even furnished it to me, I
[3] don't know. But it shows grows assets of $488,903 and
[4] that Mr. Feldman retained $41,593.49 for expenses and
[5] that he retained $134,294.90 for taxes, and then there's
[6] an amount receivable or amount received by the estate of
[7] $329,350.72.

[8] A: Right. That came right off of the, the list of
[9] invoices that he gave us. That is to say, you add up
[10] all the total gross amount that he reported that he
[11] received on the invoices and it would total up to 488.
[12] You add up all the deductions that he put down that he
[13] was taking out for expenses and it would add up to the
[14] other figure. You added up all the deductions that he
[15] put down that he was retaining for taxes and it added up
[16] to the third column. And then the amount received by
[17] the estate was the — you could add up on the invoices
[18] all of the amounts that he said was left over after he
[19] took out his deductions and it would add up to that
[20] figure.

[21] Q: Is it your testimony that you actually received
[22] $329,350.72?

[23] A: I believe that I actually received about
[24] $20,000 more that's mentioned in another paragraph in
[25] the report that wasn't under his invoices. So I think

Page 33

[1] that if you look at the — all of the final report it
[2] will disclose that there should have been about a total
[3] of 349.
[4]    Q: Well, there's the report that you have. Could
[5] you find that number for me, please?
[6]    A: Well, let's see.
[7]    Q: It's your report.
[8]    A: Yeah, it says here in paragraph 47 taking the
[9] assets of 349,000 and subtracting —
[10]    Q: What's the exact amount?
[11]    A: Well, it says 349,000. I think it may mention
[12] it a little bit further earlier the other 20,000. It's
[13] not in the, in the invoices. I'm sure it's there before
[14] we get to 47 also.
[15]    Q: So how much money totally, approximately, did
[16] you receive?
[17]    A: Well, it would be the 329, plus the additional
[18] 20.
[19]    Q: Okay. And that's the total amount of the
[20] assets that you received, is 349,000 approximately?
[21]    A: Well, there was approximately $6,000 worth of
[22] interest that was earned on the money market account
[23] that's — it's mentioned in that green summary there and
[24] it's — so the — you know, I don't know if you want to
[25] talk about that as saying it was received or not. It

Page 34

[1] was —
[2]    Q: No. I was trying to find out how much money
[3] you actually received from Mr. Feldman.
[4]    A: Well, we actually received the 329, plus
[5] another 20,000.
[6]    Q: Okay. How much money is in the account today?
[7]    A: The money market account, about 600.
[8]    Q: No. Of the, of the $349,000 in assets and cash
[9] that you received, how much money is left today?
[10]    A: Like I said, I think there's about $600 or so
[11] in the money market account.
[12]    Q: And there's no other money?
[13]    A: That's correct.
[14]    Q: And so all the money, essentially about — it's
[15] all been disbursed for fees, mostly to you?
[16]    A: It's all been disbursed for fees, most of that
[17] went to me.
[18]    Q: And so your proposed final report talks about a
[19] distribution to creditors of at least $70,000.
[20]    A: Well —
[21]    Q: Where were you going to get the $70,000?
[22]    A: I was going to — I was going to give up some
[23] of the fees that I had earned and received and put back
[24] some money so that there was actually money for
[25] creditors, but I'm going to — I should say right now

Page 35

[1] that I have changed my mind about that. I'm withdrawing
[2] the offer and I'm going to file an amendment to the
[3] proposed final report not offering to put up money to
[4] pay creditors.
[5]    Q: Okay. So you're, you're intending — So of
[6] the, of the $349,000 you're not proposing to pay the
[7] creditors anything at this point?
[8]    A: Not at this point. I had intended to, but I
[9] felt that I wasn't being fairly treated by this
[10] deposition and this litigation and I thought you were
[11] making me do $30,000 worth of work for free, and so I'm
[12] withdrawing the offer to put up money out of my own
[13] assets to ensure that creditors have something.
[14]    You know, my motive in doing that —
[15] There's a famous case, it's discussed in Bleak House,
[16] it's called Jarndyce versus Jarndyce. And, as you
[17] recall, Bleak House is a famous novel by Charles Dickens
[18] and in it he discusses how the Jarndyce versus Jarndyce
[19] litigation went on and on until finally all the money
[20] was spent for attorneys' fees.
[21]    I wanted to avoid that, but I have since
[22] come to the conclusion that it isn't my fault that the
[23] other parties in this case are so litigious. And I feel
[24] that I've earned my attorney's fees and since I can't
[25] get you guys to stop litigating, even after the money in

Page 36

[1] the estate is gone, I'm going to just let Jarndyce
[2] versus Jarndyce happen in this case. I don't think it's
[3] my fault that the litigiousness has gone on the way it
[4] has in this case.
[5]    MR. ROSENSTEIN: Let's go off the record
[6] for a few minutes. I would like to consult with my
[7] client and co-counsel.
[8]    MR. COOK: Off the record.
[9]    (A recess was taken.)
[10]    MR. COOK: Back on the record.
[11]    Q: (By Mr. Rosenstein) Mr. Kaufman, going back to
[12] the First Amended Plan of Reorganization —
[13]    A: Uh-huh.
[14]    Q: — would you please look on page eight —
[15]    A: Uh-huh.
[16]    Q: — paragraph 7.3?
[17]    A: Yes.
[18]    Q: It says, "Plan trustee."
[19]    A: Uh-huh.
[20]    Q: It says, "Along with the powers and duties
[21] specifically set forth herein and in any agreement with
[22] such entity, the plan trustee shall have the powers,
[23] duties and responsibilities as set forth in the Texas
[24] Trust Act."
[25]    A: Uh-huh.

Page 37

[1] Q: Are you familiar with the Texas Trust Act?

[2] A: It's a — It's been replaced by the Texas Trust

[3] Code, as I recall.

[4] Q: Okay.

[5] A: But anyhow, it's a section or a subdivision of

[6] the property code.

[7] Q: Correct. And are you familiar with the

[8] standard of care of a trustee under the Texas Trust

[9] Code?

[10] A: Well, I mean, I'm familiar with the fact that

[11] there is a standard set out in there.

[12] Q: Can you tell the court, please, what your

[13] understanding is of the standard of care of a trustee

[14] under the Texas Trust Code?

[15] A: Well, I brought my property code with me, so I

[16] can —

[17] Q: Can you do it without looking?

[18] A: Well, no, I can't do it without looking, but, I

[19] mean, it's in here.

[20] MR. GRANT: Do you have a general

[21] understanding of what your duty and care is to

[22] beneficiaries of the estate?

[23] THE WITNESS: Well, let me put it this

[24] way: It was my impression that if I did the best job

[25] that I could to take care of the creditors and make them

Page 38

[1] the most money possible, that that would be adequate.

[2] Q: (By Mr. Rosenstein) Do you, do you agree that

[3] you act as a fiduciary in connection with your

[4] responsibilities as the Chapter 11 plan trustee?

[5] A: I believe the plan trustee is a fiduciary,

[6] that's correct.

[7] Q: And so then you owe a fiduciary duty to the

[8] beneficiaries of the trust that was created under the

[9] plan?

[10] A: Well, I owe a fiduciary duty to carry out the

[11] terms of the plan.

[12] Q: And who do you owe that duty to?

[13] A: I owe it to creditors in general, yeah.

[14] Q: Okay. The creditors that are the beneficiaries

[15] under the plan?

[16] A: Uh-huh.

[17] Q: Is that correct?

[18] A: The creditors are the beneficiaries under the

[19] plan.

[20] Q: Okay. What I would like to see at this point,

[21] Mr. Kaufman, is the bank statements that show all the —

[22] and the deposit slips that you've made, I would like to

[23] see the originals of all the monies that have come into

[24] the estate and then, of course, all the checks that have

[25] gone out of the estate.

Page 39

[1] A: We brought all those things in these documents

[2] here. And I suggest that the easiest way for you to do

[3] it is —

[4] (Ms. Sharon Kaufman entered the deposition

[5] room.)

[6] MR. ROSENSTEIN: Why don't you put that in

[7] the other room, if you would like, please.

[8] THE WITNESS: Well, I would like to have a

[9] couple of those before.

[10] (There was discussion off the record.)

[11] MR. ROSENSTEIN: Would you like to go off

[12] the record while we just go ahead and pull those out?

[13] THE WITNESS: Okay.

[14] MR. COOK: Off the record.

[15] (A recess was taken.)

[16] MR. COOK: Back on the record.

[17] Q: (By Mr. Rosenstein) Mr. Kaufman, we've had an

[18] off the record discussion with your wife, Sharon

[19] Kaufman, about how the records were kept and let me see

[20] if I can understand this. $149,843.61 was deposited

[21] into Charter Bank from Mr. Feldman?

[22] A: Yes, that's what the deposit slip says.

[23] Q: And that's what you call the money market?

[24] A: That's correct.

[25] Q: And all the other monies, as I understand it,

Page 40

[1] were kept in your IOLTA account?

[2] A: That's correct.

[3] Q: And that would be approximately 300 and —

[4] Well, you've disbursed out, you've disbursed out

[5] $354,066.92 shown by this exhibit K-16?

[6] A: Uh-huh.

[7] Q: So we know that at least the 354 — of the

[8] monies you disbursed — let's see.

[9] MR. GRANT: 200 was IOLTA and 150 was

[10] money market.

[11] THE WITNESS: Well, the money market also

[12] had the interest on it.

[13] MR. GRANT: Of about 6,000.

[14] THE WITNESS: 6,000 in interest.

[15] Q: (By Mr. Rosenstein) So roughly 204,000 or

[16] about 200,000 maybe 198 to 200 money was kept in your

[17] IOLTA account?

[18] A: I think it was a little less than 200 because I

[19] think you take off 156 or so, 140 — 155 went to the

[20] money market —

[21] Q: Now, the IOLTA account —

[22] A: — account.

[23] Q: — means interest on lawyer's trust account; is

[24] that correct?

[25] A: That's correct.

Page 41

[1] Q: And those are accounts that the Supreme Court
[2] has mandated that be established by every lawyer that
[3] has a trust account?
[4] A: That's correct.
[5] Q: And, generally, there's no charge by the banks
[6] for maintaining those IOLTA accounts; isn't that true?
[7] A: I've never been charged by Frost for mine.
[8] Q: But interest is earned on those accounts?
[9] A: Interest is earned on those accounts. Most of
[10] the interest that's earned on those accounts or, as I
[11] understand it, a large portion of the interest that is
[12] earned in those accounts gets paid to the State of Texas
[13] where it's used to fund legal services for the poor.
[14] MR. GRANT: Isn't it true that all the
[15] interest on the account —
[16] MR. ROSENSTEIN: Just let me take the
[17] deposition, counsel.
[18] THE WITNESS: It's not true that all the
[19] interest in the account goes to the state, though.
[20] Q: (By Mr. Rosenstein) Where does some of the
[21] interest go?
[22] A: Some of the interest gets credited on the
[23] account. I've seen it.
[24] Q: Okay. Did any of that money, that interest get
[25] paid over to the Feldman estate?

Page 42

[1] A: No.
[2] Q: So roughly $200,000 did not earn interest in a
[3] separate interest-bearing account as the plan required?
[4] A: No, that's not a fair statement because you
[5] have to, — you're saying: Well, there's $200,000 didn't
[6] earn interest as the plan required. Right at the
[7] beginning, for example, there's more than $50,000. That
[8] didn't earn interest because it didn't — because it was
[9] paid out the day that it came in. There wasn't any
[10] possibility that that money would have ever earned
[11] interest.
[12] Q: Okay.
[13] A: And some of the other — You know, we got money
[14] that came in, we paid out the money later. Like 1085, I
[15] mean, that money didn't earn interest because when we'd
[16] gotten enough money that came in to pay the, the lawyer
[17] the money that he was owed, we paid the lawyer.
[18] Q: But the money that was in the IOLTA account did
[19] not earn interest for the Feldman estate?
[20] A: That's right.
[21] Q: Okay.
[22] (Ms. Sharon Kaufman entered the deposition
[23] room.)
[24] MS. KAUFMAN: Excuse me just a minute.
[25] Could you go off the record just for a second.

Page 43

[1] MR. ROSENSTEIN: Off the record.
[2] MR. COOK: Off the record.
[3] (There was discussion off the record.)
[4] MR. COOK: Back on the record.
[5] Q: (By Mr. Rosenstein) Mr. Kaufman, under the
[6] plan of reorganization as amended you were required to
[7] pursue certain causes of action or were you?
[8] A: No, because the claims against Mr. Feldman were
[9] settled. That's one of the things that's in the
[10] amendment. Anyway, it was — those were settled and Mr.
[11] Feldman was — agreed to do certain things. In
[12] exchange, those causes of actions as far as the
[13] conveyances and the like were, were done away with.
[14] Q: Well, as plan trustee has, has Mr. Feldman
[15] done — in your opinion, has Mr. Feldman done everything
[16] that he is required to do under the Chapter 11 plan as
[17] amended and modified?
[18] A: No, and that's why it says in the proposed
[19] final report that I think he shorted us a couple hundred
[20] thousand dollars to creditors, and I think that there
[21] are claims against him that can be brought not just for
[22] the 200,000, 215, whatever it is that he's shorted us,
[23] but I think that we can get the value of the causes of
[24] action that were given up, reliance damages, restitution
[25] damages rather than expectation damages.

Page 44

[1] Q: What, what —
[2] (There was discussion off the record.)
[3] Q: (By Mr. Rosenstein) What, what is the basis
[4] for your assertion that Mr. Feldman has not done
[5] everything he's required to do under the plan? Could
[6] you tell us in detail, please?
[7] A: Well, last November we finally got copies of
[8] the tax returns from Mr. White. Mr. Feldman authorized
[9] the release of his — some of his tax returns, none of
[10] his personal tax returns, but the tax returns on some of
[11] the entities that were in the Feldman group. And in the
[12] plan it says that the Feldman group, that they're going
[13] to turn over all of the Feldman family's share of the
[14] income to creditors during the plan term, so there was
[15] supposed to be five years' worth of income that was
[16] turned over to creditors. And instead of turning over
[17] all of the income to creditors, they just distributed
[18] half of it and they left the other half of the, of the
[19] income in the entities that earned it; that is to say,
[20] Feldman Real Estate, Inc., Clara Feldman Properties and
[21] Feldman-Reynolds.
[22] Q: When did you learn of this?
[23] A: Well, the documents that I got — the first
[24] opportunity I would have had to discover it was in
[25] November, however —

Page 45

[1] Q: Of 2000?

[2] A: Of the year 2000; however, I went to a CLE
[3] meeting at the end of November and the first part of
[4] December and caught a bug and was extremely ill for
[5] about three months. So I didn't actually discover it at
[6] that time even though I had the documents there. I
[7] actually discovered it while I was doing the proposed
[8] final report in about March.

[9] Q: Have you taken any legal action to pursue those
[10] claims?

[11] A: Well, I did the proposed final report and I
[12] have inquired about hiring counsel to take the work on a
[13] contingent fee. I would like, before August gets here,
[14] to have an adversary proceeding on file.

[15] I think it would be better to have this
[16] pursued by an adversary proceeding rather than to pursue
[17] it as an incident or something — part of the proposed
[18] final report.

[19] Q: So would it be your testimony that this estate
[20] is not ready to close?

[21] A: I don't see how we can close it unless we're
[22] going to abandon the claims against Feldman, and I think
[23] those are good claims. I think that they're worth the
[24] 200,000. I think it will take another probably maybe
[25] $70,000 in administrative expenses to close this estate

Page 46

[1] and it might cost us another 70 to recover the 215. We
[2] could actually recover maybe more than 600 if we pursue
[3] the restitution damages instead of expectation. But, in
[4] any event, like I said, I think there may be another
[5] 140- or $150,000 in expenses, but I think that there is
[6] money there for creditors if Feldman is made to account
[7] for his wrongs.

[8] It's just as clear as anything from the
[9] reports, the tax returns that he gave us, that the
[10] companies even though it says in the plan that they
[11] promise to turn over their income, that they didn't do
[12] it.

[13] Q: Have you analyzed the claim that Parkwell has
[14] filed in this case?

[15] A: Yes, but, you know, I didn't do a lot at the
[16] beginning for it because it was settled between the
[17] attorney for the FDIC and Parkwell; that is to say, Moon
[18] and I think his name was Jefferson, was the attorney's
[19] name, and Ron Simank and Mr. Jefferson got together and
[20] they agreed that that claim would be allowed as an
[21] unsecured claim. And so I didn't have, it seemed to me,
[22] a great deal to do to complain about that.

[23] And the other thing of course about it is
[24] that if you look at the plan, that so long as the plan
[25] term exists it's provided that it's the debtor's right

Page 47

[1] to object to claims, not the plan trustee's. But I did
[2] deal with the Parkwell claim when I discovered that they
[3] had sold their collateral; that is to say, they had
[4] filed the claim as an unsecured claim but they actually
[5] had a large amount of collateral out there. They had
[6] Island Moorings Marina, which is a marina out on Padre
[7] Island, and they sold that. Mr. Ditto told me that they
[8] sold that about August or September of the year 2000.
[9] And I asked Mr. Simank if he was going to amend his
[10] claim and he told me for a couple months that he would.
[11] And then eventually he told me that he wasn't. And I
[12] researched the effect of the sale on whether or not he
[13] would have a good claim and it was my opinion that if he
[14] didn't amend his proof of claim that I would have a good
[15] objection to his claim, and so I have included that in
[16] the proposed final report. However, the last time I
[17] talked to him he said that he does intend to amend his
[18] proof of claim to reflect the gains, whatever they may
[19] be, on the sale of Island Mooring Marina property and
[20] that he will have that done by the time the deadline
[21] expires to object to the proposed final report.

[22] Q: Is there any other — But you — But I take it
[23] that your answer is that you haven't — Well, my
[24] question at this point is: You haven't filed an
[25] objection to the Parkwell claim at this point?

Page 48

[1] A: Well, I objected to it in the proposed final
[2] report. I said that unless he files an amended proof of
[3] claim that they ought not to allow it. I think that if
[4] he does file an amended proof of claim that it will moot
[5] the objection in the proposed final report.

[6] Q: But you haven't filed a separate document
[7] called an Objection to Claim?

[8] A: No, I haven't filed a separate document called
[9] an Objection to Claim.

[10] Q: Okay.

[11] A: And I'm, you know, hoping that if, if he is
[12] going to amend his proof of claim it would be a waste of
[13] my effort to draft one up.

[14] Q: Are there any other claims that need to be
[15] pursued by the plan trustee in the Feldman estate?

[16] A: The only claims that it seems to me that are
[17] likely to raise any money, net of litigation expenses,
[18] are the claims against Mr. Feldman. And I think, I
[19] think it's mentioned in the final report, but I think
[20] that his children also would be liable for these claims
[21] because the plan promises a performance by them as well.
[22] And when Mr. Feldman didn't carry out his own
[23] obligations to pay the money, he also didn't carry out
[24] the children's obligation to pay the money. So they
[25] breached their promise at the same time and by the same

Page 49

[1] means that he breached his. So I think that the cause
[2] of action against Mr. Feldman and his family are the
[3] only remaining causes of action that are valuable.
[4]     Q: What — When did this breach occur in terms of
[5] statute of limitations?
[6]     A: Well, the breach didn't occur until the plan
[7] term expired at the very earliest; that is to say, it
[8] could have occurred as early as October 2nd of 1997
[9] because that would be when he would have been due to
[10] turn over the rest of the income for the plan term. I
[11] don't believe —
[12]     Q: Did he furnish you information relating to that
[13] income?
[14]     A: He did not furnish me any information relating
[15] to that income until November of 2000. That was the
[16] first data that I ever got about how he calculated the
[17] amounts of income that he turned over. And it was —
[18] that was the first opportunity I think anyone could
[19] possibly have figured out that he had underpaid the
[20] income that he was supposed to pay.
[21]     Q: One of the documents that we had listed that
[22] you are required to bring in your Notice of Deposition
[23] is a surety bond. Did you file a surety bond in this
[24] case?
[25]     A: I didn't have a surety bond. They didn't

Page 50

[1] require one.
[2]     Q: You mean the plan doesn't say you have to —
[3]     A: The plan doesn't say I have to and —
[4]     Q: The plan doesn't say you don't have to, either,
[5] does it, Mr. Kaufman?
[6]     A: No, it doesn't say that I don't have to;
[7] however, when I was discussing with the — proposed
[8] employment of me with Mr. Jefferson, he told me that
[9] they weren't going to require a bond because it would
[10] just deplete the estate.
[11]     Q: You would be classified as a non-corporate
[12] trustee under the Texas Trust Code, wouldn't you?
[13]     A: I would think I would have to be non-corporate,
[14] I'm not a corporation.
[15]     Q: Okay. You have the Texas Trust Code there with
[16] you?
[17]     A: Yes, I do.
[18]     Q: Would you take a look at section 113.058.
[19]     A: Uh-huh.
[20]     Q: Now, we talked a little bit ago about the
[21] provision in the plan that says that the trustee has the
[22] duties and responsibilities as set forth in the Texas
[23] Trust Act?
[24]     A: Uh-huh.
[25]     Q: And the obligations?

Page 51

[1]     A: Yes.
[2]     Q: As I read and my co-counsel reads this section
[3] 113.058 of the Texas Trust Code, subparagraph (b), which
[4] applies to non-corporate trustees, requires a bond
[5] unless the instrument creating the trust provides
[6] otherwise.
[7]     Does the instrument creating the trust
[8] provide that you don't have to give a bond?
[9]     A: I don't — I haven't ever had occasion to look
[10] through the four writings to discover that particular
[11] point. This is the first time that anyone has ever
[12] requested to — asked whether I know that information.
[13]     Q: I'm showing you exhibit Deposition Exhibit K-1.
[14] Do you recognize that as the Notice of Deposition in
[15] this case?
[16]     A: Yes, I do.
[17]     Q: I'm showing you also exhibit K-2 and I'll
[18] represent I faxed a copy of that to you yesterday. Do
[19] you recognize that as Judge Brown's order denying your
[20] Motion for Protective Order requiring you to attend this
[21] deposition and bring each and every original document
[22] that's listed in the Notice of Deposition?
[23]     A: Well, I recognize that is Judge Brown's order
[24] and it speaks for itself as to what it requires.
[25]     Q: Okay. Have you fully and completely complied

Page 52

[1] with her order today?
[2]     A: I have brought everything I could find.
[3]     Q: Okay.
[4]     MR. ROSENSTEIN: Let's take another break,
[5] if we could, and go off the record.
[6]     MR. COOK: Off the record.
[7]     (A recess was taken.)
[8]     MR. COOK: Back on the record.
[9]     Q: (By Mr. Rosenstein) Mr. Kaufman, first of all,
[10] this exhibit K-17 —
[11]     A: Yes.
[12]     Q: — that's a document that you all prepared last
[13] night?
[14]     A: Well, I don't know if I would say we prepared
[15] it last night. I mean this is — these things are —
[16]     Q: It was printed out last night?
[17]     A: It was printed out last night.
[18]     Q: And this represents the time and expenses that
[19] you have in the case?
[20]     A: Yes, it does, up — that doesn't necessarily
[21] include all of them, because I think there's a few of
[22] them missing, but that, that represents all of them that
[23] have been recorded that had accrued as through
[24] yesterday.
[25]     Q: Okay. Other than receive checks from Mr.

Page 53

[1] Feldman, deposit them in your account and make
[2] disbursements out of your account, what did you do in
[3] this, in this case to benefit creditors?
[4] A: I dealt with all of the requests that were made
[5] for dealing with Feldman, I dealt with selling the three
[6] real properties after the plan term expired and Mr.
[7] Feldman conveyed those to me. I was involved in the
[8] original CKS objections to the claim of Parkwell,
[9] because Mr. Simank came up with the idea that CKS lacked
[10] standing to object to the claims of Parkwell, and so I
[11] had to join in that objection as a, I don't know,
[12] co-objector in order to assure that CKS had standing.
[13] And I — It's all in the bill. I mean, you can see
[14] pretty much everything that went on in the case in the
[15] bill.
[16] Q: How have you benefited any of the creditors or
[17] the beneficiaries of this trust?
[18] A: I have benefited —
[1] Q: There's no money left.
[20] A: I have benefited them by doing what the people
[21] who hired me wanted done; and that is to say they wanted
[22] to be sure that Mr. Feldman didn't have the opportunity
[23] to welch on his obligations and not pay the full amount
[24] that he was supposed to pay to creditors under the plan.
[25] That is to say, the FDIC was suspicious of

Page 54

[1] Mr. Feldman from the beginning. It was well known to
[2] everyone that he was a sharp businessman, would be able
[3] to sell his properties for the best price, but it was
[4] their opinion that he was also sharp in the sense that
[5] he would not — could not be trusted to pay all the
[6] money to creditors that he promised to. And they, I
[7] don't believe, because of the amount that was — money
[1] that was there in the original schedules that they ever
[9] thought there would be a significant payment to
[10] creditors, but they did want to make sure that he
[11] carried out his duties and that he didn't get away with
[12] something.
[13] They felt that he would take of advantage
[14] of creditors and put money in his own pocket and they
[15] wanted that to be prevented at all costs. And they got
[16] exactly what they bargained for; that is to say, if I
[17] hadn't been on the case he would have gotten away with
[18] it already.
[19] Q: But according to you he hasn't paid — done —
[20] he hasn't — Mr. Feldman and his children have not done
[21] everything they're supposed to do under the plan?
[22] A: That's right, but their, their deadline to
[23] answer my allegations of that hasn't run yet; that is to
[24] say they don't have to answer my final report until the
[25] 31st, so I, I don't know if they are going to state that

Page 55

[1] they have a defense or not. I don't believe they have a
[2] defense, but they might state one.
[3] Q: Is there anything else you have done to benefit
[4] this estate other than what you have just talked about?
[5] A: Well, I mean, other than carrying out the
[6] duties that were expected of me, I don't think there is.
[7] Q: What hourly rate are you assessing to yourself
[8] in this exhibit number K-17? It says 250 an hour I'm
[9] seeing, then it goes up to 275 an hour, then it goes up
[10] to $400 an hour.
[11] A: Yeah. My, my rate that I charge people has
[12] gone up over the years and it's gone up in there as it's
[13] gone up other places; that is to say, I think that my
[14] very first bill in that case when I was an examiner was
[15] only $200 an hour.
[16] Q: I see. And how many other cases are you
[17] charging $400 an hour in?
[18] A: At the present time?
[19] Q: Yes, sir.
[20] A: About two or three.
[21] Q: What cases are those that are of public record?
[22] A: Well, I'm keeping my time in the Allan Potter
[23] case at that same rate. I've been keeping my time in
[24] the Camelot bankruptcy at that rate.
[25] Q: Is the Potter case one in which you have been

Page 56

[1] discharged as an attorney?
[2] A: The Potter case is one where I sued Allan
[3] Potter.
[4] Q: Oh, I see. Okay. But you were previously
[5] representing Allan Potter?
[6] A: I represented Allan Potter and he took $80,000
[7] that was mine at the end of the case. He got the
[8] insurance company to pay him instead of paying me.
[9] Q: And the insurance company is suing you?
[10] A: No, I'm suing the insurance company.
[11] Q: But aren't they countersuing you?
[12] A: I think they may have a counterclaim on file,
[13] yeah.
[14] Q: They paid you $25,000 and they're asking to
[15] have that money back?
[16] A: Yeah.
[17] Q: Okay.
[18] A: I thought it was humorous because there were
[19] $19,000 in copying costs and that sort of thing, and I
[20] thought it was humorous that they thought that an
[21] attorney's time is not even worth the amount of cost of
[22] copies and postage.
[23] Q: What is exhibit K-18?
[24] A: Well, it's marked draft and it goes through —
[25] it has numbers one through 106, which are the numbers of

Page 57

[1] the invoices that Mr. Feldman gave us when he, when he
[2] sent us checks and sold property.
[3]    Q: Is that something that was prepared in your
[4] office?
[5]    A: I think it was prepared in my office by Casi
[6] and it was created for the purpose of putting in the
[7] proposed final report.
[8]    Q: Okay.
[9]    A: I don't know that it was created for putting in
[10] the proposed final report, but I'm pretty sure Casi
[11] created it. I think there's some errors. In it, for
[12] example, it says number 60, no invoice with this number,
[13] and I think in the proposed final report we — there was
[14] an invoice with that number.
[15]    Q: I'm going to turn the deposition over to my
[16] co-counsel, Mr. Grant, for just a few questions that I
[17] haven't covered. He will not go over anything that
[18] we've already covered, but he has a few questions and
[19] then I think what we'll do after that is take these
[20] documents, have them sent out, and adjourn just briefly
[21] until Mrs. Kaufman can bring back those documents that
[22] she was going to bring back.
[23]    A: All right.
[24]    Q: But I think, for all practical purposes, we'll
[25] be done very shortly.

Page 58

[1]    MR. ROSENSTEIN: You want to change places
[2] with me?
[3]    MR. GRANT: No.
[4]            EXAMINATION
[5]          BY MR. GRANT:
[6]    Q: In the proposed final report you have a listing
[7] of all of the checks that you received or all of the
[8] invoices that you received from Mr. Kaufman.
[9]    A: Feldman.
[10]    Q: I'm sorry, Mr. Feldman. Forgive me. In that
[11] listing, does that reflect the date which you actually
[12] received those payments?
[13]    A: He didn't always send me the invoice
[14] immediately, so that the date on the invoice isn't
[15] always the date that we received the payments. That is
[16] to say, we might actually receive an invoice 30 or 45
[17] days after the date that he put on the invoice.
[18]    Q: So you received the check before the date
[19] stated in the schedule in your, in your proposed final
[20] report?
[21]    A: I don't think so. I think sometimes we
[22] received the checks after the date that's shown there in
[23] the proposed final report.
[24]    Q: What's the time difference?
[25]    A: Well, I mean, I don't know, but like I said

Page 59

[1] sometimes we would get things as much as a month after
[2] the date that's shown on the invoice.
[3]    Q: Any more than a month?
[4]    A: I think we got one of them 45 days after the
[5] date shown on there.
[6]    Q: Any of them more than 45 days?
[7]    A: I don't think any of them came more than 45
[8] days. I don't — I mean, I haven't gone back and looked
[9] at all 106 of them, but that is my impression based on
[10] experience over the years.
[11]    Q: Okay. When was the first time that Mr. Ditto
[12] asked you for an accounting of receipts and
[13] disbursements by you?
[14]    A: Well, it will show in the bill, and it's —
[15]    Q: Approximately?
[16]    A: My impression is it was probably some time in
[17] about 1995, which is, you know — they, CKS acquired the
[18] claim of the FDIC in the early part of 1995, and I think
[19] it was probably two or three months after that. I mean,
[20] I don't know the exact date, but that's my impression
[21] that it would have been spring or summer of '95.
[22]    Q: How long did it take you to prepare exhibit
[23] K-16, the Feldman Estate Payment Summary?
[24]    A: I don't recall. I mean, it was just part of
[25] what I did last night.

Page 60

[1]    Q: Okay. But you did it last night?
[2]    A: Yes, sir.
[3]    MR. GRANT: Okay. Go ahead.
[4]    MR. ROSENSTEIN: I'm going to ask just a
[5] couple questions.
[6]          REEXAMINATION
[7]        BY MR. ROSENSTEIN:
[8]    Q: Did you receive the original documents of
[9] exhibits K-12, K-13, K-14?
[10]    A: Okay. K-12 was a long time ago and I just
[11] don't remember whether I saw this one or not. It would
[12] probably be in the files that we brought here today if I
[13] did. And I don't have any reason at this point to doubt
[14] that I got it, but, you know, if it's in the files, then
[15] we got it and if it's not in the files, then I didn't.
[16] I think that would be right. It might be —
[17]    Q: You don't have an independent recollection of
[18] having received it?
[19]    A: Not at the present time.
[20]    Q: Okay.
[21]    A: I do recall having heard from CKS in 1995, but
[22] I don't recall —
[23]    Q: Did they ask for an accounting then?
[24]    A: I don't recall if this is it. I, I think they
[25] did ask for an accounting in 1995, yes.

Page 61

[1] Q: They started asking for an accounting at least
[2] in 1995 and they asked periodically thereafter?
[3] A: I think all the accountings that are in the
[4] file that we did were done in response to a request by
[5] CKS.
[6] Q: Did you ever furnish CKS an accounting of all
[7] the money that's come in and all the money that's gone
[8] out?
[9] A: Have I ever given them — I don't believe I've
[10] ever furnished them with an accounting of all the
[11] expenditures before the present — before that green
[12] exhibit that's right there.
[13] MR. GRANT: Exhibit K-16?
[14] THE WITNESS: K-16.
[15] Q: (By Mr. Rosenstein) So this is the first time
[16] today that you've actually told everybody or told
[17] publicly that there's substantially less than $1,000 in
[18] the estate?
[19] A: I thought it was a very bad idea to tell Mr.
[20] Feldman that the estate was essentially broke. I mean,
[21] I think he may have suspected it, but I felt like if you
[22] tell — told Mr. Feldman, that he would feel that he
[23] wouldn't have to pay the balance of the money that he
[24] would owe.
[25] Q: Was it also a bad idea not to tell CKS Asset

Page 62

[1] Management that the estate was broke —
[2] A: Well —
[3] Q: — or any other beneficiaries?
[4] A: — I intended to put some money up, give some
[5] money back to pay a dividend to creditors up until the
[6] past three or four days. So there would have been money
[7] to pay CKS and Parkwell and that sort of thing except
[8] for the, I guess I should say, the bad feeling that was
[9] generated by the — your deposition notice and your
[10] refusal to give me the time that I wanted to respond to
[11] it, because this, as you know, time interrupted my
[12] preparation time for the hearings in front of Judge
[13] Jack.
[14] Q: What hearings are those, Mr. Kaufman? Did you
[15] have a hearing on the 22nd?
[16] A: No, I had — Since I started preparing for
[17] those hearings I have discovered that those hearings
[18] have been all consolidated for the 30th now. So we
[19] originally had one the 22nd, the 25th, and the 30th and
[20] the two on the 22nd and the 25th have been moved to the
[21] 30th.
[22] Q: And when did you find out about that?
[23] A: It's been a couple of days.
[24] Q: How did you find out about it?
[25] A: I had, I had Sharon tell Casi to assemble me a

Page 63

[1] working file for the appeal. I haven't had a chance to
[2] look at much of it yet, but she went and pulled the
[3] docket of all of the cases, all of the pleadings, all of
[4] the — everything that has happened in those three
[5] appeals and I noticed when she gave it to me that the
[6] hearings had been consolidated on the 30th.
[7] Q: So your representations to me and to Judge
[8] Karen Brown in your Motion for Protective Order as to
[9] having hearings on the 22nd and 23rd were inaccurate?
[10] A: 22nd and 25th. Yeah — well, they were
[11] inaccurate in the sense that they had already been
[12] superseded by an order — a later order of Judge Jack
[13] resetting the hearing dates, but they were accurate in
[14] the sense that back in January and February when the
[15] hearings were first set we had one set on the 22nd, the
[16] 25th and the 30th.
[17] Q: But you had that order in your — resetting
[18] everything to the 30th, you had that order at your firm
[19] at the time you drafted this —
[20] A: I don't know if I did or not. I discovered the
[21] order resetting it when I got the — ordered the
[22] docket —
[23] Q: Let me ask you —
[24] A: — which has been earlier this week.
[25] Q: Let me ask you why you didn't deliver the

Page 64

[1] accounting that Judge Schmidt ordered you to — orally
[2] ordered you to deliver by May 4th?
[3] A: I didn't believe that what Judge Schmidt was
[4] ordering was what you claimed that he was ordering,
[5] because you asked for certain things and Judge said —
[6] basically asked me or wanted to know from me if it was
[7] possible for me to give them. And I said, "Well, you
[8] know, I've got all these other things I've got to do,
[9] but I think that if you gave me a week I could probably
[10] get it together and get some stuff to him."
[11] And what I understood that you were asking
[12] for is what I understood that had been — CKS wanted
[13] before, which is all of the documents that I would get
[14] from Feldman. And I think the proof of that is the fact
[15] that I immediately wrote Mr. Moon and says: Hey, CKS
[16] wants all your documents, hand them over.
[17] Q: Mr. Kaufman, isn't it a fact that you really
[18] were attempting not to disclose the fact that this
[19] estate had no money in it?
[20] A: Well, I haven't tried to keep it a secret from
[21] the people on the creditors' side of the case; that is
[22] to say, I've written letters to Ron Simank, it's also in
[23] the proposed final report that I was going to have to
[24] limit or give up my attorney's fees in order for there
[25] to be money for creditors, so —

Page 65

[1] Q: Where in your proposed final report does it say
[2] that this estate has less than $1,000 in it?
[3] A: Well, it doesn't say that the estate has less
[4] than $1,000 in it, but it does state in there that I
[5] have to limit my attorney's fees in order to give the 70
[6] odd or whatever it was thousand dollar dividend to
[7] creditors.
[8] Q: Well, if you had to limit your attorney's
[9] fees — It doesn't say in the final report you would
[10] have to give money back, does it?
[11] A: No, it doesn't, and as I told you —
[12] Q: Why doesn't it?
[13] A: — I don't think that Mr. Feldman will be
[14] willing to settle now that you have disclosed to him
[15] that the estate is essentially insolvent. And I think
[16] that that — your conduct in doing that is basically
[17] calculated to cost the estate a couple hundred thousand
[18] dollars that we could have gotten, I think, from Mr.
[19] Feldman in settlement, rather than now we're going to
[20] have to litigate it.
[21] Q: Mr. Kaufman, haven't you ever heard of a
[22] confidentiality agreement? Why didn't you just say:
[23] Mr. Rosenstein, I'll be glad to give you a full
[24] accounting, just keep it away from Mr. Feldman so that,
[25] so that he doesn't find out about it so that we can go

Page 66

[1] ahead and pursue him?
[2] A: You didn't ask me — The first time that I
[3] understood that you wanted my records was the letter
[4] that you sent me on the Friday before you filed the
[5] Notice of Deposition in this case. And so it seems to
[6] me that the person who should have proposed — the
[7] person who should have initiated the contact about let's
[8] discuss about what your records will show in terms of
[9] how much assets we have should have been you.
[10] You should have called me and given me the
[11] opportunity to show them to you. I would have been
[12] willing to give you records under a confidentiality
[13] agreement, but it seemed to me that it was your
[14] determination to proceed under the route that you have
[15] taken. And it didn't seem to me that it would be
[16] productive and fruitful to try to negotiate with you.
[17] You will recall that on the Monday before
[18] you issued that notice on a Tuesday that I was involved
[19] the whole day with trying to meet a filing deadline on
[20] another case.
[21] Q: This exhibit K-13 is a letter to you from Steve
[22] Ditto, president of CKS Asset Management, March 14th,
[23] 2001 asking for an accounting. Why didn't you provide
[24] that for Mr. Ditto?
[25] A: I — This does not say that he wants my bank

Page 67

[1] statements. I thought that he wanted at this time the
[2] Feldman — the copies of the reserve account and the tax
[3] reserve account from Feldman. That's the bank
[4] statements that I thought that he wanted.
[5] This, this letter did not make it clear to
[6] me that he was seeking the copies of the money market
[7] account and the IOLTA account. And the complaint that
[8] had been made before was you aren't getting Mr.
[9] Feldman's bank statements.
[10] Q: He says the copies of the bank statements.
[11] He's asking for that.
[12] A: That's right, and I thought that he was talking
[13] about the same —
[14] Q: Did you —
[15] A: — Feldman bank statements that Mr. Feldman had
[16] refused to give us before. He did not make it clear
[17] that this was a change in the terms of what we had
[18] previously been seeking to recover to find to look at.
[19] Q: Did you file tax returns for this trust?
[20] A: The plan calls for Mr. Feldman to treat the
[21] income as his and to file the tax returns, so the plan
[22] does not call for me to file tax returns for the trust.
[23] Q: Where in the plan does, does it require that?
[24] A: Well, it's right in there where it says that
[25] Mr. Feldman is going to withhold the money for the

Page 68

[1] taxes.
[2] Q: What page?
[3] A: I think you're — on page six there it says
[4] that the debtor will deduct from the net proceeds the
[5] amounts equal to federal, state and/or local income tax
[6] due on because of such sale or disposition of property
[7] personal assets.
[8] MS. HOBLIT: Would you say that last part
[9] again, "sale of."
[10] MR. ROSENSTEIN: Personal assets.
[11] THE WITNESS: Personal assets
[12] Q: (By Mr. Rosenstein) In fact, there's nothing
[13] in this plan that says who's going to file tax returns
[14] and who's not going to file tax returns, is there?
[15] A: Well, it says that he's going to withhold the
[16] money to pay the taxes, so I think that makes it
[17] perfectly clear that he's going to file the tax returns.
[18] Q: What about the interest that was earned on the
[19] money market at the Charter Bank, did you file tax
[20] returns on that?
[21] A: No, I didn't.
[22] Q: And why is that?
[23] A: Well, I guess because I didn't think of it
[24] because it was clear to me that Mr. Feldman was filing
[25] tax returns, but now that you have mentioned it I will

Page 69

[1] check into seeing if I have to. The total amount of
[2] interest is not a very great amount. It may very well
[3] be that I don't have to, but if I do have to, then we'll
[4] file them.
[5]   Q: Mr. Kaufman, what I propose to do at this point
[6] is send these documents that I have here that you've
[7] delivered to us over to Paper Chase or IKON for copying
[8] and then I'll have the originals returned to you
[9] immediately.
[10]   A: Okay.
[11]   Q: And then what I would like to do is adjourn
[12] this deposition, say, maybe until 3:00 o'clock just for
[13] the purpose of having you deliver the documents Mrs.
[14] Kaufman is getting, and I'm going to have Paper Chase
[15] copy those as well.
[16]   A: All right.
[17]   MR. ROSENSTEIN: Thank you.
[18]   MR. COOK: Off the record.
[19]
[20]   (All exhibits were retained by
[21] Mr. Matthew A. Rosenstein.)
[22]
[23]
[24]
[25]

Page 71

[1] Witness my hand, this the 24th day of May, 2001.
[2]
[3]
[4]
[5]      CAROL R. HOBLIT, Texas CSR 1910
        Expiration Date: 12-31-01
        Ak/Ret Reporting, Inc
[6]      555 N. Carancahua, Suite 880
        Corpus Christi, Texas 78478
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
[1]

Page 70

[1]         THE STATE OF TEXAS:
[2]         COUNTY OF NUECES:
[3]
[4]   I, CAROL R. HOBLIT, Certified Shorthand Reporter
[5] in and for the State of Texas, do hereby certify that
[6] the facts stated by me in the caption hereto are true;
[7] that the foregoing 2004 Examination of COLIN KELLY
[8] KAUFMAN, the witness hereinbefore named, was at the time
[9] named, taken by me in Stenograph, the said witness
[10] having been by me first duly cautioned and sworn upon
[11] his oath to tell the truth, the whole truth, and nothing
[12] but the truth, and later transcribed from Stenograph to
[13] typewriting under my supervision.
[14]   I further certify that the above and foregoing
[15] 2004 Examination as set forth in typewriting is a full,
[16] true and correct transcript of the proceedings had at
[17] the time of taking said 2004 Examination.
[18]   I further certify that I am neither attorney or
[19] counsel for, nor related to or employed by any of the
[20] parties to the action in which this deposition is taken,
[21] and further that I am not a relative or employee of any
[22] attorney or counsel employed by the parties hereto, or
[23] financially interested in the action.
[24]
[25]

**Lawyer's Notes**

**$**

$1,000 61:17; 65:2, 4
$100,000 27:15
$134,294.90 32:5
$149,843.61 39:20
$150,000 17:4, 6, 9, 13; 46:5
$19,000 56:19
$20,000 25:22; 32:24
$200 55:15
$200,000 42:2
$249,000 26:18
$25,000 56:14
$250,000 28:1
$30,000 25:22; 35:11
$329,350.72 32:7, 22
$349,000 34:8; 35:6
$354,066.92 18:25; 40:5
$400 55:10, 17
$41,593.49 32:4
$488,903 32:3
$50,000 42:7
$6,000 33:21
$600 34:10
$70,000 34:19, 21; 45:25
$80,000 56:6

**1**

100,000 28:3
1003 26:8, 15
1014 23:11; 25:8
1015 25:8
1016 25:8
1059 23:24
106 56:25; 59:9
1070 25:8
1084 25:10, 11
1085 24:11; 25:8; 42:14
11 10:15, 19, 24, 25; 11:3, 4, 11, 23; 12:8; 14:11; 20:7; 29:11; 38:4; 43:16
1106 5:10
1108 25:8, 9, 11
113.058 50:18; 51:3
1139 26:6
1157 26:6
12-29-92 23:23; 24:6
1238 26:10, 16
13 10:7
14 20:23
140 40:19; 46:5
14th 66:22
150 40:9
155 40:19
156 40:19
1970 6:19
1976 6:22
198 40:16

**2**

1992 14:9, 9
1995 59:17, 18; 60:21, 25; 61:2
1996 26:7
1997 16:22; 17:7, 11, 13, 16; 49:8
1998 25:23; 26:2
1st 16:22; 17:7, 11, 13, 16

**2**

20 15:21; 16:5; 25:22; 33:18
20,000 33:12; 34:5
200 40:9, 16, 18
200,000 40:16; 42:5; 43:22; 45:24
2000 45:1, 2; 47:8; 49:15
2001 14:22; 25:17; 66:23
2004 70:7, 15, 17
204,000 40:15
215 43:22; 46:1
22nd 14:19; 62:15, 19, 20; 63:9, 10, 15
23 14:22
23rd 63:9
250 28:4; 55:8
25th 62:19, 20; 63:10, 16
275 55:9
2nd 14:20; 49:8

**3**

30 6:24; 7:12; 58:16
300 40:3
30th 62:18, 19, 21; 63:6, 16, 18
31 16:2, 2, 5
3134 23:25
31st 54:25
329 33:17; 34:4
33 10:1
34 10:1
349 33:3
349,000 33:9, 11, 20
354 40:7
3:00 69:12

**4**

45 58:16; 59:4, 6, 7
47 33:8, 14
488 32:11
4th 26:2; 64:2

**6**

6,000 40:13, 14
60 57:12
600 34:7; 46:2

**7**

7 9:25; 10:3, 4, 11
7.3 20:13; 22:10; 36:16
7.5 20:14
70 46:1; 65:5
78404 5:13

**8**

80 15:10, 18

**9**

9,000 24:12
90 9:18
93 25:13
95 24:13; 25:14; 59:21
96 26:5

**A**

abandon 45:22
ability 29:9
able 22:20; 54:2
above 70:14
according 9:7; 54:19
account 15:13, 14; 16:15, 18, 23; 17:1, 5, 21, 23; 19:19, 20; 23:11; 25:20; 26:14; 29:2; 31:3; 33:22; 34:6, 7, 11; 40:1, 17, 21, 22, 23; 41:3, 15, 19, 23; 42:3, 18; 46:6; 53:1, 2; 67:2, 3, 7, 7
accountant 31:16
accountants 17:24; 18:1
accounting 28:15; 29:12; 30:1; 31:7, 8, 9, 17; 59:12; 60:23, 25; 61:1, 6, 10; 64:1; 65:24; 66:23
accountings 28:16, 17, 18; 61:3
accounts 41:1, 6, 8, 9, 10, 12
accrued 18:14; 26:1; 52:23
accurate 26:17; 63:13
acknowledge 12:5, 6
acquired 59:17
Act 36:24; 37:1; 38:3; 50:23
acted 9:25; 10:7, 11, 14, 24; 11:2
acting 30:17
action 43:7, 24; 45:9; 49:2, 3; 70:20, 23
actions 12:7; 43:12
actually 14:8; 18:1; 25:16; 32:21, 23; 34:3, 4, 24; 45:5, 7; 46:2; 47:4;

58:1, 1:16
add 22:25; 26:20; 27:5; 29:10; 32:9, 12, 13, 17, 19
added 32:14, 15
adding 26:19
additional 33:17
adequate 38:1
adjourn 57:20; 69:11
adjustment 10:8
administration 10:15, 25
administrative 45:25
admitted 6:3, 17, 20, 23
advantage 54:13
adversary 45:14, 16
again 17:8; 68:9
against 8:18, 21; 45:22; 48:18; 49:2
ago 50:20; 60:10
agree 38:2
agreed 43:11; 46:20
agreement 36:21; 65:22; 66:13
ahead 39:12; 60:3; 66:1
Allan 55:22; 56:2, 5, 6
allegations 54:23
allow 48:3
allowance 20:24
allowed 46:20
allowing 22:1
allows 20:6; 21:22
almost 18:20
Along 36:20
alter 14:3
altered 12:21
altering 13:21
although 22:2
always 16:2; 58:13, 15
amend 47:9, 14, 17; 48:12
Amended 11:21; 12:2; 36:12; 43:6, 17; 48:2, 4
amendment 11:13; 35:2; 43:10
amount 16:1; 18:24; 29:13, 14; 32:6, 6, 10, 16; 33:10, 19; 47:5; 53:23; 54:7; 56:21; 69:1, 2
amounts 15:12; 18:11; 27:5; 32:18; 49:17; 68:5
analyzed 46:13
and/or 22:9; 68:5
apparently 25:21
appeal 27:9, 12; 63:1
appeals 63:5
appears 11:24; 12:4
applications 20:25
applied 8:18, 18; 20:17
applies 51:4
appointed 10:19; 14:15
approval 21:8, 14
approved 11:14; 18:3, 5, 7; 23:15, 18, 21; 24:2, 5,

10, 18
approving 18:13; 23:24; 24:25
approximately 18:24; 26:18; 33:15, 20, 21; 40:3; 59:15
April 17:19
around 14:20; 16:22; 17:4
assemble 62:25
assertion 44:4
assessing 55:7
Asset 61:25; 66:22
assets 32:3; 33:9, 20; 34:8; 35:13; 66:9; 68:7, 10, 11
assume 10:21
assure 53:12
attempt 9:13; 14:2
attempting 64:18
attend 51:20
attorney 5:24; 46:17; 56:1; 70:18, 22
attorney's 17:21; 35:24; 46:18; 56:21; 64:24; 65:5, 8
attorneys 9:3; 17:24; 18:1, 14, 16; 20:7, 16; 21:16, 19; 35:20
August 16:22; 17:7, 11, 13, 16; 45:13; 47:8
Austin 6:7, 8, 9
authorize 21:15, 18; 22:5
authorized 13:2; 23:5; 44:8
authorizing 25:6
avoid 35:21
aware 13:20
away 43:13; 54:11, 17, 65:24

**B**

B 11:11, 22; 12:3, 13:9; 16:13; 51:3
Back 7:10; 10:1; 19:21; 20:2; 22:3; 28:3; 34:23, 36:10, 11; 39:16; 43:4, 52:8; 56:15; 57:21, 22, 59:8; 62:5; 63:14; 65:10
bad 61:19, 25; 62:8
balance 24:4, 4; 61:23
Bank 17:4; 38:21; 39:21; 66:25; 67:3, 9, 10, 15; 68:19
bankruptcy 7:17; 8:8, 11, 15, 19, 22; 9:13, 16, 18, 19; 10:4, 18; 11:11; 13:2, 4, 17; 17:19; 18:4, 5, 7, 9; 20:9, 23; 21:4, 8, 9, 22:7; 23:6, 15, 18; 24:10, 18, 25; 27:9; 55:24
banks 41:5
bar 6:3, 17, 20, 23

bargained 54:16
based 59:9
basic 21:9
basically 11:12; 64:6; 65:16
basis 44:3
become 14:13
beginning 13:22; 18:10; 24:22; 25:23; 26:2, 8; 42:7; 46:16; 54:1
behind 24:16, 17
beneficiaries 37:22; 38:8, 14, 18; 53:17; 62:3
benefit 53:3; 55:3
benefited 53:16, 18, 20
Besides 23:22
best 37:24; 54:3
better 45:15
big 8:2
bill 22:3; 25:20; 29:7; 31:21; 53:13, 15; 55:14; 59:14
' 3:12; 50:20
break 35:15, 17
board 7:16, 18, 22; 8:9, 21, 24; 9:5
bond 49:23, 23, 25; 50:9; 51:4, 8
book 29:8, 9
both 8:18, 21
boxes 17:2; 19:7
breach 49:4, 6
breached 48:25; 49:1
break 52:4
briefly 27:7; 57:20
bring 49:22; 51:21; 57:21, 22
broke 61:20; 62:1
brought 19:1, 4; 28:7; 37:15; 39:1; 43:21; 52:2, 2
Brown 63:8
Brown's 51:19, 23
bug 45:4
business 7:16; 8:8, 11, 19, 21
businessman 54:2

**C**

calculated 49:16; 65:17
calculator 26:20
call 39:23; 67:22
called 27:10; 30:4; 35:16; 48:7, 8; 66:10
calls 67:20
came 17:9; 19:19, 20; 27:22, 23; 28:24; 29:4, 15; 32:8; 42:9, 14, 16; 53:9; 59:7
Camelot 55:24
can 7:5; 19:14; 22:25; 26:20; 27:5; 37:12, 16, 17;

39:20; 43:21, 23; 48:21; 53:13; 57:21; 65:25
caption 70:6
card 28:23
care 37:8, 13, 21, 25
CAROL 70:4
carried 54:11
carry 38:10; 48:22, 23
carrying 55:5
case 10:5, 15, 25; 11:7, 23; 12:25; 13:24; 14:10; 22:23; 25:1, 12, 24; 27:9, 14; 28:1, 2; 29:21, 21; 35:15, 23; 36:2, 4; 46:14; 49:24; 51:15; 52:19; 53:3, 14; 54:17; 55:14, 23, 25; 56:2, 7; 64:21; 66:5, 20
cases 9:24; 10:9, 14; 11:2; 55:16, 21; 63:3
cash 34:8
Casi 57:5, 10; 62:25
caught 45:4
cause 10:20; 49:1
causes 43:7, 12, 23; 49:3
cautioned 70:10
certain 9:7; 16:7; 43:7, 11; 64:5
certainly 12:16; 19:22; 22:11
certificate 7:22, 23; 8:3, 8
certified 7:16; 8:21; 9:5; 70:4
certify 70:5, 14, 18
chance 63:1
change 58:1; 67:17
changed 35:1
Chapter 9:25; 10:3, 4, 7, 11, 14, 19, 24, 25; 11:2, 3, 11, 23; 12:8; 20:7; 29:11; 38:4; 43:16
charge 30:12, 14; 41:5; 55:11
charged 41:7
charging 55:17
Charles 11:11, 22; 12:3; 13:9; 16:12, 13; 30:23; 35:17
Charter 17:4; 39:21; 68:19
Chase 69:7, 14
check 24:16, 16, 23, 24; 25:4, 7, 16; 26:8, 10; 29:15, 17; 30:24, 24; 58:18; 69:1
checks 19:18, 19; 25:11; 26:15; 28:6; 38:24; 52:25; 57:2; 58:7, 22
children 48:20; 54:20
children's 48:24
Christi 5:10
CKS 53:8, 9, 12; 59:17; 60:21; 61:5, 6, 25; 62:7; 64:12, 15; 66:22
claim 46:13, 20, 21; 47:2, 4, 4, 10, 13, 14, 15, 18, 25;

48:3, 4, 7, 9, 12; 53:8; 59:18
claimed 64:4
claims 43:8, 21; 45:10, 22, 23; 47:1; 48:14, 16, 18, 20; 53:10
Clara 44:20
class 6:14; 15:6
classified 50:11
CLE 45:2
clear 46:8; 67:5, 16; 68:17, 24
clerk 25:1
client 36:7
close 45:20, 21, 25
co-counsel 36:7; 51:2; 57:16
co-objector 53:12
Code 37:3, 6, 9, 14, 15; 50:12, 15; 51:3
COLIN 5:2, 8; 70:7
collateral 47:3, 5
column 32:16
companies 46:10
company 56:8, 9, 10
compensation 20:25; 22:23; 23:3
competence 7:23; 8:4, 8
complain 46:22
complaint 67:7
completely 51:25
complied 12:17; 13:10; 51:25
computer 29:20, 23; 30:1, 2; 31:13
concerned 20:22
conclusion 35:22
conduct 65:16
confidentiality 65:22; 66:12
confirm 13:13
confirmation 10:22, 23; 14:16, 18; 18:11, 17; 23:18; 25:25
confirmed 11:4, 15; 13:5, 7; 18:15; 21:10
confirming 11:15, 16
confirms 13:8
confused 17:18
connection 12:8; 38:3
consecutive 26:15
consented 13:25
consequences 5:16
consolidated 62:18; 63:6
consult 36:6
consumer 7:16; 8:15, 21
contact 66:7
contemplated 22:11
contemplation 22:18
contingent 45:13
control 11:9
convenient 31:22

conveyance     5:13
conveyed 55:7
COOK 5:1; 7:7, 10; 19:25; 20:2; 36:8, 10; 39:14, 16; 43:2, 4; 52:6, 8; 69:18
copies 31:20; 44:7; 56:22; 67:2, 6, 10
copy 19:5, 6, 7; 28:21; 51:18; 69:15
copying 56:19; 69:7
corporation 50:14
Corpus 5:10
correspondence 28:11
cost 46:1; 56:21; 65:17
costs 54:15; 56:19
counsel 21:16, 19; 41:17; 45:12; 70:19, 22
counterclaim 56:12
countersuing 56:11
COUNTY 70:2
couple 20:18; 26:4; 39:9; 43:19; 47:10; 60:5; 62:23; 65:17
course 38:24; 46:23
court 10:20; 13:2, 4, 17, 21; 14:5; 17:19; 18:4, 5, 7, 9, 17; 20:9, 23; 21:5, 8, 12; 22:1, 2, 4; 23:6, 15, 18, 21, 23; 24:2, 10, 13, 18, 25; 25:6; 27:1, 16, 16, 25; 28:2, 3, 19, 22; 37:12; 41:1
court's 21:10, 14
covered 57:17, 18
created 38:8; 57:6, 9, 11
creating 51:5, 7
credited 41:22
creditors 9:21; 13:24; 14:3; 16:21; 22:6, 12; 34:19, 25; 35:4, 7, 13; 37:25; 38:13, 14, 18; 43:20; 44:14, 16, 17; 46:6; 53:3, 16, 24; 54:6, 10, 14; 62:5; 64:21, 25; 65:7

**D**

damages 43:24, 25, 25; 46:3
data 31:18; 49:16
date 14:17, 19; 21:17, 20; 58:11, 14, 15, 17, 18, 22; 59:2, 5, 20
dates 63:13
day 42:9; 66:19
days 58:17; 59:4, 6, 8; 62:6, 23
deadline 47:20; 54:22; 66:19
deal 13:21; 46:22; 47:2
dealing 20:17; 21:25; 53:5
dealt 53:4, 5
debtor 13:9; 15:10, 17, 20; 16:7, 12; 68:4

debtor's 21:16, 19; 46:25
debtors 9:21
December 45:4
deduct 15:24, 25; 68:4
deductions 15:21; 32:12, 14, 19
defense 55:1, 2
degree 6:6, 10
deliver 63:25; 64:2; 69:13
delivered 69:7
denying 69:7
deplete 50:10
deposit 38:22; 39:22; 53:1
deposited 15:12; 39:20
deposition 5:19; 7:3, 8; 11:19, 25; 19:14; 22:19; 35:10; 39:4; 41:17; 42:22; 49:22; 51:13, 14, 21, 22; 57:15; 62:9; 66:5; 69:12; 70:20
detail 44:6
determination 66:14
determine 20:24
deviations 14:6, 9
Dickens 35:17
difference 58:24
different 12:14; 17:12; 26:13
digress 27:7
disburse 31:12
disbursed 26:17, 25; 29:16; 31:12; 34:15, 16; 40:4, 4, 8
disbursements 25:7, 7; 27:3; 53:2; 59:13
disbursing 26:9
discharged 56:1
disclose 33:2; 64:18
disclosed 65:14
disclosure 11:13
discover 44:24; 45:5; 51:10
discovered 45:7; 47:2. 62:17; 63:20
discuss 66:8
discussed 35:15
discusses 20:16; 35:18
discussing 50:7
discussion 19:11; 22:14; 39:10, 18; 43:3; 44:2
disposition 68:6
distribute 16:21; 18:16, 19
distributed 17:23; 18:20, 24; 44:17
distribution 15:13; 16:14, 17; 34:19
distributions 22:10, 12
district 27:16
Ditto 28:10, 18, 20; 47:7; 59:11; 66:22, 24
dividend 62:5; 65:6

docket 63:3, 22
document 8:2; 13:23; 19:15; 20:6; 48:6, 8; 51:21; 52:12
documents 11:9, 20; 12:6, 6, 11, 12, 13; 13:3, 6; 39:1; 44:23; 45:6; 49:21; 57:20, 21; 60:8; 64:13, 16; 69:6, 13
dollar 65:6
dollars 43:20; 65:18
done 9:23; 10:3, 10; 14:7, 12, 12; 23:23; 28:7, 17; 43:13, 15, 15; 44:4; 47:20; 53:21; 54:19, 20; 55:3; 57:25; 61:4
doubt 60:13
down 15:9; 22:22; 23:2; 26:3; 29:13, 14, 15; 32:12, 15
draft 48:13; 56:24
drafted 63:19
drawing 26:3
drawn 22:22; 23:2
due 18:11; 49:9; 68:6
duly 5:3; 70:10
during 5:19; 10:15, 24; 44:14
duties 12:8, 18; 13:18; 36:20, 23; 50:22; 54:11; 55:6
duty 37:21; 38:7, 10, 12

**E**

earlier 11:20; 33:12; 63:24
earliest 49:7
early 49:8; 59:18
earn 42:2, 6, 8, 15, 19
earned 33:22; 34:23; 35:24; 41:8, 9, 10, 12; 42:10; 44:19; 68:18
earner 10:8
easiest 39:2
effect 28:15; 47:12
effective 14:19; 21:17, 20
effort 48:13
eight 36:14
either 50:4
else 9:10, 14; 55:3
employed 70:19, 22
employee 70:21
employment 50:8
end 45:3; 56:7
enough 16:19; 17:25; 24:7; 42:16
ensure 35:13
ensured 29:23
enter 31:10
entered 7:3; 13:17; 39:4; 42:22
entities 44:11, 19

entitled 15:24, 25
entity 36:22
entry 23:11
equal 16:1; 68:5
errors 57:11
essentially 34:14; 61:20; 65:15
establish 16:14, 17
established 15:14; 16:23; 29:12; 41:2
Estate 12:3; 19:17; 22:7; 24:7; 26:18, 25; 27:21, 22; 28:1; 32:6, 17; 36:1; 37:22; 38:24, 25; 41:25; 42:19; 44:20; 45:19, 25; 48:15; 50:10; 55:4; 59:23; 61:18, 20; 62:1; 64:19; 65:2, 3, 15, 17
even 32:2; 35:25; 45:6; 46:10; 56:21
event 46:4
eventually 47:11
everybody 61:16
everyone 54:2
exact 33:10; 59:20
exactly 19:14; 54:16
EXAMINATION 5:4; 58:4; 70:7, 15, 17
examinations 9:8
examiner 23:7, 12; 55:14
example 31:8; 42:7; 57:12
Excel 29:2
excellence 9:2
excellent 9:6
except 11:5; 25:7; 26:13; 62:7
excess 6:24; 7:12
exchange 43:12
exclusively 9:15, 18
Excuse 6:8; 42:24
Exhibit 11:19, 25; 14:24; 15:2; 19:13, 14; 22:15, 18; 23:5, 20; 24:9; 25:6; 40:5; 51:13, 13, 17; 52:10; 55:8; 56:23; 59:22; 61:12, 13; 66:21
exhibits 60:9; 69:20
exists 46:25
expectation 43:25; 46:3
expected 55:6
expenditures 61:11
expense 29:22; 31:12
expenses 15:23, 24; 16:6; 21:1, 6, 9; 22:13; 23:6, 9; 30:7; 31:15; 32:4, 13; 45:25; 46:5; 48:17; 52:18
experience 59:10
expired 49:7; 53:6
expires 47:21
extent 21:11; 31:19
extremely 45:4

**F**

fact 17:24; 31:20; 37:10; 64:14, 17, 18; 68:12
facts 70:6
fair 42:4
fairly 35:9
familiar 12:13, 15; 28:10; 37:1, 7, 10
family 49:2
family's 44:13
famous 35:15, 17
far 43:12
faster 26:19
fault 35:22; 36:3
faxed 51:18
FDIC 46:17; 53:25; 59:18
February 63:14
federal 68:5
federally 15:15; 16:15
fee 21:19; 45:13
feel 35:23; 61:22
feeling 62:8
fees 17:24, 24; 18:1, 2, 3, 14, 16; 20:8, 8, 8, 16; 21:5, 8, 16; 23:9, 15, 17, 21, 24; 24:5; 34:15, 16, 23; 35:20, 24; 64:24; 65:5, 9
Feldman 11:11, 22; 12:3; 13:10; 16:12, 13; 19:17; 27:20; 29:7; 30:19, 23; 32:4; 34:3; 39:21; 41:25; 42:19; 43:8, 11, 14, 15; 44:4, 8, 11, 12, 13, 20, 20; 45:22; 46:6; 48:15, 18, 22; 49:2; 53:1, 5, 7, 22; 54:1, 20; 57:1; 58:9, 10; 59:23; 61:20, 22; 64:14; 65:13, 19, 24; 67:2, 3, 15, 15, 20, 25; 68:24
Feldman's 67:9
Feldman-Reynolds 44:21
felt 35:9; 54:13; 61:21
few 28:12; 36:6; 52:21; 57:16, 18
fiduciary 38:3, 5, 7, 10
field 9:11
fields 9:3
figure 29:10; 32:14, 20
figured 49:19
file 35:2; 45:14; 48:4; 49:23; 56:12; 61:4; 63:1; 67:19, 21, 22; 68:13, 14, 17, 19; 69:4
filed 10:19; 28:19, 22; 46:14; 47:4, 24; 48:6, 8; 66:4
files 48:2; 60:12, 14, 15
filing 66:19; 68:24
final 31:25; 33:1; 34:18; 35:3; 43:19; 45:8, 11, 18; 47:16, 21; 48:1, 5, 19; 54:24; 57:7, 10, 13; 58:6,

19, 25; 4:23; 65:1, 9
finally 35:19; 44:7
financial 15:15; 16:15; 31:18
financially 70:23
find 20:18; 28:6; 33:5; 34:2; 52:2; 62:22, 24; 65:25; 67:18
finished 22:17
firm 30:17; 63:18
first 5:3; 8:10; 10:2; 11:21; 12:2, 19; 15:17; 16:19, 19, 23; 20:6; 23:22; 36:12; 44:23; 45:3; 49:16, 18; 51:11; 52:9; 55:14; 59:11; 61:15; 63:15; 66:2; 70:10
five 25:24; 44:15
folder 31:4
follow 21:23
follows 5:3
foregoing 70:7, 14
Forgive 58:10
formal 13:20
forth 36:21, 23; 50:22; 70:15
found 13:13
four 12:10; 15:7; 51:10; 62:6
free 35:11
Friday 66:4
front 13:3; 20:5; 24:17; 62:12
Frost 41:7
fruitful 66:16
full 53:23; 65:23; 70:15
fully 51:25
fund 41:13
funds 18:10; 24:7; 25:1, 25; 27:24
furnish 28:20; 49:12, 14; 61:6
furnished 11:20; 28:18; 32:2; 61:10
further 33:12; 70:14, 18, 21

**G**

gains 47:18
gave 28:21; 32:9; 46:9; 57:1; 63:5; 64:9
general 28:9; 37:20; 38:13
generally 41:5
generated 62:9
gets 41:12, 22; 45:13
given 5:14; 29:10; 43:24; 61:9; 66:10
gives 9:8; 20:23; 31:14, 15
giving 22:19
glad 65:23

goes 13:12; 41:19; 55:9, 9; 56:24
good 9:10; 45:23; 47:13, 14
governing 12:10
GRANT 21:15; 22:5; 37:20; 40:9, 13; 41:14; 57:16; 58:3, 5; 60:3; 61:13
great 46:22; 69:2
green 19:13; 33:23; 61:11
gross 32:10
group 44:11, 12
grows 32:3
guess 62:8; 68:23
guys 35:25

**H**

half 44:18, 18
hand 64:16
happen 29:20; 36:2
happened 17:6, 9, 15; 63:4
happens 29:21
Harvard 6:13, 15
heading 19:16
hear 20:24
heard 60:21; 65:21
hearing 62:15; 63:13
hearings 62:12, 14, 17, 17; 63:6, 9, 15
hereby 70:5
herein 36:21
hereinafter 15:13
hereinbefore 70:8
hereto 70:6, 22
Hey 64:15
higher 9:2
hired 53:21
hiring 45:12
history 14:11
HOBLIT 68:8; 70:4
Honorable 27:14
hoping 48:11
hour 55:8, 9, 10, 15, 1_
hourly 55:7
House 35:15, 17
humorous 56:18, 20
hundred 43:19; 65:1_

**I**

idea 53:9; 61:19, 25
IKON 69:7
ill 45:4
immediately 58:14; 64:15; 69:9
impression 37:24; 59:9, 16, 20
inaccurate 63:9, 11
Inc 44:20

incident 45:17
include 52:21
included 47:15
including 21:5
income 10:8; 44:14, 15, 17, 19; 46:11; 49:10, 13, 15, 17, 20; 67:21; 68:5
incurred 21:16, 19; 23:17
independent 60:17
individual 30:8
information 49:12, 14; 51:12
initiated 66:7
input 30:18
inquired 45:12
insisted 21:25
insolvent 65:15
instead 44:16; 46:3; 56:8
institution 15:15; 16:15
instrument 51:5, 7
insurance 56:8, 9, 10
⸱ ᵤred 15:15; 16:15
ᵢₙₜend 47:17
intended 35:8; 62:4
intending 35:5
interest 15:22, 22; 33:22; 40:12, 14, 23; 41:8, 9, 10, 11, 15, 19, 21, 22, 24; 42:2, 6, 8, 11, 15, 19; 68:18; 69:2
interest-bearing 15:12; 42:3
interested 70:23
interrupted 62:11
into 14:11; 16:25; 17:9, 20, 22; 29:20; 30:19; 31:2, 4; 38:23; 39:1; 59:2
invoice 30:23; 31:4, 21; 57:12, 14; 58:13, 14, 16, 17; 59:2
⸱⸱ᵢ̣ces 29:8, 8, 9; 31:5, 7; 32:9, 11, 17, 25; 33:13; 57:1; 58:8
involve 9:22
involved 53:7; 66:18
involving 27:9
IOLTA 17:21, 23; 19:19; 23:11, 24; 26:6; 40:1, 9, 17, 21; 41:6; 42:18; 67:7
Island 47:6, 7, 19
issued 66:18
itemizes 31:14
items 22:13; 23:4, 20; 29:20

**J**

Jack 27:15; 62:13; 63:12
James 24:3, 4, 8, 9
January 63:14
Jarndyce 35:16, 16, 18, 18; 36:1, 2
Jefferson 46:18, 19; 50:8

job 37:24
John 27:10
join 53:11
judge 17:20; 27:14; 51:19, 23; 62:12; 63:7, 12; 64:1, 3, 5
jurisdiction 20:24; 21:11

**K**

K 11:25; 20:23
K-1 51:13
K-12 60:9, 10
K-13 60:9; 66:21
K-14 60:9
K-16 19:14; 22:16; 23:5, 20; 24:10, 16; 25:6; 40:5; 59:23; 61:13, 14
K-17 52:10; 55:8
K-18 56:23
K-2 51:17
K-3 11:19; 15:2, 3
K-4 11:25; 15:2
Kansas 6:3, 21
Karen 63:8
KAUFMAN 5:2, 8, 9, 14, 24; 7:3, 8, 11; 12:1; 17:19; 19:12; 20:3, 22; 23:14; 28:9; 36:11; 38:21; 39:4, 17, 19; 42:22, 24; 43:5; 50:5; 52:9; 57:21; 58:8; 62:14; 64:17; 65:21; 69:5, 14; 70:8
keep 28:23; 29:2, 3; 30:2, 10, 10, 11; 31:9, 17; 64:20; 65:24
keeping 55:22, 23
keeps 30:6, 6, 7
KELLY 5:2, 8; 70:7
kept 29:8; 39:19; 40:1, 16
kind 28:23; 30:1
knew 12:25
known 9:5; 54:1

**L**

lacked 53:9
large 41:11; 47:5
last 10:12; 17:19; 22:17; 44:7; 47:16; 52:12, 15, 16, 17; 59:25; 60:1; 68:8
lately 7:25; 8:6
later 28:3; 42:14; 63:12; 70:12
law 6:12; 7:12, 17; 8:3, 9, 12, 15, 22; 9:2, 11, 13, 16, 18, 19; 21:9
lawyer 41:2; 42:16, 17
lawyer's 40:23
learn 44:22
least 6:24; 7:12; 8:13, 14; 34:19; 40:7; 61:1
ledger 28:23

left 7:8; 32:18; 34:9; 44:18; 53:19
Legal 7:19, 22; 8:9, 24; 41:13; 45:9
less 16:3; 40:18; 61:17; 65:2, 3
letter 66:3, 21; 67:5
letterhead 8:20
letters 28:15, 16; 64:22
level 9:7
liable 48:20
license 8:3
licensed 5:24; 6:2
likely 48:17
limit 64:24; 65:5, 8
limitations 49:5
liquidation 10:4
list 13:12; 32:8
listed 49:21; 51:22
listing 58:6, 11
litigate 65:20
litigating 35:23
litigation 35:10, 19; 48:17
litigious 35:23
litigiousness 36:3
little 17:18; 20:18; 29:18; 33:12; 40:18; 50:20
local 68:5
log 31:21
long 46:24; 59:22; 60:10
look 14:24; 15:6; 19:3, 9; 20:4; 33:1; 36:14; 46:24; 50:18; 51:9; 63:2; 67:18
looked 7:25; 8:5; 16:20; 59:8
looking 22:3; 31:6, 24; 37:17, 18
looks 8:2
lot 26:19; 46:15
Lotus 29:3

**M**

maintaining 41:6
makes 68:16
making 35:11
Management 62:1; 66:22
mandated 41:2
many 9:24; 10:14; 11:2; 55:16
March 45:8; 66:22
Marina 47:6, 6, 19
mark 24:16
marked 11:18; 19:13; 56:24
market 17:5; 19:20; 33:22; 34:7, 11; 39:23; 40:10, 11, 20; 67:6; 68:19
Matthew 69:21
may 12:21; 14:22; 19:3, 9, 21; 26:2; 32:2; 33:11; 46:4;

left 47:18; 56:12, ⸱ᵤ:21; 64:2; 69:2
maybe 25:8; 40:16; 45:24; 46:2; 69:12
mean 9:1, 6, 9; 10:17; 12:16; 15:22; 17:15; 22:25, 25; 23:14; 26:20; 37:10, 19; 42:15; 50:2; 52:15; 53:13; 55:5; 58:25; 59:8, 19, 24; 62:6
means 9:4, 6; 40:23; 49:1
meant 10:21
meet 9:7; 66:19
meeting 45:3
mention 33:11
mentioned 12:11; 15:23; 32:24; 33:23; 48:19; 68:25
met 28:12
might 16:20; 18:15; 20:17, 18; 23:25; 24:24; 25:9, 9; 26:5; 46:1; 55:2; 58:16; 60:16
mind 35:1
mine 41:7; 56:7
minimum 9:7
minute 42:24
minutes 20:18; 36:6
missing 52:22
Modification 12:2, 19; 13:8, 25; 20:6
modified 13:1, 18; 43:17
Monday 66:17
money 16:8, 19, 21, 25; 17:5, 22, 25; 18:16, 19; 19:20; 22:22; 24:6; 26:24; 27:20; 29:4, 4, 6, 13, 14; 31:12; 33:15, 22; 34:2, 6, 7, 9, 11, 12, 14, 24, 24; 35:3, 12, 19, 25; 38:1; 39:23; 40:10, 11, 16, 20; 41:24; 42:10, 13, 14, 15, 16, 17, 18; 46:6; 48:17, 23, 24; 53:19; 54:6, 7, 14; 56:15; 61:7, 7, 23; 62:4, 5, 6; 64:19, 25; 65:10; 67:6, 25; 68:16, 19
monies 17:20; 26:9; 28:24, 24; 30:18; 31:2, 10, 11; 38:23; 39:25; 40:8
month 25:22, 22; 59:1, 3
months 45:5; 47:10; 59:19
Moon 20:17; 21:25; 22:3; 24:3, 4, 8; 46:17; 64:15
Moon's 24:9
Mooring 47:19
Moorings 47:6
moot 48:4
more 9:18; 16:4; 23:13; 32:24; 42:7; 46:2; 59:3, 6, 7
most 9:19; 16:4; 31:8; 34:16; 38:1; 41:9
mostly 9:11; 34:15
Motion 51:20; 63:8

motive 35:14
moved 62:20
Mrs 57:21; 69:13
much 16:25; 18:19, 21; 22:22; 23:2; 26:20, 24; 29:10; 33:15; 34:2, 6, 9; 53:14; 59:1; 63:2; 66:9
must 17:12; 24:13
myself 25:25

**N**

name 5:6, 8; 46:18, 19
named 70:8, 9
nature 5:15
necessarily 9:4; 21:23; 52:20
need 20:20; 21:4; 48:14
negotiate 66:16
neither 70:18
net 15:11, 18, 20; 48:17; 68:4
night 22:17; 52:13, 15, 16, 17; 59:25; 60:1
non-corporate 50:11, 13; 51:4
none 27:23; 44:9
nor 70:19
Notice 49:22; 51:14, 22; 62:9; 66:5, 18
noticed 63:5
novel 35:17
November 44:7, 25; 45:3; 49:15
NUECES 70:2
number 22:24; 24:23, 24; 26:8; 28:12; 30:23; 33:5; 55:8; 57:12, 12, 14
numbers 25:8; 26:14; 56:25, 25

**O**

o'clock 69:12
oath 5:14, 16; 70:11
object 47:1, 21; 53:10
objected 48:1
objection 47:15, 25; 48:5, 7, 9; 53:11
objections 53:8
obligation 48:24
obligations 11:10; 12:7, 18; 13:11, 19; 48:23; 50:25; 53:23
occasion 51:9
occasions 12:14; 22:4; 28:13
occur 49:4, 6
occurred 49:8
October 14:20; 49:8
odd 65:6
off 7:5, 7; 19:11, 23, 25;

# P

22:14; 32:8; 36:5, 8; 39:10,
11, 14, 18; 40:19; 42:25;
43:1, 2, 3; 44:2; 52:5, 6;
69:18

**offer** 35:2, 12

**offered** 8:11, 19

**offering** 35:3

**office** 30:13, 14; 57:4, 5

**once** 10:18

**one** 9:10; 11:6, 20; 15:21;
17:2; 18:15; 20:19; 23:8,
10, 24; 24:11; 25:9, 10;
26:5; 28:22; 43:9; 48:13;
49:21; 50:1; 55:2, 25; 56:2,
25; 59:4; 60:11; 62:19;
63:15

**ones** 27:4

**only** 11:7; 21:11, 12; 23:8;
30:6; 48:16; 49:3; 55:15

**open-ended** 23:13

**opinion** 43:15; 47:13;
54:4

**opportunity** 44:24;
49:18; 53:22; 66:11

**orally** 64:1

**order** 11:15, 16; 13:2, 4,
7, 13, 21; 18:4, 6, 8, 12;
20:9; 21:4; 22:1, 2, 4;
24:12; 51:19, 20, 23; 52:1;
53:12; 63:8, 12, 12, 17, 18,
21; 64:24; 65:5

**ordered** 11:15; 13:5;
27:15, 25; 28:3; 63:21;
64:1, 2

**ordering** 64:4, 4

**orders** 13:16; 18:9, 13,
17; 23:23; 24:25; 25:6;
27:1

**organization** 9:8

**original** 17:22; 51:21;
53:8; 54:8; 60:8

**originally** 62:19

**originals** 38:23; 69:8

**otherwise** 51:6

**ought** 48:3

**out** 9:17; 15:24, 25; 16:2,
3, 4, 6; 17:23; 19:19, 20;
21:11; 25:20; 26:18, 25;
28:25; 29:5, 7, 10, 17;
31:14; 32:13, 19; 34:2;
35:12; 37:11; 38:10, 25;
39:12; 40:4, 4; 42:9, 14;
47:5, 6; 48:22, 23; 49:19;
52:16, 17; 53:2; 54:11;
55:5; 57:20; 61:8; 62:22,
24; 65:25

**over** 21:11; 32:18; 41:25;
44:13, 16, 16; 46:11;
49:10, 17; 55:12; 57:15,
17; 59:10; 64:16; 69:7

**owe** 38:7, 10, 12, 13;
61:24

**owed** 42:17

**own** 35:12; 48:22; 54:14

# P

**Padre** 47:6

**page** 15:4; 20:11, 23;
36:14; 68:2, 3

**paid** 15:20; 22:2; 25:16,
20, 21; 27:5, 24; 41:12, 25;
42:9, 14, 17; 54:19; 56:14

**paper** 19:13; 69:7, 14

**paragraph** 15:6; 16:10;
20:12, 13, 14; 32:24; 33:8;
36:16

**paralegal** 30:11

**Parkwell** 46:13, 17; 47:2,
25; 53:8, 10; 62:7

**part** 45:3, 17; 59:18, 24;
68:8

**particular** 51:10

**parties** 12:25; 35:23;
70:20, 22

**party** 27:12

**past** 62:6

**pay** 15:10, 17; 16:7; 18:1;
21:5, 16, 19; 22:1, 4, 6;
24:6, 7; 27:15, 18; 28:3;
35:4; 42:16; 48:23, 24;
49:20; 53:23, 24; 54:5;
56:8; 61:23; 62:5, 7; 68:16

**paying** 25:25; 56:8

**Payment** 18:23; 19:17;
23:16, 17; 24:17, 18; 54:9;
59:23

**payments** 20:7; 22:9, 11,
12; 23:1, 4, 5, 5, 21; 24:9,
25; 58:12, 15

**people** 9:5; 30:13, 13;
53:20; 55:11; 64:21

**percent** 9:19; 15:11, 18,
21; 16:2, 3, 5, 5

**perfectly** 68:17

**performance** 48:21

**period** 17:25

**periodically** 61:2

**person** 66:6, 7

**personal** 44:10; 68:7, 10,
11

**petition** 10:18

**piece** 19:13

**places** 55:13; 58:1

**plan** 10:21, 23, 23; 11:3,
3, 4, 10, 12, 14, 14, 16, 22;
12:2, 9, 18, 19; 13:1, 5, 7,
9, 15, 19, 19, 25; 14:4, 6, 9,
14, 15, 25; 15:10, 14, 18;
18:12, 14, 17; 20:4, 7, 8,
13, 14; 21:3, 5, 7, 10, 12,
12, 13, 15, 18, 21; 22:5, 6,
8, 8, 10, 23; 23:1, 2, 8;
25:24; 27:4, 6; 29:11;
36:12, 18, 22; 38:4, 5, 9,
11, 15, 19; 42:3, 6; 43:6,
14, 16; 44:5, 12, 14; 46:10,
24, 24; 47:1; 48:15, 21;
49:6, 10; 50:2, 3, 4, 21;
53:6, 24; 54:21; 67:20, 21,

**pleadings** 63:3

**please** 5:6; 14:25; 15:4;
19:3, 21; 33:5; 36:14;
37:12; 39:7; 44:6

**plus** 33:17; 34:4

**pocket** 54:14

**point** 27:14; 35:7, 8;
38:20; 47:24, 25; 51:11;
60:13; 69:5

**Political** 6:11

**poor** 41:13

**portion** 17:10

**possession** 17:10

**possibility** 42:10

**possible** 16:20; 29:25;
38:1; 64:7

**possibly** 49:19

**postage** 56:22

**Potter** 55:22, 25; 56:2, 3,
5, 6

**powers** 21:12; 36:20, 22

**practical** 57:24

**practice** 9:2, 12, 20, 10

**practicing** 7:1, 12; 10:2

**preconfirmation** 23:6, 7,
9, 21

**preparation** 62:12

**prepare** 59:22

**prepared** 22:16, 18;
52:12, 14; 57:3, 5

**preparing** 62:16

**present** 55:18; 60:19;
61:11

**president** 66:22

**pretty** 53:14; 57:10

**prevented** 54:15

**previously** 24:5; 56:4;
67:18

**price** 54:3

**print** 31:13

**printed** 52:16, 17

**prior** 10:21, 23; 18:11;
23:18

**probably** 8:1; 16:22;
45:24; 59:16, 19; 60:12;
64:9

**proceed** 66:14

**proceeding** 45:14, 16

**proceedings** 70:16

**proceeds** 15:7, 11, 19,
20; 68:4

**productive** 66:16

**professional** 20:8; 21:5;
23:15, 17

**program** 30:2, 4; 31:9,
17, 17, 18

**promise** 46:11; 48:25

**promised** 54:6

**promises** 48:21

**proof** 47:14, 18; 48:2, 4,
12; 64:14

**Properties** 44:20; 53:6;

23; 68:13

**property** 37:6, 15; 47:19;
57:2; 68:6

**propose** 69:5

**proposed** 31:25; 34:18;
35:3; 43:18; 45:7, 11, 17;
47:16, 21; 48:1, 5; 50:7;
57:7, 10, 13; 58:6, 19, 23;
64:23; 65:1; 66:6

**proposing** 35:6

**Protective** 51:20; 63:8

**provide** 21:13; 51:8;
66:23

**provided** 46:25

**provides** 51:5

**provision** 20:15; 50:21

**public** 55:21

**publicly** 61:17

**pull** 39:12

**pulled** 63:2

**purpose** 57:6; 69:13

**purposes** 57:24

**pursue** 43:7; 45:9, 16;
46:2; 66:1

**pursued** 45:16; 48:15

**put** 8:20; 12:20; 16:25;
21:21; 24:16, 20, 22;
25:20; 29:7, 18, 20, 22;
31:1, 20; 32:12, 15; 34:23;
35:3, 12; 37:23; 39:6;
54:14; 58:17; 62:4

**putting** 57:6, 9

# Q

**quarter** 6:16

**quite** 28:12

# R

**R** 27:10; 70:4

**raise** 48:17

**rank** 6:14

**rate** 55:7, 11, 23, 24

**rather** 22:1; 43:25; 45:16;
65:19

**read** 12:12, 14, 16; 51:2

**reads** 51:2

**ready** 45:20

**Real** 44:20; 53:6

**really** 64:17

**reason** 60:13

**recall** 8:10; 35:17; 37:3;
59:24; 60:21, 22, 24; 66:17

**receipts** 31:14; 59:12

**receivable** 32:6

**receive** 8:7; 22:9; 30:20;
33:16; 52:25; 58:16; 60:25

**received** 17:7, 10, 16;
28:11, 15, 16; 30:18, 22;
31:2, 11; 32:6, 11, 16, 22;
23; 33:20, 25; 34:3, 4, 9,
23; 58:7, 8, 12, 15, 18, 22;

54:3

**60:18**

**recess** 20:1; 36:9; 39:15;
52:7

**recognize** 11:21; 12:1;
51:14, 19, 23

**recollection** 60:17

**record** 5:1, 7; 7:5, 7, 10;
19:11, 23, 25; 20:2; 22:14;
29:12, 24; 30:1; 36:5, 8,
10; 39:10, 12, 14, 16, 18;
42:25; 43:1, 2, 3, 4; 44:2;
52:5, 6, 8; 55:21; 69:18

**recorded** 31:19, 21;
52:23

**records** 28:7; 31:7, 8;
39:19; 66:3, 8, 12

**recover** 46:1, 2; 67:18

**REEXAMINATION** 60:6

**referred** 15:13

**refers** 20:13, 14

**reflect** 47:18; 58:11

**refusal** 62:10

**refused** 67:16

**registry** 27:15; 28:2

**regular** 55:20

**regulates** 9:9

**reimbursement** 20:25

**relate** 27:9

**related** 70:19

**relating** 49:12, 14

**relative** 70:21

**release** 44:9

**reliance** 43:24

**remaining** 15:11, 18.
49:3

**remember** 25:2; 60:11

**reopen** 25:1, 12, 17

**reopened** 25:13, 14

**Reorganization** 11:22;
12:3; 20:4; 36:12; 43:6

**replaced** 37:2

**report** 17:3, 3; 31:14, 25;
32:25; 33:1, 4, 7; 34:18,
35:3; 43:19; 45:8, 11, 18;
47:16, 21; 48:2, 5, 19,
54:24; 57:7, 10, 13; 55:6,
20, 23; 64:23; 65:1, 9

**reported** 32:10

**Reporter** 70:4

**reports** 46:9

**represent** 11:19; 23:20,
51:18

**representations** 63

**represented** 17:20; 56:6

**representing** 9:20; 56:5

**represents** 52:18, 22

**request** 61:4

**requested** 51:12

**requesting** 28:16

**requests** 53:4

**require** 50:1, 9; 67:23

**required** 5:19; 21:14:
42:3, 6; 43:6, 16; 44:5:

49:22
requires 21:7, 13; 51:4, 24
requiring 51:20
researched 47:12
reserve 15:14; 16:6, 14, 18; 67:2, 3
resetting 63:13, 17, 21
reside 5:9, 10
respect 12:17; 22:15; 25:5
respond 62:10
response 61:4
responsibilities 11:10; 13:18; 36:23; 38:4; 50:22
rest 49:10
restitution 43:24; 46:3
retained 32:4, 5; 69:20
retaining 32:15
retention 21:10
return 27:17
  'rned 69:8
returns 44:8, 9, 10, 10; 46:9; 67:19, 21, 22; 68:13, 14, 17, 20, 25
reviewed 30:22
right 8:1; 11:17; 14:21; 18:9; 21:24; 25:2; 26:23; 32:8, 8; 34:25; 42:6, 20; 46:25; 54:22; 57:23; 60:16; 61:12; 67:12, 24; 69:16
Ron 46:19; 64:22
room 7:4, 9; 39:5, 7; 42:23
ROSENSTEIN 5:5; 7:5, 11; 19:12, 23; 20:3; 22:15; 36:5, 11; 38:2; 39:6, 11, 17; 40:15; 41:16, 20; 43:1, 5; 44:3; 52:4, 9; 58:1; 60:4, :15; 65:23; 68:10, 12; 67:17, 21
rough 29:9
roughly 40:15; 42:2
route 66:14
rule 21:9
run 54:23

S

S-C-H-U-E-H-E-L-E 27:10
sale 47:12, 19; 68:6, 9
sales 15:7, 11, 19, 21; 31:11
same 8:16, 19; 48:25, 25; 55:23; 67:13
saw 60:11
saying 33:25; 42:5
schedule 58:19
schedules 54:8
Schmidt 64:1, 3
school 6:12

Schuehele 27:10, 22
science 6:11
second 6:22; 7:6; 19:24; 42:25
secret 64:20
secretaries 29:19
section 37:5; 50:18; 51:2
seeing 55:9; 69:1
seek 21:8
seeking 67:6, 18
seem 66:15
seemed 46:21; 66:13
seems 48:16; 66:5
sell 54:3
selling 53:5
send 58:13; 69:6
sense 54:4; 63:11, 14
sent 57:2, 20; 66:4
separate 24:12; 42:3; 48:6, 8
September 14:18; 47:8
serve 23:8
served 23:7
services 41:13
set 21:11; 26:15; 36:21, 23; 37:11; 50:22; 63:15, 15; 70:15
sets 15:21
settle 65:14
settled 43:9, 10; 46:16
settlement 65:19
several 5:18; 22:4; 30:13
shall 15:10, 12; 36:22
share 31:25; 44:13
Sharon 7:3, 8; 39:4, 18; 42:22; 62:25
Sharon's 30:11
sharp 54:2, 4
shorted 43:19, 22
Shorthand 70:4
shortly 24:14; 57:25
show 17:4; 38:21; 59:14; 66:8, 11
showing 11:18, 25; 51:13, 17
shown 13:6; 40:5; 58:22; 59:2, 5
shows 27:2; 28:24; 32:3
side 64:21
sign 14:3
signed 13:24; 24:12, 14
significant 54:9
Simank 46:19; 47:9; 53:9; 64:22
simply 27:5
six 15:4; 25:24; 68:3
slip 29:22, 22; 30:21; 39:22
slips 29:18; 30:4, 19; 31:18, 23; 38:22
software 30:2
sold 47:3, 7, 8; 57:2

somebody 29:13
someone 9:10
sometimes 10:19; 16:3, 3; 58:21; 59:1
somewhere 8:5; 18:22; 19:4
sorry 58:10
sort 56:19; 62:7
sorts 9:9, 23; 21:22
speaks 51:24
special 7:23; 8:3, 8
Specialization 7:19, 22; 8:9, 11, 24
specialized 7:15, 21
specific 25:7
specifically 14:5, 6; 20:15; 36:21
specify 12:7
spent 35:20
spreadsheet 29:3, 3
spring 59:21
standard 9:2; 37:8, 11, 13
standing 12:1; 53:10, 12
started 10:2; 25:25; 26:3, 9; 61:1; 62:16
state 5:6; 41:12, 19; 54:25; 55:2; 65:4; 68:5; 70:1, 5
stated 58:19; 70:6
statement 11:13; 42:4
statements 17:5; 38:21; 67:1, 4, 9, 10, 15
states 6:2
statute 49:5
Stenograph 70:9, 12
Steve 66:21
stop 35:25
Street 5:10
stuff 64:10
subdivision 37:5
subparagraph 20:23; 51:3
substantially 61:17
subtracted 16:2, 3, 4, 6
subtracting 33:9
sued 56:2
suggest 39:2
suing 56:9, 10
summarizes 19:18
summary 18:23, 23; 19:1, 17; 33:23; 59:23
summer 59:21
sums 16:8
superseded 63:12
supervision 29:14; 70:13
supposed 44:15; 49:20; 53:24; 54:21
Supreme 41:1
Sure 19:10; 25:2; 33:13; 53:22; 54:10; 57:10
Surely 20:10

surety 49:23, ...,25
surprised 26:23
suspected 61:21
suspicious 53:25
sworn 5:3; 70:10

T

talk 33:25
talked 47:17; 50:20; 55:4
talking 67:12
talks 34:18
tax 44:8, 9, 10, 10; 46:9; 67:2, 19, 21, 22; 68:5, 13, 14, 17, 19, 25
taxes 16:1, 5; 32:5, 15; 68:1, 16
telling 14:9
ten 8:13, 14; 10:12; 14:10
term 44:14; 46:25; 49:7, 10; 53:6
termed 14:1
terms 12:21; 14:3; 38:11; 49:4; 66:8; 67:17
testified 5:3
testimony 24:9; 25:5; 26:3; 27:23; 32:21; 45:19
Texas 5:11; 6:4, 7, 9, 18, 24; 7:18, 22; 8:9, 24; 36:23; 37:1, 2, 8, 14; 41:12; 50:12, 15, 22; 51:3; 70:1, 5
Thereafter 15:10; 61:2
Third 5:10; 23:11; 32:16
thoroughly 12:13, 15
though 41:19; 45:6; 46:10
thought 35:10; 54:9; 56:18, 20, 20; 61:19; 67:1, 4, 12
thousand 43:20; 65:6, 17
three 19:6; 23:22; 45:5; 53:5; 55:20; 59:19; 62:6; 63:4
three-fourths 15:9
today 14:22; 19:1; 22:19; 28:8; 34:6, 9; 52:1; 60:12; 61:16
together 46:19; 64:10
told 17:13; 47:7, 10, 11; 50:8; 61:16, 16, 22; 65:11
took 32:19; 56:6
top 6:16; 19:17; 23:10
total 18:24; 32:10, 11; 33:2, 19; 69:1
totally 33:15
track 29:4; 31:18
transcribed 70:12
transcript 70:16
treat 67:20
treated 35:9
tried 64:20
true 13:15; 41:6, 14, 18;

70:6, 16
Trust 36:24; 37:1, 2, 8, 14; 38:8; 40:23; 41:3; 50:12, 15, 23; 51:3, 5, 7; 53:17; 67:19, 22
trusted 54:5
trustee 9:25; 10:8, 11, 15, 19, 24; 11:3, 3, 10; 12:9; 13:19; 14:14, 15; 15:10, 14, 18; 20:7, 14, 14; 21:6; 22:6, 9, 23; 23:1, 8, 16; 27:4, 6; 29:11; 30:17; 36:18, 22; 37:8, 13; 38:4, 5; 43:14; 48:15; 50:12, 21
trustee's 20:8; 47:1
trustees 9:21; 31:8; 51:4
trusteeships 10:3
truth 5:15; 70:11, 11, 12
truthfully 5:20
try 66:16
trying 10:17; 34:2; 66:19
Tuesday 66:18
turn 15:4; 44:13; 46:11; 49:10; 57:15
turned 44:16; 49:17
turning 44:16
two 12:10; 13:3, 5; 15:21; 25:11; 26:5, 7, 13; 55:20; 59:19; 62:20
type 31:9
typewriting 70:13, 15

U

under 12:18; 13:19, 25; 15:6; 16:10; 22:10; 23:23; 29:13; 31:22; 32:25; 37:8, 14; 38:8, 15, 18; 43:5, 16; 44:5; 50:12; 53:24; 54:21; 66:12, 14; 70:13
undergraduate 6:6
underpaid 49:19
understood 64:11, 12; 66:3
University 6:7, 9
unless 21:13; 45:21; 48:2; 51:5
unsecured 46:21; 47:4
up 22:25; 26:9, 20; 27:5; 29:10; 32:9, 11, 12, 13, 14, 15, 17, 19; 34:22; 35:3, 12; 43:24; 48:13; 52:20; 53:9; 55:9, 9, 12, 12, 13; 62:4, 5, 64:24
upon 70:10
usage 12:22, 23, 23; 14:1, 7
use 29:19; 30:3
used 41:13

V

valuable 49:3
value 43:23



**Lawyer's Notes**

### Amounts Paid to Colin K Kaufman
### Without Court Approval

| Date | Cumulative Invoice Fee as of Date | "Expenses" and Costs per Invoice as of Date of Invoice | Cumulative Fees and Expenses as of Dates of Payments | Amout of Pymt to CKK | Cumulative Pymts to CKK | Pymts vs Billing |
|---|---|---|---|---|---|---|
| 3/30/94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3/23/96 | 42,001.50 | 5,308.77 | 47,310.27 | 5,000.00 | 5,000.00 | -42,310.27 |
| 12/23/96 | 49,326.50 | 5,856.87 | 55,183.37 | 1,000.00 | 6,000.00 | -49,183.37 |
| 7/16/97 | 84,510.00 | 9,094.11 | 93,604.11 | 2,600.00 | 8,600.00 | -85,004.11 |
| 5/4/98 | 154,982.50 | 17,476.10 | 172,458.60 | 10,000.00 | 18,600.00 | -153,858.60 |
| 5/20/98 | 155,302.50 | 17,476.10 | 172,778.60 | 10,000.00 | 28,600.00 | -144,178.60 |
| 6/5/98 | 155,452.50 | 17,476.10 | 172,928.60 | 10,000.00 | 38,600.00 | -134,328.60 |
| 6/12/98 | 155,477.50 | 17,476.10 | 172,953.60 | 10,000.00 | 48,600.00 | -124,353.60 |
| 6/22/98 | 160,702.50 | 17,821.10 | 178,523.60 | 10,000.00 | 58,600.00 | -119,923.60 |
| 7/10/98 | 166,077.50 | 18,341.63 | 184,419.13 | 10,000.00 | 68,600.00 | -115,819.13 |
| 7/23/98 | 168,962.50 | 18,489.51 | 187,452.01 | 10,000.00 | 78,600.00 | -108,852.01 |
| 7/31/98 | 169,087.50 | 18,509.51 | 187,597.01 | 10,000.00 | 88,600.00 | -98,997.01 |
| 8/17/98 | 170,187.50 | 18,531.23 | 188,718.73 | 10,000.00 | 98,600.00 | -90,118.73 |
| 10/20/98 | 174,304.50 | 18,715.22 | 193,019.72 | 10,000.00 | 108,600.00 | -84,419.72 |
| 10/28/98 | 174,329.50 | 18,715.22 | 193,044.72 | 10,000.00 | 118,600.00 | -74,444.72 |
| 3/23/99 | 175,432.00 | 18,717.15 | 194,149.15 | 10,000.00 | 128,600.00 | -65,549.15 |
| 4/10/99 | 175,794.50 | 18,717.15 | 194,511.65 | 6,000.00 | 134,600.00 | -59,911.65 |
| 4/19/99 | 175,857.00 | 18,717.75 | 194,574.75 | 9,000.00 | 143,600.00 | -50,974.75 |
| 5/1/99 | 175,882.00 | 18,717.75 | 194,599.75 | 10,000.00 | 153,600.00 | -40,999.75 |
| 5/14/99 | 175,982.00 | 18,717.75 | 194,699.75 | 10,000.00 | 163,600.00 | -31,099.75 |
| 5/26/99 | 176,007.00 | 18,717.75 | 194,724.75 | 10,000.00 | 173,600.00 | -21,124.75 |
| 6/7/99 | 176,157.00 | 18,717.75 | 194,874.75 | 10,000.00 | 183,600.00 | -11,274.75 |
| 6/12/99 | 176,294.50 | 18,717.75 | 195,012.25 | 10,000.00 | 193,600.00 | -1,412.25 |
| 6/23/99 | 176,319.50 | 18,717.75 | 195,037.25 | 10,000.00 | 203,600.00 | 8,562.75 |
| 7/5/99 | 176,344.50 | 18,717.75 | 195,062.25 | 10,000.00 | 213,600.00 | 18,537.75 |
| 7/13/99 | 176,444.50 | 18,717.75 | 195,162.25 | 10,000.00 | 223,600.00 | 28,437.75 |
| 7/26/99 | 176,469.50 | 18,717.75 | 195,187.25 | 10,000.00 | 233,600.00 | 38,412.75 |
| 8/11/99 | 176,694.50 | 18,717.75 | 195,412.25 | 10,000.00 | 243,600.00 | 48,187.75 |
| 9/3/99 | 176,994.50 | 18,718.85 | 195,713.35 | 2,000.00 | 245,600.00 | 49,886.65 |
| 11/23/99 | 178,059.50 | 18,719.25 | 196,778.75 | 5,000.00 | 250,600.00 | 53,821.25 |
| 4/25/00 | 182,587.50 | 18,723.64 | 201,311.14 | 597.50 | 251,197.50 | 49,886.36 |
| 1/6/01 | 194,285.00 | 19,048.85 | 213,333.85 | 5,000.00 | 256,197.50 | 42,863.65 |
| 1/22/01 | 194,805.00 | 19,863.24 | 214,668.24 | 5,000.00 | 261,197.50 | 46,529.26 |
| 1/31/01 | 195,110.00 | 19,866.04 | 214,976.04 | 5,000.00 | 266,197.50 | 51,221.46 |
| 2/15/01 | 195,790.00 | 19,879.09 | 215,669.09 | 5,000.00 | 271,197.50 | 55,528.41 |
| 3/19/01 | 204,429.00 | 20,063.25 | 224,492.25 | 2,000.00 | 273,197.50 | 48,705.25 |
| 3/26/01 | 205,669.00 | 20,099.55 | 225,768.55 | 2,000.00 | 275,197.50 | 49,428.95 |
| 5/19/01 | 297,004.50 | 21,182.18 | 318,186.68 | 2,600.00 | 277,797.50 | -40,389.18 |
| Bill Date 5/22/01 | 314,555.50 | 21,528.18 | 336,083.68 | 277,797.50 | | -58,286.18 |



EXHIBIT
CKS 17