24

United States District Court
Southern District of Texas
FILED

JAN 0 3 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | District Court Civil Case # B-02-073 |
| Charles B. FELDMAN dba | Consolidated with Case # B-02-074 |
| Charles B. Feldman Investments | Appeal of Bankruptcy Case |
| Debtor | # 90-01254-B-11 |
| Colin Kelly KAUFMAN, Appellant | Appeal No. 02-05| |
| vs. | and |
| CKS ASSET MANAGEMENT, INC. & | Appeal No. 02-06 |
| Michael BOUDLOCHE, Appellees | |

Font Korinna

## APPELLANT'S ORIGINAL RESPONSE TO APPELLEE'S MOTION TO DISMISS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Colin Kelly Kaufman, the Appellant and for his Original Response to

Appellee's Motion to Dismiss, respectfully shows the Court as follows:

### I. Preliminary Statements.

1. Basic Principles. In law school, one is told, "when the facts are on your side, pound

on the facts. When the law is on your side, pound on the law. When neither are on your side,

pound on the table." In more recent times, it seems that "pounding on the table" equates with

"make personal attacks on the personality and character of your opponent." Since people have

been trying to use the Cantu case order to harm Appellant's practice in other cases as well,

Appellant is taking this opportunity to clarify matters. A reasonable observer will see that what

the court below did in the Cantu case was wrong. Appellant is perfectly willing for a higher

court to look into what happened in Cantu. Appellant could do nothing at the time of the order

Appellee relies on, because the client did not want to appeal. But a fair examination of the

record and facts in that case will show that Appellant's conduct was exactly what it should have

-1-

been.[1]

2. <u>Did Appellant Sensationalize the Facts</u>?  Basically, in Cantu, Appellant pled that his client was a trustee in bankruptcy for a convicted criminal serving a 12-year term for defrauding Mexican investors, who with only a minimum wage occupation and income, transferred $6.544 million (over $4 million in a single bankwire) through the banking system to a drug lord, and that recovery was authorized under civil RICO, because the banks must have known they were assisting a criminal enterprise.  Copies of the criminal conviction and the writings transferring the money to one of the defendants in Mexico were attached.

3. <u>Stated Facts Reported in the Newspaper</u>.  The problem that the court below had with criticizing Appellant's statement of the facts is that Appellant did not just say that "Defendant X, the guy who was laundering the money, is a drug lord" (which Appellant sincerely to this day believes he was).  Instead, Appellant, in as understated a way that he could (given the nature of the facts, which were fairly interesting), alleged some other facts which were reported in the Laredo newspaper, which would support an inference by the fact-finder that Defendant X was involved in the drug trade – about how Defendant X's brother was found cut up into pieces, and put into plastic garbage bags, and left floating in the Rio Grande.  Appellant also attached affidavits from the Mexican investors as to what the bankruptcy debtor did, and a magazine article.

4. <u>Sensationalized Inferences</u>.  Perhaps the court below thought the allegations were

---

[1] Since the Cantu case was decided and heard in this jurisdiction, this Court may take judicial notice of the pleadings which Judge Steen was commenting on; and Appellant asks that this Court do so.



merely intended to prejudice the fact-finder against the defendant. That is what the description "inflammatory" seems to say. But Appellant had a duty to allege a connection to organized crime as a precondition of using Civil RICO. The connection which the Appellant chose to allege was public knowledge, publicly recorded. So nobody could say that Appellant was inventing something. Perhaps the court below thought the inference claimed was wrong -- that people from nice neighborhoods have this sort of thing happen to them all the time; and that it was improper to draw the inference that Defendant X was involved in the drug trade. But one would think that's at least a summary judgment issue, not grounds for a motion to dismiss, since a reasonable fact-finder could still draw the inference asked for anyway. Or at least, the facts of the newspaper report certainly contributed to the inference that Appellant wanted drawn; and showed that Appellant was not alleging a complaint in bad faith without good grounds to support it.[2]

    5. <u>Was It an Abuse to Use Civil RICO in Cantu</u>? It is said to be an abuse to use civil RICO where a defendant is really not involved in organized criminal activity. So one must allege a connection to an organized crime activity to use civil RICO properly. If one is obliged by the law to plead something in a case, then the court ought not to penalize it.[3]

---

[2] One would also think a judge would want to know about these facts, in case he felt that additional security precautions might be justified by the nature of the case.

[3] While Appellant was teaching law and serving as revision editor of <u>Corbin on Contracts</u> at St. Mary's Law School in San Antonio, he had occasion to write a law review article. Kaufman, "The Scientific Method in Legal Thought: Legal Realism and the Fourteen Principles of Justice," 12 St. Mary's L.J. 77 (1981) (later Appellant added two or three principles). One of the original fourteen principles is that the law ought not to penalize what the law requires. The article cross-references the late Dr. Eric Berne's book, <u>Games People Play</u> (cerca 1973) for the "Double Bind:" give people a choice, and whichever choice they make, criticize them for it.

6. <u>No Alternative</u>. While the bankruptcy court alleged it was "sophomoric" for Appellant to make those allegations, what was the alternative? It seems very probable that the Cantu complaint would be just as dismissed, perhaps dismissed harder and sooner, if it had not alleged the foundation for the application of civil RICO.[4]

---

That conduct is forbidden by principles of justice, but the <u>Cantu</u> court did it when the court criticized Appellant for alleging the civil RICO case elements. This principle was expressly pointed out to the <u>Cantu</u> court, in Trustee's Response to the Amended Motion to Dismiss and Brief filed by the defendant banks, paragraph 2-B, which says:

> B. <u>The Double Bind</u>. This is another perfect example of what Dr. Eric Berne called, "The Double Bind" in his classic work, <u>Games People Play</u> (1977) (the example he gives in the book is the parent who gives a child two ties for Christmas -- that way, when the child comes downstairs wearing one, the parent can say, "What's the matter, didn't you like the other one?"). The point of the "double bind" is this: No matter what you do, a complaint is made. That's just the point of the whole exercise − to have something to complain about. No real merit is intended to exist in the complaint. If it happens to have some merit, by some coincidence, that's just lucky for the complainor, because he has already set things up to complain of what you do, whatever you do. That's the situation here. If you have stated enough to meet their virtually impossible standard of "particularity" (which they don't even concede), then you also have said so much that you cannot meet their virtually impossible standard of not being "prolix" (just a bigger, "wordy" word for "wordy").

[4] Although the complaint is so severely criticized by Judge Steen, it is worth noting where it came from. Appellant went to UT Law School to find what treatise was being used to teach Civil RICO. Then Appellant went to the campus book store, and bought a copy of the treatise that was the reference book for the class. Then Appellant wrote a complaint that it was taken almost word for word from the leading treatise on Civil RICO at the time it was written, with changes only to incorporate the facts which existed in the Cantu case different from the facts hypothesized by the treatise's author. The court below was pretty much aware of this because Appellant pled in the Trustee's Response to Defendants Amended Motion to Dismiss and Brief in support of same:

> Paragraph 4 of the Amended Motion to Dismiss is denied. The draft RICO complaint in this case was patterned after the samples in Kevin P. Roddy's three volume work, <u>RICO in Business and Commercial Litigation</u> (1995), acquired specially for the occasion. Thus, Trustee finds it hard to credit Falcon's

7. <u>It Was Not Appellant's Conduct that the Judge Objected to</u>. If the bankruptcy court

had really thought that Appellant and Appellant's writing style was the problem in the Cantu

case, why did he not comment on the contributions made by other attorneys to the complaint?

Why did he refuse to let Louis LaVaude (a very well-known and respected Laredo lawyer)

transfer in and take over the prosecution of the case in Appellant's stead?  Surely not every

lawyer in the world was subject to the complaints made by the judge below.  Few lawyers have

Appellant's writing style.  If the problem was the job Appellant was doing, then someone else

should be given a chance to do a better one.  But the real problem appears to be that the

bankruptcy judge did not want ANYONE bringing a civil RICO case alleging that banks were

assisting drug lords to make off with $6.544 million.[5]

8. <u>An Incurable Defect</u>.  Writing styles are like handwriting.  Each is unique to the

owner.  One may try to copy another's style.  But an expert, or person with sufficient familiarity,

will recognize the original anyway.  Discriminating against someone, because you do not like

how they write, is complaining about the unchangeable.  And so it is easily used  as a pretext to

justify a result that one wants to reach for other reasons.  That is especially true here, where the

court below really had no justification under the facts and the law to achieve the result it

---

accusation in Paragraph 4 that the original complaint "utterly fails" to comply with
RICO.  The original complaint alleges a RICO person, the "pattern" and the
predicate acts.  That banks make their income from the banking business is
sufficiently obvious to anyone – so obvious that it should only be necessary to
allege, as was done, that the banking transactions occurred at their institutions.

[5] One can imagine that Appellant was properly shocked by the result in <u>Cantu</u>.  Normally
one thinks of federal courts as being anti-drug-lord rather than pro-drug-lord; and expects that a
complaint aimed at sealing off their conduits for laundering money would be welcomed.

demanded.

9. <u>"Inflammatory," etc., Is Just a Conclusion</u>.  The basic problem with the opinion below, and with its use by Appellee is that saying that the writing was "sophomoric" or "inflammatory" is just a conclusion.  No evidence is given to support it, just the label.  Before language can properly be called "inflammatory" someone has to be able to identify ANOTHER WAY OF SAYING IT that is less "inflammatory."  "Fountains of blood spouted" can legitimately be called inflammatory because the same thought can be expressed in another less emotional way, "there was bleeding."  "He was butchered and bagged like a hog in a packing plant" might properly be called "inflammatory" because one can say, "he was cut up and put into plastic garbage bags" and that is less emotional.  But how can anyone say that "someone was cut up and put into plastic garbage bags" in a LESS emotional way than that?  That is as bare bones as it is possible to get; and that is why Judge Steen's opinion NOWHERE identifies any particular language as being "inflammatory."  Or as being "sophomoric," either, for that matter.  None of it really was; all of it was as dry as it was possible to be and still make the necessary allegations.  So the evidence does not support that charge.

10. <u>Motions Get Replies; Complaints Get Motions to Dismiss</u>.  It is not proper to respond to a motion with a motion.  Nevertheless, Appellant is responding to Appellee's motion to dismiss even though Appellant considers it procedurally improper.

II.  <u>Response to Numbered Paragraphs</u>.

11. <u>Jurisdiction</u>.  Appellant admits this court has jurisdiction, as alleged in Paragraph 1 of the Motion to Dismiss.

12. <u>Parties</u>.  Appellant admits that Michael Boudloche is the Movant and he is

-6-

Respondent to the Motion to Dismiss, as alleged in Paragraph 2.

13. <u>Dismissal Not Justified</u>.  Appellant denies that his motion to avoid mooting the appeal should be dismissed, as alleged in Paragraph 3.

14. <u>Not Seeking Stay Nor Supersedeas</u>.  Appellant denies that his motion to avoid mooting the appeal is merely a disguised motion for a stay pending appeal, as alleged in Paragraph 4.  Footnote 7 to the Motion to avoid mooting the appeal lists six reasons why a stay pending appeal is not what Appellant wants or needs.  What Appellant is concerned about is not Appellee trying to collect on the judgment below.  If Appellee remains liable for the damages caused by collecting on a soon-to-be reversed judgment, then Appellant is secure.  But Appellee is trying to destroy Appellant's law practice, not collect on the judgment.

15. <u>Still Not Seeking a Supersedeas Nor a Stay</u>.  Appellant denies the allegations of Paragraph 5 that a supersedeas is what he wants or has asked for, for the same reasons set out in the immediately preceding paragraph.

16. <u>Court Approval</u>.  Appellant admits that Appellee cannot make an enforceable settlement without seeking court approval under Rule 9019, Federal Rules of Bankruptcy Procedure, somewhat as alleged in Paragraph 6 of the Motion to Dismiss, but denies that merely seeking to make a settlement is Appellee's motive in making the deal with Mr. Feldman.  Appellant also denies that it would violate the general order of reference for the district court to enforce its authority to prevent an appeal before it from being mooted.  Furthermore, the district court has the power to withdraw the reference under any general order of reference in any particular case.

17. <u>Motion Was Proper</u>.  Appellant denies the allegations of Paragraph 7 of the Motion

to Dismiss that his motion goes over the line of propriety.

    A. <u>Motivations of Whom</u>? Appellant made no comment on the motivations of the bankruptcy judge. No allegation was made that the bankruptcy judge did anything, except make a comment in court. The allegation was that three people in a clique think that Appellant stands in the way of their control of the bankruptcy bar; and oppose Appellant in order to stop that. And it was noted that they think their course of conduct will please the bankruptcy judge, giving the example of Henry II and the archbishop of Canterbury, Thomas a Becket. That does not allege a motivation on the part of the judge, and none was intended; because none was needed. The bankruptcy judge rules when an issue is brought before him; here the people who are bringing these things before him are the Appellees. But if people are doing something FOR the judge, the harm to the other side is just as great though the judge never told them to do it.

    B. <u>Husbands & Wives</u>. Appellant's suggestion that Mr. and Mrs. Boudloche were in harmony in their motivations and actions is something well-known to be typical of husbands and wives. That husbands and wives help each other is a fact often noted and commented on. There is commentary to that effect in the fraudulent conveyance cases where the wife holds property to keep it from the claims of the husband's creditors. And, despite Appellee's claims that Appellant is trying to tar the innocent Mrs. Boudloche with Mr. Boudloche's brush, it is not true. Appellant did not imply that Mrs. Boudloche participated in Mr. Boudloche's wrong. He said she was committing wrongs of her own. Mrs. Boudloche is the Chapter 13 trustee. If anyone did a wrong in not paying Chapter 13 bankruptcy lawyers, SHE was the one doing it, not Mr. Boudloche. It is sexist and improper to suggest that women have no independent ability to do wrong. Mrs. Boudloche is an accountant and a Panel Trustee.

There may be women who only watch their husbands make all the decisions, and make none themselves, and so should not be called to account for what happens. That is not true where the woman in question was in charge of what was going on when the wrongdoing occurred.

        C. <u>Attorney & Client</u>. Appellant also suggested that Mike Schmidt was acting in harmony with his clients. Lawyers being in harmony with their clients is a fact often noted and commented on in the law. This is even a part of the bankruptcy code, in Sec. 327 governing the standards of "disinterestedness" for attorneys. How is it wrong to suggest that the policy of the law is accurate?

        D. <u>Remainder of Allegations</u>. Appellant denies that any of his statements are false or dissembling; nor is he aware that any of them are inflammatory, sophomoric or generally inappropriate.

18. <u>What Judge Steen Said</u>. Appellant admits that Judge Steen said the things that Appellee alleges he said in Paragraph 8 of the Motion to Dismiss, but denies that they were justified. And in order to show that they were not justified; Appellant has made the statements set out at the beginning of this response, and attached copies of the complaint on which Judge Steen was commenting,[6] so that this Court can make up its own mind as to whether Judge Steen's findings were appropriate.

        III. <u>Additional Considerations</u>.

19. <u>Using Procedural Complaints to Avoid Substantive Answers</u>. A problem with

_____

[6] In order to reduce the burden of taking judicial notice, Appellant would be glad to furnish additional writings, or bring them to a hearing, if the Court wants to delve a bit deeper into the Cantu case to determine whether the findings and conclusions of Judge Steen were justified by the record before him.

"innuendo" as used by Mr. Boudloche and in the Steen opinion, is that it avoids focusing on the truth or falsity of the issues by raising the issue of "personal attack." Not every attack is a personal attack; the question is whether the attack is a cause of action or a defense relevant to the case. Stating what the case requires one to state is not a misuse of the system, whatever is said about "you are making innuendos about us."

20. <u>What Is an Improper Innuendo</u>? Appellee complains of innuendos, but what is one? An innuendo is what someone calls an offered inference when one wants to sanction someone. No principled basis has been offered by our opponents for distinguishing real innuendos from ordinary inferences. But we will offer one now: An inference is offered when facts are stated, which tend to increase the likelihood of a certain relevant event or condition being true or having occurred. The offered facts do not become "innuendo" unless they tend only to show an irrelevant but prejudicial circumstance. In other words, Appellee's motion was innuendo, because the Steen opinion was not proof of any issue actually before the court. Appellee wanted to use the Steen opinion to persuade the court that Appellant was not a nice person -- something not an element of a defense or cause of action. What the Steen opinion called "innuendo" was an inference that the plaintiff had to persuade the finder of fact of the truth of, in order to gain a judgment. So an inference which supports the finding of a fact that someone lawfully could testify about directly to make out his cause of action is not an improper "innuendo." A requested inference is "innuendo" only where the underlying fact that was sought to be inferred from the evidence is not itself admissible on the claim in question.

21. <u>Not Innuendos Here</u>. With that distinction in mind, Appellee is offering innuendos when he says "I want you to infer that Mr. Kaufman is a bad guy, because Judge Steen didn't like

-10-

him." Appellant was not, when he said, "I want you to infer that Defendant X is affiliated with a criminal enterprise as required by RICO to impose liability on the banks, because the kinds of things that happened to his brother are the kinds of things that happen to people running criminal enterprises." The latter was a proper inference and should not have been mislabeled. Perhaps Judge Steen could have concluded, "that is not enough data to support the inference you want us to draw." Or maybe he could have said, "As a matter of public policy we will not let a man be treated as being part of a criminal enterprise because of what happened to his brother. We therefore rule that everyone is responsible for his own life, not for his brother's." (See, e.g., in the Bible, Cain's response after the death of his brother, Abel, "Am I my brother's keeper?"). But the facts stated did tend to show exactly a necessary issue in the case; and the motion was to dismiss, not for summary judgment. So, when Appellant says, "The bankruptcy bar is being mistreated by the Boudloches and their attorney," that is not "innuendo" when Appellant is saying that their conduct against Appellant is part of that pattern against the other members of the bankruptcy bar, and he wants relief from it pending final decision on the appeal. It is not innuendo when that issue is properly before this Court. And it has to be properly before this court. Who else is Appellant supposed to ask to control the bankruptcy system and make it work right, except for the federal judges who have charge over it? The bar? Mr. and Mrs. Boudloche are not even lawyers.

    WHEREFORE, PREMISES CONSIDERED, Appellant respectfully asks that this Court deny Appellee's motion to dismiss his motion to avoid mootness of the appeal, and let Appellant go hence without day free from same, and for such other and further relief as may be fair or just.

                    Respectfully submitted for Appellant,

-11-

Colin Kelly Kaufman, in propria personam

## Certificate of Service

I certify that I had one of the personnel at this law office serve the foregoing writing without its exhibits, on the list that follows, by U.S. mail, first class postage prepaid, this 2& day of January, 2003.

Colin Kelly Kaufman

## Feldman Appeal Service List

1.  Mr. Michael Schmidt, Esq.
    712 American Bank Plaza
    Corpus Christi, TX. 78475
    FAX (361) 884-6000

2.  Mr. James Moon, Esq.
    1660 N. Hampton Rd., Ste. 202
    DeSoto, TX. 75115

3.  Mr. Matthew A. Rosenstein, Esq.
    711 N. Carancahua, #420 American Bk. Plaza
    Corpus Christi, TX. 78401

4.  Ron Simank, Esq.,
    Schauer & Simank, Attys.
    615 N. Upper Broadway #2000
    Corpus Christi, TX. 78476
    Telecopier (361) 884-2822

5.  Colin Kelly Kaufman, Esq.
    PO Box 1662
    Corpus Christi, TX. 78403
    FAX (361) 888-8172

CKK

## COLIN KELLY KAUFMAN
## ATTORNEY AT LAW

P.O. Box 1662
Corpus Christi, TX 78403
Telephone (512) 888-8865 • FAX (512) 888-8172

Board Certified, Business Bankruptcy Law, Consumer Bankruptcy Law

August 13, 1997

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, Tx  78403-1662

John A. Jones, Esq.
P.O. Box 6100
Corpus Christi, Tx  78403-6100

Alberto Alarcon, Esq.
1020 Salinas
Laredo, Tx  78040

Anthony Juarez, Bankruptcy Trustee
Juarez Building
2315 Civitan
Corpus Christi, Tx  78417

Dear Gentlemen:

Enclosed please find a file-stamped copy of **Plaintiff's Original Complaint**, which was filed at the United States Bankruptcy Court on August 12, 1997.

Thank you for your time.

Sincerely,

Colin K. Kaufman

CKK:ch

Enclosure

AUG 15 1997

B 104
(Rev. 2/92)   **ADVERSARY PROCE̲ ̲NG COVER SHEET**
(Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

97-2146-L

| PLAINTIFFS | DEFENDANTS  Reginaldo Ramon Sanchez + |
|---|---|
| Anthony Juarez, Trustee | Jesus M. Cantu |

AUG 12 97

_____ ___ _ ___ COURT

| ATTORNEYS (Firm Name, Address, and Telephone No.)  Colin Kelly Kaufman, Atty. At Law  PO Box 1662  Corpus Christi, TX. 78403-1662  (512) 888-8865 | ATTORNEYS (If Known) |
|---|---|

**PARTY** (Check one box only)    ☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Claim for return of $6.5+ Million as a fraudulent transfer or preference under the Bankruptcy Code, and for treble damages and attorneys fees under Civil RICO.
See Bkcy. Code Sess. 547-550, Title 11 US Code.
see RICO, § 1961, Title 18 US Code.

**NATURE OF SUIT**
(Check the one most appropriate box only.)

☒ 454 To Recover Money or Property
☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property
☐ 424 To object or to revoke a discharge 11 U.S.C. §727

☐ 455 To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan
☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523
☐ 434 To obtain an injunction or other equitable relief
☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action
☐ 459 To determine a claim or cause of action removed to a bankruptcy court
☐ 498 Other (specify)

**ORIGIN OF PROCEEDINGS**
(Check one box only.)

☒ 1 Original Proceeding
☐ 2 Removed Proceeding
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another Bankruptcy Court

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

| DEMAND  NEAREST THOUSAND  $ 39 Million | OTHER RELIEF SOUGHT  Receiver | ☐ JURY DEMAND |
|---|---|---|

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR  Jesus M. Cantu | BANKRUPTCY CASE NO.  95-22388-1-7 through 95-22390-2-7 |
|---|---|
| DISTRICT IN WHICH CASE IS PENDING  So. Dist. of Texas | DIVISIONAL OFFICE  Laredo | NAME OF JUDGE  Schmidt |

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

**FILING FEE** (Check one box only.)    ☒ FEE ATTACHED    ☐ FEE NOT REQUIRED    ☐ FEE IS DEFERRED

| DATE | PRINT NAME | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|---|---|

B 250A
(1/88)

# United States Bankruptcy Court

Southern _____ District of __Texas__

In re  Jesus M. Cantu

**Debtor**

Anthony Juarez, Trustee **Plaintiff**

vs.

Reginaldo Ramon Sanchez + **Defendants**
Jesus M. Cantu

Bankruptcy Case No.
95-22388-L-7
95-22389-L-7
95-22390-L-7

Adversary Proceeding No.
97-2146-L

## SUMMONS IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days.

Address of Clerk
Clerk, United States Bkcy. Ct.
115 Wilson Plaza No., 615 Leopard St.
Corpus Christi, TX. 78475

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

Name and Address of Plaintiff's Attorney
Colin Kelly Kaufman, Attorney At Law
P. O. Box 1662
Corpus Christi, TX. 78403-1662

If you make a motion, your time to answer is governed by Bankruptcy Rule 7012.

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

MICHAEL N. MILBY, CLERK

_____
*Clerk of the Bankruptcy Court*

AUG 1 2 1997
_____
*Date*

By: _____
*Deputy Clerk*



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| IN RE | Bankruptcy Case No. 95-22388-L-7 |
| Jesus M. CANTU dba Continental | Bankruptcy Case No. 95-22389-L-7 |
| Charter Bk. & Trust, Ltd., dba Fidelity & | Bankruptcy Case No. 95-22390-L-7 |
| Trust, S.A. & dba Fidelity & Trust, Ltd. | In Chapter 7 |
| | |
| Anthony JUAREZ, Trustee, Plaintiff | |
| | |
| vs. | Adversary No. 97-2146-L |
| | |
| Reginaldo Ramon SANCHEZ, and Jesus | |
| M. CANTU, Defendants | |

PLAINTIFF'S ORIGINAL
COMPLAINT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Anthony Juarez, Trustee, Plaintiff and for cause of action against

Reginaldo Ramon SANCHEZ, and Jesus M. CANTU, Defendants, respectfully shows the

Court as follows:

I. Jurisdiction, Venue, Parties.

1. Jurisdiction. This Court has jurisdiction under 28 U.S.C. Sec. 1334. This is a

matter arising in a bankruptcy case, and arising under the Bankruptcy Code, Title 11, U.S.

Code, and other federal statutes including Civil RICO (Racketeer Influenced and Corrupt

Organizations), 18 U.S.C. Sec. 1961-68. It is a core proceeding under one or more of

subsections (A), (B), (E), (F), (H), or (O) of 28 U.S.C. Sec. 157(b)(2).

2. Venue. Venue of the main bankruptcy case is properly laid in Laredo under 28

U.S.C. Sec. 1408, since debtor lives there. Venue of an adversary proceeding is ordinarily

proper in the same Court as where the main bankruptcy is pending under 28 U.S.C. Sec. 1409,

1

and this case is no exception.

3. <u>Parties Plaintiff</u>. Plaintiff, Anthony Juarez, is the duly appointed trustee of the Estates of Fidelity & Trust, S.A., Fidelity & Trust, Ltd., and Continental Charter Bank & Trust, Ltd., all three of which were alter egos of Jesus M. Cantu who did business in those names. These three cases are administratively consolidated, so that only one set of notices to creditors need be sent. Plalintiff Juarez brings these actions as the legal representative of the Debtors herein, all of them stockbrokers within the meaning of 11 U.S.C. Section 101(53A); and sues in his representative capacity on their behalf, or the behalf of any one or more of them.

4. <u>Parties Defendant</u>. Defendant, Reginaldo Ramon Sanchez is an individual residing in Ciudad Acuna, Coahuila, Mexico. Defendant Jesus M. Cantu, the Debtor, is an individual residing in Laredo, Texas.

## II. <u>Nature of Case</u>.

5. <u>Introduction to Debtors</u>. Despite Defendant Cantu's use of the names of banks for their or his activities, Debtors were not chartered as banks, neither by the State of Texas, nor by the United States of America; nor were they inspected nor insured by the Federal Deposit Insurance Corporation, or any other federal bank regulatory agency. Debtors are stockbrokers within the meaning of 11 U.S.C. Section 101(53A) because they engaged in the business of effecting transactions in securities for the account of others and with members of the general public, from and for such persons' own accounts. Debtors engaged in the business of securities even though they were not licensed to transact in securities by the State and Federal agencies regulating the sale of securities. Debtors engaged in a fraud by dealing in the

2

business of securities without a license, by misrepresenting to their customers their financial condition, by misrepresenting to the customers the nature of the securities in which their customers' moneys would be invested in, by representing to the customers that their investments were insured, by representing to their customers that the interest and dividends paid to the customers was generated by the earnings of and other return on customers' capital when in fact Debtors would pay interest from the capital belonging to the same and other customers (i.e, essentially operating as a Ponzi scheme), and by failing to make financial disclosures as required by law. All of such representations were false, and because the operations of Debtors amounted to a Ponzi scheme, Debtors' business intrinsically constituted a fraud. It is believed that customers of debtors invested over $8,000,000.00 with debtors.

### III. The Facts.

6. Facts Common to All or Most of the Causes of Action. On the dates specified, the Debtors made the following transfers to Defendants:

A. Defendant First Transferred $4.675 Million. On September 22, 1994, Fidelity & Trust transferred from its account maintained at Falcon National Bank in Laredo, Account No. 0128096411, the sum of $4,080,128.00. On that same date, Continental Charter Bank & Trust transferred from its account maintained at Falcon National Bank, Account No. 0122541712, the sum of $594,985.00. The sum of these two amounts is $4,675,113.00. Attached hereto as Exhibit "1" is a true and correct copy of the authorization to transfer funds given by these two Debtors to Falcon National Bank. As stated in Exhibit No. 1, the amount was transferred to Banca Serfin's account No. 101-WA-35109100, maintained by Banca Serfin at the Swiss Bank Corporation in New York City. Also attached as Exhibit Numbers "2" and

3

"3" are copies of the bank statements for the mentioned accounts wherein the two amounts transferred are shown. Also attached as Exhibit "4" is Check No. 5575 from Fidelity & Trust's account which demonstrates the payment of $4,080,128.00 for the transfer. Attached as Exhibit "5" is Check No. 454 from Continental Charter's account which demonstrates the payment of $594,985.00 for the transfer. The transfer to Banca Serfin was for the benefit and for the further credit of Defendant, Reginaldo Ramon Sanchez.

       B. <u>Passed Along the Money</u>. The next day, on September 23, 1994, Banca Serfin transferred the sum to Reginaldo Ramon Sanchez. Attached hereto as Exhibits "6" and "7", are the deposit slips for the amount deposited at Banca Serfin which deposit slips demonstrate that those amounts were further transferred to Reginaldo Ramon Sanchez.

       C. <u>Transferred another Quarter Million</u>. On information and belief, Plaintiff would allege that on October 3, 1994, Continental Charter Bank & Trust transferred from its account maintained at Falcon National Bank, Account No. 01225417-12, to Reginaldo Ramon Sanchez' account maintained in Del Rio Bank & Trust, Account No. 3925-374, the sum of $251,753.00. Attached hereto as Exhibit "8", is a true and correct copy of the authorization to transfer funds given by Continental Charter Bank & Trust to Falcon National Bank.

       D. <u>Sent Another $287,500 to Sanchez</u>. On October 28, 1994, Fidelity & Trust, S.A. transferred from its account maintained at Falcon National Bank, Account No. 0128096411, the sum of $287,500.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "9" is a true and correct copy of the authorization to transfer funds which appears to have been given by Continental Charter

Bank & Trust. However, according to the bank statement of Fidelity & Trust which is attached hereto as Exhibit "10", the sum came out of Fidelity & Trust's Account No. 0128096411. Attached as Exhibit "11" is a true and correct copy of Check No. 5051 representing the payment for such transfer.

    E. <u>Another Week, Another $ 200 K</u>. On November 4, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $200,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "12" is a true and correct copy of the authorization to transfer funds. Also, attached hereto as Exhibit "13" is the bank statement showing this transfer. Also, attached as "Exhibit "14" is Check No. 5657 representing the payment for such transfer.

    F. <u>Another Measly Ten Grand</u>.  On November 4, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411 the sum of $10,250.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "15" is a true and correct copy of the authorization to transfer funds. Also, attached hereto as Exhibit "16" is the bank statement showing this transfer. Attached as Exhibit "17" is a copy of Check No. 5658 representing the payment for such transfer.

    G. <u>Another Three Days, Another 50 K</u>. On November 7, 1994, Fidelity & Trust transferred from its account at Falcon National Bank the sum of $50,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "18" is a true and correct copy of the authorization to transfer funds. Also, attached

5

hereto as Exhibit "19" is the bank statement showing this transfer.

H. <u>Another day, Another Quarter Mil</u>. On November 8, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, the sum of $250,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "20" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "21" is the bank statement showing that transfer.

I. <u>Another Quarter Mil Got to Sanchez the Same Day</u>. On November 8, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, the sum of $250,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "22" is a true and copy of the authorization to transfer funds and attached hereto as Exhibit "23" is the bank statement showing that transfer.

J. <u>A Measley $15,000</u>. On November 9, 1994, Fidelity and Trust transferred from its account at Falcon National Bank, the sum of $15,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "24" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "25" is the bank statement showing the transfer. Also attached as Exhibit "26" is a copy of Check No. 5665 demonstrating the payment for the transfer.

K. <u>Another Five Days, Another $150,000</u>. On November 14, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $150,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "27" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "28" is the bank statement showing the

transfer.  Also attached as Exhibit "29" is a copy of Check No. 5675 demonstrating the payment for the transfer.

      L.  <u>Another Day, Still Another $10,000.</u>  On November 15, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $10,250.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374.  Attached hereto as Exhibit "30" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "31" is the bank statement showing the transfer.  Also attached as Exhibit "32" is a copy of Check No. 5676 demonstrating the payment for the transfer.

      M.  <u>Two More Days, Another $2600.</u>  On November 17, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $2,630.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374.  Attached hereto as Exhibit "33" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "34" is the bank statement showing the transfer.  Also attached as Exhibit "35" is a copy of Check No. 5677 demonstrating the payment for the transfer.

      N.  <u>At the Same Time, Another $2600.</u>  On November 17, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $2,630.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374.  Attached hereto as Exhibit "36" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "37" is the bank statement showing the transfer.  Also attached as Exhibit "38" is a copy of Check No. 5678 demonstrating the payment for the

transfer.

O.  The Next Day, Another $5200.  On November 18, 1994, Fidelity & Trust

transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of

$5,262.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-

374.  Attached hereto as Exhibit "39" is a true and correct copy of the authorization to transfer

funds and attached hereto as Exhibit "40" is the bank statement showing the transfer.  Also

attached as Exhibit "41" is a copy of Check No. 5679 demonstrating the payment for the

transfer.

P.  Three More Days, Another $51,000.  On November 21, 1994, Fidelity &

Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum

of $50,937.50 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No.

3925-374.  Attached hereto as Exhibit "42" is a true and correct copy of the authorization to

transfer funds and attached hereto as Exhibit "43" is the bank statement showing the transfer.

Also attached as Exhibit "44" is a copy of Check No. 5689 demonstrating the payment for the

transfer.

Q.  And the Same Day, $2600.  On November 21, 1994, Fidelity & Trust

transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of

$2,645.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-

374.  Attached hereto as Exhibit "45" is a true and correct copy of the authorization to transfer

funds and attached hereto as Exhibit "46" is the bank statement showing the transfer.  Also

attached as Exhibit "47" is a copy of Check No. 5685 demonstrating the payment for the

transfer.

8

R.  Two More Days, Again Another $51,000.  On November 23, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $50,937.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374.  Attached hereto as Exhibit "48" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "49" is the bank statement showing the transfer.  Also attached as Exhibit "50" is a copy of Check No. 5697 demonstrating the payment for the transfer.

S.  After Nearly a Month Off, $2900.  On December 20, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $2,932.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374.  Attached hereto as Exhibit "51" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "52" is the bank statement showing the transfer.  Also attached as Exhibit "53" is a copy of Check No. 5778 demonstrating the payment for the transfer.

T.  After Three Days, Another $31,000.  On December 23, 1994, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $30,973.20 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374.  Attached here to as Exhibit "54" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "55" is the bank statement showing the transfer.  Also attached as Exhibit "56" is a copy of Check No. 5801 demonstrating the payment for the transfer.

U.  Six Days, and $23,000.  On December 29, 1994, Fidelity & Trust

transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $23,229.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "57" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "58" is the bank statement showing the transfer. Also attached as Exhibit "59" is a copy of Check No. 5804 demonstrating the payment for the transfer.

     V.  <u>Another Week, Another $30,000</u>. On January 5, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $30,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "60" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "61" is the bank statement showing the transfer.

     W.  <u>At the Same Time, Another $40,000</u>.  On January 5, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $39,689.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "62" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "63" is the bank statement showing the transfer. Also attached as Exhibit "64" is a copy of Check No. 5825 demonstrating the payment for the transfer.

     X.  <u>Another Month Off, and $50,000</u>.  On February 10, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $50,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "65" is a true and correct copy of the authorization to

transfer funds and attached hereto as Exhibit "66" is the bank statement showing the transfer.

Y. <u>Three More Days, and $25 K</u>. On February 13, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $25,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "67" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "68" is the bank statement showing the transfer. Also attached as Exhibit "69" is a copy of Check No. 5959 demonstrating the payment for the transfer.

Z. <u>Eight More Days and $20 K</u>. On February 21, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $20,000.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "70" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "71" is the bank statement showing the transfer.

AA. <u>Wait Three Weeks, and Pay $30,000</u>. On March 15, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $30,015.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "72" is a true and correct copy of the authorization to transfer funds and attached hereto as Exhibit "73" is the bank statement showing the transfer.

BB. <u>Two More Weeks and $7,500</u>. On March 29, 1995, Fidelity & Trust transferred from its account at Falcon National Bank, Account No. 0128096411, the sum of $7,500.00 to Reginaldo Ramon Sanchez' account at Del Rio Bank & Trust, Account No. 3925-374. Attached hereto as Exhibit "74" is a true and correct copy of the authorization to transfer

11

funds and attached hereto as Exhibit "75" is the bank statement showing the transfer.  Also

attached as Exhibit "76" is a copy of Check No. 6056 demonstrating the payment for the

transfer.

CC.  <u>Five Days and $10 K</u>.  On April 3, 1995, Fidelity & Trust transferred to

Reginaldo Ramon Sanchez the sum of $10,000.00.  Attached hereto as Exhibit "77" is a true

and correct copy of Check No. 6065 paid to Reginaldo Ramon Sanchez.

DD.  <u>Two Days and $11,000</u>.  On April 5, 1995, Fidelity & Trust transferred

to Reginaldo Ramon Sanchez the sum of $11,000.00.  Attached hereto as Exhibit "78" is a true

and correct copy of Check No. 6066 paid to Reginaldo Ramon Sanchez.

EE.  Total.  The grand total of the foregoing amounts which Defendant Sanchez

took from the bankruptcy debtors during the year prior to bankruptcy is some $6,544,245.70,

more or less.

7.  <u>Why Del Rio?  Interstate or Foreign Commerce</u>.    Del Rio, Texas is a border city.

Defendant Sanchez lives in Mexico just across the river from Del Rio, on the other side of the

Rio Grande.  The funds described in Paragraph 6-C through 6-DD were transferred to Del Rio

because this would ease and facilitate Defendant Sanchez's efforts to export them back to

Mexico.  These activities were intended to, and did, affect interstate or foreign commerce.

The funds described in Paragraph 6-A and 6-B were transferred to Swiss Bank Corp., so that

Defendant Sanchez could put them in his Swiss bank account.  These activities were intended

to and did affect interstate or foreign commerce.

IV.  <u>Causes of Action Available</u>.

8.  <u>Quasi-Contract, Quantum Meruit, Debt</u>.  By virtue of the above transactions, the

12

Debtors became indebted to their customers in an amount in excess of $8,000,000.00, although Debtors only claim to owe approximately $5,000,000.00.

9. <u>Must Be Either Voidable Preference or Fraudulent Conveyance</u>.  Plaintiff has a right under Sec. 550(a) of the Bankruptcy Code, Title 11 U.S. Code, to recover property transferred by the Debtors to insider creditors  within one year prior to the time of bankruptcy being filed.  Plaintiff also has a right to recover transferred for other than a full and fair equivalent value. One of those two things happened here.  Transfers were made.  And Defendant Sanchez was a business associate and an insider as to Defendant Cantu.  If Cantu owed the money to Sanchez, there was a preference.  If Cantu didn't owe the money to Sanchez, there was a fraudulent conveyance.

10. <u>Fraudulent Conveyance Grounds</u>.  The Debtors made such transfers within one year before the date of the filing of the petition, which was filed in September, 1995.

A. <u>Actual Intent Fraudulent Conveyance</u>.  The above transfers were made with actual intent to hinder, delay, or defraud Debtors' investors to whom Debtors were indebted.

B. <u>Constructive Fraudulent Conveyance</u>.  Additionally, Debtors received less than a reasonably equivalent value in exchange for such transfers and Debtors were insolvent on the date that such transfers were made or became insolvent as a result of such transfers.

C. <u>Inadequate Capital Fraudulent Conveyance</u>.  Also, Debtors were engaged in a business or transaction for which any property remaining with the debtors was an inadequate capital.  A Ponzi scheme always has inadequate capital; it is a characteristic of such a scheme that the more successful the promoter is in getting money in, the more insolvent the debtor is in having total liabilities exceed total assets.

13

11. <u>Securities Investors Protection Act Allegations</u>. Except for the transfers in question, the transferred property would constitute "customer property" within the meaning of 11 USC § 741(4) and all of the investors of Debtors would be "customers" within the meaning of 11 USC § 741(2), in that at the time of the transfers, Debtors held the property in the ordinary course of business as stockbrokers for the account of the customers.

12. <u>Election to Avoid</u>. By the filing of this pleading, in the exercise of his powers as Trustee under 11 USC § 548 and §749, Plaintiff hereby elects to avoid the above described transfers to Defendant.

13. <u>Fraudulently Transferred Property Remained Estate Property</u>. By reason of the above-described fraudulent nature of the transfers to Defendant, all of which were avoidable, and must be avoided as a result hereof, the true equitable title to the property in question remained as part of the property of the bankruptcy estate of the Debtors, and passed to the Plaintiff upon filing of the petition.

14. <u>Preference Alternative</u>. Alternatively, if these funds were paid for good value to Debtors given by Defendant, they were transferred on account of antecedent debt to an insider within a year prior to the Petition, and thereby are avoidable as preferences.

15. <u>Exemption Rights of Debtors</u>. The property in question is not exempted from execution and liability by the law of the State of Texas or by the bankruptcy laws of the United States. If any property could be traced into any homestead recognized by the law of Texas, the fact that the money was taken fraudulently would require imposition of a constructive or resulting trust on any such property, and the homestead rights of a debtor would be inferior to the rights of the beneficiaries of the constructive or resulting trust.

14

16. <u>Not A Bona Fide Purchaser</u>.  In receiving the transfers in question the Defendant did not take "for value and in good faith" within the meaning of 11 U.S.C. § 548(c), and, accordingly, does not have a lien on the property.

17. <u>Racketeering Activity</u>.  On information and belief, Defendant Sanchez is involved in the drug trade (i.e., the importing of illegal narcotics into the United States), for which he is a money man, laundering funds.  Further demonstrating the nature of Defendant Sanchez's business, on information and belief, his brother washed up in the Rio Grande River some months ago, the body cut into pieces and put into plastic bags, the evident result of a gangland hit.  Defendant Cantu accepted funds from Defendant Sanchez in cooperation with his intent to launder funds.  The conduct of the two defendants constituted "racketeering activity" of one or more of the following kinds defined in 18 U.S.C. Sec. 1961:

A. <u>Drug Dealing</u>.  Dealing in the trade of narcotic or other dangerous drugs in violation of Texas law, described in 18 U.S.C. Sec. 1961(a)(1)(A).

B. <u>Mail Fraud</u>.  Mail fraud, to the extent that the Ponzi scheme was assisted or abetted by use of the U.S. mails, in violation of 18 U.S.C. Sec. 1341, as described in 18 U.S.C. Sec. 1961(a)(1)(B).

C. <u>Wire Fraud</u>.  Wire fraud, to the extent that the payments were made or received by the use of bankwire, fedwire, or any other wire services, in violation of 18 U.S.C. Sec. 1343, as described in 18 U.S.C. Sec. 1961(a)(1)(B).

D. <u>Racketeering</u>.  Racketeering, in violation of 18 U.S.C. Sec. 1952, as described in 18 U.S.C. Sec. 1961(a)(1) (B).

E. <u>Money Laundering</u>.  Money laundering, in violation of 18 U.S.C. Secs.

15

1956 (involving use of negotiable instruments) and 1957 (involving money laundering without use of negotiable instruments), as described in 18 U.S.C. Sec. 1961(a)(1)(B).as described in 18 U.S.C. Sec. 1961(a)(1)(D).

      F.  Bankruptcy Fraud.  Fraud in connection with a business which was intended to and did end up in bankruptcy under Title 11 of the U.S. Code, as described in 18 U.S.C. Sec. 1961(a)(1(D).

      G.  Securities Fraud.  Fraud in the sale of securities, as described in 18 U.S.C. Sec. 1961(a)(1)(D).

      H.  Exporting Money Without Telling the Government.  Fraudulent transfer of money with the intent of exporting it without complying with the reporting requirements of the Currency and Foreign Transactions Reporting Act, as described in 18 U.S.C. Sec. 1961(a)(1)(E).

    18.  Enterprise: Pattern.  The business of the debtors, as controlled by Mr. Cantu -- or the business of the debtors with the other Defendant, Mr. Sanchez -- was the racketeering enterprise.  The 30 instances of improper conduct described in Paragraph 6, subparagraphs A-DD above, are more than two improper acts, and constituted a "pattern of racketeering activity" which occurred within the last ten years.  On information and belief, Mr. Sanchez controlled Mr. Cantu's actions on his behalf by express or implicit threats of physical violence, not mere battery, but extreme threats such as of death or serious bodily injury.

    19.  Prohibited Transactions by One Whose Enterprise Engaged in a Pattern of Racketeering Activities.  Defendants Sanchez and Cantu, while associated with the "enterprise" described in Paragraph 18 above, violated the following prohibitions of 18 U.S.C.

16

Sec. 1962:

A. Maintained control over a racketeering enterprise which affected interstate or foreign commerce, in violation of 18 U.S.C. Sec. 1962(b).

B. Conspired with each other to maintain control over the racketeering enterprise, in violation of 18 U.S.C. Sec. 1962(d).

20. Conspiracy. Defendants Sanchez and Cantu conspired together to violate the prohibitions of RICO described in the preceding Paragraph 19.

21. Treble Damages and Attorneys Fees. 18 U.S.C. Sec. 1964(c) provides that Plaintiff may recover three times its actual damages of $6,544,245.70 in funds transferred, or some $19,632,737.10, plus his reasonable attorneys fees, which Plaintiff would show ought to be a contingent fee of half the total sum recovered, or another $19.632+million, for a total recovery of $ 39,265,474.20 ($39.265+million) to the Plaintiff Trustee.

22. Other Civil Remedies. Under 18 U.S.C. Sec. 1964(a), this Court may enter divestiture orders for, or appoint Plaintiff Trustee as receiver of, any ranches, buildings, bank accounts, or other real or personal property used in the enterprise, or proceeds thereof. Although considerable authority exists that equitable relief is not available under RICO for private plaintiffs, In re Fredeman Litigation, 843 F.2d 821, 830 (5th Cir. 1988), following Religious Technology Center v. Wollersheim, 796 F.2d 1076 (9th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); compare contra Vietnamese Fishermen's Assn. v. Knights of the Ku Klux Klan, 518 F.Supp. 993, 1014 (SD Tex. 1981); Trane Co. v. O'Connor, Sec., 718 F.2d 26, 28-29 (2d Cir. 1983) (irreparable injury will support interim equitable relief, even if no permanent injunction available to private plaintiff - unavailability of relief under civil RICO

17

does not bar such relief as would otherwise be available under state or federal law), one wonders if a publically appointed U.S. bankruptcy trustee is quite the same thing as an ordinary private plaintiff! In any event, state law would give Plaintiff relief. And Defendant Sanchez has property in the United States which ought to be subject to such an order. There is little reason to doubt that if he knows millions will be sought to be collected out of his U.S. property, he will try to pull assets back across the river to Mexico. The increased time and difficulty of recovering it there, and the long period of uncertainty which will be created, constitute sufficient "irreparable injury" to justify a court of equity in appointing a receiver for the RICO enterprise property. No additional bond should be required, as a condition of such appointment, because a bankruptcy trustee already has to put up a bond to become the trustee, under Bankruptcy Code Sec. 322(a), and because of this, Courts often excuse them from putting up another bond on the ground that excessive bonding fees serve to waste assets of bankruptcy estates by putting them into the hands of bonding companies and out of the hands of creditors.

23. <u>Limitations</u>. Limitations cannot run against a bankruptcy trustee for two years after his appointment. Sec. 108(a)(2), Bankruptcy Code.

24. <u>Procedural Requirements for Appointing Receivers</u>. The procedural requirements for appointment of a receiver are basically identical to the requirements for entry of a TRO or temporary injunction. See F.R.C.P. Rule 66 (receivers governed by prior practice, local rules, and FRCP); <u>Cagan v. Mutual Benefit Life Ins. Co.</u>, 28 F.3d 654, 656 (7th Cir. 1994) (receivership needs fidelity bond, which has a very different legal effect than an injunction bond). A temporary receiver may be appointed ex parte, pending notice and a hearing. A

18

permanent receiver must be appointed after notice and hearing. Ordinarily, it is not proper to stay a receivership. F.R.C.P. Rule 62(a). A federal receiver has nationwide reach of assets. Select Creations, Inc. v. Paliafito America, Inc., 852 F.Supp. 740 (ED Wis. 1994), quoting 28 U.S.C. Sec. 754, and citing Haile v. Henderson Natl. Bk., 657 F.2d 816 (6th Cir. 1981), cert. denied 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982).

25. Receivers Under State Law. Whenever there is proceeds of money that belongs to someone else, a constructive trust may be imposed on those proceeds. In re Greene, 40 B.R. 807 (Bkcy., ND Tex. 1984) (McGuire, J.) (imposing constructive trust on homestead of debtors acquired with money plaintiff was defrauded out of); and see also, Ellisor v. Ellisor, 630 S.W.2d 746 (Tex. App. Houston 1st 1982, check writ) (if property acquired by two people acting in a joint venture, subsequent claim of homestead by one of them could not defeat other's right to a receiver). Under Texas state law, it is commonplace that a receiver may be appointed for property which is subject to a constructive trust; see Greene & Ellisor, cited above; Harlen v. Pfeffer, 693 S.W.2d 543 (Tex. App. San Antonio 1985); Davis v. Sheerin, 754 S.W.2d 375 (Tex. App. Houston 1st 1988, check writ); Detox Inds., Inc. v. Gullett, 770 S.W.2d 954, 9 UCC Rep. 2nd 207 (Tex. App. Houston 1st 1989, check writ); Bado Equip. Co. v. Bethlehem Steel Corp., 814 S.W.2d 464 (Tex. App. Houston 14th 1991, check writ); Tracy v. Annie's Attic, Inc., 840 S.W.2d 527 (Tex. App. Tyler 1992). See likewise, the Browning-Holloway litigation cases arising in both state and federal court, in the latter locale under both civil rights and bankruptcy jurisdiction; Holloway v. Starnes, 840 S.W.2d 14 (Tex. App. Dallas 1992); and Holloway v. Walker, 784 F.2d 1287 (5th Cir.), cert. denied, 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 576 (1986); and four Fifth Circuit opinions in Browning v.

Navarro culminating in 923 F.2d 377 (5th Cir. 1991) (per curiam) (Browning IV). A federal receiver may be appointed if federal jurisdiction exists and state law grounds for appointment of the receiver exist. And if the appointed receiver is a federal receiver, he may take possession of property in other states. See citations above.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that both Defendants be cited to appear herein, and that after hearing, the Court render judgment:

A. Appoint Receiver. Appointing Plaintiff Trustee as a receiver, without additional bond, of Defendant Sanchez's bank accounts into which funds have been traced as set forth above, and any other real or personal property located with the jurisdiction of the United States of America (appointing Plaintiff Trustee receiver of Defendant Cantu's real or personal property would be redundant, since Plaintiff is already trustee of the same);

B. Give Back the $6.544 + Million with Interest. Ordering the Defendants to deliver and transfer to Plaintiff the property transferred or its actual value with pre-judgment and post-judgment interest at the legal rate per annum;

C. Give Back Another $33 + Million in Treble Damages and Attorneys Fees. Ordering the Defendants to pay the difference between the actual value and the $39.265 + million prayed for above, with interest pre-judgment and post-judgment at the legal rate per annum;

D. Costs. Ordering Defendants to pay the costs of this action, including court costs and deposition costs, and the like;

E. Other Relief. Granting Plaintiff such other and further relief as the Court might find fair or just.

20

DATED August 11, 1997.

Respectfully Submitted,

Colin Kelly Kaufman, Special Counsel and
Attorney in Charge in this Adversary
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

Address of ATTORNEY IN CHARGE:

Colin Kelly Kaufman, Attorney at Law
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (512) 888-8865
TeleFAX # (512) 888-8172

GENERAL COUNSEL FOR TRUSTEE, AND
OF COUNSEL ON THIS ADVERSARY:

John A. Jones, Esq.
State Bar of Texas # 10916500
So. Dist. Federal ID # 9241
P.O. Box 6100
Corpus Christi, TX. 78403-6100

Telephone (512) 852-6100
TeleFAX # (512) 852-6194

LOCAL COUNSEL FOR TRUSTEE:

Alberto Alarcon, Esq.
State Bar of Texas # 00968425
So. Dist. Federal ID # 10963
1020 Salinas
Laredo, TX. 78040

Telephone # (956) 723-5527
TeleFAX # (956) 723-8168

Being Attorneys for ANTHONY
JUAREZ, Bankruptcy Trustee
Juarez Building, 2315 Civitan
Corpus Christ, TX  78417

Tel #: (512) 854-0887
Fax #: (512) 854-8434